FILED

MAY 0 5 2020

CLERK, U.S. DISTRICT CLERK
WESTERN DISTRICT OF TEXAS
BY_____
                    DEPUTY

UNITED STATES OF AMERICA
    *ex rel.* JOHN ADAMS[1],
    *Plaintiff* and *Relator*,

COMMONWEALTH OF MASSACHUSETTS
    *ex rel.* JOHN ADAMS[1],


    *Plaintiff* and *Relator*,

MASSACHUSETTS DEPARTMENT OF REVENUE
    *ex rel.* JOHN ADAMS[1],

    *Plaintiff* and *Relator*,

and

JOHN ADAMS[1],

    *Plaintiff*,

v.

INTERNAL REVENUE SERVICE,

REAL PROPERTY 1 LOCATED IN BOSTON,
COUNTY OF SUFFOLK, COMMONWEALTH OF
MASSACHUSETTS,

REAL PROPERTY 2 LOCATED IN BOSTON,
COUNTY OF SUFFOLK, COMMONWEALTH OF
MASSACHUSETTS,

REAL PROPERTY 3 LOCATED IN BOSTON,
COUNTY OF SUFFOLK, COMMONWEALTH OF
MASSACHUSETTS,

**FILED *IN CAMERA* AND
UNDER SEAL**

Case No.

**W20CA362**

**COMPLAINT**

---

[1] The plaintiff and relator, Jaideep S. Chawla, is legally known as Jaideep S. Chawla at the time of the filing of this Complaint.

REAL PROPERTY 4 LOCATED IN BOSTON, )
COUNTY OF SUFFOLK, COMMONWEALTH OF )
MASSACHUSETTS, )
)
REAL PROPERTY LOCATED IN BROOKLINE, )
COUNTY OF NORFOLK, COMMONWEALTH OF )
MASSACHUSETTS, )
)
REAL PROPERTY LOCATED IN CHARLESTOWN, )
COUNTY OF SUFFOLK, COMMONWEALTH OF )
MASSACHUSETTS, )
)
REAL PROPERTY LOCATED IN CONCORD, )
COUNTY OF MERRIMACK, STATE OF NEW )
HAMPSHIRE, )
)
REAL PROPERTY LOCATED IN DENVER, )
COUNTY OF DENVER, STATE OF COLORADO, )
)
REAL PROPERTY LOCATED IN NEW YORK, )
COUNTY OF NEW YORK, STATE OF NEW YORK, )
)
REAL PROPERTY LOCATED IN NEWTON CENTRE, )
COUNTY OF MIDDLESEX, COMMONWEALTH OF )
MASSACHUSETTS, )
)
REAL PROPERTY LOCATED IN PORTLAND, )
COUNTY OF CUMBERLAND, STATE OF MAINE, )
)
ONE AUTOMOBILE WITH MASSACHUSETTS )
LICENSE PLATE "DURKIN," )
)
EQUITABLE SHARING PROGRAM BANK )
ACCOUNTS 1-X, )
)
OBAMA FOUNDATION BANK ACCOUNTS 1-X, )
)
TRUSTEES OF BOSTON COLLEGE BANK )
ACCOUNTS 1-X, )
)
JOHN DOE 1-X, individually and in his or her respective )
official capacity as a federal agent, if any, )

RONNIE ABRAMS, individually and in his official
capacity as Fake Chief Judge of the United States District
Court for the Southern District of New York,

)
)
)
)
)

JOAN AZRACK, individually and in her official
capacity as Fake Judge of the United States District
Court for the Eastern District of New York,

)
)
)
)

ROBERT BACHARACH, individually and in his official
capacity as Fake Judge of the United States Court of
Appeals for the Tenth Circuit,

)
)
)
)

PAUL BARBADORO, individually and in his official
capacity as Judge of the United States District Court for
the District of New Hampshire,

)
)
)
)

DAVID BARRON, individually and in his official
capacity as Fake Judge of the United States
Court of Appeals for the First Circuit,

)
)
)
)

ALFRED BENNETT, individually and in his official
capacity as Fake Judge of the United States District
Court for the Southern District of Texas,

)
)
)
)

AMY BERMAN JACKSON, individually and in her
official capacity as Fake Judge of the United States
District Court for the District of Columbia,

)
)
)
)

CHRISTA BERRY, individually and in her official
capacity as Clerk of the United States District Court for
the District of Maine,

)
)
)
)

BETH BLOOM, individually and in her official
capacity as Fake Judge of the United States District
Court for the Southern District of Florida,

)
)
)
)

JAMES BOASBERG, individually and in his official
capacity as Fake Judge of the United States District
Court for the District of Columbia,

)
)
)
)

STEPHEN BREYER, individually and in his official

)

4

capacity as Justice of the Supreme Court of the United
States.                                                      )
                                                             )
                                                             )
VINCENT BRICCETTI, individually and in his official          )
capacity as Fake Judge of the United States District         )
Court for the Southern District of New York,                 )
                                                             )
MARGO BRODIE, individually and in her official               )
capacity as Fake Judge of the United States District         )
Court for the Eastern District of New York,                  )
                                                             )
VERNON BRODERICK, individually and in his official           )
capacity as Fake Judge of the United States District         )
Court for the Southern District of New York,                 )
                                                             )
R. BROOKE JACKSON, individually and in his official          )
capacity as Fake Judge of the United States District         )
Court for the District of Colorado,                          )
                                                             )
KETANJI BROWN JACKSON, individually and in her               )
official capacity as Fake Judge of the United States         )
District Court for the District of Columbia,                 )
                                                             )
MARGARET BUCKLEY, individually and in her official           )
capacity as Assistant Clerk Magistrate of the                )
Commonwealth of Massachusetts,                               )
                                                             )
ALLISON BURROUGHS, individually and in her official          )
capacity as Fake Judge of the United States District         )
Court for the District of Massachusetts,                     )
                                                             )
DAVID CAMPOS GUADERRAMA, individually and                    )
in his official capacity as Fake Judge of the United States  )
District Court for the Western District of Texas,            )
                                                             )
VALERIE CAPRONI, individually and in her official            )
capacity as Fake Judge of the United States District         )
Court for the Southern District of New York,                 )
                                                             )
SUSAN CARNEY, individually and in her official               )
capacity as Fake Judge of the United States Court of         )
Appeals for the Second Circuit,                              )

5

ANDREW CARTER, JR., individually and in his official )
capacity as Fake Judge of the United States District )
Court for the Southern District of New York, )
)
DENISE CASPER, individually and in her official )
capacity as Fake Judge of the United States District )
Court for the District of Massachusetts, )
)
EDMOND CHANG, individually and in his official )
capacity as Fake Judge of the United States District Court )
for the Northern District of Illinois, )
)
EDWARD CHEN, in his official capacity as )
Fake Judge of the United States District Court for )
the Northern District of California, )
)
PAMELA CHEN, individually and in her official )
capacity as Fake Judge of the United States District )
Court for the Eastern District of New York, )
)
VINCE CHHABRIA, in his official capacity as )
Fake Judge of the United States District Court for )
the Northern District of California, )
)
DENNY CHIN, individually and in his official )
capacity as Fake Judge of the United States Court of )
Appeals for the Second Circuit, )
)
MORGAN CHRISTEN, individually and in her official )
capacity as Fake Judge of the United States Court of )
Appeals for the Ninth Circuit, )
)
TANYA CHUTKAN, individually and in her official )
capacity as Fake Judge of the United States District )
Court for the District of Columbia, )
)
JEFFREY COLWELL, individually and in his official )
capacity as Clerk of the United States District Court for )
the District of Colorado, )
)
CHRISTOPHER COOPER, individually and in his official )

6

capacity as Fake Judge of the United States District
Court for the District of Columbia,

RUDOLPH CONTRERAS, individually and in his official
capacity as Fake Judge of the United States District
Court for the District of Columbia,

GREGG COSTA, individually and in his official
capacity as Fake Judge of the U.S. Court of Appeals for
the Fifth Circuit,

KEVIN CURTIN, individually and in his official capacity
as Assistant District Attorney of Middlesex County,
Massachusetts,

MAE D'AGOSTINO, individually and in her official
capacity as Fake Judge of the United States District
Court for the Northern District of New York,

EDWARD DAVILLA, in his official capacity as
Fake Judge of the United States District Court for
the Northern District of California,

JAMES DONATO, in his official capacity as
Fake Judge of the United States District Court for
the Northern District of California,

ANN DONNELLY, individually and in her official
capacity as Fake Judge of the United States District
Court for the Eastern District of New York,

CHRISTOPHER DRONEY, individually and in his
official capacity as Fake Judge of the United States
Court of Appeals for the Second Circuit,

THOMAS DURKIN, individually and in his official
capacity as Fake Judge of the United States District Court
for the Northern District of Illinois,

SARA ELLIS, individually and in her official
capacity as Fake Judge of the United States District Court
for the Northern District of Illinois,

PAUL ENGELMEYER, individually and in his official
capacity as Fake Judge of the United States District
Court for the Southern District of New York,

KATHERINE FAILLA, individually and in her official
capacity as Fake Judge of the United States District
Court for the Southern District of New York,

ROBERT FARRELL, individually and in his official
capacity as Clerk of the United States District Court for the
District of Massachusetts,

MICHAEL FATALE, individually and in his official
capacity as a Deputy General Counsel of the
Massachusetts Department of Revenue,

GARY FEINERMAN, individually and in his official
capacity as Fake Judge of the United States District Court
for the Northern District of Illinois,

MICHELLE FRIEDLAND, individually and in her
official capacity as Fake Judge of the United States Court
of Appeals for the Ninth Circuit,

JESSE FURMAN, individually and in his official
capacity as Fake Judge of the United States District
Court for the Southern District of New York,

RALPH GANTS, individually and in his official
capacity as Chief Justice of the Supreme Judicial Court
of the Commonwealth of Massachusetts,

MERRICK GARLAND, individually and in his official
capacity as Chief Judge of the United States Court of
Appeals for the District of Columbia Circuit,

DARRIN GAYLES, individually and in his official
capacity as Fake Judge of the United States District
Court for the Southern District of Florida,

LINDA GILES, individually and in her official capacity

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

as Justice of the Superior Court of the Commonwealth
of Massachusetts,

HAYWOOD GILLIAM, in his official capacity as
Fake Judge of the United States District Court for
the Northern District of California,

NELVA GONZALES RAMOS, individually and in her
official capacity as Fake Judge of the United States District
Court for the Southern District of Texas,

YVONNE GONZALEZ ROGERS, in her official capacity
as Fake Judge of the United States District Court for
the Northern District of California,

JAMES GRAVES, JR., individually and in his official
capacity as Fake Judge of the U.S. Court of Appeals for
the Fifth Circuit,

KAREN GREEN, individually and in her official capacity
as Justice of the Superior Court of the Commonwealth
of Massachusetts,

LASHANN HALL, individually and in his official
capacity as Judge of the United States District Court for
the Eastern District of New York,

GEORGE HANKS, JR., individually and in his official
capacity as Fake Judge of the United States District
Court for the Southern District of Texas,

DAVID HAMILTON, individually and in his official
capacity as a Fake Judge of the United States Court of
Appeals for the Seventh Circuit,

MAURA HEALEY, individually and in her official
capacity as Attorney General of the Commonwealth of
Massachusetts,

STEPHEN HIGGINSON, individually and in his official
capacity as Fake Judge of the U.S. Court of Appeals for
the Fifth Circuit,

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

TIMOTHY HILLMAN, individually and in his official
capacity as Fake Judge of the United States District
Court for the District of Maine,

BERYL HOWELL, individually and in his official
capacity as Fake Chief Judge of the United States District
Court for the District of Columbia,

ANDREW HURWITZ, individually and in his official
capacity as Fake Judge of the United States Court of
Appeals for the Ninth Circuit,

SHANNON JOHNSON COLEMAN, individually and in
her official capacity as Fake Judge of the United States
District Court for the Northern District of Illinois,

ADALBERTO JORDAN, individually and in his
official capacity as Fake Judge of the United States
Court of Appeals for the Eleventh Circuit,

ELENA KAGAN, individually and in her official
capacity as Fake Justice of the Supreme Court of the
United States,

GARY KATZMANN, individually and in his official
capacity as Fake Judge of the United States Court of
International Trade,

WILLIAM KAYATTA, JR., individually and in his
official capacity as Fake Judge of the United States Court
of Appeals for the First Circuit,

C. JEFFREY KINDER, individually and in his official
capacity as Justice of the Massachusetts Appeals Court,

LUCY KOH, in her official capacity as Fake Judge of the
United States District Court for the Northern District of
California,

ERIC KOMITEE, individually and in his official
capacity as Fake Judge of the United States District

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Court for the Eastern District of New York,                          )
                                                                     )
RACHEL KOVNER, individually and in her official                      )
capacity as Fake Judge of the United States District                 )
Court for the Eastern District of New York,                          )
                                                                     )
WILLIAM KUNTZ, individually and in his official                      )
capacity as Fake Judge of the United States District                 )
Court for the Eastern District of New York,                          )
                                                                     )
BETH LABSON FREEMAN, in her official capacity as                     )
Fake Judge of the United States District Court for                   )
the Northern District of California,                                 )
                                                                     )
JOHN LEE, individually and in his official capacity as               )
Fake Judge of the United States District Court                       )
for the Northern District of Illinois,                               )
                                                                     )
JON LEVY, individually and in his official capacity as               )
Fake Chief Judge of the United States District                       )
Court for the District of Maine,                                     )
                                                                     )
RAYMOND LOHIER, JR., individually and in his                         )
official capacity as Fake Judge of the United States Court           )
of Appeals for the Second Circuit,                                   )
                                                                     )
DAVID LOWY, individually and in his official                         )
capacity as Justice of the Supreme Judicial Court of the             )
Commonwealth of Massachusetts,                                       )
                                                                     )
JORGE LUIS ALONSO, individually and in his official                  )
capacity as Fake Judge of the United States District Court           )
for the Northern District of Illinois,                               )
                                                                     )
GERARD LYNCH, individually and in his official                       )
capacity as Fake Judge of the United States Court of                 )
Appeals for the Second Circuit,                                      )
                                                                     )
SANDRA LYNCH, individually and in her official                       )
capacity as Judge of the United States Court of Appeals              )
for the First Circuit,                                               )
                                                                     )
                                                                     )

MARINA MARMOLEJO, individually and in her official )
capacity as Fake Judge of the United States District )
Court for the Southern District of Texas, )
)
BEVERLY MARTIN, individually and in her )
official capacity as Fake Judge of the United States )
Court of Appeals for the Eleventh Circuit, )
)
WILLIAM MARTINEZ, individually and in his official )
capacity as Fake Judge of the United States District )
Court for the District of Colorado, )
)
SCOTT MATHESON, JR., individually and in his official )
capacity as Fake Judge of the United States Court of )
Appeals for the Tenth Circuit, )
)
MARK MASTROIANNI, individually and in his official )
capacity as Fake Judge of the United States District )
Court for the District of Massachusetts, )
)
AMOS MAZZANT III, in his official capacity as )
Fake Judge of the United States District Court for )
the Eastern District of Texas, )
)
LANDYA MCCAFFERTY, individually and in her official )
capacity as Fake Chief Judge of the United States District )
Court for the District of New Hampshire, )
)
JOHN J. MCCONNELL, JR., in his official )
capacity as Fake Judge of the United States District )
Court for the District of Rhode Island, )
)
CAROLYN MCHUGH, individually and in his official )
capacity as Fake Judge of the United States Court of )
Appeals for the Tenth Circuit, )
)
AMIT MEHTA, individually and in his official )
capacity as Fake Judge of the United States District )
Court for the District of Columbia, )
)
PATRICIA MILLETT, individually and in her official )
capacity as Fake Judge of the United States Court of )

Appeals for the District of Columbia Circuit, )
)
RAYMOND MOORE, individually and in his official )
capacity as Fake Judge of the United States District )
Court for the District of Colorado, )
)
NANCY MORITZ, individually and in her official )
capacity as Fake Judge of the United States Court of )
Appeals for the Tenth Circuit, )
)
RANDOLPH MOSS, individually and in his official )
capacity as Fake Judge of the United States District )
Court for the District of Columbia, )
)
MARY MURGUIA, individually and in her official )
capacity as Fake Judge of the United States Court of )
Appeals for the Ninth Circuit, )
)
ALISON NATHAN, individually and in her official )
capacity as Fake Judge of the United States District )
Court for the Southern District of New York, )
)
ERIC NEYMAN, individually and in his official )
capacity as Justice of the Massachusetts Appeals Court, )
)
JACQUELINE NGUYEN, individually and in her )
official capacity as Fake Judge of the United States Court )
of Appeals for the Ninth Circuit, )
)
GEORGE O'TOOLE, JR., individually and in his official )
capacity as Judge of the United States District Court )
for the District of Massachusetts, )
)
J. PAUL OETKEN, individually and in his official )
capacity as Fake Judge of the United States District )
Court for the Southern District of New York, )
)
WILLIAM ORRICK III, in his official capacity as )
Fake Judge of the United States District Court for )
the Northern District of California, )
)
JOHN OWENS, individually and in his official )

13

capacity as Fake Judge of the United States Court of )
Appeals for the Ninth Circuit,                        )
                                                      )
GREGORY PHILLIPS, individually and in his official    )
capacity as Fake Judge of the United States Court of  )
Appeals for the Tenth Circuit,                        )
                                                      )
CORNELIA PILLARD, individually and in her official    )
capacity as Fake Judge of the United States Court of  )
Appeals for the District of Columbia Circuit,         )
                                                      )
ROBERT PITMAN, individually and in his                )
official capacity as Fake Judge of the United States  )
District Court for the Western District of Texas,     )
                                                      )
JILL PRYOR, individually and in her official capacity )
as Fake Judge of the United States Court of Appeals   )
for the Eleventh Circuit,                             )
                                                      )
EDGARDO RAMOS, individually and in his official       )
capacity as Fake Judge of the United States District  )
Court for the Southern District of New York,          )
                                                      )
JOHN ROBERT BLAKEY, individually and in his           )
official capacity as Fake Judge of the United States  )
District Court for the Northern District of Illinois, )
                                                      )
JOHN ROBERTS, individually and in his official capacity )
as Chief Justice of the Supreme Court of the United States, )
                                                      )
JAMES RODNEY GILSTRAP, in his official capacity as    )
Fake Chief Judge of the United States District Court for )
the Eastern District of Texas,                        )
                                                      )
JOSE ROLANDO OLVERA, JR., individually and in his     )
official capacity as Fake Judge of the United States District )
Court for the Southern District of Texas,             )
                                                      )
NELSON ROMAN, individually and in his official        )
capacity as Fake Judge of the United States District  )
Court for the Southern District of New York,          )
                                                      )

14

ROBIN ROSENBAUM, individually and in her official capacity as Fake Judge of the United States Court of Appeals for the Eleventh Circuit, )))) 

ROBIN ROSENBERG, individually and in her official capacity as Fake Judge of the United States District Court for the Southern District of Florida, ))))

DIANE SALDANA, individually and in her official capacity as Fake Judge of the United States District Court for the Southern District of Texas, ))))

BRENDA SANNES, individually and in her official capacity as Fake Judge of the United States District Court for the Northern District of New York, ))))

PATTI SARIS, individually and in her official capacity as Judge of the United States District Court for the District of Massachusetts, ))))

LORNA SCHOFIELD, individually and in her official capacity as Fake Judge of the United States District Court for the Southern District of New York, ))))

ROBERT SCOLA JR., individually and in his official capacity as Fake Judge of the United States District Court for the Southern District of Florida, ))))

ROBERT SCHROEDER III, in his official capacity as Fake Judge of the United States District Court for the Eastern District of Texas, ))))

RICHARD SEEBORG, in his official capacity as Fake Judge of the United States District Court for the Northern District of California, ))))

MANISH SHAH, individually and in his official capacity as Fake Judge of the United States District Court for the Northern District of Illinois, ))))

TEAGAN SNYDER, individually and in her official capacity as an Employee of the United States ))

15

District Court for the District of Maine, )
 )
LEO SOROKIN, individually and in his official capacity )
as Fake Judge of the United States District Court for the )
District of Massachusetts, )
 )
SONIA SOTOMAYOR, individually and in her official )
capacity as Fake Justice of the Supreme Court of the )
United States, )
 )
DEBRA SQUIRES-LEE, individually and in her official )
capacity as Justice of the Superior Court of the )
Commonwealth of Massachusetts, )
 )
SRI SRINIVASAN, individually and in his official )
capacity as Fake Chief Judge of the United States Court of )
Appeals for the District of Columbia Circuit, )
 )
ERIC STORMS, individually and in his official )
capacity as Chief Deputy Clerk of the United States )
District Court for the District of Maine, )
 )
INDIRA TALWANI, individually and in her official )
Capacity as Fake Judge of the United States District )
Judge for the District of Massachusetts, )
 )
JOHN THARP, individually and in his official )
capacity as Fake Judge of the United States District Court )
for the Northern District of Illinois, )
 )
O. ROGERIEE THOMPSON, individually and in her )
official capacity as Fake Judge of the United States )
Court of Appeals for the First Circuit, )
 )
JON TIGAR, in his official capacity as Fake Judge of the )
United States District Court for the Northern District of )
California, )
 )
ANNALISA TORRES, individually and in her official )
capacity as Fake Judge of the United States District )
Court for the Southern District of New York, )
 )

NANCY TORRESEN, individually and in her official
Capacity as Fake Judge of the United States District Court
for the District of Maine,

ROBERT ULLMANN, individually and in his official
capacity as Justice of the Superior Court of the
Commonwealth of Massachusetts,

MARTIN WALSH, individually and in his official
capacity as Mayor of the City of Boston, Massachusetts,

PAUL WATFORD, individually and in his official
capacity as Fake Judge of the United States Court of
Appeals for the Ninth Circuit,

KATHLEEN WILLIAMS, individually and in her official
capacity as Fake Judge of the United States District
Court for the Southern District of Florida,

ROBERT WILKINS, individually and in his official
capacity as Fake Judge of the United States Court of
Appeals for the District of Columbia Circuit,

GABRIELLE WOLOHOJIAN, individually and in her
official capacity as Justice of the Massachusetts
Appeals Court,

ANDREA WOOD, individually and in her official
capacity as Fake Judge of the United States District Court
for the Northern District of Illinois,

GREGORY WOODS, individually and in his official
capacity as Fake Judge of the United States District
Court for the Southern District of New York,

AMY CRAFTS, PIERCE CRAY, GILLIAN FEINER,
DEAN MAZZONE, HOWARD MESHNICK, JAMES
SWEENEY, LORRAINE TARROW, JEFFREY
WALKER, individually and in his or her respective
official capacity as Assistant Attorney General of the
Commonwealth,

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

THOMAS MURPHY, individually and in his official )
capacity as a State Police Officer of the Commonwealth )
of Massachusetts, )
)
JONATHAN BLODGETT, in his official capacity )
as District Attorney for Essex County, Massachusetts, )
)
CHRISTOPHER HARDING, in his official capacity )
as Commissioner of the Massachusetts Department of )
Revenue, )
)
MARIS ABBENE, NAA-SAKLE AKUETE, TYLER )
ARCHER, ROBERT BLOOM, MARK BRODIN, )
THEODORE BUNZEL, JUDD CARHART, R. MICHAEL )
CASSIDY, MARTHA COAKLEY, JAMES COLE, JOHN )
DAWLEY, ROBERT DIAMOND, BRIAN DURKIN, )
THOMAS DURKIN, BENJAMIN FLATGARD, TORIL )
FORLAND, JAVIER GONZALEZ, MARGARET )
GOODLANDER, WILLIAM HENNRIKUS, JOSEPH )
HERLIHY, SARAH HERLIHY, ERIC HOLDER, )
SAMUEL HOYLE, LILAH HUME, JULIETTE )
KAYYEM, ELISABETH KELLER, BROOKS KENYON, )
DANIEL KOH, STEVEN KOH, DAVID LAMPERT, )
FAY LAMPERT SHUTZER, HENRIK LAMPERT, )
THOMAS LAMPERT, LORETTA LYNCH, )
JOHN LYSOHIR, DAVID MACKEY, THOMAS )
MAFFEI, JUSTIN MALONEY, TEMBA MAQUBELA, )
VUYELWA MAQUBELA, GHISLAINE MAXWELL, )
CARMEN ORTIZ, DEVAL PATRICK, )
AYANNA PRESSLEY, JAMIL ROMAN, VINCENT )
ROUGEAU, DONALD SAVERY, JANET )
SCOGNAMIGLIO, WILLIAM SHUTZER, DAVID )
SIMAS, JOHN VERNER, GEORGE WALKER IV, )
SALLY YATES, individually and in his or her respective )
official capacity, if any, )
)
GEORGE W. BUSH, individually and in his official )
capacity as Former President of the United States, )
)
JOHN E. BUSH a/k/a "JEB BUSH," individually and in )
his official capacity, if any, )
)

18

OMAR MANGALJI a/k/a "RONNIE BACARDI,"
individually,                                                                    )
                                                                                )
                                                                                )
SIKANYISELWE-SIPO MAQUBELA a/k/a                                                 )
"KANYI MAQUBELA," individually,                                                  )
                                                                                )
BARACK H. OBAMA a/k/a "BARRY SOETORO"                                            )
individually and in his official capacity as Fake Former                        )
President of the United States,                                                 )
                                                                                )
CARLOS SLIM HELU a/k/a "CARLOS SLIM,"                                            )
individually,                                                                   )
                                                                                )
UNITED STATES, U.S. DEPARTMENT OF JUSTICE,                                       )
U.S. DISTRICT COURT FOR THE DISTRICT OF                                          )
COLORADO, U.S. DISTRICT COURT FOR THE                                           )
DISTRICT OF MAINE, U.S. DISTRICT COURT FOR                                       )
THE DISTRICT OF MASSACHUSETTS, U.S.                                              )
DISTRICT COURT FOR THE DISTRICT OF NEW                                          )
HAMPSHIRE, U.S. COURT OF APPEALS FOR THE                                         )
FIRST CIRCUIT, U.S. TAX COURT,                                                   )
                                                                                )
COMMONWEALTH OF MASSACHUSETTS,                                                   )
MASSACHUSETTS APPEALS COURT,                                                     )
SUFFOLK SUPERIOR COURT, MASSACHUSETTS                                            )
DEPARTMENT OF REVENUE,                                                           )
                                                                                )
AMERICAN BAR ASSOCIATION,                                                        )
                                                                                )
LAW SCHOOL ADMISSIONS COUNCIL,                                                   )
                                                                                )
RECTORS AND VISITORS OF THE UNIVERSITY                                           )
OF VIRGINIA,                                                                     )
                                                                                )
TRUSTEES OF BOSTON COLLEGE,                                                      )
                                                                                )
TRUSTEES OF COLUMBIA UNIVERSITY IN THE                                           )
CITY OF NEW YORK,                                                                )
                                                                                )
TRUSTEES OF THE UNIVERSITY OF                                                    )
PENNSYLVANIA,                                                                    )
                                                                                )

CORNELL UNIVERSITY,                          )
                                             )
NORTHWESTERN UNIVERSITY,                     )
                                             )
THE UNIVERSITY OF CHICAGO,                   )
                                             )
UNIVERSITY OF DENVER,                        )
                                             )
NEW YORK TIMES COMPANY,                      )
                                             )
and                                          )
                                             )
WILMER CUTLER PICKERING HALE AND DORR,       )
LLP,                                         )
                                             )
        *Defendants.*                        )
_____    )

[TABLE OF CONTENTS FOLLOWS]

## TABLE OF CONTENTS

INTRODUCTORY STATEMENT..................................................................22

PARTIES.........................................................................................23

JURISDICTION AND VENUE...................................................................79

LAW SCHOOL ADMISSIONS TEST...........................................................80

BOSTON COLLEGE LAW SCHOOL TUITION RATES.......................................81

CORNELL LAW SCHOOL TUITION RATES...................................................84

ANTITRUST COMBINATION OR CONSPIRACY..............................................85

LEGAL RELATIONSHIP BETWEEN FEDERAL ASSET FORFEITURE
AND THE FALSE CLAIMS ACT.................................................................87

THE ENTERPRISE...............................................................................89

GENERAL ALLEGATIONS.....................................................................100

INJURIES TO BUSINESS AND PROPERTY...................................................215

RACKETEERING ACTS.........................................................................216

CAUSES OF ACTION...........................................................................251

RELIEF REQUESTED...........................................................................341

1.  This complaint (this "Complaint") is brought by John Adams, (formerly Jaideep S. Chawla, hereinafter "THE RELATOR" or "ADAMS"), acting *pro se*, for statutory compensation and award pursuant to the False Claims Act (31 U.S.C. § 3730(b)(1)). Additional claims are made pursuant to federal law, including the Racketeer Influenced and Corrupt Organizations Act (18 U.S.C. §§ 1961 *et seq.*), as well as Massachusetts law.

2.  As set forth in the Causes of Action section, all claims are brought as a relator under state and/or federal law as well as in an individual capacity.

3.  THE RELATOR's status as a relator pursuant to Mass.Gen.Laws ch. 12 § 5C was confirmed by the Massachusetts Supreme Judicial Court in the case of <u>Chawla v. Mass. Appeals Court</u>, No. SJC-12488. That case concerned a recusal issue in <u>Commonwealth *ex rel.* Chawla & another v. Gonzalez, et al.</u>, 90 Mass. App. Ct. 1102; 56 N.E.3d 894; 2016 Mass. App. Unpub. LEXIS 836 (May 12, 2017), which was the appeal of the dismissal of <u>Commonwealth *ex rel.* Chawla v. Gonzalez, et al.</u>, C.A. No. SUCV-2014-2090D (Suffolk Super. Ct., Apr. 24, 2018) (altogether, the "*Qui Tam* Action").

4.  This Complaint arises out of narcotics trafficking between Mexico, Texas, and the Commonwealth of Massachusetts by alleged members of the "Gulf Cartel" and subsequent and repeated corruption of the judicial process occurring in connection with state and federal courts as well as at American Bar Association-approved law schools.

5.  As set forth herein, THE RELATOR cannot receive a fair trial, hearing, and/or disposition in Suffolk Superior Court of the Commonwealth of Massachusetts, the

Massachusetts Appeals Court, the Massachusetts Supreme Judicial Court; the United States Tax Court; the United States District Court for the Districts of Massachusetts, New Hampshire, and Colorado; the United States Court of Appeals for the First Circuit, and/or in the Supreme Court of the United States due to the presence of ineligible and/or allegedly corrupt "judges" and "justices."

6. As set forth herein, there are a number of purported federal judges who have participated in THE RELATOR's litigation or could participate based on the facts alleged herein. Each of these so-called judges ("FAKE FEDERAL JUDGES") is listed in the caption of this Complaint as "Fake Judge" or "Fake Justice."

7. As set forth herein, many, but not all of the claims herein have been dismissed in prior actions brought by THE RELATOR in the United States District Court for the Districts of New Hampshire, Massachusetts, and Colorado. These prior judgments are void and/or not preclusive because 1) they were made by one of the FAKE FEDERAL JUDGES; and/or 2) the racketeering and unlawful activity, as alleged herein, has continued even after entry of these purported judgments.

8. Allegations marked with an asterisk (*) are "specifically so identified" and "will likely have evidentiary support after a reasonable opportunity for further investigation or discovery" pursuant to Fed. R. Civ. P. 11(b)(3).

## PARTIES

9. The *qui tam* plaintiff, United States of America (the "United States"), is the federal government of the United States.

10. The *qui tam* plaintiff, Commonwealth of Massachusetts (the "Commonwealth" or the "Commonwealth of Massachusetts"), is the sovereign government of the state of Massachusetts.

11. The *qui tam* plaintiff, Massachusetts Department of Revenue ("DOR"), is a department, agency, and/or entity of the Commonwealth of Massachusetts, having its headquarters at 100 Cambridge Street, Boston, County of Suffolk, Commonwealth of Massachusetts.

12. The *qui tam* relator, John Adams (hereinafter, "THE RELATOR" or "ADAMS," formerly Jaideep S. Chawla), is a relator pursuant to Mass.Gen.Laws ch. 12 § 5C and brings claims pursuant to 31 U.S.C. § 3730(b)(2) and Mass.Gen.Laws ch. 12 §§ 5A *et seq.* THE RELATOR formerly identified as Jaideep S. Chawla. As of the time of the filing of this Complaint, THE RELATOR was still evaluating the best method to effectuate a legal name change. THE RELATOR is a graduate of the Pike School in Andover, Massachusetts; Groton School in Groton, Massachusetts; and Cornell University in Ithaca, New York. THE RELATOR attended but did not graduate from Boston College Law School.

13. THE RELATOR is a plaintiff in his individual capacity in this Complaint.

14. The Defendant, Internal Revenue Service (the "IRS"), is an executive agency of the United States and a bureau of the United States Department of Treasury that is headquartered in Washington, District of Columbia.

15. The Defendant, Real Property 1 Located in Boston, County of Suffolk, Commonwealth of Massachusetts ("1 COURTHOUSE WAY"), is real property located at 1 Courthouse Way, Boston, County of Suffolk, Commonwealth of Massachusetts and is a federal

courthouse for the U.S. Court of Appeals for the First Circuit and the U.S. District Court for the District of Massachusetts.

16. The Defendant, Real Property 2 Located in Boston, County of Suffolk, Commonwealth of Massachusetts ("3 PEMBERTON SQUARE"), is real property located at 3 Pemberton Square, Boston, County of Suffolk, Commonwealth of Massachusetts. 3 PEMBERTON SQUARE is next to the John Adams Courthouse ("John Adams Courthouse") at 1 Pemberton Square, Boston, County of Suffolk, Commonwealth of Massachusetts.

17. The Defendant, Real Property 3 Located in Boston, County of Suffolk, Commonwealth of Massachusetts ("1 PEMBERTON SQUARE"), is real property located at 1 Pemberton Square, Boston, County of Suffolk, Commonwealth of Massachusetts. 1 PEMBERTON SQUARE is the John Adams Courthouse at 1 Pemberton Square, Boston, County of Suffolk, Commonwealth of Massachusetts.

18. The Defendant, Real Property 4 Located in Boston, County of Suffolk, Commonwealth of Massachusetts ("MAG BOSTON"), is real property located at 1 Ashburton Place, Boston, County of Suffolk, Commonwealth of Massachusetts, being occupied by the Attorney General of the Commonwealth of Massachusetts. MAG BOSTON is multiple floors of 1 Ashburton Place, Boston, County of Suffolk, Commonwealth of Massachusetts. All allegations in this Complaint concerning the Office of the Attorney General of the Commonwealth of Massachusetts take place at, near, and/or in connection with MAG BOSTON.

19. The Defendant, Real Property Located in Brookline, County of Norfolk, Commonwealth of Massachusetts ("100 DAVIS AVENUE"), is real property located at 100 Davis Avenue, Brookline, County of Norfolk, Commonwealth of Massachusetts.

20. The Defendant, Real Property Located in Charlestown, County of Suffolk, Commonwealth of Massachusetts ("40 WINTHROP STREET"), is real property located at 40 Winthrop Street, Charlestown, County of Suffolk, Commonwealth of Massachusetts.

21. The Defendant, Real Property Located in Concord, County of Merrimack, State of New Hampshire ("55 PLEASANT STREET"), is real property located at 55 Pleasant Street, Concord, County of Merrimack, State of New Hampshire and is the Warren Rudman Federal Courthouse for the U.S. District Court for the District of New Hampshire (the "Warren Rudman Federal Courthouse").

22. The Defendant, Real Property Located in Denver, County of Denver, State of Colorado ("901 19TH STREET"), is real property located at 901 19th Street, Denver, County of Denver, State of Colorado and is the federal courthouse for the U.S. District Court for the District of Colorado.

23. The Defendant, Real Property Located in New York, County of New York, State of New York ("745 7TH AVENUE"), is real property located at 745 7th Avenue, New York, County of New York, State of New York. 745 7TH AVENUE is the former headquarters of Lehman Brothers Holdings, Inc. 745 7TH AVENUE is currently owned and operated by Barclays PLC, which purchased the property following the bankruptcy of Lehman Brothers Holdings, Inc. in September 2008.

24. The Defendant, Real Property Located in Newton Centre, County of Middlesex, Commonwealth of Massachusetts ("885 CENTRE STREET") is real property located at 885 Centre Street, Newton Centre, County of Middlesex, Commonwealth of Massachusetts. The Trustees of Boston College, which is a defendant in this Complaint, owns and/or operates Boston College Law School ("BCLS") at 885 CENTRE STREET. Any events in this Complaint concerning BCLS occurred at and/or in connection with 885 CENTRE STREET.

25. The Defendant, Real Property Located in Portland, County of Cumberland, State of Maine ("156 FEDERAL STREET"), is real property located at 156 Federal Street, Portland, County of Cumberland, State of Maine and is a federal courthouse for the U.S. District Court for the District of Maine.

26. The Defendant, One Automobile with a Certain Massachusetts License Plate (the "DURKIN CAR"), is personal property in the form of an automobile with a Commonwealth of Massachusetts license plate of "DURKIN."

27. The Defendant, Equitable Sharing Program Bank Accounts 1-X ("EQUITABLE SHARING ACCOUNTS 1-X"), are bank accounts in which funds from the Equitable Sharing Program, which is an asset forfeiture sharing program operated by the federal government, are deposited and kept by law enforcement agencies of the Commonwealth of Massachusetts.

28. The Defendant, Obama Foundation Bank Accounts 1-X ("OBAMA FOUNDATION ACCOUNTS 1-X"), is or are one or more deposit accounts of the Obama Foundation (the "Obama Foundation"), which is a non-profit corporation organized under the laws of the

State of Illinois. The Obama Foundation is owned and/or operated in whole or in part by the Defendant, Barack Obama and the Defendant, David Simas.

29. The Defendant, Trustees of Boston College Bank Accounts 1-X ("BOSTON COLLEGE ACCOUNTS 1-X"), is or are one or more deposit accounts of the Trustees of Boston College, which is a non-profit corporation organized under the laws of the Commonwealth of Massachusetts.

30. The Defendants, John Doe 1-X ("JOHN DOE 1-X"), were and/or are federal employees, federal contractors, domestic intelligence agents, foreign intelligence agents, and/or private citizens carrying out physical and/or electronic surveillance and/or threatening activities in association with one or more of the defendants named herein. The names of JOHN DOE 1-X are currently unknown, but THE RELATOR reasonably expects that their identities will be uncovered in the course of discovery.

31. The Defendant, Ronnie Abrams, ("ABRAMS"), is a Fake Judge on the United States District Court for the Southern District of New York. ABRAMS is sued in his individual capacity and in his official capacity as a Fake Judge of the United States District Court for the Southern District of New York. ABRAMS is an attorney admitted to practice law in one or more jurisdictions.

32. The Defendant, Joan Azrak, ("AZRACK"), is a Fake Judge on the United States District Court for the Eastern District of New York. AZRACK is sued in her individual capacity and in her official capacity as a Fake Judge of the United States District Court for the Eastern District of New York. AZRACK is an attorney admitted to practice law in one or more jurisdictions.

33. The Defendant, Robert Bacharach, ("BACHARACH"), is a Fake Judge on the United States Court of Appeals for the Tenth Circuit. BACHARACH is sued in his individual capacity and in his official capacity as a Fake Judge of the Court of Appeals for the Tenth Circuit. BACHARACH is an attorney admitted to practice law in one or more jurisdictions.

34. The Defendant, Paul Barbadoro, ("BARBADORO"), is a judge on the United States District Court for the District of New Hampshire. BARBADORO maintains a principal office at the Warren Rudman Federal Courthouse. BARBADORO is sued in his individual capacity and in his official capacity as a judge of the United States District Court for the District of New Hampshire. BARBADORO is a former student at and graduate of Boston College Law School. BARBADORO is an attorney admitted to practice law in one or more jurisdictions.

35. The Defendant, David Barron, ("BARRON"), is a Fake Judge on the United States Court of Appeals for the First Circuit. BARRON maintains a principal office at 1 COURTHOUSE WAY. BARRON is sued in his individual capacity and in his official capacity as a Fake Judge of the Court of Appeals for the First Circuit. BARRON is an attorney admitted to practice law in one or more jurisdictions.

36. The Defendant, Alfred Bennett, ("BENNETT"), is a Fake Judge on the United States District Court for the Southern District of Texas. BENNETT is sued individually and in his official capacity as a Fake Judge of the United States District Court for the Southern District of Texas. BENNETT is an attorney admitted to practice law in one or more jurisdictions.

37. The Defendant, Amy Berman Jackson, ("BERMAN JACKSON"), is a Fake Judge on the United States District Court for the District of Columbia. BERMAN JACKSON is sued in her individual capacity and in her official capacity as a Fake Judge of the United States District Court for the District of Columbia. BERMAN JACKSON is an attorney admitted to practice law in one or more jurisdictions.

38. The Defendant, Christa Berry, ("BERRY"), is Clerk of the United States District Court for the District of Maine. BERRY is sued in her individual capacity and in her official capacity as Clerk of the United States District Court for the District of Maine.

39. The Defendant, Beth Bloom, ("BLOOM"), is a Fake Judge on the United States District Court for the Southern District of Florida. BLOOM is sued individually and in her official capacity as a Fake Judge of the United States District Court for the Southern District of Florida. BLOOM is an attorney admitted to practice law in one or more jurisdictions.

40. The Defendant, James Boasberg, ("BOASBERG"), is a Fake Judge on the United States District Court for the District of Columbia. BOASBERG is sued in his individual capacity and in his official capacity as a Fake Judge of the United States District Court for the District of Columbia. BOASBERG is an attorney admitted to practice law in one or more jurisdictions.

41. The Defendant, Stephen Breyer, ("BREYER"), is a justice on the Supreme Court of the United States. BREYER is sued individually and in his official capacity as a Justice of the Supreme Court of the United States. BREYER is an attorney admitted to practice law in one or more jurisdictions.

42. The Defendant, Vincent Briccetti, ("BRICCETTI"), is a Fake Judge on the United States District Court for the Southern District of New York. BRICCETTI is sued in his individual capacity and in his official capacity as a Fake Judge of the United States District Court for the Southern District of New York. BRICCETTI is an attorney admitted to practice law in one or more jurisdictions.

43. The Defendant, Margo Brodie, ("BRODIE"), is a Fake Judge on the United States District Court for the Eastern District of New York. BRODIE is sued in her individual capacity and in her official capacity as a Fake Judge of the United States District Court for the Eastern District of New York. BRODIE is an attorney admitted to practice law in one or more jurisdictions.

44. The Defendant, Vernon Broderick, ("BRODERICK"), is a Fake Judge on the United States District Court for the Southern District of New York. BRODERICK is sued in his individual capacity and in his official capacity as a Fake Judge of the United States District Court for the Southern District of New York. BRODERICK is an attorney admitted to practice law in one or more jurisdictions.

45. The Defendant, R. Brooke Jackson, ("BROOKE JACKSON"), is a Fake Judge on the United States District Court for the District of Colorado. BROOKE JACKSON is sued individually and in his official capacity as a Fake Judge of the United States District Court for the District of Colorado. BROOKE JACKSON is an attorney admitted to practice law in one or more jurisdictions.

46. The Defendant, Kentanji Brown Jackson, ("BROWN JACKSON"), is a Fake Judge on the United States District Court for the District of Columbia. BROWN JACKSON is

sued individually and in an official capacity as a Fake Judge of the United States District Court for the District of Columbia. BROWN JACKSON is an attorney admitted to practice law in one or more jurisdictions.

47. The Defendant, Margaret Buckley ("BUCKLEY") is sued individually and in her official capacity as an assistant clerk magistrate of the Superior Court of the Commonwealth of Massachusetts. BUCKLEY maintains a principal office at 3 PEMBERTON SQUARE. BUCKLEY is an attorney admitted to practice law in one or more jurisdictions.*

48. The Defendant, Allison Burroughs, ("BURROUGHS"), is a Fake Judge on the United States District Court for the District of Massachusetts. BURROUGHS is sued in her individual capacity and in her official capacity as a Fake Judge of the United States District Court for the District of Massachusetts. BURROUGHS is an attorney admitted to practice law in one or more jurisdictions.

49. The Defendant, David Campos Guaderrama, ("CAMPOS GUADERRAMA"), is a Fake Judge on the United States District Court for the Western District of Illinois. CAMPOS GUADERRAMA is sued individually and in his official capacity as a Fake Judge of the United States District Court for the Western District of Illinois. CAMPOS GUADERRAMA is an attorney admitted to practice law in one or more jurisdictions.

50. The Defendant, Valerie Caproni, ("CAPRONI"), is a Fake Judge on the United States District Court for the Southern District of New York. CAPRONI is sued in her individual capacity and in her official capacity as a Fake Judge of the United States District Court for the Southern District of New York. CAPRONI is an attorney admitted to practice law in one or more jurisdictions.

51. The Defendant, Susan Carney, ("CARNEY"), is a Fake Judge on the United States Court of Appeals for the Second Circuit. CARNEY is sued in her individual capacity and in her official capacity as a Fake Judge of the Court of Appeals for the Second Circuit. CARNEY is an attorney admitted to practice law in one or more jurisdictions.

52. The Defendant, Andrew Carter, Jr., ("CARTER"), is a Fake Judge on the United States District Court for the Southern District of New York. CARTER is sued in his individual capacity and in his official capacity as a Fake Judge of the United States District Court for the Southern District of New York. CARTER is an attorney admitted to practice law in one or more jurisdictions.

53. The Defendant, Denise Casper, ("CASPER"), is a Fake Judge on the United States District Court for the District of Massachusetts. CASPER is sued in her individual capacity and in her official capacity as a Fake Judge of the United States District Court for the District of Massachusetts. CASPER is an attorney admitted to practice law in one or more jurisdictions.

54. The Defendant, Edmond Chang, ("CHANG"), is a Fake Judge on the United States District Court for the Northern District of Illinois. CHANG is sued in his individual capacity and in his official capacity as a Fake Judge of the United States District Court for the Northern District of Illinois. CHANG is an attorney admitted to practice law in one or more jurisdictions.

55. The Defendant, Edward Chen, ("EDWARD CHEN"), is a Fake Judge on the United States District Court for the Northern District of California. EDWARD CHEN is sued individually and in his official capacity as a Fake Judge of the United States District

33

Court for the Northern District of California. EDWARD CHEN is an attorney admitted to practice law in one or more jurisdictions.

56. The Defendant, Pamela Chen, ("PAMELA CHEN"), is a Fake Judge on the United States District Court for the Eastern District of New York. PAMELA CHEN is sued in her individual capacity and in her official capacity as a Fake Judge of the United States District Court for the Eastern District of New York. PAMELA CHEN is an attorney admitted to practice law in one or more jurisdictions.

57. The Defendant, Vince Chhabria, ("CHHABRIA"), is a Fake Judge on the United States District Court for the Northern District of California. CHHABRIA is sued individually and in his official capacity as a Fake Judge of the United States District Court for the Northern District of California. CHHABRIA is an attorney admitted to practice law in one or more jurisdictions.

58. The Defendant, Denny Chin, ("CHIN"), is a Fake Judge on the United States Court of Appeals for the Second Circuit. CHIN is sued in his individual capacity and in his official capacity as a Fake Judge of the Court of Appeals for the Second Circuit. CHIN is an attorney admitted to practice law in one or more jurisdictions.

59. The Defendant, Morgan Christen, ("CHRISTEN"), is a Fake Judge on the United States Court of Appeals for the Ninth Circuit. CHRISTEN is sued in her individual capacity and in his official capacity as a Fake Judge of the Court of Appeals for the Ninth Circuit. CHRISTEN is an attorney admitted to practice law in one or more jurisdictions.

60. The Defendant, Tanya Chutkan, ("CHUTKAN"), is a Fake Judge on the United States District Court for the District of Columbia. CHUTKAN is sued in her individual

capacity and in her official capacity as a Fake Judge of the United States District Court for the District of Columbia. CHUTKAN is an attorney admitted to practice law in one or more jurisdictions.

61. The Defendant, Jeffrey Colwell, ("COLWELL"), is Clerk of the United States District Court for the District of Colorado. COLWELL is sued in his individual capacity and in his official capacity as Clerk of the United States District Court for the District of Colorado. COLWELL is an attorney admitted to practice law in one or more jurisdictions.

62. The Defendant, Christopher Cooper, ("COOPER"), is a Fake Judge on the United States District Court for the District of Columbia. COOPER is sued in his individual capacity and in his official capacity as a Fake Judge of the United States District Court for the District of Columbia. COOPER is an attorney admitted to practice law in one or more jurisdictions.

63. The Defendant, Rudolph Contreras, ("CONTRERAS"), is a Fake Judge on the United States District Court for the District of Columbia. CONTRERAS is sued in his individual capacity and in his official capacity as a Fake Judge of the United States District Court for the District of Columbia. CONTRERAS is an attorney admitted to practice law in one or more jurisdictions.

64. The Defendant, Gregg Costa ("COSTA"), is a Fake Judge on the U.S. Court of Appeals for the Fifth Circuit. COSTA is sued individually and in his official capacity as a Fake Judge of the Court of Appeals for the Fifth Circuit. COSTA is an attorney admitted to practice law in one or more jurisdictions.

65. The Defendant, Kevin Curtin, ("CURTIN"), was and/or is an employee of Boston College Law School. CURTIN was and/or is an assistant district attorney for Middlesex County, Massachusetts. CURTIN is sued individually and in his official capacity as an Assistant District Attorney of Middlesex County, Massachusetts. CURTIN is a former student at and graduate of Boston College Law School. CURTIN maintains an office at 885 CENTRE STREET and/or 15 Commonwealth Avenue, Woburn, County of Middlesex, Commonwealth of Massachusetts.* CURTIN is an attorney admitted to practice law in one or more jurisdictions.

66. The Defendant, Mae D'Agostino, ("D'AGOSTINO"), is a Fake Judge on the United States District Court for the Northern District of New York. D'AGOSTINO is sued in her individual capacity and in her official capacity as a Fake Judge of the United States District Court for the Northern District of New York. D'AGOSTINO is an attorney admitted to practice law in one or more jurisdictions.

67. The Defendant, Edward Davila, ("DAVILLA"), is a Fake Judge on the United States District Court for the Northern District of California. DAVILLA is sued individually and in his official capacity as a Fake Judge of the United States District Court for the Northern District of California. DAVILLA is an attorney admitted to practice law in one or more jurisdictions.

68. The Defendant, James Donato, ("DONATO"), is a Fake Judge on the United States District Court for the Northern District of California. DONATO is sued individually and in his official capacity as a Fake Judge of the United States District Court for the

Northern District of California. DONATO is an attorney admitted to practice law in one or more jurisdictions.

69. The Defendant, Ann Donnelly, ("DONNELLY"), is a Fake Judge on the United States District Court for the Eastern District of New York. DONNELLY is sued in her individual capacity and in her official capacity as a Fake Judge of the United States District Court for the Eastern District of New York. DONNELLY is an attorney admitted to practice law in one or more jurisdictions.

70. The Defendant, Christopher Droney, ("DRONEY"), is a Fake Judge on the United States Court of Appeals for the Second Circuit. DRONEY is sued in his individual capacity and in his official capacity as a Fake Judge of the Court of Appeals for the Second Circuit. DRONEY is an attorney admitted to practice law in one or more jurisdictions.

71. The Defendant, Thomas M. Durkin, ("FAKE JUDGE DURKIN"), is a Fake Judge on the United States District Court for the Northern District of Illinois. FAKE JUDGE DURKIN is sued individually and in his official capacity as a Fake Judge of the United States District Court for the Northern District of Illinois. FAKE JUDGE DURKIN is an attorney admitted to practice law in one or more jurisdictions.

72. The Defendant, Sara Ellis, ("ELLIS"), is a Fake Judge on the United States District Court for the Northern District of Illinois. ELLIS is sued individually and in her official capacity as a Fake Judge of the United States District Court for the Northern District of Illinois. ELLIS is an attorney admitted to practice law in one or more jurisdictions.

73. The Defendant, Paul Engelmeyer, ("ENGELMEYER"), is a Fake Judge on the United States District Court for the Southern District of New York. ENGELMEYER is sued in

his individual capacity and in his official capacity as a Fake Judge of the United States District Court for the Southern District of New York. ENGELMEYER is an attorney admitted to practice law in one or more jurisdictions.

74. The Defendant, Katherine Failla, ("FAILLA"), is a Fake Judge on the United States District Court for the Southern District of New York. FAILLA is sued in her individual capacity and in her official capacity as a Fake Judge of the United States District Court for the Southern District of New York. FAILLA is an attorney admitted to practice law in one or more jurisdictions.

75. The Defendant, Robert Farrell ("FARRELL") is clerk of the United States District Court for the District of Massachusetts. FARRELL is sued individually and in his official capacity as clerk of the United States District Court for the District of Massachusetts. FARRELL maintains a principal office at 1 COURTHOUSE WAY.

76. The Defendant, Michael Fatale ("FATALE"), was and/or is an employee of Boston College Law School. FATALE is sued individually and in his official capacity as an employee of the Massachusetts Department of Revenue. At all times or during a portion of the times relevant to this Complaint, FATALE was an employee of DOR. FATALE is a former student at and graduate of Boston College Law School. FATALE maintains a principal office at 100 Cambridge Street, Boston, County of Suffolk, Commonwealth of Massachusetts. FATALE is an attorney admitted to practice law in one or more jurisdictions.

77. The Defendant, Gary Feinerman, ("FEINERMAN"), is a Fake Judge on the United States District Court for the Northern District of Illinois. FEINERMAN is sued individually

and in his official capacity as a Fake Judge of the United States District Court for the Northern District of Illinois. FEINERMAN is an attorney admitted to practice law in one or more jurisdictions.

78. The Defendant, Michelle Friedland, ("FRIEDLAND"), is a Fake Judge on the United States Court of Appeals for the Ninth Circuit. FRIEDLAND is sued in her individual capacity and in his official capacity as a Fake Judge of the Court of Appeals for the Ninth Circuit. FRIEDLAND is an attorney admitted to practice law in one or more jurisdictions.

79. The Defendant, Jesse Furman, ("FURMAN"), is a Fake Judge on the United States District Court for the Southern District of New York. FURMAN is sued in his individual capacity and in his official capacity as a Fake Judge of the United States District Court for the Southern District of New York. FURMAN is an attorney admitted to practice law in one or more jurisdictions.

80. The Defendant, Ralph Gants, ("GANTS"), is Chief Justice of the Supreme Judicial Court of the Commonwealth of Massachusetts. GANTS is sued in his individual capacity and in his official capacity as Chief Justice of the Supreme Judicial Court of the Commonwealth of Massachusetts. GANTS is an attorney admitted to practice law in one or more jurisdictions.

81. The Defendant, Merrick Garland, ("GARLAND"), is a Judge on the United States District Court for the District of Columbia. GARLAND is sued in his individual capacity and in his official capacity as a Judge of the United States District Court for the District

of Columbia. GARLAND is an attorney admitted to practice law in one or more jurisdictions.

82. The Defendant, Darrin Gayles, ("GAYLES"), is a Fake Judge on the United States District Court for the Southern District of Florida. GAYLES is sued individually and in his official capacity as a Fake Judge of the United States District Court for the Southern District of Florida. GAYLES is an attorney admitted to practice law in one or more jurisdictions.

83. The Defendant, Linda Giles ("GILES") is sued individually and in her official capacity as Justice of the Superior Court of the Commonwealth of Massachusetts. GILES maintains a principal office at 3 PEMBERTON SQUARE. GILES is an attorney admitted to practice law in one or more jurisdictions.

84. The Defendant, Haywood Gilliam, ("GILLIAM"), is a Fake Judge on the United States District Court for the Northern District of California. GILLIAM is sued individually and in his official capacity as a Fake Judge of the United States District Court for the Northern District of California. GILLIAM is an attorney admitted to practice law in one or more jurisdictions.

85. The Defendant, Nelva Gonzales Ramos, ("GONZALES RAMOS"), is a Fake Judge on the United States District Court for the Southern District of Texas. GONZALES RAMOS is sued individually and in her official capacity as a Fake Judge of the United States District Court for the Southern District of Texas. GONZALES RAMOS is an attorney admitted to practice law in one or more jurisdictions.

86. The Defendant, Yvonne Gonzalez Rogers, ("GONZALEZ ROGERS"), is a Fake Judge on the United States District Court for the Northern District of California. GONZALEZ ROGERS is sued individually and in her official capacity as a Fake Judge of the United States District Court for the Northern District of California. GONZALEZ ROGERS is an attorney admitted to practice law in one or more jurisdictions.

87. The Defendant, James Graves, Jr. ("GRAVES"), is a Fake Judge on the U.S. Court of Appeals for the Fifth Circuit. GRAVES is sued individually and in his official capacity as a Fake Judge of the Court of Appeals for the Fifth Circuit. GRAVES is an attorney admitted to practice law in one or more jurisdictions.

88. The Defendant, Karen Green ("GREEN") is sued individually and in her official capacity as Justice of the Superior Court of the Commonwealth of Massachusetts. GREEN maintains a principal office at 3 PEMBERTON SQUARE. GREEN is an attorney admitted to practice law in one or more jurisdictions. GREEN worked for more than 10 years at WILMERHALE in Boston, Massachusetts.

89. The Defendant, Lashann Hall, ("HALL"), is a Fake Judge on the United States District Court for the Eastern District of New York. HALL is sued individually and in his official capacity as a Fake Judge of the United States District Court for the Eastern District of New York. HALL is an attorney admitted to practice law in one or more jurisdictions.

90. The Defendant, George Hanks, Jr., ("HANKS"), is a Fake Judge on the United States District Court for the Southern District of Texas. HANKS is sued individually and in his official capacity as a Fake Judge of the United States District Court for the Southern

District of Texas.  HANKS is an attorney admitted to practice law in one or more jurisdictions.

91.  The Defendant, David Hamilton, ("HAMILTON"), is a Fake Judge on the United States Court of Appeals for the Seventh Circuit.  HAMILTON is sued individually and in his official capacity as a Fake Judge on the United States Court of Appeals for the Seventh Circuit.  HANKS is an attorney admitted to practice law in one or more jurisdictions.

92.  The Defendant, Maura Healey ("HEALEY"), is sued individually and in her official capacity as Attorney General of the Commonwealth of Massachusetts (the "OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH").  HEALEY maintains a principal office at One Ashburton Place, Boston, County of Suffolk, Commonwealth of Massachusetts.  HEALEY resides at 40 WINTHROP STREET.*  HEALEY is an attorney admitted to practice law in one or more jurisdictions.  HEALEY is married to the defendant, Gabrielle Wolohojian.  Prior to becoming Attorney General of the Commonwealth, HEALEY worked for approximately 11 years at WILMERHALE in Boston, Massachusetts.

93.  The Defendant, Stephen Higginson ("HIGGINSON"), is a Fake Judge on the U.S. Court of Appeals for the Fifth Circuit.  HIGGINSON is sued individually and in his official capacity as a Fake Judge of the Court of Appeals for the Fifth Circuit.  HIGGINSON is an attorney admitted to practice law in one or more jurisdictions.

94.  The Defendant, Timothy Hillman, ("HILLMAN"), is a Fake Judge on the United States District Court for the District of Massachusetts.  HILLMAN is sued individually and in his official capacity as a Fake Judge of the United States District Court for the District of

Massachusetts. HILLMAN is an attorney admitted to practice law in one or more jurisdictions.

95. The Defendant, Beryl Howell, ("HOWELL"), is a Fake Judge on the United States District Court for the District of Columbia. HOWELL is sued individually and in his official capacity as a Fake Judge of the United States District Court for the District of Columbia. HOWELL is an attorney admitted to practice law in one or more jurisdictions.

96. The Defendant, Andrew Hurwitz, ("HURWITZ"), is a Fake Judge on the United States Court of Appeals for the Ninth Circuit. HURWITZ is sued in his individual capacity and in his official capacity as a Fake Judge of the Court of Appeals for the Ninth Circuit. HURWITZ is an attorney admitted to practice law in one or more jurisdictions.

97. The Defendant, Sharon Johnson Coleman, ("JOHNSON COLEMAN"), is a Fake Judge on the United States District Court for the Northern District of Illinois. JOHNSON COLEMAN is sued in individually and in her official capacity as a Fake Judge of the United States District Court for the Northern District of Illinois. JOHNSON COLEMAN is an attorney admitted to practice law in one or more jurisdictions.

98. The Defendant, Adalberto Jordan, ("JORDAN"), is a Fake Judge on the United States Court of Appeals for the Eleventh Circuit. JORDAN is sued in his individual capacity and in his official capacity as a Fake Judge of the Court of Appeals for the Eleventh Circuit. JORDAN is an attorney admitted to practice law in one or more jurisdictions.

99. The Defendant, Elena Kagan, ("KAGAN"), is a Fake Justice on the Supreme Court of the United States. KAGAN is sued individually and in her official capacity as a Fake Justice

of the Supreme Court of the United States. KAGAN is an attorney admitted to practice law in one or more jurisdictions.

100. The Defendant, Gary Katzmann ("KATZMANN"), is a Fake Judge on the U.S. Court of International Trade. KATZMANN is sued individually and in his official capacity as a Fake Judge of the U.S. Court of International Trade. KATZMANN maintains a principal office at the U.S. Court of International Trade in New York, New York. KATZMANN is an attorney admitted to practice law in one or more jurisdictions.

101. The Defendant, William Kayatta, Jr. ("KAYATTA"), is a Fake Judge on the U.S. Court of Appeals for the First Circuit. KAYATTA is sued individually and in his official capacity as a Fake Judge of the Court of Appeals for the First Circuit. KAYATTA is an attorney admitted to practice law in one or more jurisdictions.

102. The Defendant, C. Jeffrey Kinder, ("KINDER"), is an associate justice of the Massachusetts Appeals Court. KINDER is sued individually and in his official capacity as Associate Justice of the Massachusetts Appeals Court. KINDER is an attorney admitted to practice law in one or more jurisdictions.

103. The Defendant, Lucy Koh, ("LUCY KOH"), is a Fake Judge on the United States District Court for the Northern District of California. LUCY KOH is sued individually and in her official capacity as a Fake Judge of the United States District Court for the Northern District of California. LUCY KOH is an attorney admitted to practice law in one or more jurisdictions.

104. The Defendant, Eric Komitee, ("KOMITEE"), is a Fake Judge on the United States District Court for the Eastern District of New York. KOMITEE is sued individually and

in his official capacity as a Fake Judge of the United States District Court for the Eastern District of New York. KOMITEE is an attorney admitted to practice law in one or more jurisdictions.

105. The Defendant, Rachel Kovner, ("KOVNER"), is a Fake Judge on the United States District Court for the Eastern District of New York. KOVNER is sued individually and in her official capacity as a Fake Judge of the United States District Court for the Eastern District of New York. KOVNER is an attorney admitted to practice law in one or more jurisdictions.

106. The Defendant, William Kuntz, ("KUNTZ"), is a Fake Judge on the United States District Court for the Eastern District of New York. KUNTZ is sued individually and in his official capacity as a Fake Judge of the United States District Court for the Eastern District of New York. KUNTZ is an attorney admitted to practice law in one or more jurisdictions.

107. The Defendant, Beth Labson Freeman, ("LABSON FREEMAN"), is a Fake Judge on the United States District Court for the Northern District of California. LABSON FREEMAN is sued individually and in her official capacity as a Fake Judge of the United States District Court for the Northern District of California. LABSON FREEMAN is an attorney admitted to practice law in one or more jurisdictions.

108. The Defendant, John Lee, ("LEE"), is a Fake Judge on the United States District Court for the Northern District of Illinois. LEE is sued individually and in his official capacity as a Fake Judge of the United States District Court for the Northern District of Illinois. LEE is an attorney admitted to practice law in one or more jurisdictions.

109. The Defendant, Jon Levy, ("LEVY"), is a Fake Chief Judge on the United States District Court for the District of Maine. LEVY is sued individually and in his official capacity as a Fake Chief Judge of the United States District Court for the District of Maine. LEVY is an attorney admitted to practice law in one or more jurisdictions.

110. The Defendant, Raymond Lohier, Jr. ("LOHIER"), is a Fake Judge on the U.S. Court of Appeals for the Second Circuit. LOHIER is sued individually and in his official capacity as a Fake Judge of the Court of Appeals for the Second Circuit. LOHIER is an attorney admitted to practice law in one or more jurisdictions.

111. The Defendant, David Lowy ("LOWY"), is a justice of the Massachusetts Supreme Judicial Court. LOWY is sued individually and in his official capacity as a justice of the Massachusetts Supreme Judicial Court. LOWY maintains a principal office at 1 Pemberton Square, Boston, County of Suffolk, Commonwealth of Massachusetts. LOWY is an attorney admitted to practice law in one or more jurisdictions.

112. The Defendant, Jorge Luis Alonso, ("LUIS ALONSO"), is a Fake Judge on the United States District Court for the Northern District of Illinois. LUIS ALONSO is sued individually and in his official capacity as a Fake Judge of the United States District Court for the Northern District of Illinois. LUIS ALONSO is an attorney admitted to practice law in one or more jurisdictions.

113. The Defendant, Gerard Lynch, ("GERARD LYNCH"), is a Fake Judge on the U.S. Court of Appeals for the Second Circuit. GERARD LYNCH is sued individually and in his official capacity as a Fake Judge of the Court of Appeals for the Second Circuit. GERARD LYNCH is an attorney admitted to practice law in one or more jurisdictions.

114. The Defendant, Sandra Lynch ("SANDRA LYNCH"), is a judge on the United States Court of Appeals for the First Circuit. SANDRA LYNCH maintains a principal office at 1 COURTHOUSE WAY. SANDRA LYNCH is sued individually and in her official capacity as a judge of the Court of Appeals for the First Circuit. SANDRA LYNCH is an attorney admitted to practice law in one or more jurisdictions.

115. The Defendant, Marina Marmolejo, ("MARMOLEJO"), is a Fake Judge on the United States District Court for the Southern District of Texas. MARMOLEJO is sued individually and in her official capacity as a Fake Judge of the United States District Court for the Southern District of TEXAS. MARMOLEJO is an attorney admitted to practice law in one or more jurisdictions.

116. The Defendant, Beverly Martin, ("MARTIN"), is a Fake Judge on the United States Court of Appeals for the Eleventh Circuit. MARTIN is sued individually capacity and in her official capacity as a Fake Judge of the Court of Appeals for the Eleventh Circuit. MARTIN is an attorney admitted to practice law in one or more jurisdictions.

117. The Defendant, William Martinez, ("MARTINEZ"), is Fake Judge on the United States District Court for the District of Colorado. MARTINEZ is sued in his individual capacity and in his official capacity as Fake Judge of the United States District Court for the District of Colorado. MARMOLEJO is an attorney admitted to practice law in one or more jurisdictions.

118. The Defendant, Scott Matheson, Jr. ("MATHESON"), is a Fake Judge on the United States Court of Appeals for the Tenth Circuit. MATHESON is sued individually and in

his official capacity as a Fake Judge of the Court of Appeals for the Tenth Circuit. MATHESON is an attorney admitted to practice law in one or more jurisdictions.

119. The Defendant, Mark Mastroianni, ("MASTROIANNI"), is Fake Judge on the United States District Court for the District of Massachusetts. MASTROIANNI is sued in his individual capacity and in his official capacity as Fake Judge of the United States District Court for the District of Massachusetts. MASTROIANNI is an attorney admitted to practice law in one or more jurisdictions.

120. The Defendant, Amos Mazzant III, ("MAZZANT"), is a Fake Judge on the United States District Court for the Eastern District of Texas. MAZZANT is sued individually and in his official capacity as a Fake Judge of the United States District Court for the Eastern District of Texas. MAZZANT is an attorney admitted to practice law in one or more jurisdictions.

121. The Defendant, Landya McCafferty, ("MCCAFFERTY"), is Fake Chief Judge on the United States District Court for the District of New Hampshire. MCCAFFERTY maintains a principal office at the Warren Rudman Federal Courthouse. MCCAFFERTY is sued in her individual capacity and in her official capacity as Fake Chief Judge of the United States District Court for the District of New Hampshire. MCCAFFERTY is an attorney admitted to practice law in one or more jurisdictions.

122. The Defendant, John J. McConnell, Jr., ("MCCONNELL"), is Fake Judge on the United States District Court for the District of Rhode Island. MCCONNELL is sued in his individual capacity and in his official capacity as Fake Judge of the United States District

Court for the District of Rhode Island. MCCONNELL is an attorney admitted to practice law in one or more jurisdictions.

123. The Defendant, Carolyn McHugh, ("MCHUGH"), is a Fake Judge on the United States Court of Appeals for the Tenth Circuit. MCHUGH is sued individually and in her official capacity as a Fake Judge of the Court of Appeals for the Tenth Circuit. MCHUGH is an attorney admitted to practice law in one or more jurisdictions.

124. The Defendant, Amit Mehta, ("MEHTA"), is Fake Judge on the United States District Court for the District of Columbia. MEHTA is sued in his individual capacity and in his official capacity as Fake Judge of the United States District Court for the District of Columbia. MEHTA is an attorney admitted to practice law in one or more jurisdictions.

125. The Defendant, Patricia Millett, ("MILLETT"), is a Fake Judge on the United States Court of Appeals for the District of Columbia Circuit. MILLETT is sued individually and in her official capacity as a judge of the Court of Appeals for the District of Columbia Circuit. MILLETT is an attorney admitted to practice law in one or more jurisdictions.

126. The Defendant, Nancy Moritz, ("MORITZ"), is a Fake Judge on the United States Court of Appeals for the Tenth Circuit. MORITZ is sued individually and in her official capacity as a Fake Judge of the Court of Appeals for the Tenth Circuit. MORITZ is an attorney admitted to practice law in one or more jurisdictions.

127. The Defendant, Randolph Moss, ("MOSS"), is Fake Judge on the United States District Court for the District of Columbia. MOSS is sued in his individual capacity and in his official capacity as Fake Judge of the United States District Court for the District of Columbia. MOSS is an attorney admitted to practice law in one or more jurisdictions.

128. The Defendant, Mary Murguia, ("MURGUIA"), is a Fake Judge on the United States Court of Appeals for the Ninth Circuit. MURGUIA is sued in her individual capacity and in his official capacity as a Fake Judge of the Court of Appeals for the Ninth Circuit. MURGUIA is an attorney admitted to practice law in one or more jurisdictions.

129. The Defendant, Alison Nathan, ("NATHAN"), is a Fake Judge on the United States District Court for the Southern District of New York. NATHAN is sued in her individual capacity and in her official capacity as a Fake Judge of the United States District Court for the Southern District of New York. NATHAN is an attorney admitted to practice law in one or more jurisdictions.

130. The Defendant, Eric Neyman, ("NEYMAN"), is an associate justice of the Massachusetts Appeals Court. NEYMAN is sued individually and in his official capacity as Associate Justice of the Massachusetts Appeals Court. NEYMAN maintains a principal office at 1 Pemberton Square, Boston, County of Suffolk, Commonwealth of Massachusetts. NEYMAN is an attorney admitted to practice law in one or more jurisdictions.

131. The Defendant, Jacqueline Nguyen, ("NGUYEN"), is a Fake Judge on the United States Court of Appeals for the Ninth Circuit. NGUYEN is sued in her individual capacity and in his official capacity as a Fake Judge of the Court of Appeals for the Ninth Circuit. NGUYEN is an attorney admitted to practice law in one or more jurisdictions.

132. The Defendant, George O'Toole, Jr. ("O'TOOLE"), is a senior district judge on the United States District Court for the District of Massachusetts. O'TOOLE is sued individually and in his official capacity as a judge of the United States District Court for the District of Massachusetts. O'TOOLE maintains a principal office at 1

COURTHOUSE WAY. O'TOOLE is an attorney admitted to practice law in one or more jurisdictions. O'TOOLE was the district judge in a case in which THE RELATOR was a party (the "Rigged O'Toole Action," U.S. District Court for the District of Massachusetts case number 14-14303-GAO).

133. The Defendant, J. Paul Oetken, ("OETKEN"), is a Fake Judge on the United States District Court for the Southern District of New York. OETKEN is sued in his individual capacity and in his official capacity as a Fake Judge of the United States District Court for the Southern District of New York. OETKEN is an attorney admitted to practice law in one or more jurisdictions.

134. The Defendant, William Orrick III, ("ORRICK"), is a Fake Judge on the United States District Court for the Northern District of California. ORRICK is sued individually and in his official capacity as a Fake Judge of the United States District Court for the Northern District of California. ORRICK is an attorney admitted to practice law in one or more jurisdictions.

135. The Defendant, John Owens, ("OWENS"), is a Fake Judge on the United States Court of Appeals for the Ninth Circuit. OWENS is sued in his individual capacity and in his official capacity as a Fake Judge of the Court of Appeals for the Ninth Circuit. OWENS is an attorney admitted to practice law in one or more jurisdictions.

136. The Defendant, Gregory Phillips, ("PHILLIPS"), is a Fake Judge on the United States Court of Appeals for the Tenth Circuit. PHILLIPS is sued individually and in his official capacity as a Fake Judge of the Court of Appeals for the Tenth Circuit. PHILLIPS is an attorney admitted to practice law in one or more jurisdictions.

137. The Defendant, Cornelia Pillard, ("PILLARD"), is a Fake Judge on the United States Court of Appeals for the District of Columbia Circuit. PILLARD is sued individually and in her official capacity as a Fake Judge of the Court of Appeals for the District of Columbia Circuit. PILLARD is an attorney admitted to practice law in one or more jurisdictions.

138. The Defendant, Robert Pitman, ("PITMAN"), is a Fake Judge on the United States District Court for the Western District of Texas. PITMAN is sued individually and in his official capacity as a Fake Judge of the United States District Court for the Western District of Texas. PITMAN is an attorney admitted to practice law in one or more jurisdictions.

139. The Defendant, Jill Pryor, ("PRYOR"), is a Fake Judge on the United States Court of Appeals for the Eleventh Circuit. PRYOR is sued individually capacity and in her official capacity as a Fake Judge of the Court of Appeals for the Eleventh Circuit. PRYOR is an attorney admitted to practice law in one or more jurisdictions.

140. The Defendant, Edgardo Ramos, ("RAMOS"), is a Fake Judge on the United States District Court for the Southern District of New York. RAMOS is sued in his individual capacity and in his official capacity as a Fake Judge of the United States District Court for the Southern District of New York. RAMOS is an attorney admitted to practice law in one or more jurisdictions.

141. The Defendant, John Robert Blakey, ("ROBERT BLAKEY"), is a Fake Judge on the United States District Court for the Northern District of Illinois. ROBERT BLAKEY is sued individually and in his official capacity as a Fake Judge of the United States District

Court for the Northern District of Illinois. ROBERT BLAKEY is an attorney admitted to practice law in one or more jurisdictions.

142. The Defendant, John Roberts, ("ROBERTS"), is Chief Justice of the Supreme Court of the United States. ROBERTS is sued individually and in his official capacity as Chief Justice of the Supreme Court of the United States. ROBERTS is an attorney admitted to practice law in one or more jurisdictions.

143. The Defendant, James Rodney Gilstrap, ("RODNEY GILSTRAP"), is Fake Chief Judge on the United States District Court for the Eastern District of Texas. RODNEY GILSTRAP is sued individually and in his official capacity as Fake Chief Judge of the United States District Court for the Eastern District of Texas. RODNEY GILSTRAP is an attorney admitted to practice law in one or more jurisdictions.

144. The Defendant, Jose Rolando Olvera, Jr., ("ROLANDO OLVERA"), is a Fake Judge on the United States District Court for the Southern District of Texas. ROLANDO OLVERA is sued individually and in his official capacity as a Fake Judge of the United States District Court for the Southern District of Texas. ROLANDO OLVERA is an attorney admitted to practice law in one or more jurisdictions.

145. The Defendant, Nelson Roman, ("NELSON ROMAN"), is a Fake Judge on the United States District Court for the Southern District of New York. NELSON ROMAN is sued in his individual capacity and in his official capacity as a Fake Judge of the United States District Court for the Southern District of New York. NELSON ROMAN is an attorney admitted to practice law in one or more jurisdictions.

146.   The Defendant, Robin Rosenbaum, ("ROSENBAUM"), is a Fake Judge on the United States Court of Appeals for the Eleventh Circuit. ROSENBAUM is sued individually capacity and in her official capacity as a Fake Judge of the Court of Appeals for the Eleventh Circuit. ROSENBAUM is an attorney admitted to practice law in one or more jurisdictions.

147.   The Defendant, Robin Rosenberg, ("ROSENBERG"), is a Fake Judge on the United States District Court for the Southern District of Florida. ROSENBERG is sued individually and in her official capacity as a Fake Judge of the United States District Court for the Southern District of Florida. ROSENBERG is an attorney admitted to practice law in one or more jurisdictions.

148.   The Defendant, Diana Saldana, ("SALDANA"), is a Fake Judge on the United States District Court for the Southern District of Texas. SALDANA is sued individually and in her official capacity as a Fake Judge of the United States District Court for the Southern District of Texas. SALDANA is an attorney admitted to practice law in one or more jurisdictions.

149.   The Defendant, Brenda Sannes, ("SANNES"), is a Fake Judge on the United States District Court for the Northern District of New York. SANNES is sued individually and in her official capacity as a Fake Judge of the United States District Court for the Northern District of New York. SANNES is an attorney admitted to practice law in one or more jurisdictions.

150.   The Defendant, Patti Saris ("SARIS") is a Judge of the United States District Court for the District of Massachusetts. SARIS sued individually and in her official capacity as a

Judge of the United States District Court for the District of Massachusetts. SARIS maintains a principal office at 1 COURTHOUSE WAY.

151. The Defendant, Lorna Schofeld, ("SCHOFELD"), is a Fake Judge on the United States District Court for the Southern District of New York. SCHOFELD is sued in her individual capacity and in her official capacity as a Fake Judge of the United States District Court for the Southern District of New York. SCHOFELD is an attorney admitted to practice law in one or more jurisdictions.

152. The Defendant, Robert Schroeder III, ("SCHROEDER"), is a Fake Judge on the United States District Court for the Eastern District of Texas. SCHROEDER is sued individually and in his official capacity as a Fake Judge of the United States District Court for the Eastern District of Texas. SCHROEDER is an attorney admitted to practice law in one or more jurisdictions.

153. The Defendant, Robert Scola Jr., ("SCOLA"), is a Fake Judge on the United States District Court for the Southern District of Florida. SCOLA is sued individually and in his official capacity as a Fake Judge of the United States District Court for the Southern District of Florida. SCOLA is an attorney admitted to practice law in one or more jurisdictions.

154. The Defendant, Richard Seeborg, ("SEEBORG"), is a Fake Judge on the United States District Court for the Northern District of California. SEEBORG is sued individually and in his official capacity as a Fake Judge of the United States District Court for the Northern District of California. SEEBORG is an attorney admitted to practice law in one or more jurisdictions.

155. The Defendant, Manish Shah, ("SHAH"), is a Fake Judge on the United States District Court for the Northern District of Illinois. SHAH is sued individually and in his official capacity as a Fake Judge of the United States District Court for the Northern District of Illinois. SHAH is an attorney admitted to practice law in one or more jurisdictions.

156. The Defendant, Teagan Snyder, ("SNYDER"), is an Employee of the United States District Court for the District of Maine. SNYDER is sued in her individual capacity and in her official capacity as an Employee of the United States District Court for the District of Maine.

157. The Defendant, Leo Sorokin ("SOROKIN"), is a Fake Judge on the United States District Court for the District of Massachusetts. SOROKIN is sued in his individual capacity and in his official capacity as a Fake Judge of the United States District Court for the District of Massachusetts. SOROKIN maintains a principal office at 1 COURTHOUSE WAY. SOROKIN is an attorney admitted to practice law in one or more jurisdictions. SOROKIN resides at 100 DAVIS AVENUE.*

158. The Defendant, Sonia Sotomayor, ("SOTOMAYOR"), is a Fake Justice on the Supreme Court of the United States. SOTOMAYOR is sued individually and in her official capacity as a Fake Justice of the Supreme Court of the United States. SOTOMAYOR is an attorney admitted to practice law in one or more jurisdictions.

159. The Defendant, Debra Squires-Lee ("SQUIRES-LEE") is sued individually and in her official capacity as Justice of the Superior Court of the Commonwealth of Massachusetts. SQUIRES-LEE maintains a principal office at 3 PEMBERTON SQUARE. SQUIRES-

LEE is an attorney admitted to practice law in one or more jurisdictions. SQUIRES-LEE was and/or is an employee of Boston College Law School.

160. The Defendant, Sri Srinivasan, ("SRINIVASAN"), is Fake Chief Judge on the United States Court of Appeals for the District of Columbia Circuit. SRINIVASAN is sued individually and in his official capacity as Fake Chief Judge of the Court of Appeals for the District of Columbia Circuit. SRINIVASAN is an attorney admitted to practice law in one or more jurisdictions.

161. The Defendant, Eric Storms, ("STORMS"), is Chief Deputy Clerk of the United States District Court for the District of Maine. STORMS is sued in his individual capacity and in his official capacity as Chief Deputy Clerk of the United States District Court for the District of Maine.

162. The Defendant, Indira Talwani, ("TALWANI"), is a Fake Judge on the United States District Court for the District of Massachusetts. TALWANI is sued in her individual capacity and in her official capacity as a Fake Judge of the United States District Court for the District of Massachusetts. TALWANI is an attorney admitted to practice law in one or more jurisdictions.

163. The Defendant, John Tharp, ("THARP"), is a Fake Judge on the United States District Court for the Northern District of Illinois. THARP is sued in his individual capacity and in his official capacity as a Fake Judge of the United States District Court for the Northern District of Illinois. THARP is an attorney admitted to practice law in one or more jurisdictions.

164. The Defendant, O. Rogeriee Thompson, ("THOMPSON"), is a Fake Judge on the United States Court of Appeals for the First Circuit. THOMPSON is sued individually and in her official capacity as a Fake Judge of the Court of Appeals for the First Circuit. THOMPSON is an attorney admitted to practice law in one or more jurisdictions.

165. The Defendant, Jon Tigar, ("TIGAR"), is a Fake Judge on the United States District Court for the Northern District of California. TIGAR is sued individually and in his official capacity as a Fake Judge of the United States District Court for the Northern District of California. TIGAR is an attorney admitted to practice law in one or more jurisdictions.

166. The Defendant, Annalisa Torres, ("TORRES"), is a Fake Judge on the United States District Court for the Southern District of New York. TORRES is sued in her individual capacity and in her official capacity as a Fake Judge of the United States District Court for the Southern District of New York. TORRES is an attorney admitted to practice law in one or more jurisdictions.

167. The Defendant, Nancy Torresen, ("TORRESEN"), is a Fake Judge on the United States District Court for the District of Maine. TORRESEN is sued in her individual capacity and in her official capacity as a Fake Judge of the United States District Court for the District of Maine. TORRESEN is an attorney admitted to practice law in one or more jurisdictions.

168. The Defendant, Robert Ullmann ("ULLMANN"), was and/or is an employee of Boston College Law School and is a Justice of the Superior Court of the Commonwealth of Massachusetts. ULLMANN is sued individually and in his official capacity as a Justice

of the Superior Court of the Commonwealth of Massachusetts. ULLMANN maintains a principal office at 3 PEMBERTON SQUARE. ULLMANN is an attorney admitted to practice law in one or more jurisdictions.

169. The Defendant, Martin Walsh ("WALSH"), is the Mayor of the City of Boston, Massachusetts. WALSH is sued individually and in his official capacity as Mayor of the City of Boston.

170. The Defendant, Paul Watford, ("WATFORD"), is a Fake Judge on the United States Court of Appeals for the Ninth Circuit. WATFORD is sued in his individual capacity and in his official capacity as a Fake Judge of the Court of Appeals for the Ninth Circuit. WATFORD is an attorney admitted to practice law in one or more jurisdictions.

171. The Defendant, Robert Wilkins, ("WILKINS"), is a Fake Judge on the United States Court of Appeals for the District of Columbia Circuit. WILKINS is sued individually and in his official capacity as a Fake Judge of the Court of Appeals for the District of Columbia Circuit. WILKINS is an attorney admitted to practice law in one or more jurisdictions.

172. The Defendant, Kathleen Williams, ("WILLIAMS"), is a Fake Judge on the United States District Court for the Southern District of Florida. WILLIAMS is sued individually and in her official capacity as a Fake Judge of the United States District Court for the Southern District of Florida. WILLIAMS is an attorney admitted to practice law in one or more jurisdictions.

173. The Defendant, Gabrielle Wolohojian ("WOLOHOJIAN"), is a justice of the Massachusetts Appeals Court. WOLOHOJIAN is sued individually and in her official

capacity as Associate Justice of the Massachusetts Appeals Court. WOLOHOJIAN resides at 40 WINTHROP STREET.* WOLOHOJIAN is an attorney admitted to practice law in one or more jurisdictions. WOLOHOJIAN worked for approximately 20 years at WILMERHALE in Boston, Massachusetts.

174. The Defendant, Andrea Wood, ("WOOD"), is a Fake Judge on the United States District Court for the Northern District of Illinois. WOOD is sued individually and in her official capacity as a Fake Judge of the United States District Court for the Northern District of Illinois. WOOD is an attorney admitted to practice law in one or more jurisdictions.

175. The Defendant, Gregory Woods, ("WOODS"), is a Fake Judge on the United States District Court for the Southern District of New York. WOODS is sued in his individual capacity and in his official capacity as a Fake Judge of the United States District Court for the Southern District of New York. WOODS is an attorney admitted to practice law in one or more jurisdictions.

176. The Defendant, Amy Crafts ("CRAFTS"), is sued individually and in her official capacity as Assistant Attorney General of the Commonwealth. CRAFTS maintains a principal office at One Ashburton Place, Boston, County of Suffolk, Commonwealth of Massachusetts. CRAFTS is an attorney admitted to practice law in one or more jurisdictions.

177. The Defendant, Pierce O. Cray ("CRAY"), is sued individually and in his official capacity as Assistant Attorney General of the Commonwealth. CRAY maintains a principal office at One Ashburton Place, Boston, County of Suffolk, Commonwealth of

Massachusetts. CRAY is an attorney admitted to practice law in one or more jurisdictions.

178. The Defendant, Gillian Feiner ("FEINER"), is sued individually and in her official capacity as Assistant Attorney General of the Commonwealth. FEINER maintains a principal office at One Ashburton Place, Boston, County of Suffolk, Commonwealth of Massachusetts. FEINER is an attorney admitted to practice law in one or more jurisdictions.

179. The Defendant, Dean Mazzone ("MAZZONE"), is sued individually and in his official capacity as Assistant Attorney General of the Commonwealth. MAZZONE maintains a principal office at One Ashburton Place, Boston, County of Suffolk, Commonwealth of Massachusetts. MAZZONE is an attorney admitted to practice law in one or more jurisdictions.

180. The Defendant, Howard Meshnick ("MESHNICK"), is sued individually and in his official capacity as Assistant Attorney General of the Commonwealth. MESHNICK maintains a principal office at One Ashburton Place, Boston, County of Suffolk, Commonwealth of Massachusetts. MESHNICK is an attorney admitted to practice law in one or more jurisdictions.

181. The Defendant, James Sweeney ("SWEENEY"), is sued individually and in his official capacity as Assistant Attorney General of the Commonwealth. SWEENEY maintains a principal office at One Ashburton Place, Boston, County of Suffolk, Commonwealth of Massachusetts. SWEENEY is an attorney admitted to practice law in one or more

jurisdictions. SWEENEY is a former student at and graduate of BCLS. SWEENEY was and/or is employed by BCLS.

182. The Defendant, Lorraine Tarrow ("TARROW"), is sued individually and in her official capacity as Assistant Attorney General of the Commonwealth. TARROW maintains a principal office at One Ashburton Place, Boston, County of Suffolk, Commonwealth of Massachusetts. TARROW is an attorney admitted to practice law in one or more jurisdictions.

183. The Defendant, Jeffrey Walker ("WALKER"), is sued individually and in his official capacity as Assistant Attorney General of the Commonwealth. WALKER maintains a principal office at One Ashburton Place, Boston, County of Suffolk, Commonwealth of Massachusetts. WALKER is an attorney admitted to practice law in one or more jurisdictions.

184. The Defendant, Thomas J. Murphy ("MURPHY"), is sued individually and in his official capacity as State Police Officer of the Commonwealth.

185. The Defendant, Jonathan Blodgett (the "ESSEX DA") is sued in his official capacity as District Attorney of Essex County. The ESSEX DA maintains a principal office at 10 Federal Street, 5th Floor, Salem, County of Essex, Commonwealth of Massachusetts.

186. The Defendant, Christopher Harding (the "COMMISSIONER") is sued in his official capacity as Commissioner of the Massachusetts Department of Revenue. The COMMISSIONER maintains a principal office at 100 Cambridge Street, Boston, County of Suffolk, Commonwealth of Massachusetts.

187. The Defendant, Maris Abbene, ("ABBENE"), was and/or is an employee of BCLS. ABBENE is a former student at and graduate of BCLS. ABBENE maintains a principal office at 885 CENTRE STREET. ABBENE is an attorney admitted to practice law in one or more jurisdictions. ABBENE is sued individually.

188. The Defendant, Naa-Sakle Akuete ("AKUETE"), is a former employee of Lehman Brothers Holdings, Inc. and attended the same high school as THE RELATOR at the same time as THE RELATOR with the same graduation year as THE RELATOR. AKUETE is sued individually.

189. The Defendant, Tyler Archer ("ARCHER"), is a former student at and graduate of BCLS. ARCHER is an attorney admitted to practice law in one or more jurisdictions. ARCHER is sued individually.

190. The Defendant, Robert Bloom ("BLOOM"), is a former student at, graduate of, and professor at BCLS. BLOOM is an attorney admitted to practice law in one or more jurisdictions. BLOOM is sued individually.

191. The Defendant, Mark Brodin ("BRODIN"), is a professor at BCLS. BRODIN is an attorney admitted to practice law in one or more jurisdictions. BRODIN is sued individually.

192. The Defendant, Theodore Bunzel ("BUNZEL"), is a former employee of Lehman Brothers Holdings, Inc. and attended the same high school as THE RELATOR at the same time as THE RELATOR with the same graduation year as THE RELATOR. BUNZEL is a member of one or more secret societies, including Skull and Bones.*

BUNZEL is a relative of the defendants, George Walker IV, George W. Bush, and John E. Bush. BUNZEL is sued individually.

193. The Defendant, Judd Carhart, ("CARHART"), is a retired associate justice of the Massachusetts Appeals Court. CARHART was and/or is an attorney admitted to practice law in one or more jurisdictions. CARHART is sued individually and in his official capacity as a Justice of the Massachusetts Appeals Court.

194. The Defendant, R. Michael Cassidy, ("CASSIDY"), was and/or is an employee of BCLS. CASSIDY is sued individually. CASSIDY maintains a principal office at 885 CENTRE STREET. CASSIDY is an attorney admitted to practice law in one or more jurisdictions.*

195. The Defendant, Martha Coakley, ("COAKLEY"), is the former Attorney General of the Commonwealth of Massachusetts. COAKLEY is sued individually and in her former official capacity as Attorney General of the Commonwealth. COAKLEY resides at 46 Coolidge Road, Medford, County of Middlesex, Commonwealth of Massachusetts.* Coakley is an attorney admitted to practice law in one or more jurisdictions.

196. The Defendant, James Cole ("COLE"), is the former Fake Deputy Attorney General of the United States. COLE is an attorney licensed to practice law in one or more jurisdictions. COLE is sued individually and in his former official capacity as Fake Deputy Attorney General of the United States.

197. The Defendant, John Dawley ("DAWLEY"), was and/or is an assistant district attorney for Essex County, Massachusetts and was and/or is an assistant attorney general of the

Commonwealth. DAWLEY is an attorney admitted to practice law in one or more jurisdictions.* DAWLEY is sued individually and in his official capacity, if any.

198. The Defendant, Robert Diamond ("DIAMOND"), is a former executive of Barclays PLC, which purchased the North American operations of Lehman Brothers Holdings, Inc., including 745 7TH AVENUE, in September 2008. DIAMOND is sued individually.

199. The Defendant, Brian Durkin ("BRIAN DURKIN"), is a former student at and graduate of BCLS. BRIAN DURKIN resides at 103 Marlborough Street, Apartment 6, Boston, County of Suffolk, Commonwealth of Massachusetts.* BRIAN DURKIN is an attorney admitted to practice law in one or more jurisdictions. BRIAN DURKIN is the son of the defendant, Thomas Durkin. BRIAN DURKIN is sued individually and in his official capacity, if any.

200. The Defendant, Thomas Durkin ("THOMAS DURKIN"), is a former student at and graduate of BCLS. THOMAS DURKIN resides at 20 Harbor Street, Manchester, County of Essex, Commonwealth of Massachusetts.* THOMAS DURKIN is an attorney admitted to practice law in one or more jurisdictions. THOMAS DURKIN is the father BRIAN DURKIN. THOMAS DURKIN is sued individually.

201. The Defendant, Benjamin Flatgard ("FLATGARD"), is a former federal employee who worked in or around the White House during some portion of one or more of the years 2009-2017. FLATGARD attended the same high school as THE RELATOR at the same time as THE RELATOR with a different graduation year than THE RELATOR. FLATGARD is sued individually and in his official capacity as a former federal employee.

202. The Defendant, Toril Forland ("FORLAND"), is married to the defendant, David Lampert and is the mother of the defendants, Thomas Lampert and Henrik Lampert. FORLAND was and/or is an intelligence agent or officer of Norway and/or an unknown nation or entity.* FORLAND is sued individually.

203. The Defendant, Javier Gonzalez ("JAVIER GONZALEZ"), was charged with conspiracy to distribute five or more kilograms of cocaine as a member and/or associate of an international drug cartel known as the "Gulf Cartel." JAVIER GONZALEZ was the defendant in a state *qui tam* action brought by the RELATOR in 2014. JAVIER GONZALEZ is sued individually.

204. The Defendant, Margaret Goodlander ("GOODLANDER"), is a former law clerk to GARLAND and BREYER. GOODLANDER is an attorney admitted to practice law in one or more jurisdictions. GOODLANDER attended the same high school as THE RELATOR at the same time as THE RELATOR with a different graduation year than THE RELATOR. GOODLANDER was and/or is an intelligence agent or officer of the United States. During some portion of the years 2013 and/or 2014, GOODLANDER was a national security staff member for then-Senator John McCain. GOODLANDER is a member of one or more secret societies.* GOODLANDER is sued individually and in her official capacities as a former federal court law clerk for GARLAND and BREYER as well as a federal intelligence officer.

205. The Defendant, William Hennrikus ("HENNRIKUS"), attended the same high school as THE RELATOR at the same time as THE RELATOR with a different graduation year as

THE RELATOR. HENNRIKUS is a member of one or more secret societies.*

HENNRIKUS is sued individually.

206. The Defendant, Joseph Herlihy ("JOSEPH HERLIHY"), was and/or is an employee of BCLS. JOSEPH HERLIHY is an attorney admitted to practice law in one or more jurisdictions.*. JOSEPH HERLIHY is sued individually.

207. The Defendant, Sarah Herlihy ("SARAH HERLIHY"), is a former student at and graduate of BCLS. SARAH HERLIHY is an attorney admitted to practice law in one or more jurisdictions.* SARAH HERLIHY is sued individually.

208. The Defendant, Eric Holder ("HOLDER"), is the former Fake Attorney General of the United States. HOLDER is an attorney admitted to practice law in one or more jurisdictions. HOLDER is sued individually and in his official capacity as the former Fake Attorney General of the United States.

209. The Defendant, Samuel Hoyle ("HOYLE"), attended the same high school as THE RELATOR at the same time as THE RELATOR with the same graduation year as THE RELATOR. HOYLE is sued individually. HOYLE was and/or is a resident of Manchester-by-the-Sea, Massachusetts or Manchester, Massachusetts.

210. The Defendant, Lilah Hume ("HUME"), attended the same high school as THE RELATOR at the same time as THE RELATOR with the same graduation year as THE RELATOR. HUME is an attorney admitted to practice law in one or more jurisdictions. HUME is a member of one or more secret societies.* HUME is sued individually.

211. The Defendant, Juliette Kayyem ("KAYYEM"), is married to BARRON. KAYYEM is sued individually.

212. The Defendant, Elisabeth Keller ("KELLER"), was and/or is an employee of BCLS. KELLER resides at 29 Shaw Road, Chestnut Hill, County of Norfolk, Commonwealth of Massachusetts.* KELLER is sued individually.

213. The Defendant, Brooks Kenyon ("KENYON"), is a former student at and graduate of BCLS. KENYON was a law clerk for TALWANI and is an attorney admitted to practice law in one or more jurisdictions.* KENYON is sued individually and in his official capacity, if any. During at least some of the time relevant to this Complaint, KENYON resided in

214. The Defendant, Daniel Koh ("DANIEL KOH"), was the Chief of Staff to Mayor of the City of Boston, Massachusetts (the Defendant, Martin Walsh), during some of the time relevant to this Complaint. DANIEL KOH was a grade school classmate of THE RELATOR at the Pike School. DANIEL KOH is sued individually and in his official capacity, if any.

215. The Defendant, Steven Koh ("STEVEN KOH"), is a professor at BCLS. STEVEN KOH was a grade school classmate of THE RELATOR at the Pike School. STEVEN KOH is sued individually.

216. The Defendant, David Lampert ("DAVID LAMPERT"), is married to FORLAND and is the father of the defendants, Thomas Lampert and Henrik Lampert. DAVID LAMPERT is sued individually. DAVID LAMPERT has previously resided and/or currently resides in Manchester-by-the-Sea, Massachusetts or Manchester, Massachusetts.

217. The Defendant, Fay Lampert Shutzer ("FAY LAMPERT"), is married to the defendant, William Shutzer, and is the sister of the defendant, David Lampert. FAY LAMPERT was

68

a teacher at the Dalton School in New York, New York in or around 1974. FAY LAMPERT is a former colleague at the Dalton School in New York, New York of Jeffrey Epstein ("EPSTEIN"), who is alleged to have committed suicide while incarcerated and awaiting trial in federal district court in 2019. FAY LAMPERT is a former associate and/ or friend of EPSTEIN.* FAY LAMPERT is sued individually.

218. The Defendant, Henrik Lampert ("HENRIK LAMPERT"), is the son of FORLAND and DAVID LAMPERT and is the brother of the defendant, THOMAS LAMPERT. HENRIK LAMPERT is a resident of the State of Colorado. HENRIK LAMPERT is sued individually. HENRIK LAMPERT has previously resided and/or currently resides in Manchester-by-the-Sea, Massachusetts or Manchester, Massachusetts.

219. The Defendant, Thomas Lampert ("THOMAS LAMPERT"), is a former student at and graduate of BCLS. THOMAS LAMPERT is sued individually and in his official capacity as a state court law clerk to LOWY and government intern under the defendant, Carmen Ortiz. THOMAS LAMPERT resides at 41 Phillips Street, Boston, County of Suffolk.* THOMAS LAMPERT is an attorney admitted to practice law in one or more jurisdictions. THOMAS LAMPERT has previously resided and/or currently resides in Manchester-by-the-Sea, Massachusetts or Manchester, Massachusetts.

220. The Defendant, Loretta Lynch ("LORETTA LYNCH"), is the former Fake Attorney General of the United States. LORETTA LYNCH is sued individually and in her official capacity as Fake Attorney General of the United States. LORETTA LYNCH is an attorney admitted to practice law in one or more jurisdictions.

221. The Defendant, John Lysohir ("LYSOHIR"), attended the same high school as THE RELATOR at the same time as THE RELATOR with the same graduation year as THE RELATOR. LYSOHIR is a member of one or more secret societies.* LYSOHIR is sued individually.

222. The Defendant, David Mackey ("MACKEY"), was and/or is an employee of BCLS. MACKEY is an attorney admitted to practice law in one or more jurisdictions. MACKEY is a partner in the Boston, Massachusetts office of the law firm, Anderson & Kreiger LLP.

223. The Defendant, Thomas Maffei ("MAFFEI"), was and/or is an employee of BCLS. MAFFEI is sued individually. MAFFEI is a former student at and graduate of BCLS. MAFFEI is an attorney admitted to practice law in one or more jurisdictions.

224. The Defendant, Justin Maloney ("MALONEY"), is a former student at and graduate of BCLS. MALONEY is sued individually. MALONEY is an attorney admitted to practice law in one or more jurisdictions.

225. The Defendant, Temba Maqubela ("TEMBA MAQUBELA"), is the headmaster at Groton School, which is the same high school from which THE RELATOR graduated. TEMBA MAQUBELA became headmaster at Groton School after THE RELATOR graduated from Groton School. TEMBA MAQUBELA is married to the defendant, Vuyelwa Maqubela, and is the father of the defendant, Sikanyiselwe-Sipo Maqubela a/k/a "Kanyi Maqubela." TEMBA MAQUBELA is sued individually.

226. The Defendant, Vuyelwa Maqubela ("VUYELWA MAQUBELA"), was a teacher at the Pike School and taught THE RELATOR during THE RELATOR's time at the Pike

School.  VUYELWA MAQUBELA is married to TEMBA MAQUBELA.  VUYELWA

MAQUBELA is sued individually.

227. The Defendant, Ghislaine Maxwell ("MAXWELL"), is a former associate and/or friend

of EPSTEIN.

228. The Defendant, Carmen Ortiz ("ORTIZ"), is the former Fake U.S. Attorney for the

District of Massachusetts.  ORTIZ is sued individually and in her official capacity as

Fake U.S. Attorney for the District of Massachusetts.  ORTIZ is an attorney admitted to

practice law in one or more jurisdictions.

229. The Defendant, Deval Patrick ("PATRICK"), is the former Governor of the

Commonwealth of Massachusetts.  PATRICK is sued individually and in his official

capacity as the former Governor of the Commonwealth of Massachusetts.  MALONEY is

an attorney admitted to practice law in one or more jurisdictions.

230. The Defendant, Ayanna Pressley ("PRESSLEY"), is the Congresswoman for the Seventh

District of Massachusetts.  PRESSLEY hired and was a supervisor of THE RELATOR on

a presidential campaign during the years 2003 and 2004.  PRESSLEY was a staffer for a

United States Senator and a City Councilor for the City of Boston, Massachusetts during

some of the times relevant to this Complaint.  PRESSLEY is sued individually.

231. The Defendant, Jamil Roman ("JAMIL ROMAN"), was charged with conspiracy to

distribute five or more kilograms of cocaine as a member and/or associate of an

international drug cartel known as the "Gulf Cartel."  JAMIL ROMAN was the defendant

in a state *qui tam* action brought by the RELATOR in 2014.

232. The Defendant, Vincent Rougeau. ("ROUGEAU"), is the dean of BCLS. ROUGEAU is sued individually. ROUGEAU resides at 101 Ash Street, Weston, County of Middlesex, Commonwealth of Massachusetts. ROUGEAU was and/or is an attorney admitted to practice law in one or more jurisdictions.

233. The Defendant, Donald Savery ("SAVERY"), was and/or is an employee of BCLS. SAVERY is sued individually. SAVERY is a former student at and graduate of BCLS. SAVERY was an Assistant United States Attorney under ORTIZ. SAVERY is an attorney admitted to practice law in one or more jurisdictions.

234. The Defendant, Janet Scognamiglio ("SCOGNAMIGLIO") is a former student at and graduate of BCLS. SCOGNAMIGLIO is sued individually.

235. The Defendant, William Shutzer ("SHUTZER"), is a former employee and/or executive of the now-defunct investment bank, Lehman Brothers. After leaving his position as an employee of Lehman Brothers in 2003, SHUTZER acted as a "financial consultant" to Lehman Brothers, according to filings with the Securities and Exchange Commission. SHUTZER is the uncle of THOMAS LAMPERT and HENRIK LAMPERT and is married to FAY LAMPERT.

236. The Defendant, David Simas ("SIMAS"), is a former White House employee under OBAMA and is the Chief Executive Officer of the Obama Foundation. SIMAS is sued individually and in his official capacity a former state and federal employee. SIMAS is a former student at and graduate of BCLS.

237. The Defendant, John Verner ("VERNER"), was and/or is an assistant attorney general of the Commonwealth.*  VERNER is sued individually and in his official capacity, if any. VERNER is an attorney admitted to practice law in one or more jurisdictions.*

238. The Defendant, George Walker IV ("WALKER IV"), is a former employee of Lehman Brothers Holdings, Inc. and was a member of the Executive Committee at Lehman Brothers Holdings, Inc. at the time of that company's bankruptcy.  WALKER IV is sued individually.  WALKER IV is a relative of the defendants, John E. Bush, George W. Bush, and BUNZEL.

239. The Defendant, Sally Yates ("YATES"), is the former Fake Deputy Attorney General of the United States.  YATES is sued individually and in her official capacity as former Fake Deputy Attorney General of the United States.  YATES is an attorney admitted to practice law in one or more jurisdictions.

240. The Defendant, George W. Bush, ("GEORGE W. BUSH"), is the former President of the United States.  GEORGE W. BUSH resides in the State of Texas.  GEORGE W. BUSH is sued individually and in his official capacity as former President of the United States. GEORGE W. BUSH is a member of one or more secret societies, including Skull and Bones.*

241. The Defendant, John E. Bush a/k/a "JEB Bush" ("JEB BUSH"), is the former Governor of the State of Florida and employee of Lehman Brothers Holdings, Inc.  JEB BUSH is sued individually.

242. The Defendant, Omar Mangalji a/k/a "Ronnie Bacardi" ("MANGALJI"), attended the same high school and college as THE RELATOR at the same times as THE RELATOR

with the same graduation years as THE RELATOR. MANGALJI is a member of one or more secret societies.* MANGALJI is sued individually.

243. The Defendant, Sikanyiselwe-Sipo Maqubela a/k/a "Kanyi Maqubela" ("KANYI MAQUBELA"), was a grade school classmate of THE RELATOR at the Pike School. KANYI MAQUBELA is the son of the defendants, Temba Maqubela and Vuwelya Maqubela. KANYI MAQUBELA is sued individually.

244. The Defendant, Barack Obama, ("OBAMA"), is the former Fake President of the United States. OBAMA resides at 2446 Belmont Road, Washington, District of Columbia.* OBAMA is sued individually and in his official capacity as Fake President of the United States. OBAMA has been known as "Barry Soetoro" and/or one or more other aliases.*

245. The Defendant, Carlos Slim Helu a/k/a "Carlos Slim" ("SLIM"), is a Mexican national. According to press reports, SLIM is one of the world's wealthiest men and, according to publicly-available information from the intelligence company, Stratfor, SLIM is involved in the narcotics trade with Mexican drug cartels.

246. The Defendant, United States, is the federal government of the United States of America. The United States is a defendant and *qui tam* plaintiff in this Complaint.

247. The Defendant, U.S. Department of Justice, is a federal law enforcement agency with its principal office at 950 Pennsylvania Avenue, N.W., Washington, District of Columbia.

248. The Defendant, United States District Court for the District of Colorado ("U.S. DISTRICT COURT FOR THE DISTRICT OF COLORADO"), is the federal district court for the District of Colorado having its principal office at 901 19TH STREET.

249. The Defendant, United States District Court for the District of Maine ("U.S. DISTRICT COURT FOR THE DISTRICT OF MAINE"), is the federal district court for the District of Maine having its principal office at 156 FEDERAL STREET.

250. The Defendant, United States District Court for the District of Massachusetts ("U.S. DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS"), is the federal district court for the District of Massachusetts having its principal office at 1 COURTHOUSE WAY.

251. The Defendant, U.S. District Court for the District of New Hampshire ("U.S. DISTRICT COURT FOR THE DISTRICT OF NEW HAMPSHIRE"), is the federal district court for the District of New Hampshire having its principal office at 55 PLEASANT STREET.

252. The Defendant, U.S. Court of Appeals for the First Circuit ("U.S. COURT OF APPEALS FOR THE FIRST CIRCUIT"), is the federal appeals court for the First Circuit having its principal office at 1 COURTHOUSE WAY.

253. The Defendant, U.S. Tax Court ("U.S. TAX COURT"), is a federal court with jurisdiction over certain cases concerning IRS having its principal office in Washington, District of Columbia.

254. The Defendant, Commonwealth of Massachusetts (the "Commonwealth"), is the sovereign state of Massachusetts.

255. The Defendant, Massachusetts Appeals Court, is the intermediate appellate court of the Commonwealth having its principal office at 1 Pemberton Square, Boston, County of Suffolk, Commonwealth of Massachusetts.

256. The Defendant, Suffolk Superior Court ("SUFFOLK SUPERIOR COURT"), is a trial court of the Commonwealth having its principal office at 3 PEMBERTON SQUARE.

257. The Defendant, Massachusetts Department of Revenue or DOR, is a department, agency, and/or entity of the Commonwealth of Massachusetts, having its headquarters at 100 Cambridge Street, Boston, County of Suffolk, Commonwealth of Massachusetts. DOR is a defendant and *qui tam* plaintiff in this Complaint.

258. The Defendant, American Bar Association ("ABA"), is the national association for lawyers and is the world's largest professional association. It is organized as a State of Illinois not-for-profit corporation with its principal place of business in Chicago, Illinois. The ABA is headquartered at 321 North Clark Street, Chicago, Illinois. The ABA was and/or is subject to one or more federal court orders in connection with one or more alleged violations of federal antitrust laws. The ABA promulgates and enforces standards for law schools throughout the United States. The ABA directs its activities to all 50 states of the United States.

259. The Defendant, Law School Admissions Council ("LSAC"), is a State of Delaware not-for-profit corporation headquartered at 662 Penn Street, Newtown, Pennsylvania. LSAC provides a number of services to its member law schools and to persons seeking admission to law school, including the administration of the LSAT, which is an examination related to applications for post-secondary education purposes. Among other things, LSAC administers, manages, and proctors the LSAT multiple times each year at approximately 1,400 law schools, universities, and other venues across the United States, organizes and holds open invitation forums at hotels and universities for prospective law

students, and conducts educational conferences at hotels and universities for law school professionals. LSAC directs its activities to all 50 states of the United States.

260. The Defendant, Trustees of Boston College ("TRUSTEES OF BOSTON COLLEGE" or "BOSTON COLLEGE"), is a not-for-profit corporation or organization pursuant to the laws of the Commonwealth of Massachusetts. BOSTON COLLEGE owns and/or operates 885 CENTRE STREET. BOSTON COLLEGE owns and/or operates BCLS at 885 CENTRE STREET. BCLS is an ABA-approved law school. Through LSAC and/or its own internal practices, BCLS solicits and/or accepts applications from law school applicants in all 50 states of the United States.

261. The Defendant, Rectors and Visitors of the University of Virginia ("UVA"), is a not-for-profit corporation or organization pursuant to the laws of the State of Virginia. UVA owns and/or operates University of Virginia Law School, an ABA-approved law school, in Charlottesville, Virginia. Through LSAC and/or its own internal practices, University of Virginia Law School solicits and/or accepts applications from law school applicants in all 50 states of the United States.

262. The Defendant, Trustees of Columbia University in the City of New York ("COLUMBIA"), is a not-for-profit corporation or organization pursuant to the laws of the State of New York. COLUMBIA owns and/or operates Columbia Law School, an ABA-approved law school, in New York, New York. Through LSAC and/or its own internal practices, Columbia Law School solicits and/or accepts applications from law school applicants in all 50 states of the United States.

263. The Defendant, Cornell University ("CORNELL"), is a not-for-profit corporation or organization pursuant to the laws of the State of New York. Cornell University owns and/or operates a variety of nationally-accredited educational institutions, including Cornell Law School, an ABA-approved law school, in Ithaca, New York. Through LSAC and/or its own internal practices, Cornell Law School solicits and/or accepts applications from law school applicants in all 50 states of the United States. Cornell Law School is located at Myron Taylor Hall, Ithaca, County of Tompkins, State of New York. Cornell Law School is located on real property provided by the United States to the State of New York pursuant to the Morrill Land Grant Acts (7 U.S.C. § 301).

264. The Defendant, Northwestern University ("NORTHWESTERN"), is a not-for-profit corporation or organization pursuant to the laws of the State of Illinois. NORTHWESTERN owns and/or operates Northwestern Law School, an ABA-approved law school, in Chicago, Illinois. Through LSAC and/or its own internal practices, Northwestern Law School solicits and/or accepts applications from law school applicants in all 50 states of the United States.

265. The Defendant, the University of Chicago ("UNIVERSITY OF CHICAGO"), is a not-for-profit corporation or organization pursuant to the laws of the State of Illinois. UNIVERSITY OF CHICAGO owns and/or operates University of Chicago Law School, an ABA-approved law school, in Chicago, Illinois. Through LSAC and/or its own internal practices, University of Chicago Law School solicits and/or accepts applications from law school applicants in all 50 states of the United States.

266. The Defendant, University of Denver ("UNIVERSITY OF DENVER"), is a not-for-profit corporation or organization pursuant to the laws of the State of Colorado. UNIVERSITY OF DENVER owns and/or operates University of Denver Sturm College of Law, an ABA-approved law school, in Denver, Colorado. Through LSAC and/or its own internal practices, University of Denver Sturm College of Law solicits and/or accepts applications from law school applicants in all 50 states of the United States.

267. The Defendant, New York Times Company ("NEW YORK TIMES COMPANY"), is a global media organization focused on creating, collecting, and distributing information both online and in print. NEW YORK TIMES COMPANY is a publicly-traded, for-profit corporation organized under the laws of the State of New York having its principal place of business at 620 Eighth Avenue, New York, County of New York, State of New York. SLIM is the largest or one of the largest shareholders of NEW YORK TIMES COMPANY.

268. The Defendant, Wilmer Cutler Pickering Hale and Dorr LLP ("WILMERHALE") is a law firm with offices in, among other places, Washington, District of Columbia; Denver, Colorado; and Boston, Massachusetts. WILMERHALE is a limited liability partnership organized under the laws of the State of Delaware.

## JURISDICTION AND VENUE

269. This Court has jurisdiction pursuant to 18 U.S.C. § 1964(a), 31 U.S.C. § 3732(b), and 28 U.S.C. §§ 1331, 1343.

270. This Court has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367.

271. Venue is proper in this Court pursuant to 18 U.S.C § 1965(a), 31 U.S.C. § 3732(a), and 28 U.S.C. § 1391.

## THE LAW SCHOOL ADMISSIONS TEST

272. LSAC administers the Law School Admissions Test ("LSAT") to approximately 150,000 people annually.

273. Applicants to all or most ABA-approved law schools are required to take the LSAT in order to be eligible for admission to law school.

274. LSAC administers the LSAT approximately four times per year at approximately 650 test centers throughout the United States at a base cost of approximately $160 per applicant, with test centers including, among others, universities and law schools.

275. Multiple LSAT examinees travel across state lines to take the LSAT each year.

276. The LSAT was and/or is a half-day standardized test consisting of five 35-minute sections of multiple-choice questions, four of which are scored, with a 35-minute unscored writing sample also administered.

277. LSAC offers a "Credential Assembly Service," in which an applicant to one or more ABA-approved law schools is required to pay a fee to collect his or her transcripts, letters of recommendation, evaluations, and other application materials, which LSAC disseminates, along with an applicant's LSAT score report, to ABA-approved law schools applied to by the applicant.

278. THE RELATOR paid one or more fees to LSAC in 2014, 2015, 2017, and/or 2018.

279. Nearly all ABA-approved law schools and many other law schools require the use of the Credential Assembly Service for law school applicants.

280. LSAC charges each of the approximately 84,000 annual applicants using its website a base cost of approximately $155 to participate in the Credential Assembly Service.

281. LSAC organizes and hosts open invitation forums at hotels and universities nationwide for nearly 10,000 prospective law students annually to meet with representatives of over 200 LSAC-member law schools to learn about LSAC and the LSAT.

282. LSAC organizes and hosts educational conferences for law school administrators at ABA-approved law schools to learn about LSAC and the law school admissions process.

283. THE RELATOR has paid fees in excess of $300 in connection with use of the official website of LSAC.

## BOSTON COLLEGE LAW SCHOOL TUITION RATES

284. The tuition rate at Boston College Law School was approximately $1,500 in 1966.

285. The tuition rate at Boston College Law School was approximately $2,650 in 1974.

286. The tuition rate at Boston College Law School was approximately $2,800 in 1975.

287. The tuition rate at Boston College Law School was approximately $2,950 in 1976.

288. The tuition rate at Boston College Law School was approximately $3,200 in 1977.

289. The tuition rate at Boston College Law School was approximately $3,500 in 1978.

290. The tuition rate at Boston College Law School was approximately $3,810 in 1979.

291. The tuition rate at Boston College Law School was approximately $4,200 in 1980.

292. The tuition rate at Boston College Law School was approximately $4,900 in 1981.

293. The tuition rate at Boston College Law School was approximately $5,625 in 1982.

294. The tuition rate at Boston College Law School was approximately $6,575 in 1983.

295. The tuition rate at Boston College Law School was approximately $7,450 in 1984.

296. The tuition rate at Boston College Law School was approximately $8,200 in 1985.

297. The tuition rate at Boston College Law School was approximately $8,920 in 1986.

298. The tuition rate at Boston College Law School was approximately $9,820 in 1987.

299. The tuition rate at Boston College Law School was approximately $10,560 in 1988.

300. The tuition rate at Boston College Law School was approximately $11,460 in 1989.

301. The tuition rate at Boston College Law School was approximately $12,510 in 1990.

302. The tuition rate at Boston College Law School was approximately $13,670 in 1991.

303. The tuition rate at Boston College Law School was approximately $15,570 in 1992.

304. The tuition rate at Boston College Law School was approximately $16,590 in 1993.

305. The tuition rate at Boston College Law School was approximately $17,720 in 1994.

306. The tuition rate at Boston College Law School was approximately $18,940 in 1995.

307. The tuition rate at Boston College Law School was approximately $20,180 in 1996.

308. The tuition rate at Boston College Law School was approximately $21,230 in 1997.

309. The tuition rate at Boston College Law School was approximately $22,300 in 1998.

310. The tuition rate at Boston College Law School was approximately $23,420 in 1999.

311. The tuition rate at Boston College Law School was approximately $24,480 in 2000.

312. The tuition rate at Boston College Law School was approximately $25,790 in 2001.

313. The tuition rate at Boston College Law School was approximately $27,080 in 2002.

314. The tuition rate at Boston College Law School was approximately $28,440 in 2003.

315. The tuition rate at Boston College Law School was approximately $29,720 in 2004.

316. The tuition rate at Boston College Law School was approximately $31,520 in 2005.

317. The tuition rate at Boston College Law School was approximately $33,110 in 2006.

318. The tuition rate at Boston College Law School was approximately $36,510 in 2007.

319. The tuition rate at Boston College Law School was approximately $38,340 in 2008.

320. The tuition rate at Boston College Law School was approximately $39,490 in 2009.

321. The tuition rate at Boston College Law School was approximately $40,770 in 2010.

322. The tuition rate at Boston College Law School was approximately $41,590 in 2011.

323. The tuition rate at Boston College Law School was approximately $43,170 in 2012.

324. The tuition rate at Boston College Law School was approximately $44,860 in 2013.

325. The tuition rate at Boston College Law School was approximately $46,790 in 2014.

326. The tuition rate at Boston College Law School was approximately $48,670 in 2015.

327. The tuition rate at Boston College Law School was approximately $50,620 in 2016.

328. The tuition rate at Boston College Law School was approximately $52,640 in 2017.

329. The tuition rate at Boston College Law School was approximately $54,750 in 2018.

330. The tuition rate at Boston College Law School adjusted for inflation in 2016 dollars increased by approximately 355% from 1966 to 2016.

331. The tuition rate at Boston College Law School adjusted for inflation in 2016 dollars increased by approximately 307% from 1976 to 2016.

332. The tuition rate at Boston College Law School adjusted for inflation in 2016 dollars increased by approximately 159% from 1986 to 2016.

333. The tuition rate at Boston College Law School adjusted for inflation in 2016 dollars increased by approximately 64% from 1996 to 2016.

334. The tuition rate at Boston College Law School adjusted for inflation in 2016 dollars increased by approximately 28% from 2006 to 2016.

## CORNELL LAW SCHOOL TUITION RATES

335.  The tuition rate at Cornell Law School was approximately $22,100 in 1996.

336.  The tuition rate at Cornell Law School was approximately $23,100 in 1997.

337.  The tuition rate at Cornell Law School was approximately $24,100 in 1998.

338.  The tuition rate at Cornell Law School was approximately $25,548 in 1999.

339.  The tuition rate at Cornell Law School was approximately $27,350 in 2000.

340.  The tuition rate at Cornell Law School was approximately $29,250 in 2001.

341.  The tuition rate at Cornell Law School was approximately $31,250 in 2002.

342.  The tuition rate at Cornell Law School was approximately $32,970 in 2003.

343.  The tuition rate at Cornell Law School was approximately $35,342 in 2004.

344.  The tuition rate at Cornell Law School was approximately $37,812 in 2005.

345.  The tuition rate at Cornell Law School was approximately $40,648 in 2006.

346.  The tuition rate at Cornell Law School was approximately $43,688 in 2007.

347.  The tuition rate at Cornell Law School was approximately $45,803 in 2008.

348.  The tuition rate at Cornell Law School was approximately $49,020 in 2009.

349.  The tuition rate at Cornell Law School was approximately $51,150 in 2010.

350.  The tuition rate at Cornell Law School was approximately $53,226 in 2011.

351.  The tuition rate at Cornell Law School was approximately $55,301 in 2012.

352.  The tuition rate at Cornell Law School was approximately $57,351 in 2013.

353.  The tuition rate at Cornell Law School was approximately $59,360 in 2014.

354.  The tuition rate at Cornell Law School was approximately $59,900 in 2015.

355.  The tuition rate at Cornell Law School was approximately $61,400 in 2016.

356. The tuition rate at Cornell Law School was approximately $63,342 in 2017.

357. The tuition rate at Cornell Law School was approximately $65,456 in 2018.

358. The tuition rate at Cornell Law School adjusted for inflation in 2016 dollars increased by approximately 82% from 1996 to 2016.

359. The tuition rate at Cornell Law School adjusted for inflation in 2016 dollars increased by approximately 27% from 2006 to 2016.

## ANTITRUST COMBINATION OR CONSPIRACY

360. The deans of ABA-approved law schools send and receive electronic messages to each other on a group list (the "Deans' LISTSERV").

361. The Deans' LISTSERV was and/or is used to communicate law school tuition rates by deans from ABA-approved law schools.*

362. The Deans' LISTSERV was and/or is used to communicate law school tuition rates by the deans at BCLS and Cornell Law School during the time periods relevant to this Complaint.*

363. Email or another method of electronic communication was and/or is used to communicate law school tuition rates and related information between two or more deans at ABA-approved law schools during the time period relevant to this Complaint.*

364. Email or another method of electronic communication was and/or is used to communicate law school tuition rates and related information by the deans at BCLS and Cornell Law School during the time periods relevant to this Complaint.*

365. The deans at ABA-approved law schools meet each other in person at events on a regular basis during which they communicate law school tuition rates and related information with each other.

366. ABA-approved law schools have agreed and/or continue to agree to fix, stabilize, or raise the cost of tuition by exchanging tuition rates, admission, and related information with other ABA-approved law schools in person, in writing, and/or by electronic communication.*

367. LSAC provides electronic communications platforms or services to ABA-approved law schools, including BCLS and Cornell Law School, through which ABA-approved law schools communicate competitive information with each other and LSAC.

368. The ABA provides electronic communications platforms or services to ABA-approved law schools, including BCLS and Cornell Law School, through which ABA-approved law schools communicate competitive information with each other and the ABA.

369. LSAC provides electronic communications platforms or services to ABA-approved law schools, including BCLS and Cornell Law School, through which ABA-approved law schools agree to fix, stabilize, or raise the cost of tuition by exchanging tuition rates, admissions, and/or related information with each other.*

370. The ABA provides electronic communications platforms or services to ABA-approved law schools, including BCLS and Cornell Law School, through which ABA-approved law schools agree to fix, stabilize, or raise the cost of tuition by exchanging tuition rates, admissions, and/or related information with each other.*

371. The contract, combination, and/or conspiracy between ABA-approved law schools is so powerful that all or almost all of them continued to raise tuition rates even during multi-year periods of significant application declines.

372. Cornell Law School continued to raise its tuition rates even during multi-year periods of decline in the number of applicants.*

373. Boston College Law School continued to raise its tuition rates even during multi-year periods of decline in the number of applicants.

374. By and through the services provided by the ABA, LSAC, and/or by and through direct communications, Cornell Law School and Boston College Law School have agreed with each other and other ABA-approved law schools to raise their respective rates of tuition each year.*

375. Cornell Law School and Boston College Law School raised their respective rates of tuition each year over a period lasting more than twenty years.

## LEGAL RELATIONSHIP BETWEEN FEDERAL ASSET FORFEITURE AND THE FALSE CLAIMS ACT

376. 18 U.S.C. § 1963(a) holds that

> Whoever violates any provision of section 1962 of this chapter shall be fined under this title or imprisoned not more than 20 years (or for life if the violation is based on a racketeering activity for which the maximum penalty includes life imprisonment), or both, and shall forfeit to the United States, irrespective of any provision of State law—
>
> > (1) any interest the person has acquired or maintained in violation of section 1962;
> >
> > (2) any—

(A) interest in;

(B) security of;

(C) claim against; or

(D) property or contractual right of any kind affording a source of influence over;

any enterprise which the person has established, operated, controlled, conducted, or participated in the conduct of, in violation of section 1962; and

(3) any property constituting, or derived from, any proceeds which the person obtained, directly or indirectly, from racketeering activity or unlawful debt collection in violation of section 1962.

377. 18 U.S.C. § 1963(c) holds that "[a]ll right, title, and interest in property described in subsection (a) vests in the United States upon the commission of the act giving rise to forfeiture under this section."

378. The right, title, and interest in the real and personal property for which forfeiture is sought in this Complaint have already vested in the United States upon commission of the act or acts giving rise to forfeiture pursuant to RICO.

379. 31 U.S.C. § 3729(a)(1)(G) holds that "[a]ny person who … knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government … is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000 […]."

380. As a matter of law, any person who knowingly conceals or knowingly and improperly avoids an obligation to transmit money or property to the United States that was forfeited

pursuant to 18 U.S.C. § 1963(c) or any other applicable federal forfeiture statute has committed a reverse false claim actionable under 31 U.S.C. § 3729(a)(1)(G).[2]

381. The United States owned all right, title, and interest in any property named in this Complaint and forfeited pursuant to RICO or any other relevant federal criminal offense providing for forfeiture upon commission of the violation of federal law.

382. As set forth in this Complaint, one or more of the defendants knowingly concealed or knowingly and improperly avoided an obligation to transmit the property in question to the United States government.

## THE ENTERPRISE

383. THE RELATOR has been injured in his business and/or property directly and proximately by two or more RICO predicates, including, but not limited to, the conduct of an association-in-fact enterprise (the "ENTERPRISE") within the meaning of 18 U.S.C. § 1961(4) and/or one or more other enterprises within the meaning of 18 U.S.C. § 1961(4).

384. The purpose of the ENTERPRISE is to:

   a. Distribute narcotics in the United States, including, but not limited to, cocaine;

   b. Commit major financial crimes, including, but not limited to, money laundering of narcotics proceeds, bankruptcy fraud, and securities fraud;

   c. Protect and advance the political, financial, and legal interests of its members by rigging state and federal court systems throughout the United States;

---

[2] The knowing failure to convey money or property forfeited to the United States pursuant to 18 U.S.C. § 1963(c) and/or another applicable federal forfeiture statute is an actionable reverse false claim.

d.  Protect and advance the political, financial, and legal interests of its members through blackmail, murder, bribes, gratuities, extortion, mail fraud, wire fraud, and other racketeering acts;

e.  Preserving and protecting the power, territory, and profits of the ENTERPRISE through blackmail, harassment, intimidation, and threats and acts of violence, including, but not limited to, murder and assault[3];

f.  Promoting and enhancing the activities of the ENTERPRISE and the members and/or associates of the ENTERPRISE; and

g.  Keeping one or more victims in fear of the ENTERPRISE and in fear of its members through blackmail, harassment, intimidation, and threats and acts of violence, including, but not limited to, murder and assault.

385.  To achieve its purpose, the ENTERPRISE rigs the court systems in state and federal courts at all levels nationwide by blackmail, bribery, gratuities, extortion, threats and acts of violence, and other racketeering acts while using state and federal courts, homes, schools, and automobiles, among other properties, to carry out unlawful activities.

386.  Members of the ENTERPRISE include, but may not be limited to, JOHN DOE 1-X, the FAKE FEDERAL JUDGES, current state and federal government officials, private individuals, at least one law firm, at least one newspaper company, and multiple universities.

---

[3] Assault under Massachusetts tort law is defined as intentionally causing a reasonable apprehension of an imminent harmful or offensive contact.  Conley v. Romeri, 60 Mass. App. Ct. 799, 805 n.6 (2004) ("Assault is a separate tort involving an act which puts another in reasonable apprehension of imminent harmful or offensive contact, that is, an attempted battery or an immediately threatened battery.").

387.  Members of the ENTERPRISE include, but may not be limited to (the "RICO ASSOCIATES"):

1)  ABBENE;

2)  AKUETE;

3)  ARCHER;

4)  BARBADORO;

5)  BERRY;

6)  BLOOM;

7)  BREYER;

8)  BRODIN;

9)  BUNZEL;

10)  GEORGE W. BUSH;

11)  JEB BUSH;

12)  CASSIDY;

13)  COLE;

14)  COLWELL;

15)  COAKLEY;

16)  CRAFTS;

17)  CRAY;

18)  CURTIN;

19)  DAWLEY;

20)  DIAMOND;

21)  BRIAN DURKIN;

22)  THOMAS DURKIN;

23)  EPSTEIN;

24)  FATALE;

25)  FEINER;

26)  FLATGARD;

27)  TORIL FORLAND;

28)  GANTS;

29)  GARLAND;

30)  GILES;

31)  JAVIER GONZALEZ;

32)  GOODLANDER;

33)  GREEN;

34)  HEALEY;

35)  HENNRIKUS;

36)  JOSEPH HERLIHY;

37)  SARAH HERLIHY;

38)  HOLDER;

39)  HOYLE;

40)  HUME;

41)  KATZMANN;

42)  KAYYEM;

43) KELLER;

44) KENYON;

45) DANIEL KOH;

46) STEVEN KOH;

47) DAVID LAMPERT;

48) FAY LAMPERT;

49) HENRIK LAMPERT;

50) THOMAS LAMPERT;

51) LOWY;

52) LORETTA LYNCH;

53) LYSOHIR;

54) MACKEY;

55) MAFFEI;

56) MALONEY;

57) MANGALJI;

58) KANYI MAQUBELA;

59) TEMBA MAQUBELA;

60) VUYELWA MAQUBELA;

61) MAXWELL;

62) MAZZONE;

63) MESHNICK;

64) MURPHY;

65) NEYMAN;

66) OBAMA;

67) O'TOOLE;

68) ORTIZ;

69) PATRICK;

70) PRESSLEY;

71) ROBERTS;

72) JAMIL ROMAN;

73) ROUGEAU;

74) SAVERY;

75) SCOGNAMIGLIO;

76) SHUTZER;

77) SIMAS;

78) SLIM;

79) SNYDER;

80) SQUIRES-LEE;

81) STORMS;

82) SWEENEY;

83) TARROW;

84) ULLMANN;

85) VERNER;

86) WALKER;

87) WALKER IV;

88) WOLOHOJIAN;

89) WILMERHALE;

90) NEW YORK TIMES COMPANY;

91) BOSTON COLLEGE;

92) CORNELL;

93) UNIVERSITY OF DENVER;

94) FAKE FEDERAL JUDGES; and

95) JOHN DOE 1-X.

388. RICO ASSOCIATES who received income from WILMERHALE and used that income in the operation of the ENTERPRISE, include, but may not be limited to THOMAS LAMPERT.

389. RICO ASSOCIATES who were involved with payments under the Equitable Sharing Program and/or THE RELATOR's litigation include, but may not be limited to (the "DOJ PAID ASSOCIATES"):

1) COAKLEY;

2) CRAFTS;

3) CRAY;

4) DAWLEY;

5) FEINER;

6) HEALEY;

7) MAZZONE;

8) MESHNICK;

9) MURPHY;

10) SWEENEY;

11) TARROW;

12) VERNER; and

13) WALKER.

219. One or more of the RICO ASSOCIATES and/or one or more individuals employed by the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH personally benefitted from money deposited in EQUITABLE SHARING ACCOUNTS 1-X.*

220. By virtue of their physical presence at 885 CENTRE STREET or association with any person who was present at 885 CENTRE STREET at times relevant to this Complaint, each and every one of the RICO ASSOCIATES was in a position to acquire Privileged Information.

221. OBAMA was and/or is a leader of the ENTERPRISE at the White House in Washington, District of Columbia.

222. OBAMA directed one or more RICO ASSOCIATES in carrying out unlawful and other activities in furtherance of the conduct of the ENTERPRISE's affairs.

223. OBAMA also operated through SIMAS, who visited the Boston, Massachusetts area, including 885 CENTRE STREET, during and after OBAMA's tenure as president.

224. OBAMA utilized powers of the executive branch of the United States in order to advance the objectives of the ENTERPRISE during at least some of the times relevant to the matters herein in connection with carrying on the conduct of the ENTERPRISE.

225. HEALEY was and/or is a leader of the ENTERPRISE at 40 WINTHROP STREET and MAG BOSTON.

226. HEALEY visited the White House on multiple occasions during the time period relevant to this Complaint.

227. HEALEY travelled to 885 CENTRE STREET at least one time during the time period relevant to this Complaint.

228. HEALEY directed one or more RICO ASSOCIATES in carrying out unlawful and other activities in furtherance of the conduct of the ENTERPRISE's affairs.

229. ORTIZ was and/or is a leader of the ENTERPRISE at 1 COURTHOUSE WAY and 885 CENTRE STREET who travelled to the White House on multiple occasions and was a visiting professor at BCLS during the time period relevant to this Complaint.

230. ORTIZ directed one or more RICO ASSOCIATES in carrying out unlawful and other activities in furtherance of the conduct of the ENTERPRISE's affairs.

231. ROUGEAU was and/or is a leader of the ENTERPRISE at 885 CENTRE STREET.

232. ROUGEAU travelled to the White House during KATZMANN's 100-day wait to become a federal judge.

233. ROUGEAU directed one or more RICO ASSOCIATES in carrying out unlawful and other activities in furtherance of the conduct of the ENTERPRISE's affairs.

234. BOSTON COLLEGE was and/or is a leader of the ENTERPRISE and directed one or more RICO ASSOCIATES in carrying out unlawful and other activities in furtherance of the conduct of the ENTERPRISE's affairs.

235. WILMERHALE was and/or is a leader of the ENTERPRISE and directed one or more RICO ASSOCIATES in carrying out unlawful and other activities in furtherance of the conduct of the ENTERPRISE's affairs.

236. MAFFEI participated in the conduct of the ENTERPRISE's affairs at 885 CENTRE STREET and travelled to the White House prior to KATZMANN's 100-day wait to become a federal judge.

237. STEVEN KOH participated in the conduct of the ENTERPRISE's affairs at the White House and 885 CENTRE STREET.

238. DANIEL KOH participated in the conduct of the ENTERPRISE's affairs at the White House.

239. GOODLANDER participated in the conduct of the ENTERPRISE's affairs at the White House.

240. FLATGARD participated in the conduct of the ENTERPRISE's affairs at the White House.

241. SIMAS participated in the conduct of the ENTERPRISE's affairs at the White House and 885 CENTRE STREET.

242. SAVERY participated in the conduct of the ENTERPRISE's affairs at 885 CENTRE STREET.

243. BRIAN DURKIN participated in the conduct of the ENTERPRISE's affairs at 885 CENTRE STREET.

244. THOMAS LAMPERT participated in the conduct of the ENTERPRISE's affairs at 885 CENTRE STREET.

245. PATRICK participated in the conduct of the ENTERPRISE's affairs at the White House.

246. WALSH participated in the conduct of the ENTERPRISE's affairs at the White House.

247. O'TOOLE, ORTIZ, SARIS, and BARRON participated in the conduct of the ENTERPRISE's affairs at 885 CENTRE STREET and at 1 COURTHOUSE WAY.

248. SWEENEY participated in the conduct of the ENTERPRISE's affairs at the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH and at 885 CENTRE STREET.

249. CRAFTS participated in the conduct of the ENTERPRISE's affairs at the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH and at 3 PEMBERTON SQUARE.

250. SOROKIN participated in the conduct of the ENTERPRISE's affairs at 885 CENTRE STREET and at 1 COURTHOUSE WAY.

251. SOROKIN participated in the conduct of the ENTERPRISE's affairs at 100 DAVIS AVENUE.*

252. SQUIRES-LEE and ULLMANN participated in the conduct of the ENTERPRISE's affairs at 885 CENTRE STREET and at 3 PEMBERTON SQUARE.

253. GILES participated in the conduct of the ENTERPRISE's affairs at 3 PEMBERTON SQUARE.

254. For purposes of this Complaint and pending discovery of the identities of JOHN DOE 1-X, RICO ASSOCIATES include JOHN DOE 1-X.

## GENERAL ALLEGATIONS

255. In or about the year 1967, O'TOOLE and MAFFEI were both undergraduate students at Boston College at the same time.

256. In or about the year 1986, ABBENE, CURTIN, and THOMAS DURKIN were all students at BCLS at the same time.

257. In 1996, NEYMAN was an Assistant District Attorney ("ADA") in Suffolk County, Massachusetts, where he prosecuted narcotics cases.

258. NEYMAN and LOWY were colleagues in the District Attorney's Office in Suffolk County, Massachusetts in or about 1998.*

259. On or about November 19, 1998, the Massachusetts Supreme Judicial Court, applying Dep't of Revenue of Montana v. Kurth Ranch, 511 U.S. 767 (1994), issued its opinion in the case of COMMISSIONER of Revenue v. Mullins, 428 Mass 406 (1998), which found that a DOR assessment pursuant to Mass. Gen. Laws. ch. 64K §§ 1-14 (the "Massachusetts Controlled Substances Tax" or the "CST") constituted punishment within the meaning of the Double Jeopardy Clause of the Fifth Amendment to the U.S. Constitution.

260. CRAY was counsel for the COMMISSIONER before the Supreme Judicial Court in Mullins.

261. Violation of the CST is a felony.

262. After Mullins, NEYMAN, as an ADA, declined to bring charges in 100% of cases pursuant to the CST in favor of bringing charges pursuant to Mass.Gen.Laws ch. 94C §§ 1 et seq. (the "Massachusetts Controlled Substances Act").

263. On or about April 29, 1999, more than five months after <u>Mullins</u>, NEYMAN, as an ADA in Suffolk County, signed an indictment against a defendant in a crack cocaine distribution case (the "Crack Cocaine Case") pursuant to Mass.Gen.Laws ch. 94C § 32A(c).

264. The indictment in the Crack Cocaine Case could have alleged one or more violations of the CST instead of one or more violations of the Massachusetts Controlled Substances Act.

265. GEORGE W. BUSH was a personal friend of the chief executive officer of Enron Corp., Kenneth Lay, who served on GEORGE W. BUSH's presidential transition team.

266. Enron Corp. and its executives contributed in excess of $2 million to the gubernatorial and presidential campaigns of GEORGE W. BUSH.

267. Enron Corp. was pursuing a gas pipeline in Afghanistan at or around the time of the September 11, 2001 attacks.

268. Enron Corp. employed and/or hired as contractors a number of individuals affiliated with the Central Intelligence Agency ("CIA").

269. Enron Corp. declared bankruptcy in or around November 2001.

270. The bankruptcy of Enron Corp. was the largest bankruptcy in the history of the United States.

271. In the years after the CIA launched operations in Afghanistan following the September 11, 2001 attacks, Afghanistan's practice of "bacha bazi" or "boy play," which is a form of child sexual slavery and/or child prostitution, became widespread after having been banned by the Taliban.

272. In the years after the CIA launched operations in Afghanistan following the September 11, 2001 attacks, Afghanistan's production of opium, the raw ingredient for heroin, rose to historic levels after opium cultivation was banned and virtually eradicated by the Taliban.

273. Lehman Brothers Holdings, Inc. was a financial services firm headquartered in New York, New York.

274. There was a coordinated scheme to force Lehman Brothers Holdings, Inc. to collapse multiple RICO ASSOCIATES.*

275. SHUTZER was an employee of Lehman Brothers Inc. (the predecessor company to Lehman Brothers Holdings, Inc.) during some portion of the years 2000, 2001, 2002, and/ or 2003.

276. According to one or more filings made with the Securities and Exchange Commission, after leaving the firm in 2003, SHUTZER continued to serve as a "consultant" to Lehman Brothers Holdings, Inc. and/or Lehman Brothers Inc.

277. THE RELATOR was an employee of Lehman Brothers Holdings, Inc. during the years 2007 and 2008 at 745 7TH AVENUE.

278. THE RELATOR was and/or is a shareholder of Lehman Brothers Holdings, Inc. beginning in or about the year 2007.

279. BUNZEL was an employee of Lehman Brothers Holdings, Inc. during the year 2007 at 745 7TH AVENUE.

280. AKUETE was an employee of Lehman Brothers Holdings, Inc. during the years 2007 and 2008 at 745 7TH AVENUE.

281. JEB BUSH was an employee of Lehman Brothers Holdings, Inc. during the years 2007 and/or 2008 at 745 7TH AVENUE.

282. WALKER IV was an employee of Lehman Brothers Holdings, Inc. during the years 2006, 2007, and/or 2008 at 745 7TH AVENUE.

283. JEB BUSH met with SLIM in Mexico in or around July 2008 regarding the deteriorating financial situation of Lehman Brothers Holdings, Inc.

284. JEB BUSH communicated with GEORGE W. BUSH regarding the financial position of Lehman Brothers Holdings, Inc. during his tenure at that firm.*

285. The bankruptcy of Lehman Brothers Holdings, Inc. was, at the time, the largest corporate bankruptcy in American history.

286. On or about September 10, 2008, SLIM purchased approximately six percent of all outstanding shares of NEW YORK TIMES COMPANY.

287. On or about September 11, 2008, MANGALJI sent an email to THE RELATOR stating to the effect that Lehman Brothers Holdings, Inc. would not be able to consummate a deal to avert a bankruptcy filing and/or collapse.

288. As of September 11, 2008, executives of Lehman Brothers Holdings, Inc. were still negotiating deals with multiple parties in order to avert a bankruptcy, including with Barclays PLC and DIAMOND.

289. As of September 13, 2008, executives of Lehman Brothers Holdings, Inc. were still negotiating deals with multiple parties in order to avert a bankruptcy, including with Barclays PLC and DIAMOND.

290. Lehman Brothers Holdings, Inc. filed for bankruptcy on or about September 15, 2008.

291. Despite widespread knowledge in the financial markets that Lehman Brothers Holdings, Inc. required additional equity capital investment throughout some of the year 2007 and most of the year 2008, executives at Lehman Brothers Holdings, Inc. failed to raise adequate equity capital prior to the company's bankruptcy filing in September 2008.

292. The bankruptcy of Lehman Brothers Holdings, Inc. caused significant economic turmoil prior to the presidential election of 2008.

293. JEB BUSH retained employment at 745 7TH AVENUE after the bankruptcy of Lehman Brothers, Inc. with Barclays PLC.

294. WALKER retained after the bankruptcy of Lehman Brothers, Inc. with Barclays PLC.

295. On or about September 24, 2008, then-Senator John McCain announced a suspension of his presidential campaign.

296. The bankruptcy of Lehman Brothers Holdings, Inc. and the ensuing financial crisis obfuscated the issue of OBAMA's ineligibility to be President of the United States.

297. The bankruptcy of Lehman Brothers Holdings, Inc. and the ensuing financial crisis obfuscated the issue that many banks in the United States launder proceeds from the illegal narcotics trade.

298. According to the news agency, Reuters, Antonio Maria Costa, Executive Director of the United Nations Office on Drugs and Crime, stated in late 2008 or early 2009 that "[i]n many instances, drug money is currently the only liquid investment capital."

299. According to the news agency, Reuters, Antonio Maria Costa, Executive Director of the United Nations Office on Drugs and Crime, stated in late 2008 or early 2009 that

"interbank loans were funded by money that originated from the drug trade and other illegal activities," and that "[there were] signs that some banks were rescued in that way."

300. According to FORTUNE Maganize, SLIM was worth approximately $2.8 billion in 1992.

301. According to the magazine, Latin Trade, SLIM was worth approximately $7.2 billion in 1999.

302. According to FORTUNE Magazine, SLIM was worth approximately $60 billion in 2008.

303. OBAMA was not born in the United States of America.

304. OBAMA is not a natural born citizen of the United States of America.

305. OBAMA has used a variety of fraudulent documents throughout his life, including one or more different aliases.

306. During the presidential inauguration on or about January 20, 2009, OBAMA and ROBERTS misstated the presidential oath of office.

307. THE RELATOR incorporates by reference each and every paragraph of the Affidavit of Michael Zullo (attached hereto at EXHIBIT 1) as if fully set forth herein.

308. Because OBAMA was and is not a natural born citizen, he has never been eligible to be President of the United States.

309. OBAMA conspired with JOHN DOE 1-X to create and disseminate a false birth certificate on the official website of the White House.

310. On or about April 27, 2011, OBAMA released a fraudulent birth certificate on the official website of the White House.

311. By conspiring with JOHN DOE 1-X to create and disseminate a false birth certificate on the official website of the White House, (attached hereto at EXHIBIT 2), OBAMA

violated one or more subsections of 18 U.S.C. § 1028 and/or one or more other federal laws.

312. The federal government is in possession of dispositive evidence as to the question of OBAMA's eligibility to be President of the United States.

313. Because OBAMA was and is ineligible to be President of the United States, each and every judicial commission signed by OBAMA was and is void.

314. Due to the nationwide scope of the events alleged herein, this Complaint could have been brought in a number of judicial districts in the United States: All of the Fake Federal Judges in these judicial districts are defendants in the above-captioned action.

315. Each of the FAKE FEDERAL JUDGES in federal courts who have participated in THE RELATOR's litigation or could participate based on the facts alleged herein is listed in the caption of this Complaint as "Fake Judge" or "Fake Justice."

316. In or about April 2009, THE RELATOR authored a published letter to the editor of the student newspaper at Emory University (the "Emory Letter") that called for investigation of activities on Wall Street following the bankruptcy of Lehman Brothers Holdings, Inc. and the ensuing financial crisis.

317. Despite one or more internet archive services displaying the existence of the Emory Letter (see Exhibit 3), the text of the Emory Letter is no longer accessible on the website of the student newspaper at Emory University or on internet archive services.

318. Between the years 2009 to 2019, both years being approximate, one or more of the RICO ASSOCIATES was made aware of, participated in, and/or approved electronic and/or human surveillance of THE RELATOR.*

319. Between the years 2009 to 2019, both years being approximate, one or more of the RICO ASSOCIATES was made aware of, participated in, and/or approved unlawful electronic and/or human surveillance of THE RELATOR.*

320. Intelligence agencies as well as non-state actors have been and are engaged in widespread attempts to obtain blackmail against individuals in compromising positions, including, but not limited to, sexual blackmail using so-called "honeypots," which are sexual blackmail traps setup in order to ensnare particular individuals in compromising positions.

321. EPSTEIN and/or MAXWELL possessed photographs and videos of prominent individuals in compromising positions that EPSTEIN and/or MAXWELL, themselves or through one or more other individuals, used and/or intended to use for blackmail, leverage, and/or other purposes.

322. One or more of the RICO ASSOCIATES possessed information, photographs, and/or videos of THE RELATOR's private, personal life (the "Compromising Information") that was used and/or was intended to be used for blackmail and/or leverage against THE RELATOR.*

323. One or more of the RICO ASSOCIATES was and/or is in possession of electronic and/or human surveillance information concerning THE RELATOR.

324. Monies paid, seized, or otherwise deposited by the Commonwealth pursuant to the CST are deposited in the Commonwealth's general fund.

325. At all times relevant to this Complaint, the Massachusetts Controlled Substances Act provided a means for forfeiture of assets to law enforcement agencies of the Commonwealth in connection with a criminal narcotics case.

326. At all times relevant to this Complaint, federal law provided a means for forfeiture of assets to law enforcement agencies of the federal government and/or to the the Commonwealth or a law enforcement agency thereof in connection with a narcotics case.

327. Monies forfeited pursuant to the Massachusetts Controlled Substances Act are deposited and/or kept in bank accounts segregated from taxpayer funds.

328. Monies forfeited pursuant to federal narcotics laws are deposited and/or kept in bank accounts segregated from taxpayer funds.

329. Through the Equitable Sharing Program (the "Equitable Sharing Program"), the U.S. Department of Justice ("DOJ") and the U.S. Department of Treasury distribute a share of property and cash forfeited pursuant to federal law, such as the Controlled Substances Act (21 U.S.C. §§ 801 *et seq.*), to state and local law enforcement agencies.

330. One or more Massachusetts law enforcement agencies have been receiving cash proceeds and/or property from the Equitable Sharing Program since January 1, 1996 or earlier.

331. Pursuant to the rules and regulations of the Equitable Sharing Program, payments made to state and local law enforcement agencies are deposited and/or kept in bank accounts segregated from taxpayer funds.

332. Since at least January 1, 2012, the COMMISSIONER has disseminated Form CST-1 for the purchase of marijuana and controlled substance tax stamps pursuant to the CST on the official website of the Commonwealth of Massachusetts.

333. Form CST-1 contains no statement regarding a non-enforcement directive or policy as to the CST.

334. Form CST-1 requires payments of $3.50 for each 1-gram marijuana tax stamp, $200 for each 1-gram controlled substance tax stamp, and $2,000 for 50 dosage unit tax stamps of a controlled substance not sold by weight.

335. Cocaine and marijuana are subject to and/or regulated by the CST.

336. Tax stamp purchases using Form CST-1 are non-refundable.

337. Between approximately the years 2003 to 2005, SQUIRES-LEE, WOLOHOJIAN, and/or HEALEY worked at the same law firm, WILMERHALE, in Boston, Massachusetts.

338. White House visitor logs show that MANGALJI met with FLATGARD at the White House on or about January 16, 2010.

339. During the years 2013 to 2019, both years being inclusive, GEORGE W. BUSH met with the brother of THE RELATOR on one or more occasions.

340. During the years 2013 to 2019, both years being inclusive, JEB BUSH met with the brother of THE RELATOR on one or more occasions.

341. In or about January 2013, THE RELATOR made an online posting stating to the effect that Massachusetts had a major heroin problem and that PATRICK was responsible in part for this problem.

342. White House visitor logs show that PATRICK visited the White House on or about January 21, 2013.

343. In or about February 2013, THE RELATOR made a statement at a public meeting of the Cambridge, Massachusetts Police Department to the effect that Massachusetts had a

major narcotics problem and that the CST should be enforced to mitigate the narcotics problem in Massachusetts.

344. On or about February 1, 2013, THE RELATOR received a notice of an audit or other inquiry by the Internal Revenue Service.

345. On or about February 15, 2013, the Twitter account belonging to OBAMA issued a tweet (attached hereto at Exhibit 4) stating: "I spy…"

346. In or about March 2013, all of the computers at the medical office operated by the parents of THE RELATOR were infected with malware.

347. White House visitor logs show that PATRICK visited the White House on or about February 24, 2013.

348. White House visitor logs show that PATRICK visited the White House on or about February 25, 2013.

349. White House visitor logs show that PATRICK visited the White House on or about April 1, 2013.

350. On April 15, 2013, two bombers were detonated at the Boston Marathon in Boston, Massachusetts.

351. White House visitor logs show that GOODLANDER visited the White House on or about April 16, 2013.

352. White House visitor logs show that GOODLANDER visited the White House on or about June 21, 2013.

353. White House visitor logs show that GOODLANDER visited the White House on or about August 13, 2013.

354. White House visitor logs show that GOODLANDER visited the White House on or about September 5, 2013.

355. A number of law enforcement agencies of the Commonwealth of Massachusetts, including the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH, accepted approximately $7,719,173 through the Equitable Sharing Program in federal Fiscal Year 2014, during which time the same agencies declined to bring any criminal prosecutions pursuant to the CST in 100% of cases.

356. Federal Fiscal Year 2014 was October 1, 2013 to September 30, 2014.

357. ORTIZ was responsible for the administration of the Equitable Sharing Program in the District of Massachusetts pursuant to the Controlled Substances Act and/or Equitable Sharing Program rules and regulations for judicial forfeitures amounting to less than $1 million during the years 2009-2017, or some portion thereof.

358. COLE was responsible for the administration of the Equitable Sharing Program in the District of Massachusetts pursuant to the Controlled Substances Act and/or Equitable Sharing Program rules and regulations for judicial forfeitures amounting to more than $1 million during the years 2011-2015, or some portion thereof.

359. YATES was responsible for the administration of the Equitable Sharing Program in the District of Massachusetts pursuant to the Controlled Substances Act and/or Equitable Sharing Program rules and regulations for judicial forfeitures amounting to more than $1 million during the years 2015-2017, or some portion thereof.

360. White House visitor logs show that HOYLE visited the White House on or about November 7, 2013.

361. On or about November 19, 2013, SQUIRES-LEE donated approximately $150 to HEALEY's campaign for Attorney General of the Commonwealth of Massachusetts.

362. On or about November 19, 2013, MAFFEI donated approximately $250 to HEALEY's campaign for Attorney General of the Commonwealth of Massachusetts.

363. On or about November 19, 2013, GREEN donated approximately $500 to HEALEY's campaign for Attorney General of the Commonwealth of Massachusetts.

364. MAFFEI and SQUIRES-LEE both worked at Sherin and Lodgen LLP prior to SQUIRES-LEE becoming a state court judge at SUFFOLK SUPERIOR COURT.

365. In or about 2013 or 2014, SQUIRES-LEE hosted and/or participated in a fundraiser for HEALEY's campaign for Attorney General of the Commonwealth of Massachusetts at the office of the law firm, Sherin and Lodgen LLP.

366. White House visitor logs show that GOODLANDER visited the White House on or about December 14, 2013.

367. White House visitor logs show that GOODLANDER visited the White House on or about December 16, 2013.

368. White House visitor logs show that GOODLANDER visited the White House on or about January 31, 2014.

369. White House visitor logs show that PATRICK visited the White House on or about February 23, 2014.

370. White House visitor logs show that PATRICK visited the White House on or about February 24, 2014.

371.   White House visitor logs show that SARIS visited the White House on or about February 26, 2014.

372.   SQUIRES-LEE hosted a fundraiser at her home for HEALEY's campaign for the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH in or about March 2014.

373.   White House visitor logs show that LYSOHIR visited the WHITE HOUSE on or about March 11, 2014.

374.   White House visitor logs show that GOODLANDER visited the White House on or about March 13, 2014.

375.   White House visitor logs show that GOODLANDER visited the White House on or about March 14, 2014.

376.   White House visitor logs show that GOODLANDER visited the White House on or about March 15, 2014.

377.   On or about March 18, 2014, SQUIRES-LEE donated approximately $300 to HEALEY's campaign for Attorney General of the Commonwealth of Massachusetts.

378.   On or about March 20, 2014, GREEN donated approximately $500 to HEALEY's campaign for Attorney General of the Commonwealth of Massachusetts.

379.   SQUIRES-LEE, HEALEY, GREEN, and/or WOLOHOJIAN are former colleagues at WILMERHALE.

380.   SQUIRES-LEE is a friend of HEALEY and/or WOLOHOJIAN.

381.   GREEN is a friend of HEALEY and/or WOLOHOJIAN.

382. On or about March 26, 2014, the defendants in the *Qui Tam* Action, JAVIER
GONZALEZ and JAMIL ROMAN were charged in a federal criminal complaint (the
"Federal Criminal Complaint") with conspiracy to distribute and distribution of more
than five kilograms of cocaine in the U.S. DISTRICT COURT FOR THE DISTRICT OF
MASSACHUSETTS.

383. The Federal Criminal Complaint alleged that JAVIER GONZALEZ and JAMIL ROMAN
imported illegal narcotics from Mexico to Massachusetts in collaboration with the "Gulf
Cartel," which is an international narcotics trafficking organization operating primarily
between Mexico and the United States.

384. The Federal Criminal Complaint against JAVIER GONZALEZ and JAMIL ROMAN
included an affidavit (the "Affidavit of Scott P. Smith," attached hereto at <u>EXHIBIT 5</u>)
with factual representations to the Court that 1) three kilograms of cocaine seized in
Massachusetts from the confidential informant were procured by the confidential
informant from JAVIER GONZALEZ and JAMIL ROMAN 2) more than $1.5 million in
cash was seized by agents of the U.S. government from JAVIER GONZALEZ and
JAMIL ROMAN at the time of their arrest pursuant to the Federal Criminal Complaint;
and 3) JAVIER GONZALEZ travelled by truck to McAllen, Texas on one or more
occasions to pick up large quantities of cocaine for distribution in and around Holyoke,
Massachusetts.

385. THE RELATOR incorporates by reference each and every paragraph of the Affidavit of
Scott P. Smith (attached hereto at <u>EXHIBIT 5</u>) as if fully set forth herein.

386. The U.S. Department of Justice sought forfeiture of more than $1.5 million in cash seized from JAVIER GONZALEZ and JAMIL ROMAN pursuant to the federal Controlled Substances Act (the "Federal Controlled Substances Act," or 21 U.S.C. §§ 801 *et seq.*) in the U.S. DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS.

387. White House visitor logs show that LYSOHIR visited the WHITE HOUSE on or about April 9, 2014.

388. On or about April 30, 2014, MAFFEI donated approximately $250 to HEALEY's campaign for Attorney General of the Commonwealth of Massachusetts.

389. White House visitor logs show that PATRICK visited the White House on or about May 16, 2014.

390. On or about May 23, 2014, the U.S. Department of Justice charged multiple individuals in a federal criminal complaint (the "Marijuana Federal Criminal Complaint") with conspiracy to distribute marijuana in the U.S. DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS.

391. The Marijuana Federal Criminal Complaint alleged that multiple individuals shipped marijuana from California to Massachusetts and Rhode Island.

392. The Marijuana Federal Criminal Complaint included an affidavit signed by an agent of the Drug Enforcement Administration wherein the agent estimated that the individuals charged in the Marijuana Federal Criminal Complaint shipped approximately 1,932 kilograms of marijuana from California into Massachusetts and Rhode Island.

393. On or before June 1, 2014, THE RELATOR acquired more than forty marijuana tax stamps (the "Tax Stamps") at a price of $3.50 each pursuant to the CST from the Massachusetts Department of Revenue.

394. The CST imposes a penalty of $3.50 per gram of marijuana payable to DOR by purchase of marijuana tax stamps.

395. As a matter of law, violation of the CST is penalized by imposing the original tax stamp rate and adding a 100% nonpayment penalty.

396. Under the economic laws of supply and demand, widespread voluntary compliance with the CST would significantly increase the price for marijuana or a controlled substance such as heroin, thereby destroying demand by reducing purchasing power.

397. Under the economic laws of supply and demand, a zero tolerance policy for offenders under the CST would significantly increase the price for marijuana or a controlled substance such as heroin, thereby destroying demand by reducing purchasing power.

398. White House visitor logs show that SARIS visited the White House on or about May 6, 2014.

399. White House visitor logs show that SARIS visited the White House on or about June 11, 2014.

400. White House visitor logs show that GOODLANDER visited the White House on or about June 25, 2014.

401. On or about June 27, 2014, THE RELATOR brought the *Qui Tam* Action pursuant to Mass.Gen.Laws ch. 12 §§ 5A-5O (the "Massachusetts False Claims Act" or "MFCA") in SUFFOLK SUPERIOR COURT and alleged that JAVIER GONZALEZ and JAMIL

ROMAN had failed to purchase and affix tax stamps on three kilograms of cocaine acquired or possessed in the Commonwealth as required pursuant to the CST.[4]

402. PATRICK, as governor of Massachusetts, was served with a copy of the complaint in the *Qui Tam* Action.

403. White House visitor logs show that GOODLANDER visited the White House on or about June 28, 2014.

404. HOLDER was the Fake Attorney General of the United States when the *Qui Tam* Action commenced.

405. THE RELATOR paid the full filing fee to SUFFOLK SUPERIOR COURT for the commencement of the *Qui Tam* Action.

406. In the *Qui Tam* Action, THE RELATOR submitted evidence in the form of THE RELATOR's tax stamp purchases from the COMMISSIONER to SUFFOLK SUPERIOR COURT demonstrating that JAVIER GONZALEZ and JAMIL ROMAN had not purchased tax stamps in the amount of $600,000 as required pursuant to the CST upon acquisition or possession of three kilograms of cocaine in the Commonwealth of Massachusetts.

407. In the *Qui Tam* Action, THE RELATOR alleged that, pursuant to the CST's 100% non-payment penalty, JAVIER GONZALEZ and JAMIL ROMAN had a financial obligation to the Commonwealth in the amount of $1,200,000 and that JAVIER GONZALEZ and

[4] THE RELATOR filed an amended complaint as to the *Qui Tam* Action in SUFFOLK SUPERIOR COURT at 3 PEMBERTON SQUARE on or about July 9, 2014.

JAMIL ROMAN had violated the MFCA as to the financial obligation to the Commonwealth in the amount of $1,200,000.

408. If the *Qui Tam* Action proceeded, JAVIER GONZALEZ and JAMIL ROMAN would have been subject, upon a finding of liability, to at least a $1.2 million penalty payable to the general fund of the Commonwealth of Massachusetts.

409. If the *Qui Tam* Action proceeded, the U.S. Department of Justice may have lost custody of or have been forced into litigation concerning at least $1.2 million in cash seized from JAVIER GONZALEZ and JAMIL ROMAN.

410. If the Second *Qui Tam* Action proceeded, THE RELATOR could have earned a bounty of $1.2 million.

411. On or about July 16, 2014, THE RELATOR brought a *qui tam* action (the "Second *Qui Tam* Action") based on the Marijuana Federal Criminal Complaint pursuant to the MFCA in SUFFOLK SUPERIOR COURT with DOR as the *qui tam* plaintiff and alleged that the defendants in the Second *Qui Tam* Action had failed to purchase and affix tax stamps on 1,932 kilograms of marijuana acquired or possessed in the Commonwealth as required pursuant to the CST.

412. THE RELATOR paid the full filing fee to SUFFOLK SUPERIOR COURT for the commencement of the Second *Qui Tam* Action.

413. In the Second *Qui Tam* Action, THE RELATOR submitted evidence in the form of THE RELATOR's tax stamp purchases from the COMMISSIONER to SUFFOLK SUPERIOR COURT demonstrating that the defendants in the Second *Qui Tam* Action had not purchased tax stamps in the amount of $6,762,000 as required pursuant to the CST upon

118

acquisition or possession of 1,932 kilograms of marijuana in the Commonwealth of Massachusetts based on the Marijuana Federal Criminal Complaint.

414. In the Second *Qui Tam* Action, THE RELATOR alleged that, pursuant to the CST's 100% non-payment penalty, the defendants in the Second *Qui Tam* Action had a financial obligation to the Commonwealth in the amount of $13,524,000 and that the defendants in the Second *Qui Tam* Action had violated the MFCA as to the financial obligation to the Commonwealth in the amount of $13,524,000 based on the Marijuana Federal Criminal Complaint.

415. If the Second *Qui Tam* Action proceeded, the defendants in the Second *Qui Tam* Action would have been subject to, upon a finding of liability, at least a $13,524,000 penalty payable to the general fund of the Commonwealth of Massachusetts.

416. If the Second *Qui Tam* Action proceeded, the U.S. Department of Justice may have lost custody of or have been forced into litigation concerning any cash or property seized and/or intended to be seized from the defendants in the Second *Qui Tam* Action.

417. If the Second *Qui Tam* Action proceeded, THE RELATOR could have earned a bounty of over $4 million.

418. White House visitor logs show that GOODLANDER visited the White House on or about July 10, 2014.

419. White House visitor logs show that WALSH visited the White House on or about July 21, 2014.

420. White House visitor logs show that STEVEN KOH visited the White House on or about July 30, 2014.

421. White House visitor logs show that GOODLANDER visited the White House on or about August 13, 2014.

422. White House visitor logs show that ORTIZ visited the White House on or about August 13, 2014.

423. White House visitor logs show that FLATGARD visited the White House on or about August 18, 2014.

424. White House visitor logs show that GOODLANDER visited the White House on or about August 27, 2014.

425. White House visitor logs show that FLATGARD visited the White House on or about September 12, 2014.

426. White House visitor logs show that SARIS visited the White House on or about September 15, 2014.

427. White House visitor logs show that FLATGARD visited the White House on or about September 15, 2014.

428. White House visitor logs show that FLATGARD visited the White House on or about September 24, 2014.

429. On or about October 3, 2014, the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH served on THE RELATOR a motion to dismiss and a memorandum of law in support of its motion to dismiss both the *Qui Tam* Action and the Second *Qui Tam* Action (the "Dismissal Papers") in SUFFOLK SUPERIOR COURT.

430. A number of law enforcement agencies of the Commonwealth of Massachusetts, including the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH,

accepted approximately $6,209,584 through the Equitable Sharing Program in federal Fiscal Year 2015, during which time the same agencies declined to bring any criminal prosecutions pursuant to the CST in 100% of cases.

431. Federal Fiscal Year 2015 was October 1, 2014 to September 30, 2015.

432. On or about October 3, 2014, COAKLEY, CRAFTS, and/or an employee of the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH mailed the Dismissal Papers through the United States Postal Service to THE RELATOR.

433. The Dismissal Papers show COAKLEY, as Attorney General of the Commonwealth, and CRAFTS, as Assistant Attorney General of the Commonwealth, on the signature line.

434. In the Dismissal Papers, the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH represented in writing to SUFFOLK SUPERIOR COURT that

> The arguments relied on by the Commonwealth in support of this Motion represent the type of "'non-merits, non-jurisdictional rules of dismissal'" which properly precede resolution of subject matter jurisdiction questions.

435. In the Dismissal Papers, the Attorney General represented in writing to SUFFOLK SUPERIOR COURT that "[f]ollowing the Mullins decision, the COMMISSIONER [of the Massachusetts Department of Revenue] directed DOR to abstain from enforcing the Controlled Substances Tax" (the "Secret CST Suspension Directive").

436. The COMMISSIONER did not direct DOR to abstain from enforcing the CST before the commencement of the Qui Tam Action as stated in writing by the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH.*

437. In the Dismissal Papers, the Attorney General represented in writing to SUFFOLK SUPERIOR COURT that, as to the CST, "[t]he COMMISSIONER determined that enforcement of this statute would result in an administrative burden for DOR and would jeopardize potential criminal prosecutions in the Commonwealth, and that "[t]his instruction was appropriate and within the discretion of the COMMISSIONER."

438. The COMMISSIONER publishes all Department of Revenue rules, regulations, directives, and determinations on the official website of the Commonwealth of Massachusetts.*

439. There was no evidence of the existence of the Secret CST Suspension Directive when the *Qui Tam* Action commenced.*

440. There was no evidence of the existence Secret CST Suspension Directive when the Dismissal Papers were mailed, except for representations made by the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH in the Dismissal Papers or in connection with the preparation of the Dismissal Papers.*

441. Since the *Qui Tam* Action commenced, the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH and the COMMISSIONER have not provided THE RELATOR with any document or documents setting forth the text, date, and/or manner of dissemination of the Secret CST Suspension Directive.

442. One or more of the DOJ PAID ASSOCIATES authored or contributed to authoring the Dismissal Papers.

443. In the Dismissal Papers, there was no information concerning one or more payments accepted or intended to be accepted from the Equitable Sharing Program.

444. In the Dismissal Papers, there was no information concerning any financial interest of one or more employees of the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH and/or the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH as an institution.

445. In the Dismissal Papers, there was no information concerning money accepted by the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH and/or one or more employees of the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH from the Equitable Sharing Program.

446. In the Dismissal Papers, there was no information concerning the forfeiture of assets to law enforcement agencies of the Commonwealth pursuant to state and/or federal narcotics laws.

447. One or more of the RICO ASSOCIATES and/or one or more employees of the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH fabricated the Secret CST Suspension Directive in the Dismissal Papers.*

448. One or more of the RICO ASSOCIATES and/or one or more employees of the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH fabricated the Secret CST Suspension Directive in the Dismissal Papers in order to use the Secret CST Suspension Directive to hide, conceal, and/or obscure an agreement or agreements to accept money from the Equitable Sharing Program in exchange for moving to dismiss the *Qui Tam* Action.*

449. One or more of the RICO ASSOCIATES and/or one or more employees of the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH fabricated the Secret

CST Suspension Directive in the Dismissal Papers in order to use the Secret CST Suspension Directive to hide, conceal, and/or obscure an agreement or agreements to accept money from the Equitable Sharing Program in exchange for moving to dismiss the Second *Qui Tam* Action or for not prosecuting the defendants in the Second *Qui Tam* Action.

450. White House visitor logs show that PATRICK visited the White House on or about October 18, 2014.

451. White House visitor logs show that YATES visited the White House on or about October 22, 2014.

452. On or about October 23, 2014, CRAFTS and/or an employee of the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH filed the Dismissal Papers and THE RELATOR's opposition thereto with SUFFOLK SUPERIOR COURT pursuant to Massachusetts Superior Court Rule 9A.

453. White House visitor logs show that YATES visited the White House on or about October 23, 2014.

454. White House visitor logs show that YATES visited the White House on or about October 27, 2014.

455. On or about November 17, 2014, SUFFOLK SUPERIOR COURT held oral argument (the "Superior Court Oral Argument") concerning the Dismissal Papers.

456. White House visitor logs show that PATRICK visited the White House on or about November 18, 2014.

457. White House visitor logs show that HOLDER visited the White House on or about November 23, 2014.

458. On or about November 18, 2014, an employee of the Commonwealth signed and/or submitted electronically or by mail one or more requests to the Equitable Sharing Program at the U.S. Department of Justice in connection with activities of the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH.

459. At the Superior Court Oral Argument, CRAFTS and CRAY, along with Joe Tierney from the Massachusetts Department of Revenue, appeared for the Commonwealth.

460. At the Superior Court Oral Argument, CRAFTS represented to SUFFOLK SUPERIOR COURT that

> [T]he COMMISSIONER of Revenue, after the 1998 Mullins decision, directed DOR not to enforce the Controlled Substances Tax. People have voluntarily complied with the tax since then but very, very few. And the instruction, the COMMISSIONER's instruction was appropriate and it's something that as he was delegated that authority by the legislature so it's in his power to decide which laws to enforce or not to enforce.

461. On or about December 1, 2014, THE RELATOR commenced the Rigged O'Toole Action against the COMMISSIONER, DOJ, and the United States.

462. On or about December 1, 2014, O'TOOLE was assigned to the Rigged O'Toole Action by FARRELL and/or an employee supervised by FARRELL.

463. White House visitor logs show that WALSH visited the White House on or about December 1, 2014.

464. White House visitor logs show that YATES visited the White House on or about December 3, 2014.

465.    On or about December 10, 2014, SUFFOLK SUPERIOR COURT allowed the Attorney

        General's motion to dismiss the *Qui Tam* Action and the Second *Qui Tam* Action.

466.    White House visitor logs show that YATES visited the White House on or about

        December 12, 2014.

467.    White House visitor logs show that FLATGARD visited the White House on or about

        December 15, 2014.

468.    White House visitor logs show that WALSH visited the White House on or about

        December 16, 2014.

469.    White House visitor logs show that FLATGARD visited the White House on or about

        December 17, 2014.

470.    On or about December 18, 2014, the OFFICE OF THE ATTORNEY GENERAL OF

        THE COMMONWEALTH received an email regarding an electronic payment ("DOJ

        Wire #1") from the Equitable Sharing Program from the U.S. Marshals Service,

        Massachusetts in the amount of $69,364.57 to the OFFICE OF THE ATTORNEY

        GENERAL OF THE COMMONWEALTH.

471.    White House visitor logs show that FLATGARD visited the White House on or about

        December 19, 2014.

472.    On or about December 31, 2014, THE RELATOR filed a notice of appeal of SUFFOLK

        SUPERIOR COURT's dismissal of the *Qui Tam* Action.

473.    White House visitor logs show that YATES visited the White House on or about January

        6, 2015.

474. On or about January 10, 2015, YATES became Deputy Attorney General of the United States.

475. On or about January 14, 2015, VERNER signed and/or submitted electronically or by mail one or more requests to the Equitable Sharing Program at the U.S. Department of Justice in connection with activities of the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH.

476. White House visitor logs show that WALSH visited the White House on or about January 14, 2015.

477. White House visitor logs show that YATES visited the White House on or about January 14, 2015.

478. On or about January 16, 2015, HOLDER, as Attorney General of the United States, issued an order setting forth a new policy prohibiting federal agency forfeiture, or "adoptions," of assets seized by state and local law enforcement agencies, with a limited public safety exception (altogether, the "Equitable Sharing Program Order").

479. On or about January 16, 2015, HOLDER, as Attorney General of the United States, released a public statement concerning the Equitable Sharing Program Order in which HOLDER stated that "[t]his new policy will ensure that these authorities can continue to be used to take the profit out of crime and return assets to victims, while safeguarding civil liberties."

480. On or about January 16, 2015, DOJ released a statement on its official website concerning the Equitable Sharing Order in which DOJ stated that "[s]ince 2000, the

Justice Department has returned approximately $4 billion in forfeited funds to victims of federal crime."

481. White House visitor logs show that YATES visited the White House on or about January 21, 2015.

482. White House visitor logs show that WALSH visited the White House on or about January 23, 2015.

483. On or about February 11, 2015, an employee of the Commonwealth received a check (the "Equitable Sharing Check") under the Equitable Sharing Program from IRS in the amount of $949,919.10.

484. The ESSEX DA deposited some portion of the Equitable Sharing Check into EQUITABLE SHARING ACCOUNTS 1-X.

485. The ESSEX DA mailed some portion of the Equitable Sharing Check to the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH.

486. DAWLEY was and/or is an employee of the ESSEX DA.

487. DAWLEY, MAZZONE, MURPHY, and/or VERNER sent and/or received one or more emails concerning the Equitable Sharing Check.

488. DAWLEY, MAZZONE, MURPHY, and/or VERNER worked with JOHN DOE 1-X in order to acquire the Equitable Sharing Check.*

489. White House visitor logs show that YATES visited the White House on or about February 3, 2015.

490. White House visitor logs show that YATES visited the White House on or about February 6, 2015.

491. White House visitor logs show that YATES visited the White House on or about February 11, 2015.

492. White House visitor logs show that YATES visited the White House on or about February 13, 2015.

493. White House visitor logs show that ORTIZ visited the White House on or about February 17, 2015.

494. White House visitor logs show that ORTIZ visited the White House on or about February 18, 2015.

495. White House visitor logs show that YATES visited the White House on or about February 18, 2015.

496. White House visitor logs show that BUNZEL visited the White House on or about February 23, 2015.

497. In or about February 2015, THE RELATOR took the LSAT examination.

498. White House visitor logs show that HEALEY met with SIMAS on or about March 3, 2015 at the White House.

499. On or about March 13, 2015, the U.S. Department of Justice published on its official website the statistics for federal Fiscal Year 2014 Equitable Sharing Program payments of cash and sale proceeds to law enforcement agencies of the Commonwealth of Massachusetts.

500. White House visitor logs show that KATZMANN visited the White House on or about March 17, 2015.

501. Either IRS or some other agency or department within the U.S. Department of Treasury, or both, made one or more payments to the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH during 2014, 2015, and/or 2016 under the Equitable Sharing Program.

502. As federal agent(s), JOHN DOE 1-X was or were involved with one or more payments made to the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH by IRS.*

503. As federal agent(s), JOHN DOE 1-X were involved with multiple payments made to the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH by DOJ.*

504. The U.S. Department of Justice made no disclosure as to the statistics for Equitable Sharing Program payments of cash and sale proceeds to law enforcement agencies of the Commonwealth of Massachusetts during federal Fiscal Year 2014 up until the disclosure on its official website on or about March 13, 2015.

505. The U.S. Department of Justice made no disclosure as to statistics of Equitable Sharing Program payments of cash and sale proceeds during federal Fiscal Year 2014 in any state or federal case in which THE RELATOR was and/or is a party and in which the U.S. Department of Justice was and/or is a party and/or acted as counsel.

506. The OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH made no disclosure as to receipt of Equitable Sharing Program payments of cash and sale proceeds during federal Fiscal Year 2014 in multiple federal court cases in which THE RELATOR was and/or is a party and in which the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH was and/or is a party and/or acted as counsel.

507. Absent a voluntary or court-ordered disclosure, THE RELATOR had no way of ascertaining the statistics for federal Fiscal Year 2014 Equitable Sharing Program payments of cash and sale proceeds from the U.S. Department of Justice to law enforcement agencies of the Commonwealth of Massachusetts until after the U.S. Department of Justice published such statistics on or about March 13, 2015.

508. On or about March 29, 2015, THE RELATOR paid a fee and submitted an application for the juris doctor program at Boston College Law School through a website operated by LSAC.

509. On or about March 29, 2015, THE RELATOR paid a fee and submitted an application for the juris doctor program at Cornell Law School through a website operated by LSAC.

510. On or about March 29, 2015, THE RELATOR paid a fee and submitted an application for the juris doctor program at University of Pennsylvania Law School through a website operated by LSAC.

511. On or about March 29, 2015, THE RELATOR paid a fee and submitted an application for the juris doctor program at University of Virginia Law School through a website operated by LSAC.

512. On or about March 29, 2015, THE RELATOR paid a fee and submitted an application for the juris doctor program at Northwestern Law School through a website operated by LSAC.

513. On or about March 29, 2015, THE RELATOR paid a fee and submitted an application for the juris doctor program at University of Chicago Law School through a website operated by LSAC.

514. On or about March 29, 2015, THE RELATOR paid a fee and submitted an application for the juris doctor program at Columbia Law School through a website operated by LSAC.

515. In his personal statement in his applications to Boston College Law School and Cornell Law School, THE RELATOR wrote about being a *pro se* litigant in litigation concerning the CST.

516. On or about April 7, 2015, the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH deposited and/or made an accounting record of an electronic or check payment (the "April 2015 Payment") from the Equitable Sharing Program in the amount of $12,543.00

517. On or about April 8, 2015, the appeal of the dismissal of the *Qui Tam* Action was entered in the Massachusetts Appeals Court.

518. White House visitor logs show that PATRICK visited the White House on or about April 10, 2015.

519. On or about April 13, 2015, THE RELATOR received a phone call from an employee of Boston College Law School notifying THE RELATOR that he had been accepted for the juris doctor program at Boston College Law School.

520. On or about April 13, 2015, THE RELATOR received a phone call from an employee of Boston College Law School notifying THE RELATOR that he had one week to accept the offer of admission to Boston College Law School by paying a deposit of approximately $500 and that if THE RELATOR did not accept the offer of admission within one week by paying a deposit of approximately $500, then Boston College Law School would rescind THE RELATOR's acceptance to Boston College Law School.

521. On or about April 13, 2015, THE RELATOR received an email from Boston College Law School notifying him that he had been accepted for the juris doctor program at Boston College Law School.

522. On or about April 15, 2015, THE RELATOR mailed a deposit of approximately $500 to attend the juris doctor program at Boston College Law School.

523. White House visitor logs show that FLATGARD visited the White House on or about April 15, 2015.

524. White House visitor logs show that FLATGARD visited the White House on or about April 17, 2015.

525. On or about April 20, 2015, LSAC was made aware that THE RELATOR sent a deposit to attend the juris doctor program at Boston College Law School.*

526. On or about April 20, 2015, one or more employees of Cornell Law School was made aware that THE RELATOR sent a deposit to attend the juris doctor program at Boston College Law School.*

527. On or about April 20, 2015, one or more employees of Cornell Law School was made aware that THE RELATOR sent a deposit to attend the juris doctor program at Boston College Law School by one or more employees of Boston College Law School and/or through LSAC.*

528. On or about April 27, 2015, THE RELATOR received an email from Cornell Law School notifying him that he had been denied admission to the juris doctor program at Cornell Law School.

529. The decision by Cornell Law School to deny admission to THE RELATOR for the juris doctor program at Cornell Law School was made after one or more employees at Cornell Law School became aware that THE RELATOR had sent a deposit to attend the juris doctor program at Boston College Law School through the LSAC website and/or by an employee of Boston College Law School and/or LSAC.*

530. LSAC provides participating law schools, including, but not limited to, Cornell Law School and Boston College Law School, with a website through which application information for a particular applicant can be viewed.*

531. Cornell Law School, Boston College Law School, and/or other participating law schools use a website provided by LSAC to avoid providing admission to students who have already decided to attend or provided a deposit to attend a different law school, thereby lowering the percentage of students admitted.*

532. On or about April 27, 2015, HOLDER resigned as the Attorney General of the United States.

533. On or about April 27, 2015, LORETTA LYNCH became the Attorney General of the United States.

534. White House visitor logs show that FLATGARD visited the White House on or about April 29, 2015.

535. White House visitor logs show that SARIS visited the White House on or about May 1, 2015.

536. White House visitor logs show that FLATGARD visited the White House on or about May 11, 2015.

537. White House visitor logs show that FLATGARD visited the White House on or about May 12, 2015.

538. White House visitor logs show that FLATGARD visited the White House on or about May 13, 2015.

539. In or about May 2015, SAVERY donated approximately $500 to HEALEY's campaign for the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH.

540. On or about May 21, 2015, DAWLEY mailed or otherwise transferred a portion of the Equitable Sharing Check to the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH in the amount of $316,870.75.

541. On or about May 22, 2015, SIMAS was introduced by ROUGEAU as the commencement speaker to the Class of 2015 at Boston College Law School.

542. On or about May 28, 2015, MAZZONE submitted a form to the Budget Office of the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH for the portion of the Equitable Sharing Check that was sent to the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH in the amount of $316,870.75.

543. On or about June 2, 2015, the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH deposited and/or made an accounting record of an electronic or check payment (the "June 2, 2015 Payment") from the Equitable Sharing Program in the amount of $316,870.75.

544. On or about June 4, 2015, THE RELATOR served his opening brief in the Massachusetts Appeals Court in the appeal of the dismissal of the *Qui Tam* Action by SUFFOLK SUPERIOR COURT.

545. On or about June 22, 2015, the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH deposited and/or made one or more accounting records of multiple check and/or electronic payments (the "June 22, 2015 Payments") from the Equitable Sharing Program totaling in excess of $30,000.

546. The June 2, 2015 Payment and the June 22, 2015 Payments (altogether, the "June 2015 Payments") exceeded approximately $345,000.

547. On or about June 25, 2015, CRAFTS filed a motion for summary disposition and for leave to file a memorandum in lieu of a brief (the "Summary Disposition Memorandum") in the appeal of the dismissal of the *Qui Tam* Action by SUFFOLK SUPERIOR COURT in the Massachusetts Appeals Court.

548. The Summary Disposition Memorandum stated that the COMMISSIONER issued the Secret CST Suspension Directive.

549. The Summary Disposition Memorandum stated that after Mullins, the COMMISSIONER suspended enforcement of the CST.

550. The Summary Disposition Memorandum did not mention payments received by one or more employees of the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH through the Equitable Sharing Program from the U.S. Department of Justice and/or the U.S. Department of Treasury.

551. The Summary Disposition Memorandum did not mention any conflict of interest as to representation of the Commonwealth by the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH in any action involving THE RELATOR and/or the CST.

552. The Dismissal Papers show HEALEY, as Attorney General of the Commonwealth, and CRAFTS, as Assistant Attorney General of the Commonwealth, on the signature line.

553. On or about June 25, 2015, CRAFTS mailed the Summary Disposition Memorandum through the United States Postal Service to THE RELATOR.

554. On or about July 6, 2015, CARHART entered an order which referred the Summary Disposition Memorandum to the panel designated to decide the appeal.

555. 40 WINTHROP STREET was and/or is being used to carry on or advance the purpose of the ENTERPRISE by WOLOHOJIAN and HEALEY.

556. In or about July 2015, WOLOHOJIAN and HEALEY discussed KATZMANN's participation in the appeal of the dismissal of the *Qui Tam* Action in the Massachusetts Appeals Court at 40 WINTHROP STREET.*

557. White House visitor logs show that AKUETE visited the White House on or about July 22, 2015.

558. White House visitor logs show that HOLDER visited the White House on or about July 23, 2015.

559. On or about July 30, 2015, OBAMA nominated Jennifer Choe Groves to be a judge of the United States Court of International Trade.

560. On or about July 30, 2015, OBAMA nominated KATZMANN to be a judge of the United States Court of International Trade.

561. In or about July 2015, O'TOOLE entered an opinion and/or order dismissing the Rigged O'Toole Action.

562. O'TOOLE is a former employee of the law firm, Hale & Dorr, which is now known as and/or become part of WILMERHALE.

563. OBAMA intended to offer KATZMANN a judgeship on the United States Court of International Trade because of or in exchange for a favorable ruling and/or to influence the outcome in the appeal of the dismissal of the *Qui Tam* Action.*

564. On or about August 20, 2015, THE RELATOR electronically transferred approximately $24,705 to BOSTON COLLEGE and BOSTON COLLEGE ACCOUNTS 1-X using a BOSTON COLLEGE electronic payment website.

565. THOMAS DURKIN provided BRIAN DURKIN with money to carry on the affairs of the ENTERPRISE during the years of 2015, 2016, 2017 and/or 2018.*

566. TORIL FORLAND and DAVID LAMPERT provided THOMAS LAMPERT with money to carry on the affairs of the ENTERPRISE during the years of 2015, 2016, 2017 and/or 2018.*

567. During the years of 2015, 2016, 2017, 2018, and/or 2019 TORIL FORLAND, DAVID LAMPERT, HENRIK LAMPERT, and THOMAS LAMPERT travelled to Nicaragua together on one or more occasions.

568. During the years of 2015, 2016, 2017, 2018, and/or 2019 HENRIK LAMPERT travelled to Nicaragua on multiple occasions.

569. The CIA website describes Nicaragua as a "transshipment point for cocaine destined for the US and transshipment point for arms-for-drugs dealing."

570. BRIAN DURKIN, THOMAS DURKIN, THOMAS LAMPERT, DAVID LAMPERT, HENRIK LAMPERT, and TORIL FORLAND knew each other prior to BRIAN

DURKIN and THOMAS LAMPERT attending classes at BCLS at 885 CENTRE STREET.

571. THOMAS LAMPERT and BRIAN DURKIN lived in the same residence during some or all of the years 2015, 2016, 2017, and/or 2018.

572. THOMAS LAMPERT and BRIAN DURKIN attended the same high school at the same time.

573. One or more of the RICO ASSOCIATES, one or more employees of WILMERHALE, and/or one or more employees of BOSTON COLLEGE monitored THE RELATOR's Boston College email account ("the "BC Email Account") during some or all of the time that THE RELATOR was a student at BCLS at 885 CENTRE STREET.*

574. One or more of the RICO ASSOCIATES, one or more employees of WILMERHALE, one or more employees of the Commonwealth of Massachusetts, and/or one or more employees of BOSTON COLLEGE monitored and/or performed human surveillance of THE RELATOR during some or all of the time that THE RELATOR was a student at BCLS at 885 CENTRE STREET.*

575. One or more of the RICO ASSOCIATES, one or more employees of WILMERHALE, one or more employees of the Commonwealth of Massachusetts, and/or one or more employees of BOSTON COLLEGE monitored and/or performed electronic surveillance of THE RELATOR during some or all of the time that THE RELATOR was a student at BCLS at 885 CENTRE STREET.*

576. On at least one occasion during a class at BCLS at 885 CENTRE STREET in which THE RELATOR was a student and BRODIN was the professor, BRODIN made comments

corresponding to information that had been recently transmitted through the BC EMAIL ACCOUNT regarding OBAMA's place of birth.

577. During the years 2015 to 2018, both years being inclusive and approximate, ROUGEAU was aware of and tolerated cocaine distribution and use at 885 CENTRE STREET.

578. Beginning on or about August 21, 2015 and at various times when THE RELATOR attended classes at BCLS at 885 CENTRE STREET, one or more of the RICO ASSOCIATES, one or more employees of WILMERHALE, and/or one or more employees of BOSTON COLLEGE shared and/or communicated information from the BC Email Account.*

579. On or about August 24, 2015, THE RELATOR began attending classes at BCLS at 885 CENTRE STREET as a first-year law student.

580. On or about September 1, 2015, THE RELATOR obtained accounts (the "Legal Research Accounts") for legal research services from WestLaw and LexisNexis through BOSTON COLLEGE.

581. One or more of the RICO ASSOCIATES, one or more employees of WILMERHALE, and/or one or more employees of BOSTON COLLEGE sent, received, or otherwise obtained information from the Legal Research Accounts on one or more occasions while or after THE RELATOR was a student at BCLS at 885 CENTRE STREET.*

582. Beginning on September 1, 2015 to and including October 31, 2018, both dates being approximate, THE RELATOR used the BC Email Account to store, obtain, or otherwise transmit privileged legal information (the "Privileged Information") concerning THE RELATOR's litigation.

583. Beginning on September 1, 2015 to and including January 7, 2020, both dates being approximate, THE RELATOR used the Legal Research Accounts to store, obtain, or otherwise transmit Privileged Information concerning THE RELATOR's litigation.

584. One or more of the RICO ASSOCIATES, one or more employees of WILMERHALE, and/or one or more employees of BOSTON COLLEGE acquired, possessed, and/or communicated Privileged Information during some time between September 1, 2015 to and including January 7, 2020, both dates being approximate.*

585. On or about September 7, 2015, OBAMA and HEALEY met in or around Boston, Massachusetts.

586. On or about September 11, 2015, KAGAN attended an event at BCLS at 885 CENTRE STREET.

587. White House visitor logs show that HOLDER visited the White House on or about September 18, 2015.

588. White House visitor logs show that WALSH visited the White House on or about September 23, 2015.

589. On or about October 2, 2015, LORETTA LYNCH, ORTIZ, and HEALEY met in or around Waltham, Massachusetts.

590. White House visitor logs show that HOLDER visited the White House on or about October 7, 2015.

591. White House visitor logs show that HOLDER visited the White House on or about October 8, 2015.

592. White House visitor logs show that BARRON visited the White House on or about October 10, 2015.

593. On or about October 18, 2015, O'TOOLE entered an opinion and/or order (the "October 2015 Opinion") in which O'TOOLE found that "[t]he plaintiff's change in nomenclature [between voluntary election and voluntary compliance] does not alter the underlying situation; the COMMISSIONER does not take any active steps to enforce the CST."

594. In finding no distinction between voluntary compliance and a voluntary election in the October 2015 Opinion, O'TOOLE made a legally frivolous finding: O'TOOLE's finding that THE RELATOR's "change in nomenclature does not alter the underlying situation" was frivolous because voluntary compliance and voluntary election are mutually exclusive terms of art. See McKeown v. Comm'r, 49 T.C.M. (CCH) 781, 1985 WL 14709, at *1 (1985) (holding "concept of voluntary compliance does not refer to whether one volunteers to be liable for tax."); Donelin v. Comm'r, 47 T.C.M. (IIJ) 1286, 1984 WL 15453, at *1 (1984) (holding interpretation of "voluntary compliance" to mean "voluntary" was frivolous and imposing sanctions of $500 for frivolous argument).

595. White House visitor logs show that WALSH visited the White House on or about October 23, 2015.

596. White House visitor logs show that HOLDER visited the White House on or about November 2, 2015.

597. White House visitor logs show that DIAMOND visited the White House on or about November 3, 2015.

598. On or about November 5, 2015, ROUGEAU, SIMAS, MAZZONE, and/or CURTIN attended the same event at or around 885 CENTRE STREET.

599. White House visitor logs show that SARIS visited the White House on or about November 6, 2015.

600. On or about November 9, 2015, the Massachusetts Appeals Court sent a notice seeking information on unavailability for oral argument in January 2016 as to the appeal of the dismissal of the *Qui Tam* Action.

601. On or about November 23, 2015, the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH received an electronic or check payment (the "November 23 Payment") from the Equitable Sharing Program in the amount of $127,378.80.

602. White House visitor logs show that HOLDER visited the White House on or about November 24, 2015.

603. White House visitor logs show that YATES visited the White House on or about December 10, 2015.

604. On or about December 18, 2015, the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH received an email regarding an electronic payment ("DOJ Wire #2") from the Equitable Sharing Program in the amount of $22,298.53 to the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH.

605. White House visitor logs show that WALSH visited the White House on or about January 5, 2016.

606.	On or about January 10, 2016, THE RELATOR electronically transferred approximately $25,990 to BOSTON COLLEGE and BOSTON COLLEGE ACCOUNTS 1-X using a BOSTON COLLEGE electronic payment website.

607.	On or about January 11, 2016, the Massachusetts Appeals Court held oral argument (the "Appeals Court Oral Argument") at the John Adams Courthouse as to THE RELATOR's appeal of SUFFOLK SUPERIOR COURT's allowance of the Attorney General's motion to dismiss the *Qui Tam* Action.

608.	White House visitor logs show that HOLDER visited the White House on or about January 11, 2016.

609.	At the Appeals Court Oral Argument, THE RELATOR quoted from the opinion of Associate Justice of the Supreme Court of the United States, Antonin Scalia ("Scalia"), in the case of Dep't of Revenue of Montana v. Kurth Ranch, 511 U.S. 767 (1994) and specifically mentioned Scalia by name.

610.	At the Appeals Court Oral Argument, CRAFTS stated (the "CRAFTS Statement") that, "[s]ince the Mullins decision came down, the COMMISSIONER of Revenue determined that there would be absolutely no enforcement of the Controlled Substances Tax either with respect to referrals from law enforcement or otherwise."

611.	At the Appeals Court Oral Argument and in response to the CRAFTS Statement, KATZMANN asked CRAFTS (the "Gotcha Question"), "Where is that in the record, that the COMMISSIONER has made that determination?"

612.	At the Appeals Court Oral Argument, CRAFTS responded to the Gotcha Question by stating that, "[i]t's in the brief. There's no support for it in the record."

144

613.   At the Appeals Court Oral Argument and excluding THE RELATOR, one or more Boston College Law School students was present in the courtroom and/or at the courthouse.

614.   On or about January 11, 2016, KELLER was made aware of THE RELATOR's participation in and the course of events at the Appeals Court Oral Argument by one or more BCLS students who was present at the Appeals Court Oral Argument.*

615.   White House visitor logs show that HEALEY visited the White House on or about January 12, 2016.

616.   On or about January 13, 2016, LORETTA LYNCH and HEALEY met in or around Boston, Massachusetts.

617.   White House visitor logs show that YATES visited the White House on or about January 13, 2016.

618.   On or about January 20, 2016, LORETTA LYNCH, ORTIZ, and HEALEY met in or around Boston, Massachusetts.

619.   White House visitor logs show that WALSH visited the White House on or about January 21, 2016.

620.   White House visitor logs show that HENNRIKUS visited the White House on or about January 21, 2016.

621.   On or about January 27, 2016, the U.S. Department of Justice published on its official website the statistics for federal Fiscal Year 2015 Equitable Sharing Program payments of cash and sale proceeds to law enforcement agencies of the Commonwealth of Massachusetts.

622. The U.S. Department of Justice made no public disclosure as to the statistics for Equitable Sharing Program payments of cash and sale proceeds to law enforcement agencies of the Commonwealth of Massachusetts during federal Fiscal Year 2015 up until the disclosure on its official website on or about January 27, 2016.*

623. The U.S. Department of Justice made no public disclosure as to statistics of Equitable Sharing Program payments of cash and sale proceeds during federal Fiscal Year 2015 in any state or federal court case in which THE RELATOR was and/or is a party and in which the U.S. Department of Justice was and/or is a party and/or acted as counsel.*

624. The OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH made no disclosure as to receipt of Equitable Sharing Program payments of cash and sale proceeds during federal Fiscal Year 2015 in any state or federal court case in which THE RELATOR was and/or is a party and in which the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH was and/or is a party and/or acted as counsel.

625. Absent disclosure from DOJ or the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH, THE RELATOR had no way of ascertaining the statistics for federal Fiscal Year 2015 Equitable Sharing Program payments of cash and sale proceeds from the U.S. Department of Justice to law enforcement agencies of the Commonwealth of Massachusetts until after the U.S. Department of Justice published such statistics on or about January 27, 2016.

626. On or about January 27, 2016, the Committee on the Judiciary of the United States Senate held a hearing to consider the nominations of KATZMANN and Jennifer Choe Groves to be judges on the U.S. Court of International Trade.

627. On or about January 27, 2016, KATZMANN and Jennifer Choe Groves both testified during the same hearing before the Committee on the Judiciary of the United States Senate.

628. White House visitor logs show that HEALEY visited the White House on or about January 29, 2016.

629. In or about January 2016, a student at BCLS stated to THE RELATOR during a class at 885 CENTRE STREET: "I love cocaine."

630. White House visitor logs show that HOLDER visited the White House on or about February 2, 2016.

631. On or about February 4, 2016, MCCAFFERTY attended an event at 885 CENTRE STREET along with two other federal judges with all three federal judges in attendance having been appointed by OBAMA.

632. White House visitor logs show that BARBADORO and GARLAND visited the White House on or about February 12, 2016.

633. During his visit to the White House on or about February 12, 2016, BARBADORO discussed a potential vacancy on the Supreme Court of the United States.*

634. During his visit to the White House on or about February 12, 2016, GARLAND discussed a potential vacancy on the Supreme Court of the United States.*

635. On or about February 12, 2016, Scalia travelled to the State of Texas without his United States Marshal Service security detail.

636. On or about February 13, 2016, Scalia died in or around Marfa, Texas, which is approximately sixty miles from the United States-Mexico border.

637. No autopsy was performed on Scalia's body after Scalia's body was found unresponsive in or around Marfa, Texas.

638. On or about February 13, 2016, a justice of the peace in the State of Texas certified that Scalia died from natural causes without examining Scalia's body.*

639. On or about February 13, 2016, a justice of the peace in the State of Texas certified that Scalia died from natural causes based on a phone conversation.*

640. On or about February 13, 2016, Scalia was murdered in or around Marfa, Texas.*

641. OBAMA previously made public his desire to replace Scalia on the Supreme Court of the United States.

642. OBAMA, BRODIN, KELLER, BARBADORO, GARLAND, and/or one or more other RICO ASSOCIATES have knowledge regarding Scalia's murder.*

643. On or about February 13, 2016, OBAMA made televised remarks regarding Scalia's death, during which remarks OBAMA stated his intent to nominate a justice to replace Scalia.*

644. On or about February 23, 2016, the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH deposited and/or made one or more accounting records of multiple check and/or electronic payments (the "February 23 Payments") from the Equitable Sharing Program totaling in excess of $15,000.

645. On or about February 24, 2016, the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH deposited and/or made one or more accounting records of multiple check and/or electronic payments (the "February 24 Payments") from the Equitable Sharing Program totaling in excess of $15,000.

646. On or about February 24, 2016, WOLOHOJIAN served on one or more appellate panels hearing oral argument with NEYMAN at the John Adams Courthouse.

647. On or about February 25, 2016, the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH deposited and/or made one or more accounting records of multiple check and/or electronic payments (the "February 25 Payments") from the Equitable Sharing Program totaling in excess of $60,000.

648. The February 23 Payments, February 24 Payments, and February 25 Payments (altogether, the "February 2016 Payments) totaled in excess of $90,000.

649. On or about March 1, 2016, THE RELATOR sent KELLER an email (the "First KELLER Email") from the BC Email Account requesting help for a brief due before the U.S. COURT OF APPEALS FOR THE FIRST CIRCUIT in the appeal of the Rigged O'Toole Action.

650. KELLER did not send a response to the First KELLER Email.

651. Prior to a class at 885 CENTRE STREET in or about March 2016, KELLER stated that she would attempt to find THE RELATOR legal assistance.

652. On or about March 3, 2016, WOLOHOJIAN served on one or more appellate panels hearing oral argument with CARHART and KINDER at the John Adams Courthouse.

653. On or about March 23, 2016, an email (the "Two Federal Judges Email") was sent to all Boston College Law School students stating that "I wanted to make sure you are aware that two Federal judges are coming to campus for major events in the next couple of weeks."

654. The Two Federal Judges Email noted that BARRON and O'TOOLE would be appearing at events at 885 CENTRE STREET.

655. On or about March 28, 2016, WOLOHOJIAN served on one or more appellate panels hearing oral argument with CARHART and KINDER at the John Adams Courthouse.

656. White House visitor logs show that HEALEY visited the White House on or about March 28, 2016.

657. On or about March 29, 2016, BARRON attended an event at 885 CENTRE STREET.

658. BARRON received information regarding the then-pending appeal of the Rigged O'Toole Action when BARRON visited BCLS at 885 CENTRE STREET on or about March 29, 2016.*

659. BARRON's attendance at an event at BCLS at 885 CENTRE STREET on or about March 29, 2016. was sponsored in whole or in part by the Office of the Dean, or ROUGEAU.*

660. THE RELATOR attended all or part of the public event in which BARRON participated on or about March 29, 2016 at BCLS at 885 CENTRE STREET.

661. At his speech at 885 CENTRE STREET on or about March 29, 2016, BARRON made a statement implying and/or to the effect that losing litigants should be concerned with how they lose.

662. At his speech at 885 CENTRE STREET on or about March 29, 2016, BARRON was aware that THE RELATOR had a case pending before the U.S. COURT OF APPEALS FOR THE FIRST CIRCUIT.*

663. In or about April 2016, during a class at 885 CENTRE STREET in which alcohol was being offered to students by the professor, a student at BCLS who was intoxicated from alcohol asked to borrow $20 from THE RELATOR for the purpose of purchasing cocaine from another individual.

664. On or about April 6, 2016, O'TOOLE attended an event at BCLS at 885 CENTRE STREET.

665. White House visitor logs show that KAYYEM visited the White House on or about April 7, 2016.

666. White House visitor logs show that PRESSLEY visited the White House on or about April 11, 2016.

667. On or about April 13, 2016, WOLOHOJIAN served on one or more appellate panels hearing oral argument with NEYMAN and/or KINDER at the John Adams Courthouse.

668. White House visitor logs show that HOLDER visited the White House on or about April 19, 2016.

669. On or about April 20, 2016, WOLOHOJIAN served on one or more appellate panels hearing oral argument with CARHART and KINDER at the John Adams Courthouse.

670. On or about April 21, 2016, THE RELATOR filed a motion for an extension of time to file his opening brief in the appeal of the dismissal of the Rigged O'Toole Action where such brief was due to be filed on April 20, 2016.

671. White House visitor logs show that MAFFEI visited the White House on or about April 22, 2016.

672. White House visitor logs show that WALSH visited the White House on or about April 23, 2016.

673. On or about April 25, 2016, THE RELATOR filed his brief in the appeal of the dismissal of the Rigged O'Toole Action in the U.S. COURT OF APPEALS FOR THE FIRST CIRCUIT.

674. On or about April 27, 2016, WOLOHOJIAN served on one or more appellate panels hearing oral argument with CARHART and KINDER at the John Adams Courthouse.

675. White House visitor logs show that HOLDER visited the White House on or about April 29, 2016.

676. During the summer of 2016, THOMAS LAMPERT was an intern in the Office of the U.S. Attorney for the District of Massachusetts under ORTIZ.*

677. During some time in the years of 2016 and/or 2017, THOMAS LAMPERT was a law clerk for LOWY.*

678. During some time in the years of 2016 and/or 2017, BRIAN DURKIN was a law clerk for a judge of the U.S. DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS at 1 COURTHOUSE WAY.*

679. During some time in the years of 2016 and/or 2017, BRIAN DURKIN was a law clerk for a judge of the U.S. DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS at 1 COURTHOUSE WAY hearing a case involving the Marijuana Federal Criminal Complaint.*

680. White House visitor logs show that COLE visited the White House on or about May 12, 2016.

681. White House visitor logs show that COLE visited the White House on or about May 13, 2016.

682. White House visitor logs show that YATES visited the White House on or about May 13, 2016.

683. White House visitor logs show that HEALEY visited the White House on or about May 24, 2016.

684. White House visitor logs show that WALSH visited the White House on or about May 24, 2016.

685. On or about June 6, 2016, the United States Senate confirmed KATZMANN as a judge for the United States Court of International Trade.

686. On or about June 6, 2016, the United States Senate confirmed Jennifer Choe Groves as a judge for the United States Court of International Trade.

687. On or about June 8, 2016, Jennifer Choe Groves received her commission to be a judge for the United States Court of International Trade from OBAMA.

688. White House visitor logs show that STEVEN KOH visited the White House on or about June 8, 2016.

689. White House visitor logs show that YATES visited the White House on or about June 12, 2016.

690. White House visitor logs show that YATES visited the White House on or about June 13, 2016.

691. White House visitor logs show that HUME visited the White House on or about June 13, 2016.

692. White House visitor logs show that FLATGARD visited the White House on or about June 28, 2016.

693. White House visitor logs show that KOH visited the White House on or about June 28, 2016.

694. White House visitor logs show that KOH met with SIMAS during his visit to the White House on or about June 28, 2016.

695. White House visitor logs show that KANYI MAQUBELA visited the White House on or about June 28, 2016.

696. White House visitor logs show that TEMBA MAQUBELA visited the White House on or about June 28, 2016.

697. White House visitor logs show that VUYELWA MAQUBELA visited the White House on or about June 28, 2016.

698. White House visitor logs show that GOODLANDER visited the White House on or about June 29, 2016.

699. White House visitor logs show that FLATGARD visited the White House on or about July 3, 2016.

700. White House visitor logs show that FLATGARD visited the White House on or about July 4, 2016.

701. On or about July 9, 2016, ROBERTS appointed BARBADORO to serve as chair of the Executive Committee of the Judicial Conference of the United States

702. White House visitor logs show that ROUGEAU visited the White House on or about July 26, 2016.

703. White House visitor logs show that ORTIZ visited the White House on or about July 27, 2016.

704. On or about August 9, 2016, THE RELATOR's appeal of the dismissal of the Rigged O'Toole Action was submitted to an appellate panel (the "First Circuit Panel") in the U.S. COURT OF APPEALS FOR THE FIRST CIRCUIT comprised of SANDRA LYNCH, KAYATTA, and BARRON.

705. On or about August 18, 2016, THE RELATOR electronically transferred approximately $26,761 to BOSTON COLLEGE and BOSTON COLLEGE ACCOUNTS 1-X using a BOSTON COLLEGE electronic payment website.

706. On or about August 22, 2016, in an order signed by KATZMANN, CARHART, and KINDER, the Massachusetts Appeals Court issued an unpublished memorandum and order pursuant to Appeals Court Rule 1:28 (the "Appeals Court Opinion") affirming SUFFOLK SUPERIOR COURT's dismissal of the *Qui Tam* Action.

707. White House visitor logs show that YATES visited the White House on or about August 27, 2016.

708. White House visitor logs show that YATES visited the White House on or about August 28, 2016.

709. On or about September 9, 2016, THE RELATOR filed in the Massachusetts Appeals Court (1) a motion to disqualify the Attorney General alleging that the Attorney General had a financial conflict of interest and was acting in apparent contravention of Mass.Gen.Laws ch. 268 § 36; (2) a petition for rehearing; and (3) a motion requesting

judicial notice[5] of adjudicative facts (the "Judicial Notice Motion"), including, but not limited to, evidence of the Attorney General's receipt of payments totaling $360,755 in seized cash and property from the U.S. Department of Justice's Equitable Sharing Program in federal Fiscal Years 2014 and 2015, including $291,390 in FY2014 and $69,365 in FY2015 (altogether, the "Rehearing Papers").

710.  HOLDER, LORETTA LYNCH, YATES, COLE, and ORTIZ were involved in the approval process for payments made under the Equitable Sharing Program during federal Fiscal Years 2014 and/or 2015.

711.  The Judicial Notice Motion included a printed copy from DOJ's official website of Equitable Sharing Program payments to law enforcement agencies of the Commonwealth, including the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH, for federal Fiscal Years 2014 and 2015.

712.  As THE RELATOR pursuant to the MFCA, THE RELATOR's maximum potential bounty in the *Qui Tam* Action is statutorily limited to $360,000 (30% of $1,200,000).[6]

713.  The difference between THE RELATOR's maximum potential bounty upon prevailing in the *Qui Tam* Action and the amount accepted from the U.S. Department of Justice through the Equitable Sharing Program by the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH during federal Fiscal Years 2014 and 2015 is $755, or approximately two-tenths of one percent.

---

[5] The motion requesting judicial notice was docketed on September 12, 2016 in the Massachusetts Appeals Court.

[6] Because the CST has a criminal law component, the civil penalty multiplier of the MFCA (or any other civil law) cannot apply as a matter of law to the penalty calculation in the *Qui Tam* Action.

714. Federal Fiscal Years 2014 and 2015 coincide with the commencement, dismissal, and/or appeal of the *Qui Tam* Action.

715. On or about September 13, 2016, in an order signed by KATZMANN, CARHART, and KINDER, the Massachusetts Appeals Court ordered that "[t]he Commonwealth is to respond to [the Rehearing Papers] on or before September 22, 2016" (the "Initial Rehearing Order").

716. On or about September 13, 2016, KELLER approached THE RELATOR in the computer lab of the law library of BCLS and asked THE RELATOR to visit her office.

717. During the fall 2016 semester at BCLS, THE RELATOR was not a student in any class taught or instructed by KELLER.

718. The Initial Rehearing Order caused one or more of the RICO ASSOCIATES to seek the removal of KATZMANN and/or the inclusion of NEYMAN from the Massachusetts Appeals Court due to fear of an unfavorable ruling in the appeal of the dismissal of the *Qui Tam* Action and/or fear of disclosures concerning wrongdoing associated with the dismissal of the *Qui Tam* Action and the Second *Qui Tam* Action, concerning non-enforcement of the CST, and/or concerning payments from the Equitable Sharing Program.*

719. On or about September 14, 2016, one or more of the RICO ASSOCIATES and/or one or more employees of the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH called or otherwise communicated with OBAMA, SIMAS, and/or JOHN DOE 1-X to urge the signing of KATZMANN's commission to be a judge on the

U.S. Court of International Trade so as to provide a pretext and/or opportunity for NEYMAN to rule on the Rehearing Papers.*

720. In order to influence, obstruct, and/or corrupt the appeal of the dismissal of the *Qui Tam* Action, OBAMA waited approximately one hundred days to sign the commission for KATZMANN to be a judge of the U.S. Court of International Trade after KATZMANN was confirmed by the United States Senate to be a judge on the U.S. Court of International Trade.*

721. On September 15, 2016, KATZMANN resigned as a justice of the Massachusetts Appeals Court.

722. On September 15, 2016, OBAMA signed the commission for KATZMANN to be a judge of the U.S. Court of International Trade.

723. OBAMA signed the commission for KATZMANN to be a judge of the U.S. Court of International Trade on September 15, 2016 in order to remove KATZMANN from the panel deciding the Rehearing Papers and/or to provide a pretext and/or opportunity for NEYMAN to rule on the Rehearing Papers.*

724. On or about September 15, 2016, BARRON, SANDRA LYNCH, and/or KAYATTA became aware that OBAMA signed the commission for KATZMANN to be a judge of the U.S. Court of International Trade and/or potential issues for the ENTERPRISE concerning the Rehearing Papers.

725. Jennifer Choe Groves and KATZMANN were nominated by OBAMA and confirmed by the United States Senate on the same days – July 30, 2015 and June 8, 2016, respectively – to be judges on the U.S. Court of International Trade.

726. Jennifer Choe Groves received her commission for a judgeship on the U.S. Court of International Trade from OBAMA within two days while KATZMANN received his commission for a judgeship on the U.S. Court of International Trade from OBAMA after approximately 100 days had elapsed.

727. On or about September 15, 2016, NEYMAN joined a new Massachusetts Appeals Court panel reviewing the Rehearing Papers.

728. Rule 27 of the Massachusetts Rules of Appellate Procedure holds in part that "[a] petition for rehearing shall be decided by the quorum or panel which decided the appeal."

729. On or about September 22, 2016, the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH filed an omnibus opposition memorandum (the "Omnibus Opposition") in response to the Petition for Rehearing.

730. HEALEY and FEINER appear on the signature line of the Omnibus Opposition.

731. FEINER mailed or caused to be mailed the Omnibus Opposition to THE RELATOR through the United States Postal Service on or about September 22, 2016.

732. In the Omnibus Opposition, HEALEY and/or FEINER did not provide any additional information beyond the publicly available information from DOJ concerning the acceptance of money from the Equitable Sharing Program during federal Fiscal Years 2014 and 2015 beyond what THE RELATOR asserted in the Rehearing Papers.

733. In the Omnibus Opposition, HEALEY and/or FEINER stated that "[t]he Equitable Sharing Program *described by Relator* does not compromise the Attorney General's Office" (emphasis added).

734. In the Omnibus Opposition, HEALEY and/or FEINER stated that "here, there is nothing about the Equitable Sharing Program *described by Relator* that compromises the Attorney General's Office from responsibly and impartially exercising the ample discretion afforded by the Legislature to dismiss *qui tam* actions and exercise prosecutorial discretion" (emphasis added).

735. In the Omnibus Opposition, HEALEY and/or FEINER did not state that, as to the appeal of the dismissal of the *Qui Tam* Action, there was or is nothing about the Equitable Sharing Program that *in fact* compromises or compromised the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH from responsibly and impartially exercising the discretion afforded by the Massachusetts Legislature to dismiss *qui tam* actions and exercise prosecutorial discretion.

736. Equitable Sharing Program payments from the U.S. Department of Justice to law enforcement agencies in the Commonwealth of Massachusetts were contingent, expressly or impliedly, upon the non-enforcement of the CST during all times relevant to this Complaint.*

737. The OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH's acceptance of money and/or property from the Equitable Sharing Program during federal Fiscal Years 2014, 2015, and/or 2016 was, in whole or in part, in exchange for the non-prosecution of JAVIER GONZALEZ and JAMIL ROMAN pursuant to the CST in connection with the *Qui Tam* Action.*

738. One or more of the RICO ASSOCIATES and/or one or more employees of the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH accepted money and/or

property from the Equitable Sharing Program in exchange for the non-prosecution of JAVIER GONZALEZ and JAMIL ROMAN pursuant to the CST in connection with the *Qui Tam* Action.*

739. The OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH was and is required to keep payments accepted from the Equitable Sharing Program segregated from any state taxpayer funds and/or funds from the state treasury of the Commonwealth.

740. The OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH keeps the payments from the Equitable Sharing Program in EQUITABLE SHARING ACCOUNTS 1-X.*

741. DOJ and/or U.S. Department of Treasury ("Treasury") regulations and/or agreements with DOJ and/or Treasury govern the custody and expenditure of payments made under the Equitable Sharing Program to the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH.

742. No person from the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH, individually or in his or her respective official capacity, notified SUFFOLK SUPERIOR COURT, the Massachusetts Appeals Court, the Massachusetts Supreme Judicial Court, or any federal court of the acceptance of money from the Equitable Sharing Program in the years 2014, 2015, and 2016 by the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH and/or one or more employees of that Office.

743. After being sued by THE RELATOR under the Massachusetts Public Records Act for public records concerning the Equitable Sharing Program, the OFFICE OF THE

ATTORNEY GENERAL OF THE COMMONWEALTH withheld and/or continues to withhold public records as to payments made under the Equitable Sharing Program.

744. HEALEY, TARROW, and/or one or more other attorneys in the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH worked together and continue to work together to prevent the release of public records to THE RELATOR.*

745. On or about September 28, 2016, the U.S. COURT OF APPEALS FOR THE FIRST CIRCUIT entered a judgment (the "First Circuit Judgment") in THE RELATOR's appeal of the dismissal of the Rigged O'Toole Action.

746. The First Circuit Judgment found that "[THE RELATOR] is of the view that the state's policy of non-enforcement is wrongheaded in light of the opioid crisis, but, as the district court concluded, this contention does not create a legally-cognizable injury remediable with declaratory relief."

747. In his appeal of the dismissal of the Rigged O'Toole Action to the U.S. COURT OF APPEALS FOR THE FIRST CIRCUIT, THE RELATOR submitted papers with his brief that had previously been filed in the Rigged O'Toole Action and which stated that it would be "*misleading*" to characterize any of THE RELATOR's alleged injuries as deriving from the opioid crisis (emphasis as in original).

748. On or about October 6, 2016, in an order signed by CARHART, KINDER, and NEYMAN, the Massachusetts Appeals Court denied THE RELATOR's petition for rehearing in the appeal of the dismissal of the *Qui Tam* Action.

749. The fact that NEYMAN was ruling on the appeal of the dismissal of the *Qui Tam* Action was revealed for the first time by the Massachusetts Appeals Court on or about October 6, 2016.

750. On or about October 15, 2016, HEALEY promoted CRAFTS to a position with higher pay and/or a more senior title.*

751. On or about October 15, 2016, HEALEY promoted CRAFTS to Deputy Chief of the False Claims Division of the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH.*

752. HEALEY promoted CRAFTS in exchange and/or because of CRAFTS's involvement in one or more violations of law in connection with the acceptance of payments from the Equitable Sharing Program and/or the disposition of the *Qui Tam* Action and the Second *Qui Tam* Action by the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH.*

753. HEALEY promoted CRAFTS in exchange and/or as a reward for CRAFTS's association with the ENTERPRISE, including acts taken in connection with THE RELATOR's litigation.*

754. On or about October 22, 2016, HOLDER attended and spoke at an event at BOSTON COLLEGE in and/or around Chestnut Hill, Massachusetts.*

755. On or about November 6, 2016, SIMAS met with ROUGEAU and/or MAFFEI in or around 885 CENTRE STREET.*

756. On or about December 6, 2016, THE RELATOR filed a motion for recusal of NEYMAN from participation in THE RELATOR's appeal of the dismissal of the *Qui Tam* Action.

757. On or about December 13, 2016, in an order (the "NEYMAN Recusal Denial") signed by CARHART, KINDER, and NEYMAN, the Massachusetts Appeals Court denied THE RELATOR's motion for recusal of NEYMAN from participation in THE RELATOR's appeal of the dismissal of the *Qui Tam* Action.

758. The NEYMAN Recusal Denial included no statement at all beyond denial of the motion for recusal of NEYMAN.[7]

759. On or about January 15, 2017, THE RELATOR electronically transferred approximately $26,992 to BOSTON COLLEGE and BOSTON COLLEGE ACCOUNTS 1-X using a BOSTON COLLEGE electronic payment website.

760. On or about January 15, 2017, HEALEY hired an attorney from WILMERHALE for a position at the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH.

761. SQUIRES-LEE taught a course during the spring 2017 semester at BCLS at 885 CENTRE STREET.

762. SARAH HERLIHY was a teaching assistant for SQUIRES-LEE when SQUIRES-LEE taught a course during the spring 2017 semester at BCLS at 885 CENTRE STREET.

763. BOSTON COLLEGE paid SARAH HERLIHY through one or more teaching assistant positions during 2017 and/or 2018.*

---

[7] When faced with a question of his capacity to rule fairly, the judge must first consult his own emotions and conscience. If he passes the internal test of freedom from disabling prejudice, he must next attempt an objective appraisal of whether this is a proceeding in which his impartiality might reasonably be questioned. Commonwealth v. Eddington, 71 Mass. App. Ct. 138, 143 (2008).

764. SQUIRES-LEE was aware or became aware of some or all of THE RELATOR's litigation while teaching at BCLS at 885 CENTRE STREET during the spring 2017 semester.*

765. In or about February 2017, an email (the "White Powder Email," attached here at Exhibit 6) was sent to the student body of BCLS describing how a bag of "[a]n unidentified white powder exploded over the third floor" during an event known as "law prom" organized for BCLS students.

766. THE RELATOR incorporates by reference the contents of the White Powder Email (attached hereto at EXHIBIT 6) as if fully set forth herein.

767. On or about February 1, 2017, the U.S. Department of Justice published on its official website the statistics for federal Fiscal Year 2016 Equitable Sharing Program payments of cash and sale proceeds to law enforcement agencies of the Commonwealth of Massachusetts.

768. On or about February 21, 2017, GANTS visited BCLS at 885 CENTRE STREET.

769. In or about February 2017, during a class in which THE RELATOR was a student and BLOOM was the professor, BLOOM made a statement directed to THE RELATOR to the effect that THE RELATOR should avoid being involved in any legal cases concerning narcotics.

770. On or about March 1, 2017, THE RELATOR brought a civil action in the nature of mandamus (the "Mandamus Action") in the Supreme Judicial Court for Suffolk County seeking to compel the recusal of NEYMAN from the appeal of the dismissal of the *Qui Tam* Action in the Massachusetts Appeals Court.

771. On or about March 23, 2017, SAVERY donated approximately $500 to HEALEY's campaign for Attorney General of the Commonwealth of Massachusetts.

772. On or about April 19, 2017, BARBADORO, GARLAND, and SARIS attended an event at BCLS at 885 CENTRE STREET.

773. KENYON and ROUGEAU met with BARBADORO, GARLAND, and SARIS on or about April 19, 2017 at BCLS at 885 CENTRE STREET.

774. On or about April 20, 2017, THE RELATOR released an app on the Apple App Store, Omnibus U.S. Code ("Omnibus U.S. Code"), by and through the company, Omnibus, LLC.

775. Omnibus, LLC is organized under the laws of the State of New Hampshire.

776. THOMAS LAMPERT became aware that Omnibus, LLC was registered in the State of New Hampshire in or around the time that THE RELATOR released Omnibus U.S. Code.

777. THOMAS LAMPERT and one or more other RICO ASSOCIATES came to an agreement to sabotage Omnibus U.S. Code and Omnibus, LLC.*

778. On or about April 25, 2017, HEALEY attended and participated in an event at BCLS at 885 CENTRE STREET.

779. On or about April 28, 2017, HEALEY, CRAFTS, and/or WALKER represented in writing (the "First SJC Statement") to the Supreme Judicial Court for Suffolk County that, "[a]fter Mullins, the DOR resolved internally not to enforce compliance with the CST in light of the serious concerns the case raised for both the Commonwealth's administration of criminal justice through its criminal prosecutors and the constitutional rights of drug defendants."

780. On or about April 28, 2017, HEALEY, CRAFTS, and/or WALKER represented in writing (the "Second SJC Statement") to the Supreme Judicial Court for Suffolk County that

> [THE RELATOR] makes much of the closeness of the amount the Attorney General allegedly received from the 'Equitable Sharing' program in fiscal years 2014 and 2015 ($360,755) and the amount to which he claims entitlement pursuant to the Gonzalez Qui Tam action ($360,000, *see* Amended Complaint ¶ 32). *See, e.g.,* Amended Complaint ¶¶ 53, 84. ***However, the closeness of the two numbers appears to be purely coincidental.*** (emphasis added).

781. On or about April 28, 2017, WALKER mailed papers (the "SJC Papers") containing the First SJC Statement and the Second SJC Statement to THE RELATOR by United States Postal Service.

782. HEALEY, CRAFTS, and/or WALKER appear on the signature line of the SJC Papers.

783. The SJC Papers did not discuss the Equitable Sharing Program beyond the First SJC Statement and the Second SJC Statement.

784. The SJC Papers included over one hundred pages of exhibits.

785. The SJC Papers did not include the Judicial Notice Motion.

786. HEALEY, CRAFTS, and/or WALKER chose not to include the Judicial Notice Motion or reference its contents in order to hide, conceal, and/or obscure the acceptance of money from the Equitable Sharing Program by the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH.*

787. On or about May 1, 2017, ROUGEAU hired or offered to hire ORTIZ as a visiting professor for the fall 2017 semester at BCLS at 885 CENTRE STREET.

788. ROUGEAU hired or offered to hire ORTIZ as a visiting professor for the fall 2017 semester at BCLS in exchange and/or as a reward for ORTIZ's participation in the ENTERPRISE and/or for ORTIZ's actions in connection with THE RELATOR's litigation during ORTIZ's tenure as U.S. Attorney for the District of Massachusetts.*

789. On or about May 7, 2017, OBAMA travelled interstate to an event in or around Boston, Massachusetts.

790. On or about May 7, 2017, OBAMA and HEALEY attended the same event in or around Boston, Massachusetts.

791. OBAMA spent and/or transferred money from OBAMA FOUNDATION ACCOUNTS 1-X while OBAMA was visiting Boston, Massachusetts on or about May 7, 2017.*

792. On or about May 17, 2017, WOLOHOJIAN and NEYMAN attended and provided remarks at a networking reception in or around Boston, Massachusetts that was publicly advertised as a "Law Reception with Gabrielle Wolohojian '78 & Eric Neyman '86, Associate Justices of the Massachusetts Appeals Court."

793. During the summer of 2017, THOMAS LAMPERT was employed by the law firm, WILMERHALE.

794. On or about May 26, 2017, THE RELATOR delivered by hand a request pursuant to the Massachusetts Public Records Law (Mass.Gen.Laws ch. 66 §§ 10, 10A) to the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH seeking "[a]ll records pertaining to Equitable Sharing Program payments accepted by the Attorney General in fiscal years 2012, 2013, 2014, 2015, and 2016" (altogether, the "Equitable Sharing Records Request").

795. On or about June 7, 2017, THE RELATOR mailed a request (the "DOR Request") to the Massachusetts Department of Revenue pursuant to the Massachusetts Public Records Law seeking "[a]ny directives, memoranda, or other records pertaining to DOR policies and procedures regarding enforcement of G. L. c. 64K."

796. On or about June 12, 2017, the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH, by and through TARROW, responded by letter (the "First TARROW Letter") to the Equitable Sharing Records Request and stated that "[w]e expect to be able to provide a further response accounting for any such records on or before June 19."

797. On or about June 15, 2017, THE RELATOR mailed a request pursuant to the Freedom of Information Act (5 U.S.C. § 552) to the U.S. Department of Justice seeking records pertaining to payments made under the Equitable Sharing Program by DOJ to the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH during federal Fiscal Years 2014 and 2015 (altogether, the "June 2017 FOIA").

798. The June 2017 FOIA asserted that the records requested could pertain to one or more criminal offenses.

799. On or about June 19, 2017, TARROW followed up to the First TARROW Letter by sending a follow-up letter (the "Second TARROW Letter") to THE RELATOR in which TARROW declined to provide "[a]ll records pertaining to Equitable Sharing Program payments accepted by the Attorney General in fiscal years 2012, 2013, 2014, 2015, and 2016," because, according to TARROW, "[t]o have provided you with the underlying payment records would have been very time consuming."

800. In the Second TARROW Letter, TARROW stated that, instead of providing THE RELATOR with the requested public records, the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH would "provid[e] you with a record delineating the cases associated with the relevant payments under the [Equitable Sharing Program]" for a fee of $50.00.

801. In the Second TARROW Letter, TARROW stated that, "[o]n June 12, we indicated that we were still the process of searching for records that may be responsive to your request and subject to disclosure under the public records law," and that "[t]oday, we have completed that process and enclose such a record, one (1) page in length."

802. The one-page record (the "One-Page Record") enclosed with the Second TARROW Letter was created or produced on or after May 30, 2017.*

803. The public records sought by or that could be produced in connection with the Equitable Sharing Records Request constitute *prima facie* evidence of one or more crimes under state and/or federal law.*

804. TARROW mailed the One-Page Record in order to hinder, delay, or otherwise prevent THE RELATOR from obtaining the public records sought in the Equitable Sharing Records Request.*

805. On or about June 25, 2017, THE RELATOR sent an email from the BC Email Account to ABBENE questioning whether THE RELATOR could be a visiting student at a different law school.

806. ABBENE, as an assistant dean at BCLS at 885 CENTRE STREET, reported to ROUGEAU during the time when THE RELATOR was a student at BCLS at 885 CENTRE STREET.

807. ABBENE was a subordinate of ROUGEAU during the time when THE RELATOR was a student at BCLS at 885 CENTRE STREET.

808. On or about June 26, 2017, ABBENE sent an email to the BC Email Account stating that allowance of visiting student status was granted under "very special circumstances."

809. On or about June 26, 2017, THE RELATOR sent an email from the BC Email Account to ABBENE stating that he was interested in studying "marijuana regulation" in Colorado.

810. On or about June 26, 2017, ABBENE sent an email to the BC Email Account stating that the study of "marijuana regulation" did not qualify for visiting student status.

811. On or about June 27, 2017, THE RELATOR brought a civil action pursuant to the Massachusetts Public Records Law (the "Public Records Action") in SUFFOLK SUPERIOR COURT against the Massachusetts Department of Revenue and HEALEY, in her official capacity as Attorney General of the Commonwealth, wherein THE RELATOR sought to compel production of public records concerning the CST and the Equitable Sharing Program.

812. Up to and including the day on which the Public Records Action commenced, THE RELATOR received no public records within the meaning of the Massachusetts Public Records Law from the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH or any employee thereof in response to the Equitable Sharing Records Request excluding the One-Page Record.

813. On or about August 4, 2017, in the Supreme Court of the United States, THE RELATOR filed a petition for a writ of certiorari to the U.S. COURT OF APPEALS FOR THE FIRST CIRCUIT in the appeal of the dismissal of the Rigged O'Toole Action in which THE RELATOR asserted that there appeared to be a violation of 18 U.S.C. 666 in connection with the dismissal of the *Qui Tam* Action.

814. BREYER, SOTOMAYOR, and KAGAN considered the RELATOR's August 4, 2017 certiorari petition.

815. GOODLANDER was clerking for BREYER when the RELATOR's August 4, 2017 certiorari petition was under consideration.

816. On or about August 9, 2017, THE RELATOR electronically transferred approximately $27,813 to BOSTON COLLEGE and BOSTON COLLEGE ACCOUNTS 1-X using a BOSTON COLLEGE electronic payment website.

817. On or about August 21, 2017, ORTIZ began teaching as a visiting professor at BCLS at 885 CENTRE STREET.

818. In or about the years 2017, 2018, and/or 2019, MAXWELL resided in Manchester-by-the-Sea, Massachusetts or Manchester, Massachusetts during some portion of one or more of those years.

819. While residing in Manchester-by-the-Sea, Massachusetts and/or Manchester, Massachusetts, MAXWELL was in communication with HOYLE, TORIL FORLAND, THOMAS LAMPERT, DAVID LAMPERT, HENRIK LAMPERT, THOMAS DURKIN, BRIAN DURKIN, SHUTZER, FAY LAMPERT, and/or one or more other RICO ASSOCIATES.*

172

820. While residing in Manchester-by-the-Sea, Massachusetts and/or Manchester, Massachusetts, MAXWELL communicated Compromising Information to HOYLE, TORIL FORLAND, THOMAS LAMPERT, DAVID LAMPERT, HENRIK LAMPERT, THOMAS DURKIN, BRIAN DURKIN, SHUTZER, FAY LAMPERT, and/or one or more other RICO ASSOCIATES.*

821. THE RELATOR has never been knowingly in the presence of THOMAS LAMPERT except at 885 CENTRE STREET.

822. From approximately August 2017 to December 2017, both dates being inclusive and approximate, THOMAS LAMPERT made physical and verbal advances (the "Sexual Advances") towards THE RELATOR at 885 CENTRE STREET during multiple classes, including 1) standing up in the aisle of a classroom and performing two 360-degree rotations of his body as if to simulate a fashion model on a runway while standing in front of and looking at THE RELATOR; 2) rubbing and/or bumping his body against THE RELATOR's body; 3) exposing his chest to THE RELATOR; 4) exposing his underarm to THE RELATOR on at least three distinct occasions; 5) speaking in a lisp; and 6) during a classroom simulation where THE RELATOR's fictitious client had engaged in sexual improprieties with THOMAS LAMPERT's fictitious client, asking THE RELATOR, "are you like your client?"

823. KENYON was watching THE RELATOR and/or communicating with THOMAS LAMPERT during one or more of the Sexual Advances.

824. MALONEY was watching THOMAS LAMPERT and/or THE RELATOR during one or more of the Sexual Advances.

825. THOMAS LAMPERT was attempting to entice THE RELATOR into a compromising position through the Sexual Advances in order to obtain blackmail and/or leverage against THE RELATOR.

826. On or about October 2, 2017, THE RELATOR filed a lawsuit in SUFFOLK SUPERIOR COURT (the "Parallel State Action") against the Commonwealth of Massachusetts and HEALEY, in her official capacity as the Attorney General of the Commonwealth, wherein THE RELATOR alleged that the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH purloined THE RELATOR's whistleblower bounty in the *Qui Tam* Action by accepting money from the Equitable Sharing Program in exchange for moving to dismiss the *Qui Tam* Action.

827. GILES was and/or is the judge in the Parallel State Action.

828. GREEN was and/or is the judge in the Parallel State Action.

829. The Parallel State Action includes and/or included federal causes of action that could have been brought in federal court.

830. Because the Parallel State Action includes and/or included federal causes of action pursuant to the concurrent jurisdiction of SUFFOLK SUPERIOR COURT, the Parallel State Action was a federal proceeding within the meaning of federal law.

831. GILES, KATZMANN, HEALEY, and/or WOLOHOJIAN are friends with each other.*

832. GILES was a colleague of KATZMANN and/or WOLOHOJIAN on a bar association journal's board of editors.*

833. On or about October 3, 2017, TARROW and/or one or more employees of the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH mailed THE

RELATOR a letter and 231 pages of public records (the "October 3 Disclosure") responsive to the Equitable Sharing Records Request.

834. TARROW waited until October 3, 2017 to mail the October 3 Disclosure because of her belief that the statute of limitations[8] had run to its conclusion on any claim or claims made by THE RELATOR against the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH and/or one or more employees of that Office for moving to dismiss the *Qui Tam* Action and Second *Qui Tam* Action.*

835. On or about October 27, 2017, SARIS attended an event at BCLS at 885 CENTRE STREET.

836. On or about October 27, 2017, HOLDER and HEALEY attended the same event in or around Boston, Massachusetts.

837. From about November 2017 through about April 2018, both dates inclusive and approximate, CRAFTS worked as a special assistant district attorney in the Office of the District Attorney of Suffolk County, Massachusetts.

838. CRAFTS used her position as a special assistant district attorney in the Office of the District Attorney of Suffolk County, Massachusetts in order to investigate THE RELATOR, to subvert THE RELATOR's litigation, and/or to obtain Privileged Information.*

---

[8] The statute of limitations runs from the date when THE RELATOR discovered or should have discovered the wrongful nature of the dismissal of the *Qui Tam* Action. That date is January 27, 2016, which is the date that DOJ published Equitable Sharing Program statistics for federal fiscal year 2015, or some date thereafter in view of the deliberate concealment of public records by one or more of the defendants.

839. On or about November 10, 2017, THE RELATOR sent an email from the BC Email Account to ABBENE stating that THE RELATOR was engaged in numerous court cases and that moving to a new jurisdiction, Colorado, was required as a consequence of THE RELATOR's litigation.

840. On or about November 10, 2017, ABBENE sent an email to the BC Email Account stating that ABBENE would discuss THE RELATOR's request to be a visiting student in Colorado with ROUGEAU.

841. On or about November 14, 2017, KENYON called THE RELATOR "a rat" during a class at 885 CENTRE STREET.

842. On or about November 15, 2017, SOROKIN attended and spoke at an event at BCLS at 885 CENTRE STREET concerning the opioid epidemic that was organized in whole or in part by CASSIDY.

843. On or about November 15, 2017, CASSIDY called SOROKIN a "friend of the law school" during an event concerning the opioid epidemic at BCLS at 885 CENTRE STREET.

844. SOROKIN was aware of THE RELATOR's identity during the November 15, 2017 event at BCLS at 885 CENTRE STREET where SOROKIN and THE RELATOR were in attendance.

845. BRODIN was present at the November 15, 2017 event at BCLS at 885 CENTRE STREET where SOROKIN and THE RELATOR were in attendance.

846. SOROKIN's spouse was and/or is an adjunct professor at BOSTON COLLEGE.*

847. SOROKIN's spouse was and/or is paid by BOSTON COLLEGE.*

848.  In connection with an event at BCLS on or about November 15, 2017, one or more employees of BOSTON COLLEGE directly or indirectly offered or promised to SOROKIN that BOSTON COLLEGE would create, establish, continue, provide a raise in pay for, and/or resume a teaching or other position for SOROKIN's spouse in order to influence one or more judicial decisions by SOROKIN in any future proceeding involving THE RELATOR.*

849.  In connection with an event at BCLS on or about November 15, 2017, SOROKIN agreed to be influenced by one or more employees of BOSTON COLLEGE in any future proceeding involving THE RELATOR in exchange or in return for BOSTON COLLEGE creating, establishing, continuing, providing a raise in pay for, and/or resuming a teaching or other position for SOROKIN's spouse at or in connection with BOSTON COLLEGE.*

850.  In connection with an event at BCLS at 885 CENTRE STREET on or about November 15, 2017, SOROKIN, directly and/or indirectly, accepted money from BOSTON COLLEGE.*

851.  THE RELATOR attended all or part of the event in which SOROKIN participated on or about November 15, 2017 at BCLS at 885 CENTRE STREET.

852.  SOROKIN and SOROKIN's spouse communicated at 100 DAVIS AVENUE regarding the agreement with BOSTON COLLEGE involving compensation to SOROKIN and/or SOROKIN's spouse from BOSTON COLLEGE.*

853.  On or about November 20, 2017, ABBENE sent an email to the BC Email Account stating that ROUGEAU and ABBENE had discussed and denied THE RELATOR's request to be a visiting student in Colorado.

854. On or about November 22, 2017, THE RELATOR delivered or caused to be delivered a letter to MESHNICK and SUFFOLK SUPERIOR COURT listing a number of potential offenses pursuant to 18 U.S.C. § 1961(1) in connection with the Parallel State Action.

855. On or about November 28, 2017, THE RELATOR and CURTIN shook hands, during which handshake CURTIN turned his head and looked in a different direction so as to avoid looking at THE RELATOR.

856. On or about November 30, 2017, THE RELATOR sent an email (the "FBI Email") from the BC Email Account in which he stated that "I'm fairly certain there was/is some sort of FBI intelligence operation going on against me" and that "[l]ots of weird shit is going down."

857. On or about November 30, 2017, within one hour of sending the FBI Email, THE RELATOR encountered ROUGEAU (the "ROUGEAU Stairwell Encounter") in one of the stairwells at BCLS at 885 CENTRE STREET.

858. ROUGEAU attempted to encounter and/or speak with THE RELATOR during the ROUGEAU Stairwell Encounter because ROUGEAU had read the FBI Email.*

859. THE RELATOR avoided ROUGEAU during the ROUGEAU Stairwell Encounter.

860. On or about December 15, 2017, THE RELATOR sent an email from the BC Email Account to ABBENE stating that THE RELATOR had submitted a visiting application to Sturm College of Law at the University of Denver and that THE RELATOR was requesting permission to be a visiting student in Colorado.

861. On or about December 18, 2017, ABBENE sent an email to the BC Email Account stating that THE RELATOR's request to be a visiting student at Sturm College of Law at the University of Denver had been denied.

862. On or about December 20, 2017, THE RELATOR sent an email (the "JOSEPH HERLIHY Email") from the BC Email Account to JOSEPH HERLIHY in which THE RELATOR informed JOSEPH HERLIHY regarding his repeated attempts to be a visiting student in Colorado and potential litigation as a consequence of the conduct of BCLS.

863. JOSEPH HERLIHY did not respond to the JOSEPH HERLIHY Email in any email to the BC Email Account.

864. On or about December 23, 2017, THE RELATOR electronically submitted a "Boston College Bias-Related Incident Report Form" (the "Anti-Asian Report") to one or more employees of BOSTON COLLEGE.

865. The Anti-Asian Report stated that "[a]t one point during his speech, the guest speaker said something to the effect that observing cultural niceties with Asians was not as important, because 1) no one really cares what Asians think; and 2) Asians won't stand up for themselves."

866. The Anti-Asian Report stated that "[a]lthough I do not remember the precise words chosen by the guest speaker, I know that I confirmed his the [sic] bias of his comments both in real time and after the class with at least two students."

867. On or about December 27, 2017, THE RELATOR sent an email (the "Farewell Email") to multiple students and multiple faculty members at BCLS at 885 CENTRE STREET with the subject line, "Farewell," in which THE RELATOR stated that "Monday of last

week was my final day at Boston College Law School," that "I am currently a litigant in the Supreme Judicial Court," and that "I am moving to a different jurisdiction in the new year to avoid a conflict."

868. Excluding ABBENE, no faculty member at BCLS responded to the Farewell Email.

869. THE RELATOR did not send the Farewell Email to THOMAS LAMPERT or BRIAN DURKIN.

870. On or about January 2, 2018, THE RELATOR filed a motion for appointment of a special prosecutor (the "Special Prosecutor Motion") in the Mandamus Action.

871. There were no docket entries in the Mandamus Action for approximately 82 days until the Special Prosecutor Motion.

872. In the Special Prosecutor Motion, THE RELATOR alleged that there was reasonable suspicion of a violation of Mass.Gen.Laws ch. 268 § 36 by one or more individuals in the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH.

873. On or about January 11, 2018, THE RELATOR sent a letter (the "93A Demand Letter") by facsimile and/or first class mail to ROUGEAU at 885 CENTRE STREET.

874. On or about January 11, 2018, a copy of the 93A Demand Letter was sent to the Federal Trade Commission and/or DOJ.

875. In the 93A Demand Letter, THE RELATOR demanded permission from BCLS to be a visiting student at Sturm College of Law at the University of Denver or for a full refund of all tuition payments made by THE RELATOR to BCLS.

876. The 93A Demand Letter stated that there might be a potential violation of law by BCLS and/or ROUGEAU with respect to the Sherman Antitrust Act.

877. Between approximately January 11, 2018 and January 22, 2018, THE RELATOR corresponded by email with ABBENE (the "January Correspondence").

878. In the January Correspondence and/or before the January Correspondence, THE RELATOR informed ABBENE that one or more individuals employed by the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH may have committed a crime.

879. In the January Correspondence, ABBENE repeatedly communicated that BCLS denied THE RELATOR's request to visit at a different law school.

880. In the January Correspondence, ABBENE repeatedly communicated that THE RELATOR's litigation in Massachusetts courts did not qualify under the BCLS visiting student policy.

881. In the January Correspondence or in any correspondence with THE RELATOR, ABBENE did not state, expressly or impliedly, that one or more employees of BCLS had an interest and/or was serving in some capacity as an attorney in any of the cases in which THE RELATOR was and/or is a party.

882. In the January Correspondence or in any previous correspondence with THE RELATOR, ABBENE did not mention that one or more employees of BCLS had been communicating and/or continued to communicate Privileged Information obtained from the BC Email Account or the Legal Research Accounts.

883. On or about January 17, 2018, SUFFOLK SUPERIOR COURT held a hearing (the "Reasonable Suspicion Hearing") regarding multiple motions filed by THE RELATOR.

884. During the Reasonable Suspicion Hearing, THE RELATOR alleged that there was reasonable suspicion of a violation of Mass.Gen.Laws ch. 268 § 36 by one or more individuals employed by the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH.

885. MESHNICK represented the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH during the Reasonable Suspicion Hearing.

886. GREEN was the presiding judge for the Reasonable Suspicion Hearing.

887. On or about January 23, 2018, THE RELATOR communicated to ABBENE that he would return to BCLS at a reduced load of credits for the full rate of tuition.

888. On or about January 24, 2018, THE RELATOR electronically transferred approximately $28,205 to BOSTON COLLEGE and BOSTON COLLEGE ACCOUNTS 1-X using a BOSTON COLLEGE electronic payment website.

889. Based on tuition costs at BCLS and Sturm College of Law at the University of Denver for the spring 2018 semester, THE RELATOR would have saved in excess of $10,000 if he had been a visiting student at Sturm College of Law at the University of Denver for ten credits during the spring 2018 semester.

890. On or about January 24, 2018, after having missed approximately one week of classes, THE RELATOR attended his first class of the spring 2018 semester at BCLS at 885 CENTRE STREET.

891. On or about January 24, 2018, THE RELATOR and BRIAN DURKIN attended a constitutional law seminar (the "Seminar") which met once per week for approximately one to two hours on each Wednesday of the semester.

892. The first class that THE RELATOR attended during the spring 2018 semester at BCLS at 885 CENTRE STREET was the Seminar.

893. The professor teaching the Seminar (the "Seminar Professor") sat with his back facing the entrance to the classroom in each class that THE RELATOR attended.

894. Because of where the Seminar Professor sat in each class attended by THE RELATOR, there was a space behind the Seminar Professor with the result that the Seminar Professor could not see unless he turned around to look at that space.

895. On or about January 24, 2018 during the Seminar, THE RELATOR sat next to the Seminar Professor and was located in front of and to the left of the Seminar Professor.

896. ARCHER sat directly next to THE RELATOR on THE RELATOR's left during the Seminar on or about January 24, 2018.

897. THE RELATOR and BRIAN DURKIN did not speak with each other or otherwise interact during the Seminar on or about January 24, 2018.

898. On or about January 29, 2018, the U.S. Department of Justice published on its official website the statistics for federal Fiscal Year 2017 Equitable Sharing Program payments of cash and sale proceeds to law enforcement agencies of the Commonwealth of Massachusetts.

899. On or about January 31, 2018, THE RELATOR and BRIAN DURKIN attended the Seminar.

900. On or about January 31, 2018 during the Seminar, THE RELATOR sat next to the Seminar Professor and was located in front of and to the left of the Seminar Professor.

901. ARCHER sat directly next to THE RELATOR on THE RELATOR's left during the Seminar on or about January 31, 2018.

902. THE RELATOR and BRIAN DURKIN did not speak with each other or otherwise interact during the Seminar on or about January 31, 2018.

903. On or about February 5, 2018, ROUGEAU sent by mail a response to the 93A Demand Letter (the "93A Response").

904. In the 93A Response, ROUGEAU denied that any of the provisions of Mass.Gen.Laws ch. 93A applied to Boston College Law School's denial of THE RELATOR's request for permission to be a visiting student at Sturm College of Law at the University of Denver.

905. In the 93A Response, ROUGEAU did not mention the Sherman Antitrust Act or any other antitrust law.

906. On or about February 7, 2018, THE RELATOR and BRIAN DURKIN attended the Seminar.

907. THE RELATOR and BRIAN DURKIN did not speak with each other or otherwise interact during the Seminar on or about February 7, 2018.

908. On or about February 7, 2018 during the Seminar, THE RELATOR sat next to the Seminar Professor and was located in front of and to the left of the Seminar Professor.

909. ARCHER sat directly next to THE RELATOR on THE RELATOR's left during the Seminar on or about February 7, 2018, if ARCHER was present for that class.

910. On or about February 7, 2018, the Mandamus Action was listed as under advisement by LOWY of the Massachusetts Supreme Judicial Court.

911. On or about February 7, 2018, HEALEY approved a deal (the "Art Deal") in which the Berkshire Art Museum in Berkshire County, Massachusetts could sell up to $55 million in art using the authority of the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH.

912. One or more WILMERHALE clients obtained money from or in connection with the Art Deal.*

913. WILMERHALE obtained one or more payments from or in connection with the Art Deal.*

914. The Art Deal was subject to litigation in the Supreme Judicial Court for the County of Suffolk (the "LOWY Litigation"), where LOWY entered an order or judgment allowing the Art Deal to proceed.[9]

915. The Massachusetts Cultural Council prepared an amicus brief (the "Art Brief") opposing the Art Deal to be filed in the LOWY Litigation in or about February 2018.

916. The OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH sent a letter or other communication to the Massachusetts Cultural Council cautioning against filing the Art Brief.

917. The Massachusetts Cultural Council did not file the Art Brief despite having fully prepared the Art Brief.

918. HEALEY, THOMAS LAMPERT, WILMERHALE, and/or one or more other members of the ENTERPRISE possess and/or possessed blackmail or other embarrassing information against LOWY.*

---

[9] On or about April 5, 2018, LOWY entered a judgment allowing the Art Deal to proceed.

919. As of about February 2018 and based on all campaign donations to HEALEY for the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH, WILMERHALE employees gave the most to HEALEY's political campaigns of any of the employees at the top ten law firms by number of attorneys in Boston, Massachusetts.

920. As of about February 2018 and based on all campaign donations to HEALEY for the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH, WILMERHALE employees gave approximately $555 per attorney at WILMERHALE to HEALEY's political campaigns.

921. As of about February 2018 and based on all campaign donations to HEALEY for the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH, the employees of the top ten law firms by size in Boston, Massachusetts excluding WILMERHALE gave approximately $86 per attorney to HEALEY's political campaigns.

922. On or about February 13, 2018, WALKER, on behalf of the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH, submitted an opposition to the Special Prosecutor Motion (the "Special Prosecutor Opposition").

923. The Special Prosecutor Opposition did not deny that one or more individuals in the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH accepted something of value in exchange for the non-prosecution of JAVIER GONZALEZ and JAMIL ROMAN.

924. The Special Prosecutor Opposition did not deny that one or more individuals in the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH personally

benefitted from that Office's acceptance of payments from the Equitable Sharing Program.

925. On or about February 14, 2018, THE RELATOR visited the Supreme Judicial Court for the County of Suffolk in order to obtain a copy of the Special Prosecutor Opposition, but the Clerk's Office of that court denied his request for a a copy of the Special Prosecutor Opposition.

926. On or about February 14, 2018, THE RELATOR and BRIAN DURKIN attended the Seminar.

927. On or about February 14, 2018 during the Seminar, THE RELATOR sat next to the Seminar Professor and was located in front of and to the left of the Seminar Professor.

928. ARCHER sat directly next to THE RELATOR on THE RELATOR's left during the Seminar on or about February 14, 2018, if ARCHER was present at that class.

929. THE RELATOR and BRIAN DURKIN did not speak with each other or otherwise interact during the Seminar on or about February 14, 2018.

930. On or about February 15, 2018, LOWY entered a judgment (the "LOWY Judgment") dismissing the Mandamus Action.

931. THE RELATOR did not receive or otherwise obtain a copy of the Special Prosecutor Opposition prior to the LOWY Judgment.

932. On or about February 15, 2018, THOMAS LAMPERT became aware of the LOWY Judgment from one or more of the RICO ASSOCIATES.*

933. The Supreme Judicial Court for the Commonwealth of Massachusetts, the Supreme Judicial Court for the County of Suffolk, and the Massachusetts Appeals Court provide a

website located at http://www.ma-appellatecourts.org (the "Public Case Website") that provides public case information concerning cases before those courts.

934. The Public Case Website updates after approximately 9:00 PM Eastern Standard Time with the latest case information inputted on that day.

935. The Public Case Website did not provide the latest case information for a day on which the courts are open until or after 9:00 PM.

936. On February 15, 2018, the only ways to obtain public case information entered on a specific day concerning the Supreme Judicial Court for the Commonwealth of Massachusetts, the Supreme Judicial Court for the County of Suffolk, and/or the Massachusetts Appeals Court were to 1) visit the relevant court in person; 2) call the relevant court; 3) communicate with someone with knowledge; or 4) visit the Public Case Website after approximately 9:00 PM.

937. On or about February 15, 2018, THE RELATOR arrived at approximately 5:00 PM for a class (the "Judgment Class") that was taught by SAVERY.

938. Before and during the Judgment Class, THE RELATOR had no knowledge that the LOWY Judgment had been entered earlier that day.

939. THOMAS LAMPERT was present at the Judgment Class.

940. During some portion of the years 2017, 2018, and/or 2019, THOMAS LAMPERT was an employee of WILMERHALE.*

941. Prior to the Judgment Class, SAVERY became aware of the 93A Letter.*

942. Prior to the Judgment Class, SAVERY and/or THOMAS LAMPERT became aware of the LOWY Judgment.*

943.	THE RELATOR first learned of the LOWY Judgment at some time after approximately 9:00 PM on February 15, 2018 when THE RELATOR checked the Public Case Website.

944.	During the Judgment Class and excluding THE RELATOR, multiple students attending the Judgment Class were aware of the LOWY Judgment.*

945.	On or about February 15, 2018, one or more of the RICO ASSOCIATES communicated information concerning the LOWY Judgment among the students and/or faculty of BCLS in order to cause embarrassment to, harassment of, and/or retaliation against THE RELATOR, to dissuade THE RELATOR from pursuing further litigation, and/or to cause damage to THE RELATOR's reputation.*

946.	On or about February 19, 2018, THE RELATOR faxed and/or mailed a notice of appeal of the LOWY Judgment to the Supreme Judicial Court for the County of Suffolk.

947.	On or about February 21, 2018, THE RELATOR and BRIAN DURKIN attended the Seminar.

948.	On or about February 21, 2018 during the Seminar, THE RELATOR sat next to the Seminar Professor and was located in front of and to the left of the Seminar Professor.

949.	ARCHER sat directly next to THE RELATOR on THE RELATOR's left during the Seminar on or about February 21, 2018, if ARCHER was present at that class.

950.	THE RELATOR and BRIAN DURKIN did not speak with each other or otherwise interact during the Seminar on or about February 21, 2018.

951.	MAFFEI and ROUGEAU discussed THE RELATOR and/or THE RELATOR's litigation prior to one or more classes in which THE RELATOR was a student and in which MAFFEI was an instructor.*

952. MAFFEI and ROUGEAU discussed THE RELATOR and/or THE RELATOR's litigation by email and/or in person at 885 CENTRE STREET.*

953. MAFFEI and MALONEY discussed THE RELATOR and/or THE RELATOR's litigation prior to one or more classes in which THE RELATOR was a student and in which MAFFEI was an instructor.*

954. MAFFEI and MALONEY discussed THE RELATOR and/or THE RELATOR's litigation by email and/or in person at 885 CENTRE STREET.*

955. MALONEY provided surveillance of THE RELATOR for MAFFEI and/or one or more other members of the ENTERPRISE.

956. On or about February 26, 2018 and during a class concerning Professional Responsibility (the "*Pro Se* Class") in which THE RELATOR was a student, MAFFEI showed a video of a lawyer representing himself (the "*Pro Se* Lawyer Video") during oral argument before the Supreme Judicial Court for the Commonwealth.

957. During the *Pro Se* Class, MAFFEI mocked the *pro se* litigant shown in the *Pro Se* Lawyer Video.

958. During the *Pro Se* Class, MAFFEI stated or attempted to state the adage, "[a] man who is his own lawyer has a fool for a client."

959. MAFFEI's actions as to the *Pro Se* Lawyer Video were directed at THE RELATOR.

960. MAFFEI's actions as to the *Pro Se* Lawyer Video were intended to harass, dissuade, or otherwise influence THE RELATOR into abandoning his appeal of the dismissal of the Mandamus Action and/or any plans to pursue litigation in federal court.

961. On or about February 28, 2018, THE RELATOR and BRIAN DURKIN attended the Seminar.

962. On or about February 28, 2018 during the Seminar, THE RELATOR sat next to the Seminar Professor and was located in front of and to the left of the Seminar Professor.

963. ARCHER sat directly next to THE RELATOR on THE RELATOR's left during the Seminar on or about February 28, 2018, if ARCHER was present at that class.

964. THE RELATOR and BRIAN DURKIN did not speak with each other or otherwise interact during the Seminar on or about February 28, 2018.

965. On or about March 14, 2018, THE RELATOR and BRIAN DURKIN attended the Seminar.

966. On or about March 14, 2018 during the Seminar, THE RELATOR sat next to the Seminar Professor and was located in front of and to the left of the Seminar Professor.

967. On or about March 14, 2018, while THE RELATOR was waiting for the Seminar to begin, BRIAN DURKIN arrived in the classroom in the area behind the Seminar Professor.

968. On or about March 14, 2018, after arriving in the classroom for the Seminar and standing behind where the Seminar Professor was sitting, BRIAN DURKIN made a threatening motion towards THE RELATOR (the "BRIAN DURKIN Assault") while THE RELATOR was seated in his regular seat for the Seminar.

969. BRIAN DURKIN did not speak to THE RELATOR before, during, or after the BRIAN DURKIN Assault or at any time on the day of the BRIAN DURKIN Assault.

970. During the BRIAN DURKIN Assault, BRIAN DURKIN, without forewarning, moved in the direction of THE RELATOR while remaining behind the Seminar Professor.

971. During the BRIAN DURKIN Assault, BRIAN DURKIN leaned towards where THE RELATOR was seated.

972. During the BRIAN DURKIN Assault, BRIAN DURKIN glared directly at THE RELATOR with a menacing, crazed, and/or enraged look.

973. During the BRIAN DURKIN Assault, BRIAN DURKIN appeared to THE RELATOR to be positioning himself to throw a punch at THE RELATOR.

974. During the BRIAN DURKIN Assault, BRIAN DURKIN appeared to THE RELATOR to be positioning himself to lunge at THE RELATOR.

975. During the BRIAN DURKIN Assault, BRIAN DURKIN appeared to THE RELATOR to be positioning himself to physically contact and/or attack THE RELATOR.

976. During the BRIAN DURKIN Assault, THE RELATOR believed that BRIAN DURKIN was maneuvering in order to physically and imminently contact and/or attack THE RELATOR.

977. During and in response to the BRIAN DURKIN Assault, THE RELATOR moved backwards in his chair and away from BRIAN DURKIN.

978. THE RELATOR was shocked by the BRIAN DURKIN Assault.

979. THE RELATOR was frightened by the BRIAN DURKIN Assault.

980. After the BRIAN DURKIN Assault ended, ARCHER entered the classroom.

981. After the BRIAN DURKIN Assault ended, ARCHER glanced at THE RELATOR upon entering the classroom and then walked in the direction of where BRIAN DURKIN was sitting and/or usually sat.

982. After the BRIAN DURKIN Assault ended, ARCHER did not sit next to THE RELATOR.

983. Because of where he was sitting and because he did not turn around, the Seminar Professor could not see the BRIAN DURKIN Assault.

984. THE RELATOR was not notified in any manner beforehand by any person of the possibility or likelihood of the BRIAN DURKIN Assault.

985. BRIAN DURKIN did not communicate in any manner with THE RELATOR during the year 2018 prior to or after the BRIAN DURKIN Assault.

986. SARAH HERLIHY witnessed the BRIAN DURKIN Assault.*

987. SARAH HERLIHY was aware that the BRIAN DURKIN Assault had occurred, but did not report the BRIAN DURKIN Assault to any authority.

988. THOMAS LAMPERT was aware that the BRIAN DURKIN Assault had occurred, but did not report the BRIAN DURKIN Assault to any authority.

989. KENYON was aware that the BRIAN DURKIN Assault had occurred, but did not report the BRIAN DURKIN Assault to any authority.

990. ARCHER was aware that the BRIAN DURKIN Assault had occurred, but did not report the BRIAN DURKIN Assault to any authority.

991. SCOGNAMIGLIO was aware that the BRIAN DURKIN Assault had occurred, but did not report the BRIAN DURKIN Assault to any authority.

992. On or about March 21, 2018, THE RELATOR booked a hotel room at the Extended Stay America in Nashua, New Hampshire ("ESA Nashua").

993. During March, April, and May 2018, THE RELATOR booked numerous stays at ESA Nashua and stayed overnight at ESA Nashua in excess of thirty non-consecutive nights.

994. THE RELATOR missed all classes at BCLS at 885 CENTRE STREET after the day of the BRIAN DURKIN Assault until March 22, 2018.

995. On or about March 22, 2018, THE RELATOR filed a complaint against the COMMISSIONER, the United States, and DOJ in the U.S. DISTRICT COURT FOR THE DISTRICT OF NEW HAMPSHIRE (the "Rigged Sorokin Action").

996. At the time of the filing of the Rigged Sorokin Action, SWEENEY was an attorney admitted to practice law in the State of New Hampshire.

997. On or about March 22, 2018, THE RELATOR attended a class (the "March 22nd Class") at BCLS at 885 CENTRE STREET for the first time after the day of the BRIAN DURKIN Assault.

998. On or about March 22, 2018, ROUGEAU was waiting for THE RELATOR in the hallway in a building at BCLS at 885 CENTRE STREET as THE RELATOR was proceeding to the March 22nd Class.

999. On or about March 22, 2018, THE RELATOR avoided ROUGEAU in the hallway in a building at BCLS at 885 CENTRE STREET as THE RELATOR made his way to the March 22nd Class.

1000. MAFFEI became aware that THE RELATOR had filed the Rigged Sorokin Action on or about March 26, 2018.*

1001. On or about March 26, 2018 during the final class attended by THE RELATOR at BCLS at 885 CENTRE STREET (the "Final Class"), MAFFEI spoke to the class about how it was unusual for a junior person at a law firm to launch a lawsuit without proceeding through multiple layers of authority prior to filing the lawsuit.

1002. During the Final Class, MAFFEI used the word "deadly" in a discussion with THE RELATOR.

1003. During the Final Class, MAFFEI asked a question (the "Deadly Question") to THE RELATOR about his prior employment at Lehman Brothers Holdings, Inc.: "Was it deadly?"

1004. During the Final Class, MAFFEI issued a threat to THE RELATOR by insinuating that THE RELATOR was engaging in a "deadly" course of conduct and/or that the filing of the Rigged Sorokin Action was "deadly."

1005. During the Final Class, MAFFEI's use of the word, "deadly," bore no connection to any topic being discussed by MAFFEI, THE RELATOR, or any other person in the classroom.

1006. On or about March 28, 2018, THE RELATOR sent an email from the BC Email Account to ABBENE in which THE RELATOR inquired about taking a leave of absence from BCLS.

1007. On or about March 28, 2018, ABBENE sent an email to the BC Email Account in which ABBENE encouraged THE RELATOR to return to BCLS and stated that a leave of absence was a possibility.

1008. On or about March 28, 2018, THE RELATOR stopped regularly checking the BC Email Account.

1009. In or about April 2018, HEALEY cancelled an appearance to speak on the campus of BOSTON COLLEGE.

1010. On or about April 6, 2018, THOMAS LAMPERT wrote an email (the "THOMAS LAMPERT Email") to the BC Email Account in which THOMAS LAMPERT stated that THOMAS LAMPERT hoped to see THE RELATOR at 885 CENTRE STREET.

1011. LAMPERT did not send any emails to THE RELATOR in the year 2018 prior to the THOMAS LAMPERT Email.

1012. On or about April 16, 2018, ULLMANN wrote an email to the BC Email Account with the subject line of "Prof. Ullmann here, hoping to talk to you" (the "ULLMANN Email").

1013. In the ULLMANN Email, ULLMANN encouraged THE RELATOR to return to 885 CENTRE STREET.

1014. On or about April 18, 2018, ABBENE wrote an email (the "ULLMANN Follow-Up Email") to the BC Email Account following up to the ULLMANN Email.

1015. In the ULLMANN Follow-Up Email, ABBENE encouraged THE RELATOR to return to 885 CENTRE STREET and referenced the ULLMANN Email.

1016. On or about April 18, 2018, an individual (the "Massachusetts Photographer") driving an automobile with Massachusetts license plates took one or more photographs of THE RELATOR while THE RELATOR was sitting in his vehicle in the parking lot of the ESA Nashua.

1017. The Massachusetts Photographer was and/or is an employee of the Commonwealth of Massachusetts and/or a member of the ENTERPRISE.*

1018. One or more members of the ENTERPRISE conducted surveillance of THE RELATOR while THE RELATOR was staying at the ESA Nashua in order to develop grounds for seeking a court order to transfer the Rigged Sorokin Action to the District of Massachusetts.*

1019. On or about April 13, 2018, SWEENEY electronically filed a motion to extend the time to respond to the Rigged Sorokin Action in the U.S. DISTRICT COURT FOR THE DISTRICT OF NEW HAMPSHIRE.

1020. On or about April 22, 2018, SAVERY wrote an email (the "SAVERY Email") to the BC Email Account in which SAVERY encouraged THE RELATOR to return to 885 CENTRE STREET.

1021. On or about April 26, 2018, THE RELATOR filed a motion to disqualify the entire OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH (the "Motion to Disqualify") from participation in the Rigged Sorokin Action in the U.S. DISTRICT COURT FOR THE DISTRICT OF NEW HAMPSHIRE.

1022. On or about May 10, 2018, SWEENEY electronically filed an objection (the "Disqualification Objection") to the Motion to Disqualify in the U.S. DISTRICT COURT FOR THE DISTRICT OF NEW HAMPSHIRE.

1023. In the Disqualification Objection, SWEENEY stated that "[g]iven the fact that the Mullins Double Jeopardy decision provides a perfectly reasonable explanation for why no state criminal prosecutor has brought a CST enforcement prosecution since its

issuance, Chawla's empty and inflammatory conjecture about the Attorney General's motivation in dismissing <u>Gonzalez</u> could not be more easily refuted."

1024. In the Disqualification Objection, SWEENEY addressed the acceptance of one or more payments from the Equitable Sharing Program by the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH during the pendency of the *Qui Tam* Action by stating that "[a]s a point of reference, that number represents .002% of the Attorney General's $149,748,467 unrestricted budget during those years."

1025. In the Disqualification Objection, SWEENEY made no statement denying that one or more payments from the Equitable Sharing Program influenced the decisions by the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH to move to dismiss the *Qui Tam* Action or the Second *Qui Tam* Action.

1026. In or about May 2008, THE RELATOR encountered JEB BUSH at an airport terminal in New York City (the "JEB BUSH Encounter").

1027. JEB BUSH was aware of THE RELATOR's identity prior to the JEB BUSH Encounter.

1028. On or about June 2, 2018, THE RELATOR emailed a request to the Committee on Financial Disclosure of the Administrative Office of the U.S. Courts seeking the financial disclosure records (the "Judicial Financial Records Request") of, among others, BARRON, O'TOOLE, and SOROKIN.

1029. The Judicial Financial Records Request did not seek the financial disclosure records of any judges on the U.S. DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS except O'TOOLE and SOROKIN.

1030. On or about June 4, 2018, THE RELATOR filed a motion for leave to amend the complaint in the Rigged Sorokin Action in order to, among other things, change the statute governing venue to 18 U.S.C. § 1965.

1031. On or about June 4, 2018, ABBENE sent an email to the BC Email Account inquiring about whether THE RELATOR would be withdrawing from BCLS.

1032. On or about June 7, 2018, SWEENEY electronically filed a motion to dismiss the Rigged Sorokin Action (the "Motion to Dismiss the Rigged Sorokin Action").

1033. In the Motion to Dismiss the Rigged Sorokin Action, SWEENEY made no statement specifically denying that one or more payments from the Equitable Sharing Program influenced the decisions by the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH to move to dismiss the *Qui Tam* Action or the Second *Qui Tam* Action.

1034. On or about June 22, 2018, THE RELATOR visited the United States Court of International Trade in New York, New York and inquired with the United States Marshals Service and one or more employees of that court regarding how to communicate with KATZMANN concerning the appeal of the dismissal of the *Qui Tam* Action.

1035. On or about June 26, 2018, one or more family members of THE RELATOR was visited and questioned by the United States Marshals Service in or around New York, New York.

1036. On or about June 28, 2018, the Rigged Sorokin Action was transferred from the U.S. DISTRICT COURT FOR THE DISTRICT OF NEW HAMPSHIRE to the U.S. DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS.

1037. On or about June 29, 2018, THE RELATOR communicated by telephone with more than one employee in the Clerk's Office of the U.S. DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS in Boston, Massachusetts in order to alert that Office to preserve all records relevant to the assignment of a judge in the Rigged Sorokin Action.

1038. On or about June 29, 2018, an individual in the Clerk's Office of the U.S. DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS in Boston, Massachusetts stated by telephone to THE RELATOR that the assignment of a judge in the Rigged Sorokin Action would be carried out by computer.

1039. On or about June 29, 2018, an individual in the Clerk's Office of the U.S. DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS in Boston, Massachusetts stated by telephone to THE RELATOR that the assignment of a judge in the Rigged Sorokin Action would be "random."

1040. As of July 2, 2018, there were a total of fourteen judges and senior judges serving in the U.S. DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS in Boston, Massachusetts.

1041. If the judge selection process for the U.S. DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS at 1 COURTHOUSE WAY were random, there would be a chance of approximately 7% (one in fourteen) of correctly guessing which one judge would be randomly assigned to a civil case on July 2, 2018 in the U.S. DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS if all of the district judges and senior district judges at 1 COURTHOUSE WAY were counted.

1042. If the judge selection process for the U.S. DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS at 1 COURTHOUSE WAY were random, there would be a chance of approximately 10% (one in ten) of correctly guessing which one judge would be randomly assigned to a civil case on July 2, 2018 in the U.S. DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS if all of the district judges (excluding senior district judges) at 1 COURTHOUSE WAY were counted.

1043. As of July 2, 2018, FARRELL managed the Clerk's Office of the U.S. DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS in Boston, Massachusetts.

1044. On or about July 2, 2018, SOROKIN was assigned to the Rigged Sorokin Action by FARRELL and/or one or more agents, employees, or assigns of FARRELL and/or the U.S. DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS.

1045. On or about July 2, 2018, SOROKIN was deliberately assigned (the "Non-Random Assignment") to the Rigged Sorokin Action by FARRELL and/or JOHN DOE 1-X.*

1046. On or about July 13, 2018, THE RELATOR mailed a notice in the Rigged Sorokin Action to the U.S. DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS stating that 1) THE RELATOR intended to file a motion for recusal of SOROKIN; and 2) THE RELATOR had requested the financial records of SOROKIN on June 2, 2018 due at least in part to THE RELATOR's belief that the judge selection process at the John J. Moakley Federal Courthouse at 1 COURTHOUSE WAY was and/or is rigged.

1047. The judge selection process at the John J. Moakley Federal Courthouse at 1 COURTHOUSE WAY was, is, and/or can be rigged to predetermine judge selection.*

1048. SARIS, who in 2018 was Chief Judge of the U.S. DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS, had legal authority and/or control over the manner in which judge selection occurs at the U.S. DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS.*

1049. FARRELL, as Clerk of the U.S. DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS, has legal authority and/or control over the manner in which judge selection occurs at the U.S. DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS.*

1050. SARIS and/or FARRELL were aware of the Non-Random Assignment before the Non-Random Assignment was made.*

1051. On or about August 10, 2018, Cornell Law School refused to allow THE RELATOR to apply as a transfer student.

1052. On or about August 17, 2018, THE RELATOR received in the mail partial production (the "Partial Production") of the Judicial Financial Records Request from the Committee on Financial Disclosure of the Administrative Office of the United States Courts.

1053. The Partial Production included the financial disclosure report for O'TOOLE for the year 2017.

1054. The Partial Production did not include the financial disclosure report for SOROKIN for the year 2017.

1055. On or about September 21, 2018, SIMAS visited the campus of BCLS at 885 CENTRE STREET.

1056. On or about September 21, 2018, ROUGEAU, CURTIN, and SIMAS were present at 885 CENTRE STREET.

1057. In or around September 2018, THE RELATOR submitted a FOIA request to DOJ in which THE RELATOR requested records requested in the June 2017 FOIA and additional, related records (altogether, the "September 2018 FOIA").

1058. SIMAS used funds from OBAMA FOUNDATION ACCOUNTS 1-X during his interstate travel to and/or from 885 CENTRE STREET on or about September 21, 2018.*

1059. On or about September 25, 2018, THE RELATOR notified SUFFOLK SUPERIOR COURT at 3 PEMBERTON SQUARE and the Supreme Judicial Court for the Commonwealth in writing that there was probable cause such that a reasonable person could conclude that HEALEY had violated Mass.Gen.Laws ch. 268 § 36 in connection with the *Qui Tam* Action.

1060. On or about September 26, 2018, GILES presided as a judge in a hearing in which THE RELATOR and MESHNICK participated in SUFFOLK SUPERIOR COURT concerning the Parallel State Action.

1061. On or about September 26, 2018, during oral argument, in response to a statement by THE RELATOR that GILES had already determined the outcome of the Parallel State Action, GILES denied that she had already made a decision as to the disposition the Parallel State Action.

1062. On or about October 6, 2018, SQUIRES-LEE denied a recusal motion filed by THE RELATOR in the Public Records Action in SUFFOLK SUPERIOR COURT.

1063. On or about October 10, 2018, THE RELATOR served MESHNICK with a motion for leave to file a supplemental memorandum of law addressing claim preclusion (the "Claim Preclusion Papers") in the Parallel State Action.

1064. On or about October 15, 2018, MESHNICK mailed an emergency motion to strike (the "Motion to Strike") the Claim Preclusion Papers in the Parallel State Action by United States Postal Service on grounds that THE RELATOR had improperly mailed the Claim Preclusion Papers to GILES as a judge at SUFFOLK SUPERIOR COURT.

1065. On or about October 15, 2018, MESHNICK intentionally mailed the Motion to Strike in the Parallel State Action by United States Postal Service to the incorrect mailing address of THE RELATOR so as to preclude THE RELATOR from ascertaining its contents before a ruling from SUFFOLK SUPERIOR COURT at 3 PEMBERTON SQUARE.*

1066. The Motion to Strike requested that SUFFOLK SUPERIOR COURT at 3 PEMBERTON SQUARE strike the Claim Preclusion Papers.

1067. THE RELATOR never filed the original, signed versions of the Claim Preclusion Papers with Suffolk Superior Court.

1068. MESHNICK filed the Motion to Strike in order to preclude THE RELATOR from preserving certain arguments as to claim preclusion on appeal.*

1069. THE RELATOR never mailed, delivered, or otherwise caused the filing of the original versions or copies of the Claim Preclusion Papers to GILES or SUFFOLK SUPERIOR COURT at 3 PEMBERTON SQUARE.

1070. On or about October 19, 2018, THE RELATOR spoke with BUCKLEY, an assistant clerk-magistrate in Suffolk Superior Court, by phone (the "BUCKLEY Phone Call") regarding the Motion to Strike.

1071. During the BUCKLEY Phone Call, BUCKLEY was informed by THE RELATOR that THE RELATOR had not mailed, delivered, or otherwise caused the filing of the Claim Preclusion Papers to Judge Linda GILES or SUFFOLK SUPERIOR COURT at 3 PEMBERTON SQUARE.

1072. During the BUCKLEY Phone Call, BUCKLEY advised THE RELATOR to file the Claim Preclusion Papers but did not mention that SUFFOLK SUPERIOR COURT at 3 PEMBERTON SQUARE had entered an order allowing the Motion to Strike on October 18, 2018.

1073. On or about October 22, 2018, GILES prepared an order (the "Undocketed Order") allowing the motion to dismiss filed by MESHNICK in the Parallel State Action.*

1074. On or about October 22, 2018, GILES intended to issue the Undocketed Order allowing the motion to dismiss filed by MESHNICK in the Parallel State Action.*

1075. GILES intended to issue the Undocketed Order or about October 22, 2018 allowing a motion to dismiss filed by MESHNICK in the Parallel State Action in order to preclude THE RELATOR from preserving legal arguments as to claim preclusion on appeal.*

1076. At approximately 3:30 PM on or about October 22, 2018, while THE RELATOR was waiting for BUCKLEY to make a copy of GILES's allowance of the Motion to Strike, BUCKLEY removed or instructed another person to remove the Undocketed Order from

the Civil Clerk's Office of SUFFOLK SUPERIOR COURT at 3 PEMBERTON SQUARE.*

1077. On or about October 23, 2018, THE RELATOR filed an affidavit in SUFFOLK SUPERIOR COURT at 3 PEMBERTON SQUARE in the Parallel State Action setting forth one or more facts as to deceptive or false statements by MESHNICK and/or BUCKLEY.

1078. As of November 15, 2018, no attorney from the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH had made any correction to any statement made in the Motion to Strike.

1079. As of November 15, 2018, no attorney from the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH had taken any reasonable remedial measures or made any disclosure to a tribunal as to any criminal or fraudulent conduct related to the Motion to Strike.

1080. On or about November 30, 2018, THOMAS DURKIN, BRIAN DURKIN, and/or THOMAS LAMPERT agreed to conduct surveillance of or attempt to intimidate THE RELATOR in or around courts in Massachusetts and/or New Hampshire.*

1081. On November 30, 2018, THE RELATOR visited the U.S. DISTRICT COURT FOR THE DISTRICT OF NEW HAMPSHIRE in Concord, New Hampshire.

1082. THOMAS DURKIN and/or one or more relatives or associates of BRIAN DURKIN was present in the DURKIN CAR in the State of New Hampshire on November 30, 2018.

1083. On November 30, 2018, the DURKIN CAR came within 20 feet of a car in which THE RELATOR was traveling on Interstate 93 Southbound in the State of New Hampshire in or around Concord, New Hampshire.

1084. During at least some portion of November 30, 2018, the DURKIN CAR was used by BRIAN DURKIN, THOMAS DURKIN, and/or one or more family members or associates of BRIAN DURKIN in order to surveil and/or harass, intimidate, or coerce THE RELATOR near the U.S. DISTRICT COURT FOR THE DISTRICT OF NEW HAMPSHIRE.*

1085. On or about November 30, 2018, in or around Massachusetts and/or New Hampshire, the DURKIN CAR was used to surveil and/or harass, intimidate, or coerce THE RELATOR and/or another person associated with THE RELATOR.

1086. On or about December 12, 2018, SOROKIN dismissed or otherwise closed the case in the Rigged Sorokin Action in a written order.

1087. On or about December 20, 2018, GILES allowed a motion to dismiss (the "Prejudged Opinion") filed by MESHNICK on behalf of the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH.

1088. The Prejudged Opinion stated that "[a] motion to dismiss filed on behalf of the Appeals Court on August 11, 2017 is still pending [in the Mandamus Action]."

1089. The "motion to dismiss filed on behalf of the Appeals Court on August 11, 2017" referred to in the Prejudged Opinion was not pending as of December 20, 2018 because it had been disposed of on February 15, 2018 by LOWY.

1090. The Prejudged Opinion was written before February 15, 2018.*

1091. GILES, BUCKLEY, and/or another person changed the date on the Prejudged Opinion to December 20, 2018 without updating the statement regarding the "motion to dismiss filed on behalf of the Appeals Court on August 11, 2017."*

1092. On or about December 24, 2018, THE RELATOR received public records in the mail responsive to the DOR Request from DOR.

1093. On or about December 27, 2018, judgment entered in SUFFOLK SUPERIOR COURT as to the dismissal of the Parallel State Action by GILES based on claim preclusion.

1094. In or about December 2018, IRS sent THE RELATOR a notice claiming that THE RELATOR owed money to the United States government.

1095. In or about January 2019, DOR sent THE RELATOR a notice claiming that THE RELATOR owed money to the Commonwealth of Massachusetts.

1096. In or about January 2019, IRS and/or the U.S. TAX COURT were closed or partially closed due to a government shutdown.

1097. In or about January 2019, THE RELATOR filed a petition with the U.S. TAX COURT.

1098. On or about January 2, 2019, THE RELATOR commenced a lawsuit (the "Rigged New Hampshire Lawsuit") in the U.S. DISTRICT COURT FOR THE DISTICT OF NEW HAMPSHIRE.

1099. On or about January 3, 2019, the Rigged New Hampshire Lawsuit was assigned to BARBADORO.

1100. On or about January 3, 2019, MCCAFFERTY assigned the Rigged New Hampshire Lawsuit to BARBADORO.*

1101. On or about February 7, 2019, SAVERY donated approximately $500 to HEALEY's campaign for the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH.

1102. In or about March 2019, GANTS presided over oral argument over an appeal of the dismissal of the Mandamus Action at the Supreme Judicial Court for the Commonwealth of Massachusetts.

1103. In or about April 2019, the Supreme Judicial Court for the Commonwealth of Massachusetts affirmed the dismissal of the Mandamus Action.

1104. On or about June 13, 2019, the Chief Judge of the U.S. COURT OF APPEALS FOR THE FIRST CIRCUIT designated TORRESEN as the presiding judge in the Rigged New Hampshire Lawsuit.

1105. In or about the second half of the year 2019, STEVEN KOH became a professor at BCLS at 885 CENTRE STREET.

1106. In or about the second half of the year 2019, despite lacking jurisdiction over False Claims Act cases, a judge on the U.S. TAX COURT ordered THE RELATOR to provide that court with a copy of the complaint in the Rigged New Hampshire Action while the same complaint was under seal.

1107. On or about January 13, 2020, THE RELATOR filed a complaint (the "Rigged Colorado Action") based on some, but not all of the same facts and causes of action as those set forth in this Complaint that was initially assigned to MARTINEZ (who was a defendant in the Rigged Colorado Action) and was subsequently disposed of by BROOKE

JACKSON despite the fact that BROOKE JACKSON was also a defendant in the Rigged Colorado Action.

1108.  According to the Clerk's Office of the UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLORADO, both MARTINEZ and BROOKE JACKSON were assigned to the Rigged Colorado Action according to a random draw (despite both being defendants in the Rigged Colorado Action).

1109.  Including the senior judges at the UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLORADO, the odds of being randomly and consecutively assigned two judges appointed by OBAMA in January 2020 for the same case were one in eight, or 12.5%.

1110.  Excluding the senior judges at the UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLORADO, the odds of being randomly and consecutively assigned two judges appointed by OBAMA in January 2020 for the same case were one in four, or 25%

1111.  COLWELL and/or JOHN DOE 1-X rigged the judge selection process in the Rigged Colorado Action.*

1112.  In or about January 2020, BROOKE JACKSON dismissed the Rigged Colorado Action with prejudice (the "Colorado Judgment").

1113.  In or about January 2020, the Clerk's Office of the UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLORADO mailed a copy (the "Stolen Judgment Copy") of the Colorado Judgment to THE RELATOR, but the Stolen Judgment Copy was

removed from the envelope prior to THE RELATOR obtaining possession of the envelope containing the Stolen Judgment Copy.

1114. In or about February 2020, THE RELATOR notified the Federal Bureau of Investigation and the United States Postal Service that his mail appeared to have been tampered with and/or opened prior to reaching the destination mailbox.

1115. Mail sent by the UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLORADO to THE RELATOR in January 2020 in connection with the Rigged Colorado Action was opened by JOHN DOE 1-X prior to THE RELATOR obtaining possession of that mail.

1116. The United States was never served with the Rigged Colorado Action by THE RELATOR.

1117. The Rigged New Hampshire Lawsuit was based on some, but not all of the same facts and causes of action as those set forth in this Complaint.

1118. TORRESEN dismissed the Rigged New Hampshire Lawsuit with prejudice on or about January 17, 2020 for failure to serve the defendants with a copy of the complaint and summons.

1119. On or about February 5, 2020, SAVERY donated approximately $500 to HEALEY's campaign for Attorney General of the Commonwealth of Massachusetts.

1120. On February 9, 2020, THE RELATOR sent a series of emails (the "February 9 Emails," attached hereto at Exhibit 7) to a number of the RICO ASSOCIATES.

1121. THE RELATOR incorporates by reference the contents of the February 9 Emails (attached hereto at EXHIBIT 7) as if fully set forth herein.

1122. The February 9 Emails included an image file (the "Image File") posted online by one or more individuals operating under the pseudonym, "Q" and/or "QAnon."

1123. The image file displays a paragraph in a federal indictment stating that reference to "cheese pizza" is a code for child pornography.

1124. At approximately 7:00 PM on February 9, 2020, NEW YORK TIMES COMPANY published an article (the "Coordinated Media Response") on its website entitled: "What Happens When QAnon Seeps From the Web to the Offline World."

1125. THE RELATOR incorporates by reference the contents of the Coordinated Media Response (attached hereto at EXHIBIT 8) as if fully set forth herein.

1126. The title and/or text of the Coordinated Media Response mimics the style and syntax of many of the questions posed by THE RELATOR in the February 9 Emails, including the words: "What happens when […]."

1127. NEW YORK TIMES COMPANY coordinated with one or more other RICO ASSOCIATES in a scheme to discredit THE RELATOR and/or communicate information to one or more other RICO ASSOCIATES.

1128. At approximately 7:00 PM on February 9, 2020, a rental car being used by the parents of THE RELATOR was damaged and/or defaced (the "Rental Car Damage") in or around Fort Lauderdale, Florida.

1129. One or more of the RICO ASSOCIATES initiated or was otherwise involved with the Rental Car Damage.*

1130. One or more of the RICO ASSOCIATES initiated or was otherwise involved with the Rental Car Damage in order to retaliate against THE RELATOR for the February 9 Emails.*

1131. On February 13, 2020, THE RELATOR mailed by first class mail with email receipt a motion pursuant to Fed. R. Civ. P. 59(e) (the "TORRESEN Mailing") to alter or amend the judgment in the Rigged New Hampshire Lawsuit.

1132. The TORRESEN Mailing included an affidavit alleging that OBAMA had disseminated a forged birth certificate on the official website of the White House.

1133. The TORRESEN Mailing was delivered to the UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MAINE on either February 15, 2020 or February 18, 2020.

1134. February 17, 2020 was a federal holiday (President's Day).

1135. TORRESEN, SNYDER, BERRY, and/or STORMS became aware of the TORRESEN Mailing on or before February 18, 2020.

1136. As of February 19, 2020 at approximately 3:00 PM, the TORRESEN Mailing did not appear on the docket of the Rigged New Hampshire Lawsuit.

1137. On February 19, 2020 at approximately 3:00 PM EST, THE RELATOR phoned SNYDER (the "SNYDER Call") regarding receipt of the TORRESEN Mailing.

1138. During the SNYDER Call, SNYDER repeatedly denied that the UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MAINE received the TORRESEN Mailing.

1139. During the SNYDER Call, after Snyder repeatedly denied that the UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MAINE received the TORRESEN

Mailing, THE RELATOR informed SNYDER that THE RELATOR had received an email message (the "Email Receipt") from the United States Postal Service concerning the TORRESEN Mailing.

1140. After being informed regarding the Email Receipt, SNYDER placed THE RELATOR on hold for approximately one minute and after returning to the SNYDER call, SNYDER confirmed that the UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MAINE had received the TORRESEN Mailing.

1141. TORRESEN, SNYDER, BERRY, and/or STORMS attempted to suppress the TORRESEN Mailing based on a belief that THE RELATOR could not prove delivery to and/or timely filing with the UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MAINE.

1142. SNYDER conferred with TORRESEN, BERRY, and/or STORMS during the SNYDER Call, at which time SNYDER, TORRESEN, BERRY, and/or STORMS decided to admit receipt and possession of the TORRESEN Mailing.

1143. In or about March 2020, THE RELATOR sent a letter to the Clerk's Office of the UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLORADO requesting a copy of the judgment in the Rigged Colorado Action be sent to THE RELATOR by email and regular mail.

1144. As of the date of filing this Complaint, THE RELATOR had not received a copy of the judgment in the Rigged Colorado Action.

1145. As of the date of filing of this Complaint, THE RELATOR had not received any records in response to the June 2017 FOIA from DOJ.

1146. As of the date of filing of this Complaint, THE RELATOR had not received any records in response to the September 2018 FOIA from DOJ.

## INJURIES TO BUSINESS AND PROPERTY

1147. THE RELATOR sustained injuries in excess of $500 in connection with purchase of tax stamps pursuant to Mass.Gen.Laws ch. 64K by reason and as a proximate cause of the conduct of one or more of the defendants.

1148. THE RELATOR sustained injuries at or in excess of $160,000 in connection with tuition payments made to BCLS by reason and as a proximate cause of the conduct of one or more of the defendants.

1149. THE RELATOR sustained injuries in excess of $300 in connection with use of the official website of LSAC by reason and as a proximate cause of the conduct of one or more of the defendants.

1150. THE RELATOR sustained injuries at or in excess of $4,000 in connection with filing fees paid in court cases by reason and as a proximate cause of the conduct of one or more of the defendants.

1151. THE RELATOR sustained injuries at or in excess of $1,000 in connection with costs incurred in connection with court cases by reason and as a proximate cause of the conduct of one or more of the defendants.

1152. By reason and as a proximate cause of the conduct of one or more of the defendants, THE RELATOR's Apple app company, Omnibus, LLC, a New Hampshire limited liability company, is no longer operating.

1153. By reason and as a proximate cause of the conduct of one or more of the defendants, THE RELATOR sustained injuries at or in excess of $360,000 in connection with his whistleblower bounty as a relator in the *Qui Tam* Action.[10]

1154. By reason and as a proximate cause of the conduct of the ENTERPRISE, THE RELATOR sustained injuries at or in excess of $4,057,200 in connection with his whistleblower bounty as a relator in the Second *Qui Tam* Action.[11]

## **RACKETEERING ACTS**

1155. As set forth herein, there were two or more acts that constitute "racketeering activity" within the meaning of 18 U.S.C. § 1961(1) carried out by the RICO ASSOCIATES.[12]

## **OBAMA IDENTIFICATION FRAUD**

1156. Racketeering Act 1 – Fraud in connection with Identification Documents (18 U.S.C. § 1028). OBAMA and JOHN DOE 1-X conspired to produce and disseminate one or more unlawful identification documents, including a false birth certificate disseminated on the official website of the White House.

---

[10] The calculation for the bounty in the *Qui Tam* Action is: $200.00 per gram of cocaine multiplied by 3 kilograms of cocaine at issue in the *Qui Tam* Action equals $600,000; $600,000 doubled for the 100% nonpayment penalty equals $1,200,000, multiplied by 30% for the whistleblower bounty, equals $360,000.

[11] The calculation for the bounty in the Second *Qui Tam* Action is: $3.50 per gram of marijuana multiplied by 1,932 kilograms of marijuana at issue in the Second *Qui Tam* Action equals $6,762,000; $6,762,000 doubled for the 100% nonpayment penalty equals $13,524,000, multiplied by 30% for the whistleblower bounty, equals $4,057,200.

[12] Enumeration of particular statutes in this section is not intended to be exhaustive or exclusive of other statutes.

**PERSONAL BENEFIT FROM EQUITABLE SHARING PROGRAM PAYMENTS**

1157. Racketeering Act 2 – State Law Bribery (Mass.Gen.Laws. ch. 268A § 2). JOHN DOE 1-X, OBAMA, PATRICK, SARIS, O'TOOLE, GOODLANDER, FLATGARD, LORETTA LYNCH, WALSH, DANIEL KOH, STEVEN KOH, COLE, YATES, HOLDER, ORTIZ, and the DOJ PAID ASSOCIATES conspired to offer or accept and offered or accepted one or more payments from the Equitable Sharing Program in whole or in part for personal benefit in exchange for the non-prosecution of JAVIER GONZALEZ and JAMIL ROMAN pursuant to the CST, thereby purloining some or all of THE RELATOR's whistleblower bounty.

1158. Racketeering Act 3 – 18 U.S.C. § 1951 (Hobbs Act Extortion Under Color of Official Right) ("Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by … extortion or attempts or conspires to do so."). JOHN DOE 1-X, OBAMA, PATRICK, SARIS, O'TOOLE, GOODLANDER, FLATGARD, LORETTA LYNCH, WALSH, DANIEL KOH, STEVEN KOH, COLE, YATES, HOLDER, ORTIZ, and the DOJ PAID ASSOCIATES, under color of official right, conspired to obtain and obtained one or more payments from the Equitable Sharing Program in or around December 2014 .

1159. Racketeering Act 4 – State Law Bribery (Mass.Gen.Laws. ch. 268A § 2). JOHN DOE 1-X, OBAMA, PATRICK, SARIS, O'TOOLE, GOODLANDER, FLATGARD, LORETTA LYNCH, WALSH, DANIEL KOH, STEVEN KOH, COLE, YATES, HOLDER, ORTIZ, and the DOJ PAID ASSOCIATES conspired to accept and accepted one or more payments from the Equitable Sharing Program in whole or in part for personal benefit in

exchange for the dismissal of the *Qui Tam* Action, thereby purloined some or all of THE RELATOR's whistleblower bounty.

1160. <u>Racketeering Act 5 – Mail Fraud (18 U.S.C. § 1341)</u>. JOHN DOE 1-X, OBAMA, PATRICK, SARIS, O'TOOLE, GOODLANDER, FLATGARD, LORETTA LYNCH, WALSH, DANIEL KOH, STEVEN KOH, COLE, YATES, HOLDER, ORTIZ, and the DOJ PAID ASSOCIATES conspired to carry out and carried out a scheme to defraud THE RELATOR utilizing the mail for Equitable Sharing Program payments, namely funds from or in connection with the Equitable Sharing Check. JOHN DOE 1-X, OBAMA, PATRICK, SARIS, O'TOOLE, GOODLANDER, FLATGARD, LORETTA LYNCH, WALSH, DANIEL KOH, STEVEN KOH, COLE, YATES, HOLDER, ORTIZ, and the DOJ PAID ASSOCIATES had a duty to disclose payments made or received and payments intended to be made or received from the Equitable Sharing Program pursuant to the Rules of Professional Conduct of the Commonwealth and the Due Process Clause of the U.S. Constitution.

1161. <u>Racketeering Act 6 – Wire Fraud (18 U.S.C. § 1343)</u>. JOHN DOE 1-X, OBAMA, PATRICK, SARIS, O'TOOLE, GOODLANDER, FLATGARD, LORETTA LYNCH, WALSH, DANIEL KOH, STEVEN KOH, COLE, YATES, HOLDER, ORTIZ, and the DOJ PAID ASSOCIATES conspired to carry out and carried out a scheme to defraud THE RELATOR utilizing electronic communications for Equitable Sharing Program payments, including the DOJ Wires #1-2; the April 2015 Payment; the June 2015 Payments; and the February 2016 Payments. JOHN DOE 1-X, OBAMA, PATRICK, SARIS, O'TOOLE, GOODLANDER, FLATGARD, LORETTA LYNCH, WALSH,

DANIEL KOH, STEVEN KOH, COLE, YATES, HOLDER, ORTIZ, and the DOJ PAID ASSOCIATES had a duty to disclose payments made or received and payments intended to be made or received from the Equitable Sharing Program pursuant to the Rules of Professional Conduct of the Commonwealth and the Due Process Clause of the U.S. Constitution.

1162. Racketeering Act 7 – 18 U.S.C. § 1956. JOHN DOE 1-X, OBAMA, PATRICK, SARIS, O'TOOLE, GOODLANDER, FLATGARD, LORETTA LYNCH, WALSH, DANIEL KOH, STEVEN KOH, COLE, YATES, HOLDER, ORTIZ, and the DOJ PAID ASSOCIATES conspired to conduct and conducted one or more financial transactions which in fact involved the proceeds of racketeering activity with intent to carry on the conduct of the ENTERPRISE, including the deposit of funds from or in connection with the Equitable Sharing Check. The Equitable Sharing Check involves a racketeering act and/or a violation of 18 U.S.C. § 666, which is a prerequisite for "specified unlawful activity" pursuant to 18 U.S.C. § 1956.

1163. Racketeering Act 8 – 18 U.S.C. § 1957. JOHN DOE 1-X, OBAMA, PATRICK, SARIS, O'TOOLE, GOODLANDER, FLATGARD, LORETTA LYNCH, WALSH, DANIEL KOH, STEVEN KOH, COLE, YATES, HOLDER, ORTIZ, and the DOJ PAID ASSOCIATES conspired to conduct and conducted one or more financial transactions in excess of $10,000 which in fact involved the proceeds of racketeering activity with intent to carry on the conduct of the ENTERPRISE, including the deposit of funds from or in connection with the Equitable Sharing Check. The Equitable Sharing Check involves a

violation of 18 U.S.C. § 666, which is a prerequisite for "specified unlawful activity" pursuant to 18 U.S.C. § 1957.

1164. Racketeering Act 9 – 18 U.S.C. § 2314. JOHN DOE 1-X, OBAMA, PATRICK, SARIS, O'TOOLE, GOODLANDER, FLATGARD, LORETTA LYNCH, WALSH, DANIEL KOH, STEVEN KOH, COLE, YATES, HOLDER, ORTIZ, and the DOJ PAID ASSOCIATES conspired to transport, transmit, or transfer and transported, transmitted, or transferred in interstate commerce securities or money of the value of $5,000 or more, namely the deposit of funds from or in connection with the Equitable Sharing Check, knowing the same to have been stolen, converted, or taken by fraud.

1165. Racketeering Act 10 – 18 U.S.C. § 2315. JOHN DOE 1-X, OBAMA, PATRICK, SARIS, O'TOOLE, GOODLANDER, FLATGARD, LORETTA LYNCH, WALSH, DANIEL KOH, STEVEN KOH, COLE, YATES, HOLDER, ORTIZ, and the DOJ PAID ASSOCIATES conspired to receive and received, possessed, concealed, or stored securities or money of the value of $5,000 or more from the Equitable Sharing Program, namely the deposit of funds from or in connection with the Equitable Sharing Check, knowing the same to have been stolen, converted, or taken by fraud.

1166. Racketeering Act 11 – 18 U.S.C. § 1951 (Hobbs Act Extortion Under Color of Official Right) ("Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by … extortion or attempts or conspires to do so."). JOHN DOE 1-X, OBAMA, PATRICK, SARIS, O'TOOLE, GOODLANDER, FLATGARD, LORETTA LYNCH, WALSH, DANIEL KOH, STEVEN KOH, COLE, YATES, HOLDER, ORTIZ, and the DOJ PAID ASSOCIATES,

under color of official right, conspired to obtain and obtained one or more payments from the Equitable Sharing Program in whole or in part for personal benefit in or around February 2015 to which they were not entitled.

1167. Racketeering Act 12 – Mail Fraud (18 U.S.C. § 1341). HEALEY, CRAFTS, and/or WALKER mailed documents setting forth the First SJC Statement and Second SJC Statement, where such documents contained false statements and/or material omissions in violation of the Rules of Professional Conduct of the Commonwealth and the Due Process Clause in order to cover-up unlawful activity in connection with the Equitable Sharing Program, including one or more violations 18 U.S.C. § 666.

**MORE THAN $150,000 TO BOSTON COLLEGE**

1168. Racketeering Act 13 – 18 U.S.C. § 1951 (Hobbs Act Extortion Using Fear) ("Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by … extortion or attempts or conspires to do so."). The RICO ASSOCIATES using economic fear, conspired to obtain and obtained payment from THE RELATOR in the amount of approximately $500 in or about April 2015.

1169. Racketeering Act 14 – Mail Fraud (18 U.S.C. § 1341). The RICO ASSOCIATES conspired to obtain and obtained payment from THE RELATOR in the amount of approximately $500 in April 2015, where each had an obligation to disclose their respective roles in any litigation involving THE RELATOR under the Rules of Professional Conduct of the Commonwealth and under the Due Process Clause of the U.S. Constitution.

1170. <u>Racketeering Act 15 – Wire Fraud (18 U.S.C. § 1343).</u> The RICO ASSOCIATES conspired to carry out and carried out a scheme to defraud THE RELATOR by sending and receiving electronic communications, including six separate electronic funds transfers from THE RELATOR for tuition, in connection with THE RELATOR's attendance of classes and use of online services at BCLS at 885 CENTRE STREET. Each of the RICO ASSOCIATES had a duty, to the extent each was or is an attorney, to notify THE RELATOR that one or more of the RICO ASSOCIATES had obtained or could obtain Privileged Information in violation of the Rules of Professional Conduct of the Commonwealth and the Due Process Clause of the U.S. Constitution.

1171. <u>Racketeering Act 16 – 18 U.S.C. § 1956.</u> Through THE RELATOR's tuition payments to BCLS, the RICO ASSOCIATES conspired to send money which in fact involved the proceeds of specified unlawful activity.

1172. <u>Racketeering Act 17 – 18 U.S.C. § 1957.</u> Through THE RELATOR's tuition payments to BCLS, the RICO ASSOCIATES conspired to receive money which in fact involved the proceeds of specified unlawful activity.

## KATZMANN'S TIMELY ELEVATION

1173. <u>Racketeering Act 18 – 18 U.S.C. § 1512(c)(2)</u> ("Whoever corruptly … otherwise obstructs, influences, or impedes any official proceeding or attempts to do so."). OBAMA influenced and/or obstructed THE RELATOR's appeal of the Rigged O'Toole Action with the timing of removing KATZMANN from the appeal of the dismissal of the *Qui Tam* Action. BARRON had been aware of THE RELATOR's then pending-litigation months before his purported random assignment to the appeal of the Rigged O'Toole

Action.  BARRON received extrajudicial information regarding the appeal of the Rigged

O'Toole Action when BARRON visited BCLS.*  BARRON, SANDRA LYNCH, and

KAYATTA issued a judgment in the Rigged O'Toole Action 13 days after KATZMANN

was elevated, where such judgment found that THE RELATOR had alleged a general

injury from the opioid epidemic, where THE RELATOR had previously asserted in

writing that the general injury from the opioid epidemic was a "misleading" argument

improperly made by ORTIZ and HEALEY.

1174.  <u>Racketeering Act 19 – State Law Bribery (Mass.Gen.Laws ch. 268A § 2(a)</u>.  ("Whoever,

directly or indirectly, corruptly gives, offers or promises anything of value … to any

member of the judiciary, … with intent (1) to influence any official act or any act within

the official responsibility of such … member of the judiciary … or  (2) to influence such

… member of the judiciary … to commit or aid in committing, or collude in, or allow,

any fraud, or make opportunity for the commission of any fraud on the commonwealth or

a state, county or municipal agency, or (3) to induce such … member of the judiciary …

to do or omit to do any act in violation of his lawful duty.").  The RICO ASSOCIATES

conspired to offer and offered KATZMANN a federal judgeship in exchange for a

favorable ruling or in order to otherwise influence the appeal of the dismissal of the *Qui*

*Tam* Action.  The offer became apparent when OBAMA, two days after Senate

confirmation of both KATZMANN and Jennifer Choe Groves, signed the commission for

the U.S. Court of International Trade for only Jennifer Choe Groves, who was nominated,

had a hearing, and was confirmed all on the same days as KATZMANN.  OBAMA

waited approximately 100 days after Senate confirmation before signing KATZMANN's

commission for the U.S. Court of International Trade. OBAMA waited just two days to sign KATZMANN's commission after KATZMANN entered an order seeking a response to the Rehearing Papers from the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH in the appeal of the dismissal of the *Qui Tam* Action.

1175. Racketeering Act 20 – State Law Bribery (Mass.Gen.Laws ch. 268A § 2(b)) Under section 2(b), "[w]hoever, being ... a member of the judiciary ... directly or indirectly, corruptly asks, demands, exacts, solicits, seeks, accepts, receives or agrees to receive anything of value for himself or for any other person or entity, in return for being influenced in his performance of any official act or any act within his official responsibility." ). KATZMANN accepted the offer from OBAMA and others to become a judge on the U.S. Court of International Trade on or about September 15, 2016 knowing what the offer entailed.

1176. Racketeering Act 21 – 18 U.S.C. § 1951 (Hobbs Act Extortion Under Color of Official Right) ("Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by ... extortion or attempts or conspires to do so."). KATZMANN obtained money from the U.S. government through OBAMA in connection with one or more official acts taken by KATZMANN as a justice of the Massachusetts Appeals Court, namely his resignation after making a ruling adverse to the ENTERPRISE.

## INTERSTATE TRAVEL TO AND FROM THE WHITE HOUSE
## IN CONNECTION WITH KATZMANN'S ELEVATION

1177. <u>Racketeering Act 22 – 18 U.S.C. § 1952(a)(3)</u> ("Whoever travels in interstate …

commerce … with intent to … otherwise promote, manage, establish, carry on, or

facilitate the promotion, management, establishment, or carrying on, of any unlawful

activity and thereafter [does] or attempts to ... [promote, manage, establish, carry on, or

facilitate the promotion, management, establishment, or carrying on, of any unlawful

activity]."). In May 2015, SIMAS travelled interstate to 885 CENTRE STREET and/or

Boston, Massachusetts to carry on the affairs of the ENTERPRISE with one or more of

the RICO ASSOCIATES. In November 2015, SIMAS travelled interstate to 885

CENTRE STREET and/or Boston, Massachusetts to carry on the affairs of the

ENTERPRISE with one or more of the RICO ASSOCIATES. SIMAS travelled interstate

to 885 CENTRE STREET and/or in or around Boston, Massachusetts in November 2016

after KATZMANN was elevated to a federal judgeship.

1178. <u>Racketeering Act 23 – 18 U.S.C. § 1952(a)(3)</u>. OBAMA travelled interstate and met with

HEALEY at a location in or around Boston, Massachusetts in September 2015 after

KATZMANN was nominated to a federal judgeship.

1179. <u>Racketeering Act 24 – 18 U.S.C. § 1952(a)(3)</u>. LYNCH travelled interstate and met with

HEALEY and ORTIZ at a location in or around Boston, Massachusetts in September

2015 after KATZMANN was nominated to a federal judgeship.

1180. Racketeering Act 25 – 18 U.S.C. § 1952(a)(3). As set forth herein, MAFFEI travelled interstate to Washington, DC to carry on the affairs of the ENTERPRISE with OBAMA, SIMAS, and/or JOHN DOE 1-X, including a visit to the White House.

1181. Racketeering Act 26 – 18 U.S.C. § 1952(a)(3). As set forth herein, ORTIZ travelled interstate to Washington, DC to carry on the affairs of the ENTERPRISE with OBAMA, SIMAS, and/or JOHN DOE 1-X, including multiple visits to the White House.

1182. Racketeering Act 27 – 18 U.S.C. § 1952(a)(3). As set forth herein, ROUGEAU travelled interstate to Washington, DC to carry on the affairs of the ENTERPRISE with OBAMA, SIMAS, and/or JOHN DOE 1-X, including a visit to the White House.

1183. Racketeering Act 28 – 18 U.S.C. § 1952(a)(3). On multiple occasions as set forth herein, HEALEY travelled interstate to Washington, DC to carry on the affairs of the ENTERPRISE with OBAMA, SIMAS, and/or JOHN DOE 1-X, including multiple visits to the White House.

## WITHHOLDING PUBLIC RECORDS TO COVER UP VIOLATIONS OF FEDERAL LAW

1184. Racketeering Act 29 – 18 U.S.C. § 1512(c)(2) ("Whoever corruptly … otherwise obstructs, influences, or impedes any official proceeding or attempts to do so."). The DOJ PAID ASSOCIATES conspired to obstruct and obstructed the due administration of justice by precluding THE RELATOR from obtaining public records concerning the Equitable Sharing Records Request. The obstruction was carried out in order to hinder, delay, or prevent THE RELATOR from pursuing a federal civil action or from amending his then-pending federal civil action.

1185. <u>Racketeering Act 30 – 18 U.S.C. § 1512(b)(3)</u> ("Whoever knowingly … engages in misleading conduct toward another person, with intent to … hinder, delay, or prevent the communication to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a Federal offense."). The DOJ PAID ASSOCIATES engaged in misleading conduct towards THE RELATOR concerning the Equitable Sharing Records Request in order to hinder, delay, or prevent THE RELATOR from reporting one or more violations of federal law by any member of the ENTERPRISE to a federal judge or law enforcement official.

1186. <u>Racketeering Act 31 – 18 U.S.C. § 1512(c)</u> ("Whoever corruptly (1) alters … or conceals a record, document, or other object, or attempts to do so, with the intent to impair the object's integrity or availability for use in an official proceeding; or (2) otherwise obstructs, influences, or impedes any official proceeding or attempts to do so."). The DOJ PAID ASSOCIATES conspired to conceal and did conceal records responsive to the Equitable Sharing Records Request in order to hinder, delay, or prevent THE RELATOR from reporting one or more violations of federal law by any member of the ENTERPRISE to a federal judge or law enforcement official.

### CRAFTS'S TIMELY PROMOTION

1187. <u>Racketeering Act 32 – State Law Bribery (Mass.Gen.Laws ch. 268A § 2(a))</u> ("Whoever, directly or indirectly, corruptly gives, offers or promises anything of value to any state … employee, … with intent (1) to influence any official act or any act within the official responsibility of such employee … or (2) to influence such an employee … to commit or aid in committing, or collude in, or allow, any fraud, or make opportunity for the

commission of any fraud on the commonwealth or a state, county or municipal agency, or

(3) to induce such an employee … to do or omit to do any act in violation of his lawful

duty."). In or about October 2016, HEALEY offered CRAFTS a promotion to Deputy

Chief of the False Claims Division of the OFFICE OF THE ATTORNEY GENERAL OF

THE COMMONWEALTH in exchange for CRAFTS's role in the ENTERPRISE,

including as the attorney appearing in most of the proceedings in the *Qui Tam* Action,

where CRAFTS made false statements in writing and during oral argument.

1188. Racketeering Act 33 – State Law Bribery (Mass.Gen.Laws ch. 268A § 2(b)) ("Whoever,

being a state … employee … directly or indirectly, corruptly asks, demands, exacts,

solicits, seeks, accepts, receives or agrees to receive anything of value for [herself] … in

return for (1) being influenced in [her] performance of any official act or any act within

[her] official responsibility, or (2) being influenced to commit or aid in committing, or to

collude in, or allow any fraud, or make opportunity for the commission of any fraud, on

the commonwealth or on a state, county or municipal agency, or (3) being induced to do

or omit to do any acts in violation of [her] official duty."). In or about October 2016,

CRAFTS accepted a promotion to Deputy Chief of the False Claims Division of the

OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH from

HEALEY in exchange for CRAFTS's role in the ENTERPRISE, including as the attorney

appearing in most of the proceedings in the *Qui Tam* Action, where CRAFTS made false

statements in writing and during oral argument.

1189. Racketeering Act 34 – 18 U.S.C. § 1951 (Hobbs Act Extortion Under Color of Official

Right) ("Whoever in any way or degree obstructs, delays, or affects commerce or the

movement of any article or commodity in commerce, by … extortion or attempts or conspires to do so."). CRAFTS obtained money from the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH through HEALEY in connection with one or more official acts before the DOJ PAID ASSOCIATES.

## HEALEY'S FUNDRAISER IS HIRED BY BCLS

1190. Racketeering Act 35 – State Law Bribery (Mass.Gen.Laws. ch. 268A § 2(b)) ("Whoever, being a state … employee … directly or indirectly, corruptly asks, demands, exacts, solicits, seeks, accepts, receives or agrees to receive anything of value for [herself] … in return for (1) being influenced in [her] performance of any official act or any act within [her] official responsibility, or (2) being influenced to commit or aid in committing, or to collude in, or allow any fraud, or make opportunity for the commission of any fraud, on the commonwealth or on a state, county or municipal agency, or (3) being induced to do or omit to do any acts in violation of [her] official duty."). SQUIRES-LEE accepted one or more payments from BOSTON COLLEGE through one or more of the RICO ASSOCIATES in exchange for a favorable ruling or rulings as to any future proceeding involving THE RELATOR before SQUIRES-LEE as a judge.

1191. Racketeering Act 36 – State Law Bribery (Mass.Gen.Laws. ch. 268A § 2(a)). ("Whoever, directly or indirectly, corruptly gives, offers or promises anything of value to any state … employee, … with intent (1) to influence any official act or any act within the official responsibility of such employee … or (2) to influence such an employee … to commit or aid in committing, or collude in, or allow, any fraud, or make opportunity for the commission of any fraud on the commonwealth or a state, county or municipal agency, or

229

(3) to induce such an employee … to do or omit to do any act in violation of his lawful duty.").  One or more of the RICO ASSOCIATES offered one or more payments from BOSTON COLLEGE to SQUIRES-LEE in exchange for a favorable ruling or rulings as to any future proceeding involving THE RELATOR before SQUIRES-LEE as a judge.

1192.  Racketeering Act 37 – 18 U.S.C. § 1951 (Hobbs Act Extortion Under Color of Official Right)  ("Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by … extortion or attempts or conspires to do so.").  SQUIRES-LEE obtained money from BOSTON COLLEGE through one or more of the RICO ASSOCIATES in connection with one or more official acts before SQUIRES-LEE as a judge.

## OBAMA TRAVELS AND MEETS HEALEY

1193.  Racketeering Act 38 – 18 U.S.C. § 1952(a)(3) ("Whoever travels in interstate … commerce … with intent to … otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity and thereafter [does] or attempts to … [promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity].").  On or about May 7, 2017 as set forth herein, OBAMA travelled to Boston, Massachusetts and/or the surrounding area to carry on the affairs of the ENTERPRISE with HEALEY using funds from the OBAMA FOUNDATION ACCOUNTS 1-X while traveling to and/or from Washington, District of Columbia.

## TWO JOBS FOR ORTIZ: BCLS & PARTNER

1194. <u>Racketeering Act 39 – 18 U.S.C. § 201(b)(1) (bribery)</u> ("Whoever … directly or indirectly, corruptly gives, offers or promises anything of value to any public official (A) to influence any official act; or (B) to influence such public official … to commit or aid in committing, or collude in, or allow any fraud, or make opportunity for the commission of any fraud, on the United States; or (C) to induce such public official … to do or omit to do any act in violation of the lawful duty of such official or person."). One or more of the RICO ASSOCIATES offered something of value to ORTIZ, namely a professorship at BCLS at 885 CENTRE STREET, in exchange for making or agreeing to make payments under the Equitable Sharing Program to the EQUITABLE SHARING ACCOUNTS 1-X and/or for decisions made in connection with THE RELATOR's litigation in federal courts.

1195. <u>Racketeering Act 40 – 18 U.S.C. § 201(b)(2) (bribery)</u> ("Whoever … being a public official, … directly or indirectly, corruptly demands, seeks, receives, accepts, or agrees to receive or accept anything of value personally or for any other person or entity, in return for: (A) being influenced in the performance of any official act; or (B) being influenced to commit or aid in committing, or collude in, or allow any fraud, or make opportunity for the commission of any fraud, on the United States; or (C) being induced to do or omit to any act in violation of the lawful duty of such official or person."). ORTIZ accepted something of value from one or more of the RICO ASSOCIATES, namely a professorship at BCLS at 885 CENTRE STREET, in exchange for making or agreeing to make payments under the Equitable Sharing Program to the EQUITABLE SHARING

ACCOUNTS 1-X and/or for decisions made in connection with THE RELATOR's litigation in federal courts.

1196.  Racketeering Act 41 – 18 U.S.C. § 201(c)(1)(A) (gratuity) ("Whoever … otherwise than as provided by law for the proper discharge of official duty … directly or indirectly gives, offers, or promises anything of value to any public official.").  In the alternative of a bribe, one or more of the RICO ASSOCIATES offered compensation to ORTIZ through a professorship at BCLS at 885 CENTRE STREET as a gratuity to ORTIZ because of making or agreeing to make payments under the Equitable Sharing Program to the EQUITABLE SHARING ACCOUNTS 1-X and/or for decisions made in connection with THE RELATOR's litigation in federal courts.

1197.  Racketeering Act 42 – 18 U.S.C. § 201(c)(1)(B) (gratuity).  ("Whoever … being a public official, former public official, or person selected to be a public official, otherwise than as provided by law for the proper discharge of official duty, directly or indirectly demands, seeks, receives, accepts, or agrees to receive or accept anything of value personally for or because of any official act performed or to be performed by such official or person.").  In the alternative of a bribe, ORTIZ accepted compensation from one or more of the RICO ASSOCIATES through a teaching or other position at 885 CENTRE STREET as a gratuity to ORTIZ because of making or agreeing to make payments under the Equitable Sharing Program and/or for decisions made in connection with THE RELATOR's litigation in federal courts.

1198.  Racketeering Act 43 – 18 U.S.C. § 201(b)(1) (bribery).  MACKEY offered compensation to ORTIZ through a job at the law firm, Anderson & Kreiger LLP in Boston,

Massachusetts, in exchange for ORTIZ making or agreeing to make payments under the Equitable Sharing Program and/or for decisions made in connection with THE RELATOR's litigation in federal courts.

1199. <u>Racketeering Act 44 – 18 U.S.C. § 201(b)(2) (bribery)</u>. ORTIZ accepted something of value from MACKEY, namely a job at the law firm, Anderson & Kreiger LLP in Boston, Massachusetts, in exchange for making or agreeing to make payments under the Equitable Sharing Program and/or for decisions made in connection with THE RELATOR's litigation in federal courts.

1200. <u>Racketeering Act 45 – 18 U.S.C. § 201(c)(1)(A) (gratuity)</u>. In the alternative of a bribe, MACKEY offered compensation to ORTIZ through a job at the law firm, Anderson & Kreiger LLP in Boston, Massachusetts, as a gratuity to ORTIZ because of making or agreeing to make payments under the Equitable Sharing Program and/or for decisions made in connection with THE RELATOR's litigation in federal courts.

1201. <u>Racketeering Act 46 – 18 U.S.C. § 201(c)(1)(B) (gratuity)</u>. In the alternative of a bribe, ORTIZ accepted compensation from MACKEY through a job at the law firm, Anderson & Kreiger LLP in Boston, Massachusetts, as a gratuity to ORTIZ because of making or agreeing to make payments under the Equitable Sharing Program and/or for decisions made in connection with THE RELATOR's litigation in federal courts.

1202. <u>Racketeering Act 47 – 18 U.S.C. § 1951 (Hobbs Act Extortion Under Color of Official Right)</u> ("Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by ... extortion or attempts or conspires to do so."). ORTIZ accepted a payment to which she was not entitled from one

or more of the RICO ASSOCIATES through a teaching or other position at 885 CENTRE STREET because of making or agreeing to make payments under the Equitable Sharing Program and/or for decisions made in connection with THE RELATOR's litigation in federal courts.

1203. <u>Racketeering Act 48 – 18 U.S.C. § 1951 (Hobbs Act Extortion Under Color of Official Right)</u>. ORTIZ accepted a payment to which she was not entitled from MACKEY through a job at the law firm Anderson & Kreiger LLP in Boston, Massachusetts in connection with making or agreeing to make payments under the Equitable Sharing Program and/or for decisions made in connection with THE RELATOR's litigation in federal courts.

<b>HOLDER AND HEALEY MEET IN BOSTON</b>

1204. <u>Racketeering Act 49 – 18 U.S.C. § 1952(a)(3)</u> ("Whoever travels in interstate … commerce … with intent to … otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity and thereafter [does] or attempts to ... [promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity]."). HOLDER travelled interstate to Boston, Massachusetts in October 2017 to attend an event where HEALEY was present.

<b>SOROKIN VISITS BCLS AND COLLECTS FROM BOSTON COLLEGE</b>

1205. <u>Racketeering Act 50 – 18 U.S.C. § 201(b)(1) (bribery)</u> ("Whoever … directly or indirectly, corruptly gives, offers or promises anything of value to any public official (A) to influence any official act; or (B) to influence such public official … to commit or aid

234

in committing, or collude in, or allow any fraud, or make opportunity for the commission of any fraud, on the United States; or (C) to induce such public official … to do or omit to do any act in violation of the lawful duty of such official or person."). One or more of the RICO ASSOCIATES offered something of value to SOROKIN through a conference on opioids and/or a teaching or other position for SOROKIN's spouse in exchange for a favorable ruling or rulings as to any future proceeding involving THE RELATOR before SOROKIN as a judge.

1206. Racketeering Act 51 – 18 U.S.C. § 201(b)(2) (bribery) ("Whoever … being a public official, … directly or indirectly, corruptly demands, seeks, receives, accepts, or agrees to receive or accept anything of value personally or for any other person or entity, in return for: (A) being influenced in the performance of any official act; or (B) being influenced to commit or aid in committing, or collude in, or allow any fraud, or make opportunity for the commission of any fraud, on the United States; or (C) being induced to do or omit to any act in violation of the lawful duty of such official or person."). SOROKIN, through a conference on opioids and/or teaching or other position for SOROKIN's spouse, accepted something of value from one or more of the RICO ASSOCIATES in exchange for a favorable ruling or rulings as to any future proceeding involving THE RELATOR before SOROKIN as a judge.

1207. Racketeering Act 52 – 18 U.S.C. § 201(c)(1)(A) (gratuity) ("Whoever … otherwise than as provided by law for the proper discharge of official duty … directly or indirectly gives, offers, or promises anything of value to any public official."). In the alternative of a bribe, one or more of the RICO ASSOCIATES offered compensation to SOROKIN or

SOROKIN's spouse through a conference on opioids and/or a teaching or other position as a gratuity to SOROKIN because of a favorable ruling or rulings to be made in any future proceeding involving THE RELATOR before SOROKIN as a judge.

1208. Racketeering Act 53 – 18 U.S.C. § 201(c)(1)(B) (gratuity). ("Whoever … being a public official, former public official, or person selected to be a public official, otherwise than as provided by law for the proper discharge of official duty, directly or indirectly demands, seeks, receives, accepts, or agrees to receive or accept anything of value personally for or because of any official act performed or to be performed by such official or person."). In the alternative of a bribe, SOROKIN and/or SOROKIN's spouse accepted compensation from one or more of the RICO ASSOCIATES through a conference on opioids and/or a teaching or other position as a gratuity to SOROKIN because of a favorable ruling or rulings to be made in any future proceeding involving THE RELATOR before SOROKIN as a judge.

1209. Racketeering Act 54 – 18 U.S.C. § 1951 (Hobbs Act Extortion Under Color of Official Right) ("Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by … extortion or attempts or conspires to do so."). SOROKIN and/or SOROKIN's spouse accepted a payment to which he and/or she was not entitled from one or more of the RICO ASSOCIATES through a conference on opioids and/or a teaching or other position in connection with conduct in future federal proceedings involving THE RELATOR before SOROKIN.

## PURPOSEFUL OBSTRUCTION OF A CHANGE OF VENUE

1210. <u>Racketeering Act 55 – 18 U.S.C. § 1951 (Hobbs Act Extortion Using Fear)</u> ("Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by ... extortion or attempts or conspires to do so."). The RICO ASSOCIATES, using economic fear, conspired to obtain and obtained payment from THE RELATOR in the amount of approximately $28,205 in January 2018.

1211. <u>Racketeering Act 56 – Wire Fraud (18 U.S.C. § 1343)</u>. The RICO ASSOCIATES intended to carry out and carried out a scheme using interstate electronic communications to defraud THE RELATOR by denying THE RELATOR's visiting application to the University of Denver Sturm College of Law by engaging in and failing to disclose physical and electronic surveillance of and information sharing concerning THE RELATOR at BCLS at 885 CENTRE STREET to the benefit of THE RELATOR's legal adversaries and/or the ENTERPRISE. The RICO ASSOCIATES had a duty to 1) immediately cease information sharing of Privileged Information concerning THE RELATOR's litigation; and 2) disclose the occurrence of information sharing concerning THE RELATOR's litigation pursuant to the Rules of Professional Conduct of the Commonwealth and the Due Process Clause of the U.S. Constitution.

1212. <u>Racketeering Act 57 – Mail Fraud (18 U.S.C. § 1343)</u>. The RICO ASSOCIATES conspired to carry out and carried out a scheme using the mail to defraud THE RELATOR by denying THE RELATOR's visiting application to the University of Denver Sturm College of Law by engaging in and failing to disclose physical and electronic surveillance of and information sharing concerning THE RELATOR at BCLS at 885

CENTRE STREET to the benefit of THE RELATOR's legal adversaries and the ENTERPRISE. The RICO ASSOCIATES each had a duty to 1) immediately cease information sharing of Privileged Information concerning THE RELATOR's litigation; and 2) disclose the occurrence information sharing concerning THE RELATOR's litigation pursuant to the Rules of Professional Conduct of the Commonwealth and the Due Process Clause.

1213.   Racketeering Act 58 – 18 U.S.C. § 1512(b)(3) ("Whoever … knowingly … engages in misleading conduct toward another person, with intent to … hinder, delay, or prevent the communication to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a Federal offense."). The RICO ASSOCIATES each engaged in misleading conduct towards THE RELATOR concerning THE RELATOR's visiting application to the University of Denver Sturm College of Law in order to hinder, delay, or prevent THE RELATOR from making any report to a federal official in Colorado and from filing any case in the United States District Court for the District of Colorado concerning one or more violations of federal law by any member of the ENTERPRISE.

1214.   Racketeering Act 59 – 18 U.S.C. § 1512(c)(2) ("Whoever corruptly … otherwise obstructs, influences, or impedes any official proceeding or attempts to do so."). The RICO ASSOCIATES each precluded THE RELATOR from attending the University of Denver Sturm College of Law in order to hinder, delay, or prevent THE RELATOR from filing any case in the United States District Court for the District of Colorado concerning one or more violations of federal law by any member of the ENTERPRISE.

## HEALEY'S STREAM OF BENEFITS WITH WILMERHALE

1215. <u>Racketeering Act 60 – State Law Bribery (Mass.Gen.Laws. ch. 268A § 2).</u> HEALEY and WILMERHALE collaborate in a sophisticated system amounting to a stream of benefits wherein WILMERHALE sends money to and performs other acts for HEALEY in exchange for or because of official acts taken or to be taken by HEALEY. An official act taken to benefit WILMERHALE by HEALEY includes the approval of approximately $55 million in art sales through the Art Deal by the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH to the benefit of a WILMERHALE client. Benefits to HEALEY from WILMERHALE include 1) campaign contributions from WILMERHALE that amounted to several times more than campaign contributions at each of the other top 10 law firms in Boston, Massachusetts; 2) use of WILMERHALE and its employees, including THOMAS LAMPERT, as a conduit for Privileged Information, for communication with and/or blackmail of LOWY, and to advance the interests of the ENTERPRISE.

1216. <u>Racketeering Act 61 – 18 U.S.C. § 1951 (Hobbs Act Extortion Under Color of Official Right)</u> ("Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by … extortion or attempts or conspires to do so."). In exchange for or because of the Art Deal, HEALEY obtained valuable services and money from WILMERHALE, while WILMERHALE benefitted from an official action taken by HEALEY through the Art Deal.

## THE JUDGMENT CLASS

1217. <u>Racketeering Act 62 – 18 U.S.C. § 1512(b) and (d)</u>.  During the Judgment Class, WILMERHALE, BOSTON COLLEGE, OBAMA, LOWY, BRIAN DURKIN, THOMAS LAMPERT, KENYON, ROUGEAU, HEALEY, NEYMAN, and SAVERY sought to harass THE RELATOR in order to hinder, delay, prevent, or dissuade THE RELATOR from communicating information concerning a potential federal criminal offense to a federal judge or law enforcement officer.

1218. <u>Racketeering Act 63 – 18 U.S.C. § 1513(e)</u> ("Whoever knowingly, with the intent to retaliate, takes any action harmful to any person, including interference with the lawful employment or livelihood of any person, for providing to a law enforcement officer any truthful information relating to the commission or possible commission of any Federal offense.").  During the Judgment Class, WILMERHALE, BOSTON COLLEGE, OBAMA, LOWY, BRIAN DURKIN, THOMAS LAMPERT, KENYON, ROUGEAU, HEALEY, NEYMAN, and SAVERY sought to retaliate against THE RELATOR by harassing and/or embarrassing THE RELATOR in connection with THE RELATOR's legal training because THE RELATOR had communicated truthful information concerning a potential federal criminal offense to a federal judge or law enforcement officer through the 93A Demand Letter and/or through THE RELATOR's litigation.

## THE BRIAN DURKIN ASSAULT

1219. <u>Racketeering Act 64 – 18 U.S.C. § 1512(c)(2)</u> ("Whoever corruptly … otherwise obstructs, influences, or impedes any official proceeding or attempts to do so."). BOSTON COLLEGE, BRIAN DURKIN, THOMAS LAMPERT, ARCHER,

SCOGNAMIGLIO, KENYON, and SARAH HERLIHY carried out the BRIAN DURKIN Assault in order to hinder, delay, or prevent THE RELATOR from pursuing a federal civil action.

1220. Racketeering Act 65 – 18 U.S.C. §§ 1512(a)(2), 1512(b), and 1512(d). BOSTON COLLEGE, BRIAN DURKIN, THOMAS LAMPERT, ARCHER, SCOGNAMIGLIO, KENYON, and SARAH HERLIHY sought to hinder, delay, prevent, or dissuade, by means of the BRIAN DURKIN Assault, THE RELATOR from communicating truthful information concerning a potential federal criminal offense to a federal judge or law enforcement officer.

1221. Racketeering Act 66 – 18 U.S.C. § 1513(b)(2) ("Whoever knowingly engages in any conduct and thereby causes bodily injury to another person … or threatens to do so, with intent to retaliate against any person for … any information relating to the commission or possible commission of a Federal offense … given by a person to a law enforcement officer."). BOSTON COLLEGE, BRIAN DURKIN, THOMAS LAMPERT, ARCHER, SCOGNAMIGLIO, KENYON, and SARAH HERLIHY sought to retaliate against THE RELATOR with the BRIAN DURKIN Assault because THE RELATOR was communicating truthful information concerning a potential federal criminal offense to a federal judge or law enforcement officer through the 93A Demand Letter and/or through THE RELATOR's litigation.

1222. Racketeering Act 67 – 18 U.S.C. § 1513(e) ("Whoever knowingly, with the intent to retaliate, takes any action harmful to any person, including interference with the lawful employment or livelihood of any person, for providing to a law enforcement officer any

241

truthful information relating to the commission or possible commission of any Federal

offense."). BOSTON COLLEGE, BRIAN DURKIN, THOMAS LAMPERT, ARCHER,

SCOGNAMIGLIO, KENYON, and SARAH HERLIHY sought to retaliate against THE

RELATOR with the BRIAN DURKIN Assault because THE RELATOR was

communicating truthful information concerning a potential federal criminal offense to a

federal judge or law enforcement officer through the 93A Demand Letter and/or through

THE RELATOR's litigation.

1223. Racketeering Act 68 – 18 U.S.C. § 1961(1) ("any... threat involving ... bribery,

extortion, ... or dealing in a controlled substance or listed chemical (as defined in section

102 of the Controlled Substances Act), which is chargeable under State law and

punishable by imprisonment for more than one year."). BOSTON COLLEGE, BRIAN

DURKIN, THOMAS LAMPERT, ARCHER, SCOGNAMIGLIO, KENYON, and

SARAH HERLIHY committed the BRIAN DURKIN Assault because THE RELATOR

was engaged in litigation that, at the time of the BRIAN DURKIN Assault, involved

bribery, extortion, and/or dealing in a controlled substance chargeable under state law.

**THE DEADLY QUESTION**

1224. Racketeering Act 69 – 18 U.S.C. § 1512(c)(2) ("Whoever corruptly ... otherwise

obstructs, influences, or impedes any official proceeding or attempts to do so."). MAFFEI

asked the Deadly Question in order to hinder, delay, and/or prevent THE RELATOR from

pursuing a federal civil action.

1225. Racketeering Act 70 – 18 U.S.C. §§ 1512(a)(2), 1512(b), and 1512(d). MAFFEI sought

to hinder, delay, prevent, and/or dissuade, by means of the Deadly Question, THE

242

RELATOR from communicating truthful information concerning a potential federal criminal offense to a federal judge or law enforcement officer.

1226. Racketeering Act 71 – 18 U.S.C. § 1513(b)(2) ("Whoever knowingly engages in any conduct and thereby causes bodily injury to another person … or threatens to do so, with intent to retaliate against any person for … any information relating to the commission or possible commission of a Federal offense … given by a person to a law enforcement officer."). MAFFEI sought to retaliate against THE RELATOR with the Deadly Question because THE RELATOR had communicated truthful information concerning a potential federal criminal offense to a federal judge or law enforcement officer through the 93A Demand Letter and the Rigged Sorokin Action.

1227. Racketeering Act 72 – 18 U.S.C. § 1961(1) ("any… threat involving murder, … bribery, extortion, … or dealing in a controlled substance or listed chemical (as defined in section 102 of the Controlled Substances Act), which is chargeable under State law and punishable by imprisonment for more than one year."). MAFFEI asked the Deadly Question because THE RELATOR was engaged in litigation that, at the time of the Deadly Question, involved bribery, extortion, and/or dealing in a controlled substance chargeable under state law concerning MAFFEI and other RICO ASSOCIATES. The Deadly Question itself was a death threat and/or a threat involving murder.

**ATTEMPTING TO INDUCE THE RELATOR TO RETURN TO BCLS**

1228. Racketeering Act 73 – 18 U.S.C. § 1512(c)(2) ("Whoever corruptly … otherwise obstructs, influences, or impedes any official proceeding or attempts to do so."). SAVERY, ULLMANN, ABBENE, and THOMAS LAMPERT each sent an email to the

243

BC Email Account in an attempt to induce THE RELATOR to return to 885 CENTRE STREET, where the ENTERPRISE could further injure THE RELATOR and obstruct his federal litigation.

1229. Racketeering Act 74 –18 U.S.C. § 1512(b)(3) and (c)(2). As set forth herein, SAVERY, ULLMANN, ABBENE, and THOMAS LAMPERT each sent an email to the BC Email Account in an attempt to induce THE RELATOR to return to 885 CENTRE STREET, where the ENTERPRISE could further injure THE RELATOR and obstruct his state and federal litigation.

### MAILING THE EMERGENCY MOTION TO THE WRONG ADDRESS

1230. Racketeering Act 75 – 18 U.S.C. §§ 1341, 1343 (mail and wire fraud). MESHNICK knowingly mailed the Motion to Strike to the wrong address for THE RELATOR, while BUCKLEY withheld information and gave improper instructions by telephone to THE RELATOR regarding the Motion to Strike in an attempt to preclude filings by THE RELATOR in the Parallel State Action involving damages for the $360,000 bounty in the *Qui Tam* Action. MESHNICK intended to deprive THE RELATOR of his legal interest in damages for the $360,000 bounty in the *Qui Tam* Action.

### INCIDENT #1 WITH THE DURKIN CAR

1231. Racketeering Act 76 – 18 U.S.C. § 1952(a)(3) ("Whoever travels in interstate … commerce … with intent to … otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity and thereafter [does] or attempts to ... [promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful

activity].").  On November 30, 2018, THOMAS DURKIN and BRIAN DURKIN agreed to use the DURKIN CAR to surveil and to intimidate THE RELATOR in connection with THE RELATOR's activities at the U.S. District Court for the District of New Hampshire. The DURKIN CAR was transported interstate between Massachusetts and New Hampshire on November 30, 2018.

1232. <u>Racketeering Act 77 – 18 U.S.C. §§ 1512(a)(2), 1512(b), and 1512(d)</u>.  The DURKIN CAR was used by THOMAS DURKIN and BRIAN DURKIN to surveil and to intimidate THE RELATOR in order to preclude THE RELATOR from communicating truthful information concerning a potential federal criminal offense to a federal judge or law enforcement officer.

1233. <u>Racketeering Act 78 – 18 U.S.C. § 1513(b)(2)</u> ("Whoever knowingly engages in any conduct and thereby causes bodily injury to another person … or threatens to do so, with intent to retaliate against any person for … any information relating to the commission or possible commission of a Federal offense … given by a person to a law enforcement officer.").  The DURKIN CAR was used by THOMAS DURKIN and BRIAN DURKIN to surveil and to intimidate THE RELATOR in order to preclude THE RELATOR from communicating truthful information concerning a potential federal criminal offense to a federal judge or law enforcement officer.

1234. <u>Racketeering Act 79 – 18 U.S.C. § 1961(1)</u> ("any… threat involving murder, … bribery, extortion, … or dealing in a controlled substance or listed chemical (as defined in section 102 of the Controlled Substances Act), which is chargeable under State law and punishable by imprisonment for more than one year.").  On November 30, 2018,

THOMAS DURKIN and BRIAN DURKIN agreed to use the DURKIN CAR to surveil and to intimidate THE RELATOR in connection with THE RELATOR's activities at the U.S. DISTRICT COURT FOR THE DISTRICT OF NEW HAMPSHIRE.

### INCIDENT #2 WITH THE DURKIN CAR

1235. Racketeering Act 80 – 18 U.S.C. § 1952(a)(3) ("Whoever travels in interstate … commerce … with intent to … otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity and thereafter [does] or attempts to ... [promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity]."). On or about November 30, 2018, THOMAS DURKIN and BRIAN DURKIN agreed to use the DURKIN CAR to surveil and to intimidate a person associated with THE RELATOR and THE RELATOR in connection with THE RELATOR's litigation. The DURKIN CAR was transported using an interstate highway in or around Massachusetts on or about November 30, 2018.

1236. Racketeering Act 81 – 18 U.S.C. §§ 1512(a)(2), 1512(b), and 1512(d). The DURKIN CAR was used by THOMAS DURKIN and BRIAN DURKIN to surveil and to intimidate a person associated with THE RELATOR and to intimidate THE RELATOR in connection with THE RELATOR's litigation and providing information to a federal official about a potential federal crime. The DURKIN CAR was transported using in or around Massachusetts on or about November 30, 2018.

1237. Racketeering Act 82 – 18 U.S.C. § 1513(b)(2) ("Whoever knowingly engages in any conduct and thereby causes bodily injury to another person … or threatens to do so, with

intent to retaliate against any person for … any information relating to the commission or possible commission of a Federal offense … given by a person to a law enforcement officer."). The DURKIN CAR was used by THOMAS DURKIN and BRIAN DURKIN to surveil and to intimidate a person associated with THE RELATOR and THE RELATOR in connection with THE RELATOR's litigation and providing information to a federal official about a potential federal crime. The DURKIN CAR was transported in or around Massachusetts on or about November 30, 2018.

1238. Racketeering Act 83 – 18 U.S.C. § 1961(1) ("any… threat involving murder, … bribery, extortion, … or dealing in a controlled substance or listed chemical (as defined in section 102 of the Controlled Substances Act), which is chargeable under State law and punishable by imprisonment for more than one year."). The DURKIN CAR was used by THOMAS DURKIN and BRIAN DURKIN to surveil and to intimidate one other person associated with THE RELATOR and THE RELATOR concerning THE RELATOR's litigation and communication of truthful information concerning a potential federal criminal offense to a federal judge or law enforcement officer. The DURKIN CAR was transported using an interstate highway in or around New Hampshire and/or Massachusetts on or about November 30, 2018.

**THE NON-RANDOM ASSIGNMENT OF SOROKIN**

1239. Racketeering Act 84 – 18 U.S.C. § 1512(c)(2) ("Whoever corruptly … otherwise obstructs, influences, or impedes any official proceeding or attempts to do so."). The Non-Random Assignment of SOROKIN to the Rigged Sorokin Action was a corruption

of the judicial process in the U.S. DISTRICT COURT FOR THE DISTRICT OF

MASSACHUSETTS by FARRELL and/or one more other RICO ASSOCIATES.

## SIMAS RETURNS TO BCLS

1240. Racketeering Act 85 – 18 U.S.C. § 1952(a)(3) ("Whoever travels in interstate …

commerce … with intent to … otherwise promote, manage, establish, carry on, or

facilitate the promotion, management, establishment, or carrying on, of any unlawful

activity and thereafter [does] or attempts to ... [promote, manage, establish, carry on, or

facilitate the promotion, management, establishment, or carrying on, of any unlawful

activity]."). SIMAS travelled interstate to 885 CENTRE STREET in September 2018

after SOROKIN was assigned to the Rigged Sorokin Action.

## SOROKIN PERFORMS FOR THE ENTERPRISE

1241. Racketeering Act 86 – 18 U.S.C. § 1512(c)(2) ("Whoever corruptly … otherwise

obstructs, influences, or impedes any official proceeding or attempts to do so."). As set

forth herein, after having been deliberately assigned to the Rigged Sorokin Action and

having accepted a bribe, gratuity, and/or payment in violation of the Hobbs Act,

SOROKIN entered a judgment knowing that the judgement was in exchange for, because

of, or otherwise influenced by BOSTON COLLEGE and ROUGEAU.

## GILES PREJUDGES THE PARALLEL STATE ACTION

1242. Racketeering Act 87 – 18 U.S.C. § 1512(c)(2) ("Whoever corruptly … otherwise

obstructs, influences, or impedes any official proceeding or attempts to do so."). GILES

entered a written memorandum on December 20, 2018 allowing a motion to dismiss one

or more federal causes of action pursuant to 42 U.S.C. § 1983 brought in SUFFOLK

SUPERIOR COURT in the Parallel State Action knowing that the memorandum in question had been authored before February 15, 2018, or at least seven months before a hearing on the motion to dismiss occurred and at least ten months before the memorandum was put on the record with GILES' signature.

## OBSTRUCTION OF JUSTICE AT THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLORADO

1243.  Racketeering Act 88 – 18 U.S.C. § 1512(c)(2) ("Whoever corruptly … otherwise obstructs, influences, or impedes any official proceeding or attempts to do so."). COLWELL and/or JOHN DOE 1-X obstructed justice by intentionally assigning the Rigged Colorado Action to MARTINEZ and BROOKE JACKSON and claiming that those assignments were random.

1244.  Racketeering Act 89 – 18 U.S.C. § 1512(c)(2) ("Whoever corruptly … otherwise obstructs, influences, or impedes any official proceeding or attempts to do so.").  Despite being a defendant in the Rigged Colorado Action, BROOKE JACKSON obstructed justice by purporting to act as a United States District Judge, when confronted with evidence that his judicial appointment was and is invalid.

## OBSTRUCTION OF JUSTICE AT THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MAINE

1245.  Racketeering Act 90 – 18 U.S.C. § 1512(c)(2) ("Whoever corruptly … otherwise obstructs, influences, or impedes any official proceeding or attempts to do so."). TORRESEN, BERRY, STORMS, and/or SNYDER conspired to obstruct justice by attempting to conceal the TORRESEN Filing and denying receipt of the TORRESEN Filing until confronted with the existence of an email receipt by THE RELATOR.

1246. Racketeering Act 91 – 18 U.S.C. § 1512(c)(2) ("Whoever corruptly … otherwise obstructs, influences, or impedes any official proceeding or attempts to do so."). TORRESEN obstructed justice by purporting to act as a United States District Judge, when confronted with evidence that her judicial appointment was and is invalid.

## RETALIATION AGAINST THE PARENTS OF THE RELATOR

1247. Racketeering Act 92 – 18 U.S.C. § 1513(b)(2) ("Whoever knowingly engages in any conduct and thereby causes bodily injury to another person … or threatens to do so, with intent to retaliate against any person for … any information relating to the commission or possible commission of a Federal offense … given by a person to a law enforcement officer."). One or more of the RICO ASSOCIATES retaliated against the parents of THE RELATOR by damaging their rental car immediately after THE RELATOR sent one or more of the February 9 Emails.

## COCAINE DISTRIBUTION

1248. Racketeering Act 93 – Conspiracy to Distribute and Distribution of Cocaine (21 U.S.C. §§ 841, 846; Conspiracy to violate the Massachusetts CST). THOMAS LAMPERT, HENRIK LAMPERT, DAVID LAMPERT, TORIL FORLAND, and/or other RICO ASSOCIATES engaged in a conspiracy to distribute and distribution of cocaine at 885 CENTRE STREET.

1249. Racketeering Act 94 – Conspiracy to Distribute and Distribution of Five or More Kilograms of Cocaine (21 U.S.C. §§ 841, 846; Conspiracy to Violate the Massachusetts CST). JAVIER GONZALEZ and JAMIL ROMAN distributed five or more kilograms of cocaine using their international drug smuggling network. Through corruption of the

judicial process and other racketeering acts, the ENTERPRISE has to this point

succeeded in precluding collection for the obligation owed by JAVIER GONZALEZ and

JAMIL ROMAN to the Commonwealth of Massachusetts.

## MURDER

1250. <u>Racketeering Act 95 – Conspiracy to Murder and Murder</u>.  The RICO ASSOCIATES

engaged in a conspiracy to murder and did murder of cocaine former Associate Justice of

the Supreme Court of the United States, Antonin Scalia.  The RICO ASSOCIATES used

885 CENTRE STREET in connection with carrying out and covering up the murder of

Scalia.

## <u>CAUSES OF ACTION</u>

1251. Each and every count herein which raises a claim against multiple defendants also alleges

in the alternative that the claim consisted of some combination(s) of the remaining

defendants or the remaining defendant if one or more defendants were removed.

## <u>COUNT 1</u>

**(Claim for Violation of FOIA, 5 U.S.C. § 552 against the
U.S. DEPARTMENT OF JUSTICE)**

1252. THE RELATOR incorporates the foregoing paragraphs and allegations as if fully set

forth herein.

1253. The U.S. Department of Justice has violated FOIA by refusing to produce any and/or all

non-exempt records responsive to the June 2017 FOIA.

1254. THE RELATOR is being irreparably harmed by DOJ's violation of FOIA, and THE RELATOR will continue to be irreparably harmed unless DOJ is compelled to comply with FOIA.

1255. THE RELATOR is entitled to injunctive relief as to production of records pursuant to the June 2017 FOIA.

## COUNT 2

### (Claim for Violation of FOIA, 5 U.S.C. § 552 against the U.S. DEPARTMENT OF JUSTICE)

1256. THE RELATOR incorporates the foregoing paragraphs and allegations as if fully set forth herein.

1257. The U.S. Department of Justice has violated FOIA by refusing to produce any and/or all non-exempt records responsive to the September 2018 FOIA.

1258. THE RELATOR is being irreparably harmed by DOJ's violation of FOIA, and THE RELATOR will continue to be irreparably harmed unless DOJ is compelled to comply with FOIA.

1259. THE RELATOR is entitled to injunctive relief as to production of records pursuant to the September 2018 FOIA.

## COUNT 3

### (Claim for Declaratory Judgment pursuant to 28 U.S.C. § 2201, 2202 against the MASSACHUSETTS DEPARTMENT OF REVENUE)

1260. THE RELATOR incorporates the foregoing paragraphs and allegations as if fully set forth herein.

1261. An actual controversy has arisen between THE RELATOR and the Massachusetts Department of Revenue as to whether DOR failed to comply with the Massachusetts Public Records Law by refusing to provide responsive documents within 10 business days of receiving the DOR Request.

1262. DOR is an agency, department, or other entity of the Commonwealth of Massachusetts and is required to respond in compliance with the Massachusetts Public Records Law within 10 business days of receiving a public records request.

1263. Any and all records in existence concerning the Secret DOR Directive fall within the purview of the DOR Request.

1264. DOR has failed to produce any records specifying the contents of the Secret DOR Directive.

1265. DOR has produced no documents that either confirm or deny the existence of the Secret DOR Directive.

1266. Non-production of the records in question concerns the due administration of justice within the meaning of federal law.

1267. For these reasons, this Court should declare that DOR violated the Massachusetts Public Records Law.

## COUNT 4

**(Claim for Violation of Mass.Gen.Laws ch. 66 § 10 and Mass.Gen.Laws ch. 4 § 7, Twenty-Sixth, against the MASSACHUSETTS DEPARTMENT OF REVENUE)**

1268. THE RELATOR incorporates the foregoing paragraphs and allegations as if fully set forth herein.

1269. DOR failed to comply with the Massachusetts Public Records Law with respect to the DOR Request.

1270. The Massachusetts Public Records Law provides that "[a] records access officer appointed pursuant to section 6A, or a designee, shall at reasonable times and without unreasonable delay permit inspection or furnish a copy of any public record as defined in clause twenty-sixth of section 7 of chapter 4, or any segregable portion of a public record, not later than 10 business days following the receipt of the Request." Mass.Gen.Laws ch. 66 § 10(a).

1271. By refusing to provide all of the public records requested by THE RELATOR within 10 business days after receipt of the DOR Request, DOR violated the Massachusetts Public Records Law.

1272. THE RELATOR is entitled to preliminary and permanent injunctive relief ordering DOR's compliance with the Massachusetts Public Records Law concerning the DOR Request.

## COUNT 5

**(Claim for Declaratory Judgment pursuant to 28 U.S.C. § 2201, 2202 against the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH)**

1273. THE RELATOR incorporates the foregoing paragraphs and allegations as if fully set forth herein.

1274. An actual controversy has arisen between THE RELATOR and the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH as to whether the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH failed to comply with the

Massachusetts Public Records Law by refusing to provide responsive documents within 10 business days of receiving the Equitable Sharing Records Request.

1275. The OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH is required to respond in compliance with the Massachusetts Public Records Law within 10 business days of receiving a public records request.

1276. Any and all records in existence concerning the Equitable Sharing Program payments accepted by the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH fall within the purview of the Equitable Sharing Records Request.

1277. The OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH has failed to produce documents pertaining to expenditures made from money paid to the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH through the Equitable Sharing Program.

1278. Non-production of the records in question concerns the due administration of justice within the meaning of federal law.

1279. For these reasons, this Court should declare that OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH violated the Massachusetts Public Records Law.

## COUNT 6

**(Claim for Violation of Mass.Gen.Laws ch. 66 § 10 and Mass.Gen.Laws ch. 4 § 7, Twenty-Sixth, against the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH)**

1280. THE RELATOR incorporates the foregoing paragraphs and allegations as if fully set forth herein.

1281. The OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH failed to comply with the Massachusetts Public Records Law with respect to the Equitable Sharing Records Request.

1282. The Massachusetts Public Records Law provides that "[a] records access officer appointed pursuant to section 6A, or a designee, shall at reasonable times and without unreasonable delay permit inspection or furnish a copy of any public record as defined in clause twenty-sixth of section 7 of chapter 4, or any segregable portion of a public record, not later than 10 business days following the receipt of the Request." Mass.Gen.Laws ch. 66 § 10(a).

1283. By refusing to provide all of the public records requested by THE RELATOR within 10 business days after receipt of the Equitable Sharing Request, the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH violated the Massachusetts Public Records Law.

1284. THE RELATOR is entitled to preliminary and permanent injunctive relief ordering the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH's compliance with the Massachusetts Public Records Law concerning the Equitable Sharing Records Request.

## COUNT 7

**(Claim for Declaratory Judgment and Related Injunctive Relief pursuant to 28 U.S.C. §§ 2201, 2202 against the COMMISSIONER)**

1285. THE RELATOR incorporates the foregoing paragraphs and allegations as if fully set forth herein.

1286. A genuine controversy exists between THE RELATOR and the COMMISSIONER for which THE RELATOR is entitled to declaratory relief pursuant to 28 U.S.C. §§ 2201, 2202, where THE RELATOR's legal rights as a relator on behalf of the Commonwealth of Massachusetts continue to be violated by the COMMISSIONER under the Fifth and Fourteenth Amendments to and the Guarantee Clause of the U.S. Constitution (the "Guarantee Clause"), where the COMMISSIONER, in secretly nullifying parts of the CST, has acted and is acting as an executive, legislative, and judicial official at the same time, depriving THE RELATOR of his property with due process or equal protection of the law.

1287. Article 20 of the Massachusetts Declaration of Rights holds that "[t]he power of suspending the laws, or the execution of the laws, ought never to be exercised but by the legislature, or by authority derived from it, to be exercised in such particular cases only as the legislature shall expressly provide for."

1288. Federalist 47 asserts that "[t]he accumulation of all powers, legislative, executive, and judiciary, in the same hands, whether of one, a few, or many, and whether hereditary, selfappointed, or elective, may justly be pronounced *the very definition of tyranny*" (emphasis added).

1289. Article IV, Section One of the U.S. Constitution holds that "[t]he United States shall guarantee to every State in this Union a Republican Form of Government."

1290. With respect to state action concerning THE RELATOR, Massachusetts is a republic in name only, because the Secret DOR Directive is a plain and pernicious usurpation of the

most basic principles of the Massachusetts Declaration of Rights and the U.S. Constitution.

1291. The Secret DOR Directive, whether or not it is a fabrication, plainly violates Article 20 of the Massachusetts Declaration of Rights and the U.S. Constitution, because the text of the CST does not expressly provide any authority for the suspension of the CST by the Commonwealth's executive branch and because, under the Massachusetts Declaration of Rights and U.S. Constitution, a state executive official has no occasion to assume the powers of the legislative or judicial branches.

1292. This Court should declare that the Secret DOR Directive is contrary to a republican form of government and is illegal, or, in the alternative, was just a gigantic lie told by the COMMISSIONER and the ENTERPRISE to cover-up and/or avoid accountability for plainly criminal acts.

1293. This Court should declare that any suspension of the CST by the executive branch of the Commonwealth, whether in secret or in public, is void for violation of Article 20 of the Massachusetts Declaration of Rights and the U.S. Constitution.

1294. This Court should declare that the COMMISSIONER is required to immediately update the public, in writing, as to the COMMISSIONER's enforcement policies as to the CST with respect to both voluntary compliance and assessment for nonpayment by DOR.

1295. This Court should declare that any prior judgment or order concerning or relating to the Secret CST Suspension and THE RELATOR is void for violation of the Due Process Clauses of the Fifth and Fourteenth Amendments to and the Guarantee Clause of the U.S. Constitution.

1296. This Court should issue related injunctive relief to immediately remedy the COMMISSIONER's longstanding violations of the Massachusetts Declaration of Rights and the U.S. Constitution.

## COUNT 8

**(Claim for Violation of the Fourteenth Amendment under 42 U.S.C. § 1983 against the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH and the ESSEX DA, as well as the DOJ PAID ASSOCIATES, JOHN DOE 1-X, OBAMA, PATRICK, SARIS, O'TOOLE, GOODLANDER, FLATGARD, COLE, YATES, WALSH, DANIEL KOH, STEVEN KOH, LORETTA LYNCH, HOLDER, and ORTIZ, individually and in their respective official capacities, if any)**

1297. THE RELATOR incorporates the foregoing paragraphs and allegations as if fully set forth herein.

1298. The Due Process Clause of the Fourteenth Amendment protects against the deprivation of life, liberty, or property without due process of law.

1299. The Equal Protection Clause of the Fourteenth Amendment protects the fundamental rights to access state and federal courts in the United States and equal application of the law.

1300. Violations of the Fourteenth Amendment under color of state law are redressable at law and in equity under 42 U.S.C. § 1983.

1301. THE RELATOR, as a relator in the *Qui Tam* Action and the Second *Qui Tam* Action, had and continues to have interests cognizable under the Fourteenth Amendment with respect to the outcome of both actions, including, but not limited to, his interests in 1) a fair and impartial disposition; 2) $360,000, or the maximum potential bounty in the *Qui Tam* Action; 3) $4,057,200, or the maximum potential bounty in the Second *Qui Tam* Action;

4) the filing fees in the *Qui Tam* Action and Second *Qui Tam* Action; and 5) a fair and impartial disposition of any future *qui tam* action undertaken as a relator.

1302. The Commonwealth of Massachusetts, by and through the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH, was and is acting under color of state law with respect to all matters concerning the *Qui Tam* Action and the Second *Qui Tam* Action.

1303. Actions taken by and through the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH and the ESSEX DA constitute state action.

1304. While acting through the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH and the ESSEX DA and under color of state law, JOHN DOE 1-X, OBAMA, PATRICK, SARIS, O'TOOLE, GOODLANDER, FLATGARD, LORETTA LYNCH, WALSH, DANIEL KOH, STEVEN KOH, COLE, YATES, HOLDER, ORTIZ, and the DOJ PAID ASSOCIATES conspired to deprive and did deprive THE RELATOR of a fair and impartial disposition of the *Qui Tam* Action and Second *Qui Tam* Action, which were brought pursuant to the MFCA.

1305. The OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH controlled the ultimate disposition of the *Qui Tam* Action and Second *Qui Tam* Action despite the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH having a direct and substantial financial interest in the outcome, thereby depriving THE RELATOR of 1) his fundamental right to a fair and impartial disposition of the *Qui Tam* Action and the Second *Qui Tam* Action; 2) $360,000, or the maximum potential bounty in

the *Qui Tam* Action; 3) $4,057,200, or the maximum potential bounty in the Second *Qui Tam* Action; and 4) the filing fees in the *Qui Tam* Action and Second *Qui Tam* Action.

1306. The deprivations occurred without due process of and/or equal protection under the law by virtue of the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH's bad faith participation in and domination of the *Qui Tam* Action and Second *Qui Tam* Action.

1307. THE RELATOR will be deprived of his right to a fair and impartial disposition of any future *qui tam* action in which he is the relator by virtue of the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH's participation in and domination of all *qui tam* actions under the MFCA and the foreseeability of future Equitable Sharing Program payments to OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH and other law enforcement agencies in the Commonwealth.

1308. The OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH, the ESSEX DA, JOHN DOE 1-X, OBAMA, PATRICK, SARIS, O'TOOLE, GOODLANDER, FLATGARD, LORETTA LYNCH, WALSH, DANIEL KOH, STEVEN KOH, COLE, YATES, HOLDER, ORTIZ, and the DOJ PAID ASSOCIATES acted with reckless or callous disregard for, or indifference to, the rights and/or safety of THE RELATOR.

1309. Because they caused the deprivation of THE RELATOR's rights under the Fourteenth Amendment, the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH, the ESSEX DA, JOHN DOE 1-X, OBAMA, PATRICK, SARIS, O'TOOLE, GOODLANDER, FLATGARD, LORETTA LYNCH, WALSH, DANIEL

KOH, STEVEN KOH, COLE, YATES, HOLDER, ORTIZ, and the DOJ PAID

ASSOCIATES are required to pay THE RELATOR the bounties from the *Qui Tam*

Action and the Second *Qui Tam* Action from money received from the Equitable Sharing

Program, EQUITABLE SHARING ACCOUNTS 1-X, and/or other non-taxpayer funds to

redress the injuries that they have caused THE RELATOR.

1310.   Because there is a real risk of a reoccurrence of a controversy related to Equitable

Sharing Program or other illicit payments, the OFFICE OF THE ATTORNEY

GENERAL OF THE COMMONWEALTH and the ESSEX DA are required to be

permanently enjoined from accepting anything of value from the Equitable Sharing

Program or any other federal program involving seized proceeds or assets from the illegal

narcotics trade.

**COUNT 9**

**(Claim for Declaratory Judgment pursuant to 28 U.S.C. §§ 2201, 2202 against the
OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH and the
ESSEX DA, as well as the DOJ PAID ASSOCIATES, JOHN DOE 1-X, OBAMA,
PATRICK, SARIS, O'TOOLE, GOODLANDER, FLATGARD, COLE, YATES,
WALSH, DANIEL KOH, STEVEN KOH, LORETTA LYNCH, HOLDER, and
ORTIZ, individually and in their respective official capacities, if any)**

1311.   THE RELATOR incorporates the foregoing paragraphs and allegations as if fully set

forth herein.

1312.   In exercising considerable discretion pursuant to the MFCA, the OFFICE OF THE

ATTORNEY GENERAL OF THE COMMONWEALTH and its employees were and are

nonetheless strictly prohibited from acting arbitrarily and capriciously, scandalously, or

unlawfully.  See Sec'y of Admin. and Fin. v. Attorney General, 367 Mass. 154, 165

262

(1975) ("we repeat that the Attorney General cannot act arbitrarily and capriciously or scandalously.").

1313. THE RELATOR has rights to recovery under the MFCA for his direct and integral role as an "original source" in exposing the failure of JAVIER GONZALEZ and JAMIL ROMAN and the defendants in the Second *Qui Tam* Action to pay monies owed to the Commonwealth, while THE RELATOR's efforts have also uncovered a corruption scheme between the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH, the ESSEX DA, JOHN DOE 1-X, OBAMA, PATRICK, SARIS, O'TOOLE, GOODLANDER, FLATGARD, LORETTA LYNCH, WALSH, DANIEL KOH, STEVEN KOH, COLE, YATES, HOLDER, ORTIZ, and the DOJ PAID ASSOCIATES in which DOJ and IRS pay money to law enforcement officials in the Commonwealth either expressly or impliedly in exchange for non-enforcement of the CST and/or decisions made in litigation in which THE RELATOR was and/or is a party.

1314. THE RELATOR, as a relator in the *Qui Tam* Action and the Second *Qui Tam* Action, had and continues to have interests cognizable under the Fourteenth Amendment with respect to the outcome of both actions, including, but not limited to, his interests in 1) a fair and impartial disposition; 2) $360,000, or the maximum potential bounty in the *Qui Tam* Action; 3) $4,057,200, or the maximum potential bounty in the Second *Qui Tam* Action; 4) the filing fees in the *Qui Tam* Action and Second *Qui Tam* Action; and 5) a fair and impartial disposition of any future *qui tam* action undertaken as a relator.

1315. Despite the risks of bringing a false claim action against alleged drug traffickers connected to an international drug cartel, THE RELATOR, through his actions, brought

forward non-public information and substantiating documentation that JAVIER GONZALEZ and JAMIL ROMAN had failed to pay a monetary obligation to the Commonwealth in excess of $1 million.

1316. THE RELATOR, through his actions, brought forward non-public information and substantiating documentation that the defendants in the Second *Qui Tam* Action had failed to pay a monetary obligation to the Commonwealth in excess of $4 million.

1317. THE RELATOR has already been adjudicated to be a "relator" within the meaning of the MFCA.

1318. The OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH, the ESSEX DA, JOHN DOE 1-X, OBAMA, PATRICK, SARIS, O'TOOLE, GOODLANDER, FLATGARD, LORETTA LYNCH, WALSH, DANIEL KOH, STEVEN KOH, COLE, YATES, HOLDER, ORTIZ, and the DOJ PAID ASSOCIATES purloined THE RELATOR's bounty in the *Qui Tam* Action and Second *Qui Tam* Action by making transactions involving the Equitable Sharing Program while the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH moved to dismiss both cases, thereby depriving THE RELATOR of his rights under the MFCA and the Fourteenth Amendment as well as contravening the fundamental principles of equity, justice, and good conscience.

1319. The OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH, the ESSEX DA, JOHN DOE 1-X, OBAMA, PATRICK, SARIS, O'TOOLE, GOODLANDER, FLATGARD, LORETTA LYNCH, WALSH, DANIEL KOH, STEVEN KOH, COLE, YATES, HOLDER, ORTIZ, and the DOJ PAID ASSOCIATES

each participated, directly or indirectly, in one or more of the transactions involving the Equitable Sharing Program during the pendency of the *Qui Tam* Action and the Second *Qui Tam* Action.

1320. The fact that the general fund of the Commonwealth has not yet made a recovery in the *Qui Tam* Action and the Second *Qui Tam* Action makes no difference, because the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH, the ESSEX DA, JOHN DOE 1-X, OBAMA, PATRICK, SARIS, O'TOOLE, GOODLANDER, FLATGARD, LORETTA LYNCH, WALSH, DANIEL KOH, STEVEN KOH, COLE, YATES, HOLDER, ORTIZ, and the DOJ PAID ASSOCIATES, acting under color of state law, purloined THE RELATOR's bounty in the *Qui Tam* Action and the Second *Qui Tam* Action and precluded both cases from proceeding in a manner consistent with law.

1321. Wherefore, a binding declaration as to THE RELATOR's rights under the MFCA to a bounty in the amount of $360,000 and to all expenses incurred in connection with proceeding *pro se* as the relator in the *Qui Tam* Action is required.

1322. Wherefore, a binding declaration as to THE RELATOR's rights under the MFCA to a bounty in the amount of $4,057,200 and to all expenses incurred in connection with proceeding *pro se* as the relator in the Second *Qui Tam* Action is required.

## COUNT 10

**(Claim for Recovery, Compensation, and Award pursuant to the MFCA against the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH and the ESSEX DA, as well as the DOJ PAID ASSOCIATES, JOHN DOE 1-X, OBAMA, PATRICK, SARIS, O'TOOLE, GOODLANDER, FLATGARD, COLE, YATES, WALSH, DANIEL KOH, STEVEN KOH, LORETTA LYNCH, HOLDER, and ORTIZ, individually and in their respective official capacities, if any)**

1323.  THE RELATOR incorporates the foregoing paragraphs and allegations as if fully set forth herein.

1324.  The decision by the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH and the ESSEX DA, as well as the DOJ PAID ASSOCIATES, JOHN DOE 1-X, OBAMA, PATRICK, SARIS, O'TOOLE, GOODLANDER, FLATGARD, COLE, YATES, WALSH, DANIEL KOH, STEVEN KOH, LORETTA LYNCH, HOLDER, and ORTIZ to dismiss the *Qui Tam* Action and Second *Qui Tam* Action while making transactions involving the Equitable Sharing Program denied THE RELATOR his rights for recovery and compensation under the Massachusetts False Claims Act; was arbitrary and capricious; was not in accordance with the MFCA or its legislative intent; constitutes an improper and inappropriate exercise of statutory authority; was an error of law made upon unlawful procedure against public policy; was an abuse of discretion in violation of the MFCA; and contravened state and federal law.

1325.  In addition to being wrongfully deprived of his statutory rights under the MFCA, THE RELATOR has suffered damages and incurred expenses by proceeding as the *pro se* relator in the *Qui Tam* Action and the Second *Qui Tam* Action to 1) recover money owed to the Commonwealth; and 2) expose the corrupt scheme to trade non-enforcement of the

CST and/or decisions in litigation in which THE RELATOR was and/or is a party in exchange for payments from the Equitable Sharing Program.

## COUNT 11

**(Claim for Violation of and Conspiracy to Violate 42 U.S.C. § 1983 against the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH and the ESSEX DA, as well as the DOJ PAID ASSOCIATES, JOHN DOE 1-X, OBAMA, PATRICK, SARIS, O'TOOLE, GOODLANDER, FLATGARD, COLE, YATES, WALSH, DANIEL KOH, STEVEN KOH, LORETTA LYNCH, HOLDER, and ORTIZ, individually and in their respective official capacities, if any)**

1326. THE RELATOR incorporates the foregoing paragraphs and allegations as if fully set forth herein.

1327. The OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH, the ESSEX DA, JOHN DOE 1-X, OBAMA, PATRICK, SARIS, O'TOOLE, GOODLANDER, FLATGARD, LORETTA LYNCH, HOLDER, WALSH, DANIEL KOH, STEVEN KOH, COLE, YATES, ORTIZ, and the DOJ PAID ASSOCIATES, while acting under color of state law, conspired to violate and did violate THE RELATOR's clearly established rights to due process and/or equal protection under the Fourteenth Amendment by depriving him of a disinterested prosecutor in the *Qui Tam* Action and the Second *Qui Tam* Action, where the prosecutor in the *Qui Tam* Action and the Second *Qui Tam* Action – the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH – was accepting payments from the Equitable Sharing Program.

1328. As a relator pursuant to the MFCA, THE RELATOR was entitled to a disinterested prosecutor in the *Qui Tam* Action and the Second *Qui Tam* Action.

1329. The OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH, the

ESSEX DA, JOHN DOE 1-X, OBAMA, PATRICK, SARIS, O'TOOLE,

GOODLANDER, FLATGARD, LORETTA LYNCH, HOLDER, WALSH, DANIEL

KOH, STEVEN KOH, COLE, YATES, ORTIZ, and the DOJ PAID ASSOCIATES acted

with reckless or callous disregard of, or indifference to, the rights and/or safety of THE

RELATOR.

## COUNT 12

**(Claim for Restitution against the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH and the ESSEX DA, as well as the DOJ PAID ASSOCIATES, JOHN DOE 1-X, OBAMA, PATRICK, SARIS, O'TOOLE, GOODLANDER, FLATGARD, COLE, YATES, WALSH, DANIEL KOH, STEVEN KOH, LORETTA LYNCH, HOLDER, and ORTIZ, individually and in their respective official capacities, if any)**

1330. THE RELATOR incorporates the foregoing paragraphs and allegations as if fully set

forth herein.

1331. The OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH, the

ESSEX DA, JOHN DOE 1-X, OBAMA, PATRICK, SARIS, O'TOOLE,

GOODLANDER, FLATGARD, LORETTA LYNCH, HOLDER, WALSH, DANIEL

KOH, STEVEN KOH, COLE, YATES, ORTIZ, and the DOJ PAID ASSOCIATES have

been enriched and reaped significant financial gain by purloining THE RELATOR's

whistleblower bounties in the *Qui Tam* Action and the Second *Qui Tam* Action.

1332. The OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH, the

ESSEX DA, JOHN DOE 1-X, OBAMA, PATRICK, SARIS, O'TOOLE,

GOODLANDER, FLATGARD, LORETTA LYNCH, HOLDER, WALSH, DANIEL

KOH, STEVEN KOH, COLE, YATES, ORTIZ, and the DOJ PAID ASSOCIATES have

been enriched and reaped significant financial gain at the expense of THE RELATOR, who has suffered damages and incurred significant expenses in proceeding as the *pro se* relator in the *Qui Tam* Action and the Second *Qui Tam* Action to 1) recover money owed to the Commonwealth; and 2) expose the corrupt scheme to trade non-enforcement of the CST and/or decisions in litigation in which THE RELATOR was and/or is a party in exchange for payments from the Equitable Sharing Program.

1333. To bar recovery, restitution, and compensation to THE RELATOR would produce a windfall for the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH, the ESSEX DA, JOHN DOE 1-X, OBAMA, PATRICK, SARIS, O'TOOLE, GOODLANDER, FLATGARD, LORETTA LYNCH, HOLDER, WALSH, DANIEL KOH, STEVEN KOH, COLE, YATES, ORTIZ, and the DOJ PAID ASSOCIATES that is contrary to the principles of equity and fairness.

## COUNT 13

**(Claim for Unjust Enrichment against the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH and the ESSEX DA, as well as the DOJ PAID ASSOCIATES, JOHN DOE 1-X, OBAMA, PATRICK, SARIS, O'TOOLE, GOODLANDER, FLATGARD, COLE, YATES, WALSH, DANIEL KOH, STEVEN KOH, LORETTA LYNCH, HOLDER, and ORTIZ, individually and in their respective official capacities, if any)**

1334. THE RELATOR incorporates the foregoing paragraphs and allegations as if fully set forth herein.

1335. The OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH, the ESSEX DA, JOHN DOE 1-X, OBAMA, PATRICK, SARIS, O'TOOLE, GOODLANDER, FLATGARD, LORETTA LYNCH, HOLDER, WALSH, DANIEL

KOH, STEVEN KOH, COLE, YATES, ORTIZ, and the DOJ PAID ASSOCIATES have been unjustly enriched and reaped significant financial gain.

1336. The OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH, the ESSEX DA, JOHN DOE 1-X, OBAMA, PATRICK, SARIS, O'TOOLE, GOODLANDER, FLATGARD, LORETTA LYNCH, HOLDER, WALSH, DANIEL KOH, STEVEN KOH, COLE, YATES, ORTIZ, and the DOJ PAID ASSOCIATES have been enriched and reaped significant financial gain at the expense of THE RELATOR, who incurred significant expenses in proceeding as a *pro se* relator in the *Qui Tam* Action and the Second *Qui Tam* Action to 1) recover money owed to the Commonwealth; and 2) expose the corrupt scheme to trade non-enforcement of the CST and/or decisions in litigation in which THE RELATOR was and/or is a party in exchange for payments from the Equitable Sharing Program.

1337. THE RELATOR has suffered cognizable detriment in the form of the sham dismissal of the *Qui Tam* Action in which THE RELATOR had the opportunity to earn a bounty of $360,000.

1338. THE RELATOR has suffered cognizable detriment in the form of the sham dismissal of the Second *Qui Tam* Action in which THE RELATOR had the opportunity to earn a bounty of $4,057,200.

1339. THE RELATOR ought to receive restitution and compensation from the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH, the ESSEX DA, JOHN DOE 1-X, OBAMA, PATRICK, SARIS, O'TOOLE, GOODLANDER, FLATGARD, LORETTA LYNCH, HOLDER, WALSH, DANIEL KOH, STEVEN KOH, COLE,

YATES, ORTIZ, and the DOJ PAID ASSOCIATES under the principles of equity and

fairness as well as under the doctrine of unjust enrichment.

1340. To bar recovery, restitution, and compensation to THE RELATOR would result in unjust

enrichment of the OFFICE OF THE ATTORNEY GENERAL OF THE

COMMONWEALTH, the ESSEX DA, JOHN DOE 1-X, OBAMA, PATRICK, SARIS,

O'TOOLE, GOODLANDER, FLATGARD, LORETTA LYNCH, HOLDER, WALSH,

DANIEL KOH, STEVEN KOH, COLE, YATES, ORTIZ, and the DOJ PAID

ASSOCIATES and produce a windfall for them while unjustly impoverishing THE

RELATOR, who was deprived of his rights under the MFCA, including, but not limited

to, his opportunity to collect a bounty.

### COUNT 14

**(Claim for Constructive Trust against the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH and the ESSEX DA, as well as the DOJ PAID ASSOCIATES, JOHN DOE 1-X, OBAMA, PATRICK, SARIS, O'TOOLE, GOODLANDER, FLATGARD, COLE, YATES, WALSH, DANIEL KOH, STEVEN KOH, LORETTA LYNCH, HOLDER, and ORTIZ, individually and in their respective official capacities, if any)**

1341. THE RELATOR incorporates the foregoing paragraphs and allegations as if fully set

forth herein.

1342. The OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH, the

ESSEX DA, JOHN DOE 1-X, OBAMA, PATRICK, SARIS, O'TOOLE,

GOODLANDER, FLATGARD, LORETTA LYNCH, HOLDER, WALSH, DANIEL

KOH, STEVEN KOH, COLE, YATES, ORTIZ, and the DOJ PAID ASSOCIATES have

been unjustly enriched and reaped significant financial gain.

1343. The OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH and the ESSEX DA retain control as a matter of law over funds accepted from the Equitable Sharing Program in EQUITABLE SHARING ACCOUNTS 1-X subject to oversight by DOJ.

1344. The OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH, the ESSEX DA, JOHN DOE 1-X, OBAMA, PATRICK, SARIS, O'TOOLE, GOODLANDER, FLATGARD, LORETTA LYNCH, HOLDER, WALSH, DANIEL KOH, STEVEN KOH, COLE, YATES, ORTIZ, and the DOJ PAID ASSOCIATES have been enriched and reaped significant financial gain at the expense of THE RELATOR, who incurred significant expenses in proceeding as a *pro se* relator in the *Qui Tam* Action and the Second *Qui Tam* Action to 1) recover money owed to the Commonwealth; and 2) expose the corrupt scheme to trade non-enforcement of the CST and/or decisions in litigation in which THE RELATOR was and/or is a party in exchange for payments from the Equitable Sharing Program.

1345. THE RELATOR has suffered the theft of his bounties through the sham dismissals of the *Qui Tam* Action and Second *Qui Tam* Action, which were submitted in the name of the Commonwealth of Massachusetts by and through the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH.

1346. The ongoing custody of funds by the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH, the ESSEX DA, JOHN DOE 1-X, OBAMA, PATRICK, SARIS, O'TOOLE, GOODLANDER, FLATGARD, LORETTA LYNCH, HOLDER, WALSH, DANIEL KOH, STEVEN KOH, COLE, YATES, ORTIZ, and/or the DOJ PAID

ASSOCIATES is contrary to Massachusetts and federal law and THE RELATOR's rights

under the MFCA.

1347.  THE RELATOR ought to receive restitution and compensation from the OFFICE OF

THE ATTORNEY GENERAL OF THE COMMONWEALTH, the ESSEX DA, JOHN

DOE 1-X, OBAMA, PATRICK, SARIS, O'TOOLE, GOODLANDER, FLATGARD,

LORETTA LYNCH, HOLDER, WALSH, DANIEL KOH, STEVEN KOH, COLE,

YATES, ORTIZ, and the DOJ PAID ASSOCIATES under the principles of equity and

fairness and under the doctrine of constructive trust.

### COUNT 15

**(Claim for Fraudulent Concealment against the DOJ PAID ASSOCIATES, JOHN DOE 1-X, OBAMA, PATRICK, SARIS, O'TOOLE, GOODLANDER, FLATGARD, COLE, YATES, WALSH, DANIEL KOH, STEVEN KOH, LORETTA LYNCH, HOLDER, and ORTIZ, individually and in their respective official capacities, if any)**

1348.  THE RELATOR incorporates the foregoing paragraphs and allegations as if fully set

forth herein.

1349.  JOHN DOE 1-X, OBAMA, PATRICK, SARIS, O'TOOLE, GOODLANDER,

FLATGARD, LORETTA LYNCH, HOLDER, WALSH, DANIEL KOH, STEVEN KOH,

COLE, YATES, ORTIZ, and the DOJ PAID ASSOCIATES knew about and concealed

and/or suppressed the fact that the OFFICE OF THE ATTORNEY GENERAL OF THE

COMMONWEALTH and the ESSEX DA were accepting payments from the Equitable

Sharing Program while participating in litigation influenced by those payments.

1350.  JOHN DOE 1-X, OBAMA, PATRICK, SARIS, O'TOOLE, GOODLANDER,

FLATGARD, LORETTA LYNCH, HOLDER, WALSH, DANIEL KOH, STEVEN KOH,

COLE, YATES, ORTIZ, and the DOJ PAID ASSOCIATES acted with intent to defraud THE RELATOR or induce THE RELATOR to act differently than THE RELATOR would have if THE RELATOR knew about the concealed and/or suppressed Equitable Sharing Program payments.

1351. THE RELATOR was unaware of the concealed and/or suppressed payments from the Equitable Sharing Program and would have acted differently with knowledge of the concealed and/or suppressed Equitable Sharing Program payments.

1352. To the extent that each is an attorney and officer of the court, JOHN DOE 1-X, OBAMA, PATRICK, SARIS, O'TOOLE, GOODLANDER, FLATGARD, LORETTA LYNCH, HOLDER, WALSH, DANIEL KOH, STEVEN KOH, COLE, YATES, ORTIZ, and the DOJ PAID ASSOCIATES have had a duty to disclose the payments under the Rules of Professional Conduct of the Commonwealth and/or the Due Process Clause since the day each became aware of the payments.

1353. As a consequence of the fraudulent concealment committed by JOHN DOE 1-X, OBAMA, PATRICK, SARIS, O'TOOLE, GOODLANDER, FLATGARD, LORETTA LYNCH, HOLDER, WALSH, DANIEL KOH, STEVEN KOH, COLE, YATES, ORTIZ, and the DOJ PAID ASSOCIATES, THE RELATOR has sustained damages.

## COUNT 16

**(Claim for Conversion against the DOJ PAID ASSOCIATES, JOHN DOE 1-X, OBAMA, PATRICK, SARIS, O'TOOLE, GOODLANDER, FLATGARD, COLE, YATES, WALSH, DANIEL KOH, STEVEN KOH, LORETTA LYNCH, HOLDER, and ORTIZ, individually and in their respective official capacities, if any)**

1354.   THE RELATOR incorporates the foregoing paragraphs and allegations as if fully set forth herein.

1355.   THE RELATOR had and has a cognizable interest in the whistleblower bounties from the *Qui Tam* Action and Second *Qui Tam* Action.

1356.   JOHN DOE 1-X, OBAMA, PATRICK, SARIS, O'TOOLE, GOODLANDER, FLATGARD, LORETTA LYNCH, HOLDER, WALSH, DANIEL KOH, STEVEN KOH, COLE, YATES, ORTIZ, and the DOJ PAID ASSOCIATES, without right or permission from THE RELATOR, improperly exercised control over and converted for their own, personal use THE RELATOR's whistleblower bounties, or some portion thereof, from the *Qui Tam* Action and the Second *Qui Tam* Action.

1357.   THE RELATOR is entitled to an immediate return of the whistleblower bounties in the *Qui Tam* Action and the Second *Qui Tam* Action from JOHN DOE 1-X, OBAMA, PATRICK, SARIS, O'TOOLE, GOODLANDER, FLATGARD, LORETTA LYNCH, HOLDER, WALSH, DANIEL KOH, STEVEN KOH, COLE, YATES, ORTIZ, and the DOJ PAID ASSOCIATES.

1358.   THE RELATOR has been damaged by the conversion of the whistleblower bounties in the *Qui Tam* Action and the Second *Qui Tam* Action by JOHN DOE 1-X, OBAMA, PATRICK, SARIS, O'TOOLE, GOODLANDER, FLATGARD, LORETTA LYNCH,

HOLDER, WALSH, DANIEL KOH, STEVEN KOH, COLE, YATES, ORTIZ, and the

DOJ PAID ASSOCIATES.

## COUNT 17

**(Claim for Trespass to Chattels against the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH and the ESSEX DA, as well as the DOJ PAID ASSOCIATES, JOHN DOE 1-X, OBAMA, PATRICK, SARIS, O'TOOLE, GOODLANDER, FLATGARD, COLE, YATES, WALSH, DANIEL KOH, STEVEN KOH, LORETTA LYNCH, HOLDER, and ORTIZ, individually and in their respective official capacities, if any)**

1359. THE RELATOR incorporates the foregoing paragraphs and allegations as if fully set forth herein.

1360. JOHN DOE 1-X, OBAMA, PATRICK, SARIS, O'TOOLE, GOODLANDER, FLATGARD, LORETTA LYNCH, HOLDER, WALSH, DANIEL KOH, STEVEN KOH, COLE, YATES, ORTIZ, and the DOJ PAID ASSOCIATES intentionally deprived THE RELATOR of the use of his whistleblower bounties for a substantial time, where, as of the commencement of this Complaint, more than five years of deprivation have already elapsed.

1361. THE RELATOR was damaged by the interference of JOHN DOE 1-X, OBAMA, PATRICK, SARIS, O'TOOLE, GOODLANDER, FLATGARD, LORETTA LYNCH, HOLDER, WALSH, DANIEL KOH, STEVEN KOH, COLE, YATES, ORTIZ, and the DOJ PAID ASSOCIATES.

## COUNT 18

**(Claim for Civil Conspiracy against the DOJ PAID ASSOCIATES, JOHN DOE 1-X, OBAMA, PATRICK, SARIS, O'TOOLE, GOODLANDER, FLATGARD, COLE, YATES, WALSH, DANIEL KOH, STEVEN KOH, LORETTA LYNCH, HOLDER, and ORTIZ, individually and in their respective official capacities, if any)**

1362.    THE RELATOR incorporates the foregoing paragraphs and allegations as if fully set forth herein.

1363.    JOHN DOE 1-X, OBAMA, PATRICK, SARIS, O'TOOLE, GOODLANDER, FLATGARD, LORETTA LYNCH, HOLDER, WALSH, DANIEL KOH, STEVEN KOH, COLE, YATES, ORTIZ, and the DOJ PAID ASSOCIATES formed a common plan to deprive THE RELATOR of his whistleblower bounties by manipulating and/or rigging the state and federal courts in Massachusetts.

1364.    The plan of JOHN DOE 1-X, OBAMA, PATRICK, SARIS, O'TOOLE, GOODLANDER, FLATGARD, LORETTA LYNCH, HOLDER, WALSH, DANIEL KOH, STEVEN KOH, COLE, YATES, ORTIZ, and the DOJ PAID ASSOCIATES was designed to achieve the wrongful purpose of depriving THE RELATOR of his whistleblower bounties.

1365.    JOHN DOE 1-X, OBAMA, PATRICK, SARIS, O'TOOLE, GOODLANDER, FLATGARD, LORETTA LYNCH, HOLDER, WALSH, DANIEL KOH, STEVEN KOH, COLE, YATES, ORTIZ, and the DOJ PAID ASSOCIATES each took affirmative steps and gave each other substantial assistance in order to carry out their common plan.

### COUNT 19

**(Claim for Violation of and Conspiracy to Violate 42 U.S.C. § 1983 against the RICO ASSOCIATES, individually and in their respective official capacities, if any)**

1366.    THE RELATOR incorporates the foregoing paragraphs and allegations as if fully set forth herein.

1367. The RICO ASSOCIATES, while acting under color of state law, conspired to violate and did violate THE RELATOR's clearly established rights to due process and/or equal protection under the Fourteenth Amendment by rigging the Parallel State Action.

1368. The RICO ASSOCIATES acted with reckless or callous disregard of, or indifference to, the rights and/or safety of THE RELATOR.

## COUNT 20

**(Claim for Violation of and Conspiracy to Violate 42 U.S.C. § 1983 against the RICO ASSOCIATES, individually and in their respective official capacities, if any)**

1369. THE RELATOR incorporates the foregoing paragraphs and allegations as if fully set forth herein.

1370. The RICO ASSOCIATES, while acting under color of state law, conspired to violate and did violate THE RELATOR's clearly established rights to due process and/or equal protection under the Fourteenth Amendment by rigging the Public Records Action.

1371. The RICO ASSOCIATES acted with reckless or callous disregard of, or indifference to, the rights and/or safety of THE RELATOR.

## COUNT 21

**(Claim for Violation of and Conspiracy to Violate 42 U.S.C. § 1983 against the RICO ASSOCIATES, individually and in their respective official capacities, if any)**

1372. THE RELATOR incorporates the foregoing paragraphs and allegations as if fully set forth herein.

1373. The RICO ASSOCIATES, while acting under color of state law, conspired to violate and did violate THE RELATOR's clearly established rights to due process and/or equal

protection under the Fourteenth Amendment by rigging the Mandamus Action and the subsequent appeal.

1374. The RICO ASSOCIATES acted with reckless or callous disregard of, or indifference to, the rights and/or safety of THE RELATOR.

## COUNT 22

**(Claim for Violation of and Conspiracy to Violate 42 U.S.C. § 1983 against the RICO ASSOCIATES, individually and in their respective official capacities, if any)**

1375. THE RELATOR incorporates the foregoing paragraphs and allegations as if fully set forth herein.

1376. The RICO ASSOCIATES, while acting under color of state law, conspired to violate and did violate THE RELATOR's clearly established rights to due process and/or equal protection under the Fourteenth Amendment by surreptitiously acquiring Privileged Information while THE RELATOR was a student at BCLS.

1377. The RICO ASSOCIATES, while acting under color of state law, conspired to violate and did violate THE RELATOR's clearly established rights to due process and/or equal protection under the Fourteenth Amendment by surreptitiously acquiring and/or communicating Privileged Information, where THE RELATOR was entitled to keep the Privileged Information private.

1378. The RICO ASSOCIATES had a duty to disclose and cease any acquisition of Privileged Information.

1379. The RICO ASSOCIATES acted with reckless or callous disregard of, or indifference to, the rights and/or safety of THE RELATOR.

## COUNT 23

**(Claim for Violation of and Conspiracy to Violate 42 U.S.C. § 1983 against the RICO ASSOCIATES, individually and in their respective official capacities, if any)**

1380.  THE RELATOR incorporates the foregoing paragraphs and allegations as if fully set forth herein.

1381.  Mass. R. App. P. 27 holds in pertinent part that "[a] petition for rehearing shall be decided by the quorum or panel which decided the appeal."

1382.  The RICO ASSOCIATES, while acting under color of state law, conspired to violate and did violate THE RELATOR's clearly established rights to due process and/or equal protection under the Fourteenth Amendment by working together to change the appellate panel disposing of the Rehearing Papers with a new appellate panel without notice or an opportunity to be heard in violation of Mass. R. App. P. 27.

1383.  The RICO ASSOCIATES acted with reckless or callous disregard of, or indifference to, the rights and/or safety of THE RELATOR.

## COUNT 24

**(Claim for State Created Danger under 42 U.S.C. § 1983 against the RICO ASSOCIATES, individually and in their respective official capacities, if any)**

1384.  THE RELATOR incorporates the foregoing paragraphs and allegations as if fully set forth herein.

1385.  By failing to disclose human and electronic surveillance of THE RELATOR, the RICO ASSOCIATES, while acting under color of state law, violated THE RELATOR's clearly established rights to due process and/or equal protection under the Fourteenth Amendment by rendering THE RELATOR more vulnerable to harms arising from 1) loss

of Privileged Information; 2) the rigging of multiple state proceedings as alleged herein; and/or 3) other wrongful acts as alleged herein.

1386. The harm to THE RELATOR was a foreseeable and direct result of the conduct of the RICO ASSOCIATES.

1387. The RICO ASSOCIATES acted with conscious disregard of great risk of serious harm and/or with deliberate indifference to THE RELATOR.

## COUNT 25

### (Claim for Assault against BRIAN DURKIN)

1388. THE RELATOR incorporates the foregoing paragraphs and allegations as if fully set forth herein.

1389. During the BRIAN DURKIN Assault on or about March 14, 2018 and without forewarning, BRIAN DURKIN intentionally caused THE RELATOR, like any reasonable person, to be put in fear or apprehension of an imminent battery.

1390. During the BRIAN DURKIN Assault, BRIAN DURKIN threatened imminent physical force and/or unwanted physical contact against THE RELATOR.

1391. THE RELATOR, like any reasonable person, was placed in fear or apprehension of an imminent battery by and as a direct and proximate result of the BRIAN DURKIN Assault.

## COUNT 26

**(Claim for Conspiracy to Violate and Violation of the Massachusetts Civil Rights Act (Mass.Gen.Laws ch. 12 § 11I) against BOSTON COLLEGE, BRIAN DURKIN, THOMAS LAMPERT, ARCHER, SCOGNAMIGLIO, KENYON, and SARAH HERLIHY)**

1392. THE RELATOR incorporates the foregoing paragraphs and allegations as if fully set forth herein.

1393. As set forth herein, BOSTON COLLEGE, BRIAN DURKIN, THOMAS LAMPERT, ARCHER, SCOGNAMIGLIO, KENYON, and SARAH HERLIHY interfered with and/or attempted to interfere with THE RELATOR's exercise or enjoyment of rights secured by the Fourteenth Amendment to the United States Constitution and Article 12 of the Massachusetts Declaration of Rights, including, but not limited to, THE RELATOR's property right to legal training at 885 CENTRE STREET.

1394. As set forth herein, the interference and/or attempted interference by BOSTON COLLEGE, BRIAN DURKIN, THOMAS LAMPERT, ARCHER, SCOGNAMIGLIO, KENYON, and SARAH HERLIHY was accomplished via threats, coercion, and/or intimidation.

1395. As a direct and proximate result of the conduct of BOSTON COLLEGE, BRIAN DURKIN, THOMAS LAMPERT, ARCHER, SCOGNAMIGLIO, KENYON, and SARAH HERLIHY, THE RELATOR suffered the damages as set forth herein.

## <u>COUNT 27</u>

**(Claim for Tortious Interference with Advantageous Business Relationship against BRIAN DURKIN, THOMAS LAMPERT, SARAH HERLIHY, SCOGNAMIGLIO, KENYON, and ARCHER)**

1396.  THE RELATOR incorporates the foregoing paragraphs and allegations as if fully set forth herein.

1397.  THE RELATOR had a business relationship with BOSTON COLLEGE for an economic benefit, namely THE RELATOR's interest in legal training from an ABA-accredited law school.

1398.  BRIAN DURKIN, THOMAS LAMPERT, SARAH HERLIHY, SCOGNAMIGLIO, KENYON, and ARCHER were each aware of THE RELATOR's relationship with BOSTON COLLEGE.

1399.  BRIAN DURKIN, THOMAS LAMPERT, SARAH HERLIHY, SCOGNAMIGLIO, KENYON, and ARCHER interfered with THE RELATOR's relationship with BOSTON COLLEGE through improper motive and/or means, namely by assisting with and/or carrying out the BRIAN DURKIN Assault.

1400.  THE RELATOR's loss of advantage resulted directly from the conduct of BRIAN DURKIN, THOMAS LAMPERT, SARAH HERLIHY, SCOGNAMIGLIO, KENYON, and ARCHER.

## COUNT 28

**(Claim for Conspiracy to Violate and Violation of 42 U.S.C. § 1985(2) against BOSTON COLLEGE, BRIAN DURKIN, THOMAS LAMPERT, ARCHER, SCOGNAMIGLIO, KENYON, and SARAH HERLIHY)**

1401. THE RELATOR incorporates the foregoing paragraphs and allegations as if fully set forth herein.

1402. There was a conspiracy involving an agreement between BOSTON COLLEGE, BRIAN DURKIN, THOMAS LAMPERT, ARCHER, SCOGNAMIGLIO, KENYON, and SARAH HERLIHY to carry out the BRIAN DURKIN Assault.

1403. BOSTON COLLEGE, BRIAN DURKIN, THOMAS LAMPERT, ARCHER, SCOGNAMIGLIO, KENYON, and SARAH HERLIHY committed an act in furtherance of the conspiracy.

1404. Between BOSTON COLLEGE, BRIAN DURKIN, THOMAS LAMPERT, ARCHER, SCOGNAMIGLIO, KENYON, and SARAH HERLIHY, there was a shared intent to deter, by force, intimidation, or threat, THE RELATOR from attending federal court in connection with THE RELATOR's litigation and/or a shared intent to injure THE RELATOR in his person or property on account of his having so attended.

1405. THE RELATOR was injured by the conspiracy as to one or more legal rights or privileges and/or continues to be injured as to one or more legal rights or privileges.

## COUNT 29

**(Claim for Civil Conspiracy against BOSTON COLLEGE, BRIAN DURKIN, THOMAS LAMPERT, ARCHER, SCOGNAMIGLIO, KENYON, and SARAH HERLIHY)**

1406. THE RELATOR incorporates the foregoing paragraphs and allegations as if fully set forth herein.

1407. BOSTON COLLEGE, BRIAN DURKIN, THOMAS LAMPERT, ARCHER, SCOGNAMIGLIO, KENYON, and SARAH HERLIHY formed a common plan to harass, threaten, and/or intimidate THE RELATOR and/or injure THE RELATOR in his business and/or property.

1408. The plan of BOSTON COLLEGE, BRIAN DURKIN, THOMAS LAMPERT, ARCHER, SCOGNAMIGLIO, KENYON, and SARAH HERLIHY was designed to achieve the wrongful purpose of harassing, threatening, and/or intimidating THE RELATOR through the BRIAN DURKIN Assault.

1409. BOSTON COLLEGE, BRIAN DURKIN, THOMAS LAMPERT, ARCHER, SCOGNAMIGLIO, KENYON, and SARAH HERLIHY each took affirmative steps and gave each other substantial assistance in order to carry out their common plan.

## COUNT 30

**(Claim for Tortious Interference with Advantageous Business Relationship against WILMERHALE, OBAMA, LOWY, BRIAN DURKIN, THOMAS LAMPERT, KENYON, ROUGEAU, HEALEY, NEYMAN, and SAVERY)**

1410. THE RELATOR incorporates the foregoing paragraphs and allegations as if fully set forth herein.

1411. THE RELATOR had a business relationship with BOSTON COLLEGE for an economic benefit, namely THE RELATOR's interest in legal training from BCLS at 885 CENTRE STREET.

1412. WILMERHALE, OBAMA, LOWY, BRIAN DURKIN, THOMAS LAMPERT, KENYON, ROUGEAU, HEALEY, NEYMAN, and SAVERY were each aware of THE RELATOR's relationship with BOSTON COLLEGE.

1413. WILMERHALE, OBAMA, LOWY, BRIAN DURKIN, THOMAS LAMPERT, KENYON, ROUGEAU, HEALEY, NEYMAN, and SAVERY interfered with THE RELATOR's relationship with BOSTON COLLEGE through improper motive and/or means, namely by deliberately setting in motion and carrying out the Judgment Class in order to harass and/or intimidate THE RELATOR as to THE RELATOR's pending litigation in state and federal courts.

1414. THE RELATOR's loss of advantage resulted directly from the conduct of WILMERHALE, OBAMA, LOWY, BRIAN DURKIN, THOMAS LAMPERT, KENYON, ROUGEAU, HEALEY, NEYMAN, and SAVERY.

## COUNT 31

**(Claim for Conspiracy to Violate and Violation of the Massachusetts Civil Rights Act (Mass.Gen.Laws ch. 12 § 11I) against WILMERHALE, OBAMA, BOSTON COLLEGE, LOWY, BRIAN DURKIN, THOMAS LAMPERT, KENYON, ROUGEAU, HEALEY, NEYMAN, and SAVERY)**

1415. THE RELATOR incorporates the foregoing paragraphs and allegations as if fully set forth herein.

1416. By threatening and intimidating THE RELATOR at 885 CENTRE STREET during the Judgment Class, WILMERHALE, OBAMA, BOSTON COLLEGE, LOWY, BRIAN DURKIN, THOMAS LAMPERT, KENYON, ROUGEAU, HEALEY, NEYMAN, and SAVERY interfered with and/or attempted to interfere with THE RELATOR's exercise or enjoyment of rights secured by the Fourteenth Amendment to the United States Constitution and Article 12 of the Massachusetts Declaration of Rights, including, but not limited to, THE RELATOR's property right to his various civil actions for recovery of the bounty in the *Qui Tam* Action and/or Second *Qui Tam* Action as well as legal training at BCLS.

1417. As set forth herein, the interference or attempted interference by WILMERHALE, OBAMA, BOSTON COLLEGE, LOWY, BRIAN DURKIN, THOMAS LAMPERT, KENYON, ROUGEAU, HEALEY, NEYMAN, and SAVERY was accomplished via threats, coercion, and/or intimidation.

1418. As a direct and proximate result of the conduct of WILMERHALE, OBAMA, BOSTON COLLEGE, LOWY, BRIAN DURKIN, THOMAS LAMPERT, KENYON, ROUGEAU, HEALEY, NEYMAN, and SAVERY, THE RELATOR suffered the damages as set forth herein.

## COUNT 32

**(Claim for Conspiracy to Violate and Violation of 42 U.S.C. § 1985(2) against WILMERHALE, OBAMA, BOSTON COLLEGE, LOWY, BRIAN DURKIN, THOMAS LAMPERT, KENYON, ROUGEAU, HEALEY, NEYMAN, and SAVERY, individually and in their respective official capacities, if any)**

1419. THE RELATOR incorporates the foregoing paragraphs and allegations as if fully set forth herein.

1420. There was a conspiracy involving an agreement between WILMERHALE, OBAMA, BOSTON COLLEGE, LOWY, BRIAN DURKIN, THOMAS LAMPERT, KENYON, ROUGEAU, HEALEY, NEYMAN, and SAVERY to threaten THE RELATOR during the Judgment Class.

1421. WILMERHALE, OBAMA, BOSTON COLLEGE, LOWY, BRIAN DURKIN, THOMAS LAMPERT, KENYON, ROUGEAU, HEALEY, NEYMAN, and SAVERY committed an act in furtherance of the conspiracy.

1422. Between WILMERHALE, OBAMA, BOSTON COLLEGE, LOWY, BRIAN DURKIN, THOMAS LAMPERT, KENYON, ROUGEAU, HEALEY, NEYMAN, and SAVERY, there was a shared intent to deter, by force, intimidation, or threat, THE RELATOR from attending federal court in connection with THE RELATOR's litigation and/or a shared intent to injure THE RELATOR in his person or property on account of his having so attended.

1423. THE RELATOR was injured by the conspiracy as to one or more legal rights or privileges and/or continues to be injured as to one or more legal rights or privileges.

## COUNT 33

**(Claim for Civil Conspiracy against WILMERHALE, OBAMA, BOSTON COLLEGE, LOWY, BRIAN DURKIN, THOMAS LAMPERT, KENYON, ROUGEAU, HEALEY, NEYMAN, and SAVERY)**

1424. THE RELATOR incorporates the foregoing paragraphs and allegations as if fully set forth herein.

1425. WILMERHALE, OBAMA, BOSTON COLLEGE, LOWY, BRIAN DURKIN, THOMAS LAMPERT, KENYON, ROUGEAU, HEALEY, NEYMAN, and SAVERY formed a common plan to harass, threaten, and/or intimidate THE RELATOR and/or injure THE RELATOR in his business and/or property.

1426. The plan of WILMERHALE, OBAMA, BOSTON COLLEGE, LOWY, BRIAN DURKIN, THOMAS LAMPERT, KENYON, ROUGEAU, HEALEY, NEYMAN, and SAVERY was designed to achieve the wrongful purpose of harassing, threatening, and/or intimidating THE RELATOR through the Judgment Class.

1427. WILMERHALE, OBAMA, BOSTON COLLEGE, LOWY, BRIAN DURKIN, THOMAS LAMPERT, KENYON, ROUGEAU, HEALEY, NEYMAN, and SAVERY each took affirmative steps and gave each other substantial assistance in order to carry out their common plan.

## COUNT 34

**(Claim for Conspiracy to Violate and Violation of the Massachusetts Civil Rights Act (Mass.Gen.Laws ch. 12 § 11I) against BOSTON COLLEGE, MAFFEI, and ROUGEAU)**

1428. THE RELATOR incorporates the foregoing paragraphs and allegations as if fully set forth herein.

1429. By threatening and intimidating THE RELATOR at 885 CENTRE STREET with the Deadly Question and during the *Pro Se* Class, BOSTON COLLEGE, MAFFEI, and ROUGEAU interfered with and/or attempted to interfere with THE RELATOR's exercise or enjoyment of rights secured by the Fourteenth Amendment to the United States Constitution and Article 12 of the Massachusetts Declaration of Rights, including, but not limited to, THE RELATOR's property right to the bounties in the *Qui Tam* Action and Second *Qui Tam* Action as well as legal training at BCLS.

1430. As set forth herein, the interference or attempted interference by BOSTON COLLEGE, MAFFEI, and ROUGEAU was accomplished via threats, coercion, and/or intimidation.

1431. As a direct and proximate result of the conduct of BOSTON COLLEGE, MAFFEI, and ROUGEAU, THE RELATOR suffered the damages as set forth herein.

## COUNT 35

**(Claim for Conspiracy to Violate and Violation of 42 U.S.C. § 1985(2) against BOSTON COLLEGE, MAFFEI, and ROUGEAU)**

1432. THE RELATOR incorporates the foregoing paragraphs and allegations as if fully set forth herein.

1433. There was a conspiracy involving an agreement between BOSTON COLLEGE, MAFFEI, and ROUGEAU to intimidate THE RELATOR for bringing the Rigged Sorokin Action.

1434. BOSTON COLLEGE, MAFFEI, and ROUGEAU committed an act in furtherance of the conspiracy.

1435. Between BOSTON COLLEGE, MAFFEI, and ROUGEAU, there was a shared intent to deter, by force, intimidation, or threat, THE RELATOR from attending federal court in connection with THE RELATOR's litigation and/or a shared intent to injure THE RELATOR in his person or property on account of his having so attended.

1436. THE RELATOR was injured by the conspiracy as to one or more legal rights or privileges and/or continues to be injured as to one or more legal rights or privileges.

## COUNT 36

**(Claim for Conspiracy to Violate and Violation of 42 U.S.C. § 1985(2) against BRIAN DURKIN, THOMAS LAMPERT, and THOMAS DURKIN)**

1437. THE RELATOR incorporates the foregoing paragraphs and allegations as if fully set forth herein.

1438. There was a conspiracy involving an agreement between BRIAN DURKIN, THOMAS LAMPERT, and THOMAS DURKIN to intimidate and/or surveil THE RELATOR using the DURKIN CAR.

1439. BRIAN DURKIN, THOMAS LAMPERT, and THOMAS DURKIN committed an act in furtherance of the conspiracy.

1440. Between BRIAN DURKIN, THOMAS LAMPERT, and THOMAS DURKIN, there was a shared intent to deter, by force, intimidation, or threat, THE RELATOR from attending federal court in connection with THE RELATOR's litigation and/or a shared intent to injure THE RELATOR in his person or property on account of his having so attended.

1441. THE RELATOR was injured by the conspiracy as to one or more legal rights or privileges and/or continues to be injured as to one or more legal rights or privileges.

## COUNT 37

**(Claim for Civil Conspiracy against BRIAN DURKIN,
THOMAS LAMPERT, and THOMAS DURKIN)**

1442. THE RELATOR incorporates the foregoing paragraphs and allegations as if fully set forth herein.

1443. BRIAN DURKIN, THOMAS LAMPERT, and THOMAS DURKIN formed a common plan to harass, threaten, and/or intimidate THE RELATOR using the DURKIN CAR.

1444. The plan of BRIAN DURKIN, THOMAS LAMPERT, and THOMAS DURKIN was designed to achieve the wrongful purpose of harassing, threatening, and/or intimidating THE RELATOR using the DURKIN CAR.

1445. BRIAN DURKIN, THOMAS LAMPERT, and THOMAS DURKIN each took affirmative steps and gave each other substantial assistance in order to carry out their common plan.

## COUNT 38

**(Claim for Conspiracy to Violate and Violation of 42 U.S.C. § 1985(2) against the RICO
ASSOCIATES, individually and in their respective official capacities, if any)**

1446. THE RELATOR incorporates the foregoing paragraphs and allegations as if fully set forth herein.

1447. There was a conspiracy involving an agreement between the RICO ASSOCIATES.

1448. The RICO ASSOCIATES committed an act in furtherance of the conspiracy.

1449. Between the RICO ASSOCIATES, there was a shared intent to deter, by force, intimidation, or threat, THE RELATOR from attending federal court in connection with

THE RELATOR's litigation and/or a shared intent to injure THE RELATOR in his person or property on account of his having so attended.

1450. THE RELATOR was injured by the conspiracy as to one or more legal rights or privileges and/or continues to be injured as to one or more legal rights or privileges.

## COUNT 39

### (Claim for Breach of Implied Covenant of Good Faith and Fair Dealing against BOSTON COLLEGE)

1451. THE RELATOR incorporates the foregoing paragraphs and allegations as if fully set forth herein.

1452. THE RELATOR had a contractual relationship with BOSTON COLLEGE for legal training at BCLS at 885 CENTRE STREET.

1453. BOSTON COLLEGE was aware of THE RELATOR's litigation.

1454. BOSTON COLLEGE enabled, assisted, and/or carried out acts that injured THE RELATOR in his rights to the fruits of his contractual relationship with BOSTON COLLEGE.

1455. BOSTON COLLEGE acted with dishonest purpose and engaged in conscious wrongdoing, including by assisting in the dissemination of Privileged Information among THE RELATOR's legal adversaries and allowing for or participating in intimidation, harassment, and/or threats of violence against THE RELATOR at 885 CENTRE STREET.

# COUNT 40

## (Claim for Fraudulent Concealment against the RICO ASSOCIATES)

1456. THE RELATOR incorporates the foregoing paragraphs and allegations as if fully set forth herein.

1457. The RICO ASSOCIATES knew about and concealed and/or suppressed the fact that one or more employees of BOSTON COLLEGE was participating, directly or indirectly, in THE RELATOR's litigation.

1458. The RICO ASSOCIATES acted with intent to defraud THE RELATOR or induce THE RELATOR to act differently than THE RELATOR would have acted with knowledge that one or more employees of BOSTON COLLEGE was participating, directly or indirectly, in THE RELATOR's litigation.

1459. THE RELATOR was unaware that one or more employees of BOSTON COLLEGE was participating, directly or indirectly, in THE RELATOR's litigation and would have acted differently had he been aware of such participation.

1460. To the extent that each is an attorney and officer of a court of the Commonwealth or the United States, the RICO ASSOCIATES have had a duty to disclose any participation by one or more employees of BOSTON COLLEGE in THE RELATOR's litigation under the Rules of Professional Conduct of the Commonwealth and/or the Due Process Clause since the day each of the RICO ASSOCIATES became aware of such participation or the day each of the RICO ASSOCIATES became an attorney and officer of the court, or both.

1461. As a consequence of the fraudulent concealment committed by the RICO ASSOCIATES, THE RELATOR has sustained damages.

## COUNT 41

### (Claim for Fraudulent Concealment against the
### RICO ASSOCIATES)

1462. THE RELATOR incorporates the foregoing paragraphs and allegations as if fully set forth herein.

1463. The RICO ASSOCIATES knew about and concealed and/or suppressed the fact that there was an agreement to subvert THE RELATOR's litigation.

1464. The RICO ASSOCIATES acted with intent to defraud THE RELATOR or induce THE RELATOR to act differently than THE RELATOR would have had THE RELATOR been aware of the concealed or suppressed agreement to subvert THE RELATOR's litigation.

1465. THE RELATOR was unaware of the concealed and/or suppressed agreement to subvert THE RELATOR's litigation and would have acted differently if THE RELATOR had known about the concealed and/or suppressed agreement.

1466. To the extent that each is an attorney and officer of a court of the Commonwealth or the United States, the RICO ASSOCIATES have had a duty to disclose the agreement under the Rules of Professional Conduct of the Commonwealth and/or the Due Process Clause since the day each of the RICO ASSOCIATES became aware of the agreement or the day each of the RICO ASSOCIATES became an attorney and officer of the court, or both.

1467. As a consequence of the fraudulent concealment of the RICO ASSOCIATES, THE RELATOR has sustained damages.

## COUNT 42

**(Claim for Tortious Interference with Advantageous Business Relationship against the RICO ASSOCIATES)**

1468.  THE RELATOR incorporates the foregoing paragraphs and allegations as if fully set forth herein.

1469.  THE RELATOR had a business relationship with the Commonwealth for an economic benefit, namely THE RELATOR's interest in the whistleblower bounties from the *Qui Tam* Action and the Second *Qui Tam* Action.

1470.  The RICO ASSOCIATES were aware of THE RELATOR's relationship with the Commonwealth as a *qui tam* relator.

1471.  The RICO ASSOCIATES interfered with THE RELATOR's relationship with the Commonwealth as a *qui tam* relator through improper motive and means, namely by assisting THE RELATOR's legal adversaries.

1472.  THE RELATOR's loss of advantage resulted directly from the conduct of the RICO ASSOCIATES.

## COUNT 43

**(Claim for Civil Conspiracy against the RICO ASSOCIATES)**

1473.  THE RELATOR incorporates the foregoing paragraphs and allegations as if fully set forth herein.

1474.  The RICO ASSOCIATES formed a common plan to deprive THE RELATOR of his whistleblower bounties by manipulating or rigging the state and federal courts in

Massachusetts and/or harassing, threatening, or intimidating THE RELATOR at 885 CENTRE STREET and other locations.

1475. The plan of the RICO ASSOCIATES was designed to achieve the wrongful purpose of depriving THE RELATOR of his whistleblower bounties, his property right to legal training at BCLS, and his civil rights.

1476. The RICO ASSOCIATES each took affirmative steps and gave each other substantial assistance in order to carry out their common plan.

## COUNT 44

**(Claim for Declaratory Judgment and Related Injunctive Relief pursuant to 28 U.S.C. §§ 2201, 2202 against OBAMA and the FAKE FEDERAL JUDGES)**

1477. THE RELATOR incorporates the foregoing paragraphs and allegations as if fully set forth herein.

1478. A genuine controversy exists between THE RELATOR, OBAMA, and each of the FAKE FEDERAL JUDGES for which THE RELATOR is entitled to declaratory relief pursuant to 28 U.S.C. §§ 2201, 2202, where there are ongoing violations of the U.S. Constitution concerning the ineligibility of OBAMA to be President of the United States.

1479. This Court should declare that OBAMA was never and is not eligible to be President of the United States, because he is not a natural born citizen of the United States.

1480. This Court should declare that the respective judicial commissions of the FAKE FEDERAL JUDGES were void *ab initio*, because OBAMA was never eligible to be President of the United States.

1481. This Court should issue related injunctive relief mandating removal of the FAKE

FEDERAL JUDGES from their respective federal judgeships.

## COUNT 45

**(Claim for Violation of 18 U.S.C. § 1962(a) against ROUGEAU and BOSTON COLLEGE)**

1482. THE RELATOR incorporates the foregoing paragraphs and allegations as if fully set

forth herein.

1483. RICO creates a private right of action for "[a]ny person injured in his business or

property by reason of a violation of [18 U.S.C. § 1962]." 18 U.S.C. § 1964(c).

1484. The "enterprise" as defined in 18 U.S.C. § 1961(4) is BCLS.

1485. As set forth herein, the activities of BCLS affect and affected interstate commerce.

1486. ROUGEAU and BOSTON COLLEGE derived income through THE RELATOR's tuition

payments to BCLS, which were obtained through, among other things, mail and wire

fraud, obstruction of justice, and/or violations of the Hobbs Act, thereby constituting a

pattern of racketeering activity.

1487. ROUGEAU and BOSTON COLLEGE used or invested the proceeds of racketeering

activity in order to host HEALEY, SIMAS, SARIS, BARBADORO, GARLAND,

GANTS, SOROKIN, BARRON, and O'TOOLE as visiting speakers (the "Visiting

Speakers") at 885 CENTRE STREET.

1488. THE RELATOR was directly and proximately injured in his business and/or property by

the investment or use of the proceeds of racketeering activity because the investment in

or use of racketeering proceeds for the Visiting Speakers, who conspired at 885 CENTRE

STREET to obstruct THE RELATOR's litigation as well as destroy THE RELATOR's

investment in legal training, his reputation in the legal community, and any professional activity in which THE RELATOR was involved, including Omnibus U.S. Code.

1489. Pursuant to 18 U.S.C. § 1964(c), THE RELATOR is entitled to treble damages for the injuries to THE RELATOR's business and property as set forth in this Complaint, including, but not limited to, the section entitled "INJURIES TO BUSINESS AND PROPERTY."

## COUNT 46

### (Violation of 18 U.S.C. § 1962(a) against WILMERHALE and HEALEY, individually and in her official capacity)

1490. THE RELATOR incorporates the foregoing paragraphs and allegations as if fully set forth herein.

1491. The "enterprise" as defined in 18 U.S.C. § 1961(4) is WILMERHALE.

1492. As set forth herein, WILMERHALE's activities affect and affected interstate commerce.

1493. HEALEY and WILMERHALE generated income for each other through a pattern of racketeering, namely a stream of benefits between HEALEY and WILMERHALE, including, among other things, through the Art Deal that involved LOWY, through donations to HEALEY's campaigns, and through hiring by HEALEY and WILMERHALE.

1494. WILMERHALE and HEALEY invested or used the proceeds of racketeering activity by making and/or arranging payments, directly and/or indirectly, to each other and to, among others, THOMAS LAMPERT, who was a law clerk for LOWY.

1495. Because HEALEY and/or WILMERHALE directly or indirectly invested or used the proceeds of racketeering activity in or for THOMAS LAMPERT, the violations of 18 U.S.C. § 1962(a) by HEALEY and WILMERHALE directly and proximately injured THE RELATOR.

1496. THE RELATOR was directly and proximately injured in his business and/or property by the investment or use of racketeering income to pay THOMAS LAMPERT, who, as a paid employee of WILMERHALE, law clerk for LOWY, and/or law student at BCLS, made the Sexual Advances for purposes of embarrassment and/or blackmail and subverted THE RELATOR's litigation, THE RELATOR's legal training, and Omnibus U.S. Code so as to advance the interests of WILMERHALE.

1497. Pursuant to 18 U.S.C. § 1964(c), THE RELATOR is entitled to treble damages for the injuries to THE RELATOR's business and property as set forth in this Complaint, including, but not limited to, the section entitled "INJURIES TO BUSINESS AND PROPERTY."

**COUNT 47**

**(Violation of 18 U.S.C. § 1962(a) against DOJ PAID ASSOCIATES, JOHN DOE 1-X, OBAMA, PATRICK, SARIS, O'TOOLE, GOODLANDER, FLATGARD, COLE, YATES, WALSH, DANIEL KOH, STEVEN KOH, LORETTA LYNCH, HOLDER, and ORTIZ, individually and in his or her respective official capacity, if any)**

1498. THE RELATOR incorporates the foregoing paragraphs and allegations as if fully set forth herein.

1499. The "enterprise" as defined in 18 U.S.C. § 1961(4) is the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH.

1500. As set forth herein, the activities of the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH affect and affected interstate commerce.

1501. The OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH derived income through Equitable Sharing Program payments, which were obtained through, among other things, mail fraud, obstruction of justice, and/or violations of the Hobbs Act, thereby constituting a pattern of racketeering activity.

1502. The DOJ PAID ASSOCIATES, JOHN DOE 1-X, OBAMA, PATRICK, SARIS, O'TOOLE, GOODLANDER, FLATGARD, COLE, YATES, WALSH, DANIEL KOH, STEVEN KOH, LORETTA LYNCH, HOLDER, and ORTIZ invested the proceeds of racketeering activity in the operation of the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH, including payments from the Equitable Sharing Program.

1503. THE RELATOR was directly and proximately injured in his business and/or property by the investment or use of racketeering income, where the investment or use of racketeering income deprived THE RELATOR of his fundamental right to a disinterested prosecutor in the disposition of the *Qui Tam* Action and Second *Qui Tam* Action.

1504. Pursuant to 18 U.S.C. § 1964(c), THE RELATOR is entitled to treble damages for the injuries to THE RELATOR's business and property as set forth in this Complaint, including, but not limited to, the section entitled "INJURIES TO BUSINESS AND PROPERTY."

# COUNT 48

## (Violation of 18 U.S.C. § 1962(b) against the RICO ASSOCIATES)

1505. THE RELATOR incorporates the foregoing paragraphs and allegations as if fully set forth herein.

1506. The "enterprise[s]" as defined in 18 U.S.C. § 1961(4) are the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH, Office of the U.S. Attorney for the District of Massachusetts, Massachusetts Appeals Court, U.S. DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS, U.S. DISTRICT COURT FOR THE DISTRICT OF NEW HAMPSHIRE, U.S. COURT OF APPEALS FOR THE FIRST CIRCUIT, and SUFFOLK SUPERIOR COURT (altogether, the "Rigged Public Enterprises").

1507. As set forth herein, the activities of the Rigged Public Enterprises affect and affected interstate commerce.

1508. Through a pattern of racketeering activity, namely through unlawful payments under the guise of employment or other agreements to state and federal officials or their relatives at or from the RICO ASSOCIATES as set forth herein, the RICO ASSOCIATES acquired and/or maintained, directly or indirectly, an interest in or control of the Rigged Public Enterprises, which were and are required to maintain the appearance and reality of impartiality in all litigation.

1509. Because THE RELATOR was and/or is pursuing *qui tam* actions with total whistleblower bounties potentially exceeding $4 million involving the Rigged Public Enterprises, the RICO ASSOCIATES directly and proximately injured THE RELATOR in his business

302

and/or property by the acquisition and/or maintenance of an interest in or control of the Rigged Public Enterprises.

1510. Pursuant to 18 U.S.C. § 1964(c), THE RELATOR is entitled to treble damages for the injuries to THE RELATOR's business and property as set forth in this Complaint, including, but not limited to, the section entitled "INJURIES TO BUSINESS AND PROPERTY."

## COUNT 49

**(Violation of 18 U.S.C. § 1962(c) against OBAMA, SIMAS, SOROKIN, SARIS, O'TOOLE, ULLMANN, BARRON, LORETTA LYNCH, HOLDER, ORTIZ, HEALEY, SWEENEY, CRAFTS, ROUGEAU, GOODLANDER, FLATGARD, MAFFEI, SAVERY, SQUIRES-LEE, BRIAN DURKIN, PATRICK, THOMAS LAMPERT, GILES, WALSH, STEVEN KOH, DANIEL KOH, BOSTON COLLEGE, and WILMERHALE, individually and in their respective official capacities, if any)**

1511. THE RELATOR incorporates the foregoing paragraphs and allegations as if fully set forth herein.

1512. Under 18 U.S.C. § 1962(c), it is "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity."

1513. As set forth herein, the "enterprise" as defined in 18 U.S.C. § 1961(4) is an association in fact, or the ENTERPRISE.

1514. In the alternative, the "enterprise[s]" as defined in 18 U.S.C. § 1961(4) are BCLS and the Rigged Public Enterprises.

1515. As set forth herein, OBAMA, SIMAS, SOROKIN, SARIS, O'TOOLE, ULLMANN, BARRON, LORETTA LYNCH, HOLDER, ORTIZ, HEALEY, SWEENEY, CRAFTS, ROUGEAU, GOODLANDER, FLATGARD, MAFFEI, SAVERY, SQUIRES-LEE, BRIAN DURKIN, PATRICK, THOMAS LAMPERT, GILES, WALSH, STEVEN KOH, DANIEL KOH, BOSTON COLLEGE, and WILMERHALE each directed and/or participated, directly or indirectly, in the affairs of the ENTERPRISE.

1516. As set forth herein, OBAMA, SIMAS, SOROKIN, SARIS, O'TOOLE, ULLMANN, BARRON, LORETTA LYNCH, HOLDER, ORTIZ, HEALEY, SWEENEY, CRAFTS, ROUGEAU, GOODLANDER, FLATGARD, MAFFEI, SAVERY, SQUIRES-LEE, BRIAN DURKIN, PATRICK, THOMAS LAMPERT, GILES, WALSH, STEVEN KOH, DANIEL KOH, BOSTON COLLEGE, and WILMERHALE each violated 18 U.S.C. § 1962(c) by conducting and/or participating in the ENTERPRISE's affairs through a pattern of racketeering activity as defined in 18 U.S.C. § 1961(5).

1517. As set forth herein, the ENTERPRISE's activities affect and affected interstate commerce.

1518. The violations of 18 U.S.C. § 1962(c) by OBAMA, SIMAS, SOROKIN, SARIS, O'TOOLE, ULLMANN, BARRON, LORETTA LYNCH, HOLDER, ORTIZ, HEALEY, SWEENEY, CRAFTS, ROUGEAU, GOODLANDER, FLATGARD, MAFFEI, SAVERY, SQUIRES-LEE, BRIAN DURKIN, PATRICK, THOMAS LAMPERT, GILES, WALSH, STEVEN KOH, DANIEL KOH, BOSTON COLLEGE, and WILMERHALE directly and proximately injured THE RELATOR in his business and/or property through

the predicate racketeering acts as set forth in the section entitled "RACKETEERING

ACTS."

1519. Pursuant to 18 U.S.C. § 1964(c), THE RELATOR is entitled to treble damages for the

injuries to THE RELATOR's business and/or property as set forth in this Complaint,

including, but not limited to, the section entitled "INJURIES TO BUSINESS AND

PROPERTY."

## COUNT 50

### (Violation of 18 U.S.C. § 1962(d) against the RICO ASSOCIATES, individually and in their respective official capacities, if any)

1520. THE RELATOR incorporates the foregoing paragraphs and allegations as if fully set

forth herein.

1521. The RICO ASSOCIATES conspired to violate 18 U.S.C. § 1962(a), (b), and/or (c).

1522. There is a conspiracy involving one or more agreements among the RICO ASSOCIATES

in violation of 18 U.S.C. § 1962(d).

1523. Each of the RICO ASSOCIATES adopted the goal of furthering the ENTERPRISE,

including, but not limited to, 1) agreeing to facilitate the operation of the ENTERPRISE,

affecting interstate commerce, through a pattern of racketeering activity; and 2) agreeing

that one or more RICO ASSOCIATES would commit two or more acts defined as

"racketeering activity" under 18 U.S.C. § 1964(1).

1524. As a direct and proximate result of the conduct of the RICO ASSOCIATES, THE

RELATOR has been injured in his business and/or property within the meaning of 18

U.S.C. § 1964(c).

1525. Pursuant to 18 U.S.C. § 1964(c), THE RELATOR is entitled to treble damages for the injuries to THE RELATOR's business and property as set forth in this Complaint, including, but not limited to, the section entitled "INJURIES TO BUSINESS AND PROPERTY."

1526. As a result of their conspiracy in violation of 18 U.S.C. § 1962(d), the RICO ASSOCIATES are jointly and severally liable to THE RELATOR in an amount to be determined at trial.

## COUNT 51

### (Claim for Violation of Mass.Gen.Laws ch. 93A § 9 against BOSTON COLLEGE)

1527. THE RELATOR incorporates the foregoing paragraphs and allegations as if fully set forth herein.

1528. The wrongful acts of BOSTON COLLEGE constitute violations of Mass.Gen.Laws ch. 93A § 9.

1529. Through the 93A Letter, THE RELATOR made a written demand for relief pursuant to Mass.Gen.Laws ch. 93A § 9(3).

1530. BOSTON COLLEGE failed to make an adequate response to the 93A Letter, thereby entitling THE RELATOR to judgment of this Court and for all damages and related relief authorized by statute.

1531. As set forth herein, BOSTON COLLEGE was and is acting in bad faith with respect to the 93A Letter.

# COUNT 52

**(Claim for Violation of the Sherman Antitrust Act, 15 U.S.C. §§ 1 *et seq.* against BOSTON COLLEGE, CORNELL, COLUMBIA, UVA, PENN, NORTHWESTERN, UNIVERSITY OF CHICAGO, UNIVERSITY OF DENVER, LAW SCHOOL ADMISSIONS COUNCIL, and AMERICAN BAR ASSOCIATION)**

1532. THE RELATOR incorporates the foregoing paragraphs and allegations as if fully set forth herein.

1533. BOSTON COLLEGE, CORNELL, COLUMBIA, UVA, PENN, NORTHWESTERN, UNIVERSITY OF CHICAGO, UNIVERSITY OF DENVER, LAW SCHOOL ADMISSIONS COUNCIL, and AMERICAN BAR ASSOCIATION as well as any unnamed co-conspirators, entered into a continuing contract, combination, or conspiracy in unreasonable restraint of trade in violation of the Sherman Act (15 U.S.C. § 1).

1534. In particular, BOSTON COLLEGE, CORNELL, COLUMBIA, UVA, PENN, NORTHWESTERN, UNIVERSITY OF CHICAGO, UNIVERSITY OF DENVER, LAW SCHOOL ADMISSIONS COUNCIL, and AMERICAN BAR ASSOCIATION have contracted, combined, or conspired to raise, fix, maintain, and/or stabilize the price of tuition at two or more ABA-approved law schools.

1535. As a result of the unlawful conduct of BOSTON COLLEGE, CORNELL, COLUMBIA, UVA, PENN, NORTHWESTERN, UNIVERSITY OF CHICAGO, UNIVERSITY OF DENVER, LAW SCHOOL ADMISSIONS COUNCIL, and AMERICAN BAR ASSOCIATION, prices for tuition at two or more ABA-approved law schools were raised, fixed, maintained, and/or stabilized in the United States.

1536. The contract, combination, or conspiracy between BOSTON COLLEGE, CORNELL, COLUMBIA, UVA, PENN, NORTHWESTERN, UNIVERSITY OF CHICAGO, UNIVERSITY OF DENVER, LAW SCHOOL ADMISSIONS COUNCIL, and AMERICAN BAR ASSOCIATION consisted of a continuing agreement, understanding, and concerted action between them and any unnamed co-conspirators, including, but not limited to, use of the Deans' LISTSERV and electronic, mail, telephone, and/or in person communications to share tuition price and related information.

1537. For purposes of formulating and effectuating their contract, combination, or conspiracy, BOSTON COLLEGE, CORNELL, COLUMBIA, UVA, PENN, NORTHWESTERN, UNIVERSITY OF CHICAGO, UNIVERSITY OF DENVER, LAW SCHOOL ADMISSIONS COUNCIL, and AMERICAN BAR ASSOCIATION and any co-conspirators did those things they contracted, combined, or conspired to do, including, but not limited to: (1) agreeing to raise, fix, and/or maintain prices for tuition at ABA-approved law schools; (2) raising, fixing, and/or maintaining prices for tuition at ABA-approved law schools; and (3) selling, offering, and/or accepting tuition at ABA-approved law schools throughout the United States at inflated prices.

1538. As a result of the unlawful conduct of BOSTON COLLEGE, CORNELL, COLUMBIA, UVA, PENN, NORTHWESTERN, UNIVERSITY OF CHICAGO, UNIVERSITY OF DENVER, LAW SCHOOL ADMISSIONS COUNCIL, and AMERICAN BAR ASSOCIATION, THE RELATOR has been injured in that he paid more for tuition at an ABA-approved law school than THE RELATOR otherwise would have paid in the absence of the unlawful conduct of BOSTON COLLEGE, CORNELL, COLUMBIA,

UVA, PENN, NORTHWESTERN, UNIVERSITY OF CHICAGO, UNIVERSITY OF DENVER, LAW SCHOOL ADMISSIONS COUNCIL, and AMERICAN BAR ASSOCIATION.

1539. The alleged contract, combination, or conspiracy between BOSTON COLLEGE, CORNELL, COLUMBIA, UVA, PENN, NORTHWESTERN, UNIVERSITY OF CHICAGO, UNIVERSITY OF DENVER, LAW SCHOOL ADMISSIONS COUNCIL, and AMERICAN BAR ASSOCIATION is a violation of the federal antitrust law.

1540. The unlawful conduct of BOSTON COLLEGE, CORNELL, COLUMBIA, UVA, PENN, NORTHWESTERN, UNIVERSITY OF CHICAGO, UNIVERSITY OF DENVER, LAW SCHOOL ADMISSIONS COUNCIL, and AMERICAN BAR ASSOCIATION is continuing and will continue unless enjoined by this Court.

1541. Pursuant to 15 U.S.C. § 9, THE RELATOR seeks the issuance of an injunction against BOSTON COLLEGE, CORNELL, COLUMBIA, UVA, PENN, NORTHWESTERN, UNIVERSITY OF CHICAGO, UNIVERSITY OF DENVER, LAW SCHOOL ADMISSIONS COUNCIL, and AMERICAN BAR ASSOCIATION, preventing and restraining the violations alleged herein.

## COUNT 53

**(Claim for Violation of Mass.Gen.Laws Ch. 93 § 4 against BOSTON COLLEGE, CORNELL, COLUMBIA, UVA, PENN, NORTHWESTERN, UNIVERSITY OF CHICAGO, UNIVERSITY OF DENVER, LAW SCHOOL ADMISSIONS COUNCIL, and AMERICAN BAR ASSOCIATION)**

1542. THE RELATOR incorporates the foregoing paragraphs and allegations as if fully set forth herein.

1543. BOSTON COLLEGE, CORNELL, COLUMBIA, UVA, PENN, NORTHWESTERN, UNIVERSITY OF CHICAGO, UNIVERSITY OF DENVER, LAW SCHOOL ADMISSIONS COUNCIL, and AMERICAN BAR ASSOCIATION as well as any unnamed co-conspirators entered into a continuing contract, combination, or conspiracy in unreasonable restraint of trade in violation of Mass.Gen.Laws ch. 93 § 4.

1544. In particular, BOSTON COLLEGE, CORNELL, COLUMBIA, UVA, PENN, NORTHWESTERN, UNIVERSITY OF CHICAGO, UNIVERSITY OF DENVER, LAW SCHOOL ADMISSIONS COUNCIL, and AMERICAN BAR ASSOCIATION have contracted, combined, or conspired to raise, fix, maintain, and/or stabilize the price of tuition at two or more ABA-approved law schools.

1545. As a result of the unlawful conduct of BOSTON COLLEGE, CORNELL, COLUMBIA, UVA, PENN, NORTHWESTERN, UNIVERSITY OF CHICAGO, UNIVERSITY OF DENVER, LAW SCHOOL ADMISSIONS COUNCIL, and AMERICAN BAR ASSOCIATION, prices for tuition at two or more ABA-approved law schools were raised, fixed, maintained, and/or stabilized in the United States.

1546. The contract, combination, or conspiracy between BOSTON COLLEGE, CORNELL, COLUMBIA, UVA, PENN, NORTHWESTERN, UNIVERSITY OF CHICAGO, UNIVERSITY OF DENVER, LAW SCHOOL ADMISSIONS COUNCIL, and AMERICAN BAR ASSOCIATION consisted of a continuing agreement, understanding, and concerted action between them and any unnamed co-conspirators, including, but not limited to, use of the Deans' LISTSERV and electronic, mail, telephone, and/or in person communications to share tuition price and related information.

1547. For purposes of formulating and effectuating their contract, combination, or conspiracy, BOSTON COLLEGE, CORNELL, COLUMBIA, UVA, PENN, NORTHWESTERN, UNIVERSITY OF CHICAGO, UNIVERSITY OF DENVER, LAW SCHOOL ADMISSIONS COUNCIL, and AMERICAN BAR ASSOCIATION and any co-conspirators did those things they contracted, combined, or conspired to do, including but not limited to: (1) agreeing to raise, fix, and/or maintain prices for tuition at ABA-approved law schools; (2) raising, fixing, and/or maintaining prices for tuition at ABA-approved law schools; and (3) selling, offering, and/or accepting tuition at ABA-approved law schools throughout the United States at inflated prices.

1548. As a result of unlawful conduct by BOSTON COLLEGE, CORNELL, COLUMBIA, UVA, PENN, NORTHWESTERN, UNIVERSITY OF CHICAGO, UNIVERSITY OF DENVER, LAW SCHOOL ADMISSIONS COUNCIL, and AMERICAN BAR ASSOCIATION, THE RELATOR has been injured in that he paid more for tuition at an ABA-approved law school than he otherwise would have paid in the absence of the unlawful conduct of BOSTON COLLEGE, CORNELL, COLUMBIA, UVA, PENN, NORTHWESTERN, UNIVERSITY OF CHICAGO, UNIVERSITY OF DENVER, LAW SCHOOL ADMISSIONS COUNCIL, and AMERICAN BAR ASSOCIATION.

1549. The alleged contract, combination, or conspiracy between BOSTON COLLEGE, CORNELL, COLUMBIA, UVA, PENN, NORTHWESTERN, UNIVERSITY OF CHICAGO, UNIVERSITY OF DENVER, LAW SCHOOL ADMISSIONS COUNCIL, and AMERICAN BAR ASSOCIATION, and the AMERICAN BAR ASSOCIATION is a violation of Massachusetts antitrust law.

1550. The unlawful conduct of BOSTON COLLEGE, CORNELL, COLUMBIA, UVA, PENN, NORTHWESTERN, UNIVERSITY OF CHICAGO, UNIVERSITY OF DENVER, LAW SCHOOL ADMISSIONS COUNCIL, and AMERICAN BAR ASSOCIATION is continuing and will continue unless enjoined by this Court.

1551. Pursuant to Mass.Gen.Laws ch. 93 § 12, THE RELATOR seeks the issuance of an injunction against BOSTON COLLEGE, CORNELL, COLUMBIA, UVA, PENN, NORTHWESTERN, UNIVERSITY OF CHICAGO, UNIVERSITY OF DENVER, LAW SCHOOL ADMISSIONS COUNCIL, and AMERICAN BAR ASSOCIATION, preventing and restraining the violations alleged herein.

### COUNT 54

**(Claim for Violation of the Sherman Antitrust Act, 15 U.S.C. §§ 1 *et seq.* against BOSTON COLLEGE, UNIVERSITY OF DENVER, LAW SCHOOL ADMISSIONS COUNCIL, and AMERICAN BAR ASSOCIATION)**

1552. THE RELATOR incorporates the foregoing paragraphs and allegations as if fully set forth herein.

1553. BOSTON COLLEGE, UNIVERSITY OF DENVER, LAW SCHOOL ADMISSIONS COUNCIL, and AMERICAN BAR ASSOCIATION entered into a conspiracy in unreasonable restraint of trade in violation of the Sherman Act (15 U.S.C. § 1).

1554. In particular, BOSTON COLLEGE, UNIVERSITY OF DENVER, LAW SCHOOL ADMISSIONS COUNCIL, and AMERICAN BAR ASSOCIATION conspired to preclude THE RELATOR from studying law in Colorado and saving in excess of $10,000 in tuition costs.

1555. As a result of the conduct of BOSTON COLLEGE, UNIVERSITY OF DENVER, LAW SCHOOL ADMISSIONS COUNCIL, and AMERICAN BAR ASSOCIATION, THE RELATOR was unlawfully restrained from studying law in Colorado and saving in excess of $10,000 in tuition costs.

1556. The conspiracy between BOSTON COLLEGE, UNIVERSITY OF DENVER, LAW SCHOOL ADMISSIONS COUNCIL, and AMERICAN BAR ASSOCIATION consisted of a continuing agreement, understanding, and concerted action among them and any unnamed co-conspirators to preclude THE RELATOR from studying law in Colorado and saving in excess of $10,000 in tuition costs.

1557. For purposes of formulating and effectuating their conspiracy, BOSTON COLLEGE, UNIVERSITY OF DENVER, LAW SCHOOL ADMISSIONS COUNCIL, and AMERICAN BAR ASSOCIATION, and any co-conspirators did those things they conspired to do, including, congregating at LAW SCHOOL ADMISSIONS COUNCIL and AMERICAN BAR ASSOCIATION events and communicating through interstate communications facilities.

1558. As a result of the unlawful conduct of BOSTON COLLEGE, UNIVERSITY OF DENVER, LAW SCHOOL ADMISSIONS COUNCIL, and AMERICAN BAR ASSOCIATION, THE RELATOR has been injured in that he paid more for tuition at an ABA-approved law school than THE RELATOR otherwise would have paid in the absence of the unlawful conduct.

1559. The alleged conspiracy involving BOSTON COLLEGE, UNIVERSITY OF DENVER, LAW SCHOOL ADMISSIONS COUNCIL, and AMERICAN BAR ASSOCIATION is a violation of the federal antitrust law.

1560. The unlawful conduct of BOSTON COLLEGE, UNIVERSITY OF DENVER, LAW SCHOOL ADMISSIONS COUNCIL, and AMERICAN BAR ASSOCIATION is continuing and will continue unless enjoined by this Court.

1561. Pursuant to 15 U.S.C. § 9, THE RELATOR seeks the issuance of an injunction against BOSTON COLLEGE, UNIVERSITY OF DENVER, LAW SCHOOL ADMISSIONS COUNCIL, and AMERICAN BAR ASSOCIATION, preventing and restraining the violations alleged herein.

## COUNT 55

**(Claim for Violation of Mass.Gen.Laws Ch. 93 § 4 against BOSTON COLLEGE, UNIVERSITY OF DENVER, LAW SCHOOL ADMISSIONS COUNCIL, and AMERICAN BAR ASSOCIATION)**

1562. THE RELATOR incorporates the foregoing paragraphs and allegations as if fully set forth herein.

1563. BOSTON COLLEGE, UNIVERSITY OF DENVER, LAW SCHOOL ADMISSIONS COUNCIL, and AMERICAN BAR ASSOCIATION entered into a conspiracy in unreasonable restraint of trade in violation of Mass.Gen.Laws ch. 93 § 4.

1564. In particular, BOSTON COLLEGE, UNIVERSITY OF DENVER, LAW SCHOOL ADMISSIONS COUNCIL, and AMERICAN BAR ASSOCIATION conspired to preclude THE RELATOR from studying law in Colorado and saving in excess of $10,000 in tuition costs.

314

1565. As a result of the conduct of BOSTON COLLEGE, UNIVERSITY OF DENVER, LAW SCHOOL ADMISSIONS COUNCIL, and AMERICAN BAR ASSOCIATION, THE RELATOR was unlawfully restrained from studying law in Colorado and saving in excess of $10,000 in tuition costs.

1566. The conspiracy between BOSTON COLLEGE, UNIVERSITY OF DENVER, LAW SCHOOL ADMISSIONS COUNCIL, and AMERICAN BAR ASSOCIATION consisted of a continuing agreement, understanding, and concerted action among them and any unnamed co-conspirators to preclude THE RELATOR from studying law in Colorado and saving in excess of $10,000 in tuition costs.

1567. For purposes of formulating and effectuating their conspiracy, BOSTON COLLEGE, UNIVERSITY OF DENVER, LAW SCHOOL ADMISSIONS COUNCIL, and AMERICAN BAR ASSOCIATION, and any co-conspirators did those things they conspired to do, including, congregating at LAW SCHOOL ADMISSIONS COUNCIL and AMERICAN BAR ASSOCIATION events and communicating through interstate communications facilities.

1568. As a result of the unlawful conduct of BOSTON COLLEGE, UNIVERSITY OF DENVER, LAW SCHOOL ADMISSIONS COUNCIL, and AMERICAN BAR ASSOCIATION, THE RELATOR has been injured in that he paid more for tuition at an ABA-approved law school than THE RELATOR otherwise would have paid in the absence of the unlawful conduct.

1569. The alleged conspiracy involving BOSTON COLLEGE, UNIVERSITY OF DENVER, LAW SCHOOL ADMISSIONS COUNCIL, and AMERICAN BAR ASSOCIATION is a violation of the Massachusetts antitrust law.

1570. The unlawful conduct of BOSTON COLLEGE, UNIVERSITY OF DENVER, LAW SCHOOL ADMISSIONS COUNCIL, and AMERICAN BAR ASSOCIATION is continuing and will continue unless enjoined by this Court.

1571. Pursuant to Mass.Gen.Laws ch. 93 § 12, THE RELATOR seeks the issuance of an injunction against BOSTON COLLEGE, UNIVERSITY OF DENVER, LAW SCHOOL ADMISSIONS COUNCIL, and AMERICAN BAR ASSOCIATION, preventing and restraining the violations alleged herein.

### COUNT 56

**(Claim for Violation of the Sherman Antitrust Act, 15 U.S.C. §§ 1 *et seq.* against BOSTON COLLEGE, CORNELL, LAW SCHOOL ADMISSIONS COUNCIL, and AMERICAN BAR ASSOCIATION)**

1572. THE RELATOR incorporates the foregoing paragraphs and allegations as if fully set forth herein.

1573. BOSTON COLLEGE, CORNELL, LAW SCHOOL ADMISSIONS COUNCIL, and AMERICAN BAR ASSOCIATION entered into a conspiracy in unreasonable restraint of trade in violation of the Sherman Act (15 U.S.C. § 1).

1574. In particular, BOSTON COLLEGE, CORNELL, LAW SCHOOL ADMISSIONS COUNCIL, and AMERICAN BAR ASSOCIATION conspired to preclude THE RELATOR from studying finishing his law degree at Cornell Law School.

1575. As a result of the conduct of BOSTON COLLEGE, CORNELL, LAW SCHOOL ADMISSIONS COUNCIL, and AMERICAN BAR ASSOCIATION, THE RELATOR was unlawfully restrained from studying law at Cornell Law School.

1576. The conspiracy between BOSTON COLLEGE, CORNELL, LAW SCHOOL ADMISSIONS COUNCIL, and AMERICAN BAR ASSOCIATION consisted of a continuing agreement, understanding, and concerted action among them and any unnamed co-conspirators to preclude THE RELATOR from studying law at Cornell Law School.

1577. For purposes of formulating and effectuating their conspiracy, BOSTON COLLEGE, CORNELL, LAW SCHOOL ADMISSIONS COUNCIL, and AMERICAN BAR ASSOCIATION, and any co-conspirators did those things they conspired to do, including, communicating regarding THE RELATOR's status at BCLS and any application to Cornell Law School in 2015 and/or in 2018.

1578. As a result of the unlawful conduct of BOSTON COLLEGE, CORNELL, LAW SCHOOL ADMISSIONS COUNCIL, and AMERICAN BAR ASSOCIATION, THE RELATOR has been injured in that he paid more for tuition at an ABA-approved law school than THE RELATOR otherwise would have paid in the absence of the unlawful conduct and in that he paid all of the tuition payments to BOSTON COLLEGE for a degree that is unobtainable except at 885 CENTRE STREET.

1579. The alleged conspiracy involving BOSTON COLLEGE, CORNELL, LAW SCHOOL ADMISSIONS COUNCIL, and AMERICAN BAR ASSOCIATION is a violation of the federal antitrust law.

1580. The unlawful conduct of BOSTON COLLEGE, CORNELL, LAW SCHOOL

ADMISSIONS COUNCIL, and AMERICAN BAR ASSOCIATION is continuing and

will continue unless enjoined by this Court.

1581. Pursuant to 15 U.S.C. § 9, THE RELATOR seeks the issuance of an injunction against

BOSTON COLLEGE, CORNELL, LAW SCHOOL ADMISSIONS COUNCIL, and

AMERICAN BAR ASSOCIATION, preventing and restraining the violations alleged

herein.

## COUNT 57

**(Claim for Violation of Mass.Gen.Laws Ch. 93 § 4 against BOSTON COLLEGE,
CORNELL, LAW SCHOOL ADMISSIONS COUNCIL, and
AMERICAN BAR ASSOCIATION)**

1582. THE RELATOR incorporates the foregoing paragraphs and allegations as if fully set

forth herein.

1583. BOSTON COLLEGE, CORNELL, LAW SCHOOL ADMISSIONS COUNCIL, and

AMERICAN BAR ASSOCIATION entered into a conspiracy in unreasonable restraint of

trade in violation of Mass.Gen.Laws ch. 93A. § 4.

1584. In particular, BOSTON COLLEGE, CORNELL, LAW SCHOOL ADMISSIONS

COUNCIL, and AMERICAN BAR ASSOCIATION conspired to preclude THE

RELATOR from studying finishing his law degree at Cornell Law School.

1585. As a result of the conduct of BOSTON COLLEGE, CORNELL, LAW SCHOOL

ADMISSIONS COUNCIL, and AMERICAN BAR ASSOCIATION, THE RELATOR

was unlawfully restrained from studying law at Cornell Law School.

1586. The conspiracy between BOSTON COLLEGE, CORNELL, LAW SCHOOL ADMISSIONS COUNCIL, and AMERICAN BAR ASSOCIATION consisted of a continuing agreement, understanding, and concerted action among them and any unnamed co-conspirators to preclude THE RELATOR from studying law at Cornell Law School.

1587. For purposes of formulating and effectuating their conspiracy, BOSTON COLLEGE, CORNELL, LAW SCHOOL ADMISSIONS COUNCIL, and AMERICAN BAR ASSOCIATION, and any co-conspirators did those things they conspired to do, including, communicating regarding THE RELATOR's status at BCLS and any application to Cornell Law School in 2015 and/or in 2018.

1588. As a result of the unlawful conduct of BOSTON COLLEGE, CORNELL, LAW SCHOOL ADMISSIONS COUNCIL, and AMERICAN BAR ASSOCIATION, THE RELATOR has been injured in that he paid more for tuition at an ABA-approved law school than THE RELATOR otherwise would have paid in the absence of the unlawful conduct and in that he paid all of the tuition payments to BOSTON COLLEGE for a degree that is unobtainable except at 885 CENTRE STREET.

1589. The alleged conspiracy involving BOSTON COLLEGE, CORNELL, LAW SCHOOL ADMISSIONS COUNCIL, and AMERICAN BAR ASSOCIATION is a violation of the Massachusetts antitrust law.

1590. The unlawful conduct of BOSTON COLLEGE, CORNELL, LAW SCHOOL ADMISSIONS COUNCIL, and AMERICAN BAR ASSOCIATION is continuing and will continue unless enjoined by this Court.

1591. Pursuant to Mass.Gen.Laws ch. 93A. § 12, THE RELATOR seeks the issuance of an injunction against BOSTON COLLEGE, CORNELL, LAW SCHOOL ADMISSIONS COUNCIL, and AMERICAN BAR ASSOCIATION, preventing and restraining the violations alleged herein.

## COUNT 58

### (Claim for Negligence against BOSTON COLLEGE)

1592. THE RELATOR incorporates the foregoing paragraphs and allegations as if fully set forth herein.

1593. BOSTON COLLEGE owed a duty of care to THE RELATOR because THE RELATOR was a student at BOSTON COLLEGE, which was aware of THE RELATOR's litigation by and through its employees.

1594. BOSTON COLLEGE knew or reasonably should have known about the risks to THE RELATOR and THE RELATOR's litigation posed by the conduct of its own employees and individuals associated with BOSTON COLLEGE.

1595. BOSTON COLLEGE breached its duty of care to THE RELATOR through the negligent conduct as alleged herein.

1596. But for the intentional and negligent acts and omissions of BOSTON COLLEGE and its violations of the standards of care and statute set forth herein, THE RELATOR would not have been injured.

1597. The intentional and negligent acts and omissions of BOSTON COLLEGE amount to negligence, negligent failure to warn, train, and educate, and negligence per se.

1598. As a result of the conduct of BOSTON COLLEGE set forth in this Complaint, THE RELATOR has suffered and continues to suffer financial losses; has suffered and continues to suffer great pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, and loss of enjoyment of life; has suffered and continues to suffer spiritually; was prevented and will continue to be prevented from performing THE RELATOR's daily activities and obtaining the full enjoyment of life; and has sustained and will continue to sustain loss of earnings and earning capacity.

## COUNT 59

### (Claim for Negligent Infliction of Emotional Distress against the RICO DEFENDANTS)

1599. THE RELATOR incorporates the foregoing paragraphs and allegations as if fully set forth herein.

1600. As set forth herein, the RICO DEFENDANTS acted negligently.

1601. As a direct and proximate result of the conduct of the RICO DEFENDANTS, Plaintiff has suffered and continues to suffer severe emotional distress.

1602. The conduct of the RICO DEFENDANTS was a substantial factor in causing Plaintiff's severe emotional distress.

1603. The conduct of the RICO DEFENDANTS was malicious, oppressive, and fraudulent, thereby warranting punitive damages.

## COUNT 60

**(Claim for Intentional Infliction of Emotional Distress against the RICO DEFENDANTS)**

1604.   THE RELATOR incorporates the foregoing paragraphs and allegations as if fully set forth herein.

1605.   The acts and omissions of the RICO DEFENDANTS were intended to inflict emotional distress and were outrageous and beyond the bounds of conduct tolerated in civilized society.

1606.   As a direct and proximate result of the acts and omissions alleged herein, THE RELATOR has suffered extreme emotional distress.

## COUNT 61

**(Claim for Recovery, Compensation, Award, and Injunctive Relief pursuant to Bivens v. Six Unknown Named Agents, 403 U.S. 388 (1971), against the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH and the ESSEX DA, as well as the RICO ASSOCIATES, individually and in their respective official capacities, if any)**

1607.   THE RELATOR incorporates the foregoing paragraphs and allegations as if fully set forth herein.

1608.   The OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH and the ESSEX DA are amenable to suit pursuant to Bivens because those offices received federal money from the Equitable Sharing Program.

1609.   The retention of THE RELATOR's property in the form of THE RELATOR's whistleblower bounties by the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH and the ESSEX DA, as well as the RICO ASSOCIATES violates THE RELATOR's due process rights under the Fifth Amendment.

1610. The RICO ASSOCIATES violated THE RELATOR's due process rights under the Fifth Amendment to the U.S. Constitution in connection with illicit Equitable Sharing Program payments and subsequent unlawful activity as alleged in this Complaint.

1611. The Fifth Amendment requires that the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH and the ESSEX DA as well as the RICO ASSOCIATES return and/or pay one the whistleblower bounties to THE RELATOR.

1612. An award of compensatory and/or punitive damages is necessary to remedy the <u>Bivens</u> violation of the guarantee of due process of law under the Constitution.

### COUNT 62

**(Claim for Recovery, Compensation, Award, and Injunctive Relief pursuant to <u>Bivens v. Six Unknown Named Agents</u>, 403 U.S. 388 (1971), against the RICO ASSOCIATES, individually and in their respective official capacities, if any)**

1613. THE RELATOR incorporates the foregoing paragraphs and allegations as if fully set forth herein.

1614. The RICO ASSOCIATES, acting under color of federal law, violated THE RELATOR's due process rights by rigging the judge selection processes in federal courts at 1 COURTHOUSE WAY, 55 PLEASANT STREET, 156 FEDERAL STREET, and 901 19TH STREET.

1615. The Fifth Amendment requires the return of money taken from THE RELATOR in connection with all federal court cases with a rigged judge selection process.

1616. An award of compensatory and/or punitive damages is necessary to remedy the <u>Bivens</u> violation of the Fifth Amendment's guarantee of due process of law.

1617. Injunctive relief against the RICO ASSOCIATES is required to preclude their participation in any case in which THE RELATOR was, is, and/or will be a party.

## COUNT 63

**(Claim for Recovery, Compensation, Award, and Injunctive Relief pursuant to <u>Bivens v. Six Unknown Named Agents</u>, 403 U.S. 388 (1971), against TORRESEN, BERRY, STORMS, and SNYDER, individually and in their respective official capacities)**

1618. THE RELATOR incorporates the foregoing paragraphs and allegations as if fully set forth herein.

1619. TORRESEN, BERRY, STORMS, and SNYDER violated THE RELATOR's due process rights by concealing receipt of the TORRESEN Mailing at 156 FEDERAL STREET.

1620. The Fifth Amendment requires the return of money taken from THE RELATOR in connection with the Rigged New Hampshire Action at 156 FEDERAL STREET.

1621. An award of compensatory and/or punitive damages is necessary to remedy the <u>Bivens</u> violation of the Fifth Amendment's guarantee of due process of law.

1622. Injunctive relief against TORRESEN, BERRY, STORMS, and SNYDER is required to preclude their participation in any case in which THE RELATOR was, is, and/or will be a party.

## COUNT 64

**(Reverse False Claim pursuant to 31 U.S.C. § 3729(a)(1)(G) against OBAMA, GEORGE W. BUSH, WALKER IV, DIAMOND, SLIM, JEB BUSH, BUNZEL, MANGALJI, and SHUTZER)**

1623. THE RELATOR incorporates the foregoing paragraphs and allegations as if fully set forth herein.

1624. Any person who knowingly conceals or knowingly and improperly avoids an obligation to transmit money or property to the United States that was forfeited upon commission of any act giving rise to forfeiture of that money or property pursuant to 18 U.S.C. § 1963(c) has committed a reverse false claim actionable under 31 U.S.C. § 3729(a)(1)(G).

1625. OBAMA, GEORGE W. BUSH, WALKER IV, DIAMOND, SLIM, JEB BUSH, BUNZEL, MANGALJI, and SHUTZER knowingly concealed or knowingly and improperly avoided an obligation to pay or transmit money and/or property forfeited to the U.S. government pursuant to 18 U.S.C. § 1963(c), including 745 7TH AVENUE.

1626. 745 7TH AVENUE is the property of the U.S. government pursuant to 18 U.S.C. § 1963(c).

## COUNT 65

**(Reverse False Claim pursuant to 31 U.S.C. § 3729(a)(1)(G) against OBAMA and SIMAS)**

1627. THE RELATOR incorporates the foregoing paragraphs and allegations as if fully set forth herein.

1628. Any person who knowingly conceals or knowingly and improperly avoids an obligation to transmit money or property to the United States that was forfeited upon commission of any act giving rise to forfeiture of that money or property pursuant to 18 U.S.C. § 1963(c) has committed a reverse false claim actionable under 31 U.S.C. § 3729(a)(1)(G).

1629. OBAMA and SIMAS knowingly concealed or knowingly and improperly avoided an obligation to pay or transmit money and/or property forfeited to the U.S. government pursuant to 18 U.S.C. § 1963(c), including OBAMA FOUNDATION ACCOUNTS 1-X.

1630. OBAMA FOUNDATION ACCOUNTS 1-X is or are the property of the U.S. government pursuant to 18 U.S.C. § 1963(c).

## COUNT 66

### (Reverse False Claim pursuant to 31 U.S.C. § 3729(a)(1)(G) against SOROKIN)

1631. THE RELATOR incorporates the foregoing paragraphs and allegations as if fully set forth herein.

1632. SOROKIN knowingly concealed or knowingly and improperly avoided an obligation to pay or transmit money and/or property forfeited to the U.S. government pursuant to 18 U.S.C. § 1963(c), including 100 DAVIS AVENUE.

1633. 100 DAVIS AVENUE is the property of the U.S. government pursuant to 18 U.S.C. § 1963(c).

## COUNT 67

### (Reverse False Claim pursuant to 31 U.S.C. § 3729(a)(1)(G) against HEALEY and WOLOHOJIAN)

1634. THE RELATOR incorporates the foregoing paragraphs and allegations as if fully set forth herein.

1635. HEALEY and WOLOHOJIAN knowingly concealed or knowingly and improperly avoided an obligation to pay or transmit money and/or property forfeited to the U.S. government pursuant to 18 U.S.C. § 1963(c), including 40 WINTHROP STREET.

1636. 40 WINTHROP STREET is the property of the U.S. government pursuant to 18 U.S.C. § 1963(c).

## COUNT 68

### (Reverse False Claim pursuant to 31 U.S.C. § 3729(a)(1)(G) against the RICO ASSOCIATES)

1637. THE RELATOR incorporates the foregoing paragraphs and allegations as if fully set forth herein.

1638. The RICO ASSOCIATES knowingly concealed or knowingly and improperly avoided an obligation to pay or transmit money and/or property forfeited to the U.S. government pursuant to 18 U.S.C. § 1963(c), including 55 PLEASANT STREET, 156 FEDERAL STREET, 1 COURTHOUSE WAY, 901 19TH STREET, 885 CENTRE STREET, BOSTON COLLEGE ACCOUNTS 1-X, 1 PEMBERTON SQUARE, 3 PEMBERTON SQUARE, MAG BOSTON, and EQUITABLE SHARING ACCOUNTS 1-X.

1639. 55 PLEASANT STREET, 156 FEDERAL STREET, 1 COURTHOUSE WAY, 901 19TH STREET, 885 CENTRE STREET, BOSTON COLLEGE ACCOUNTS 1-X, 1 PEMBERTON SQUARE, 3 PEMBERTON SQUARE, MAG BOSTON, and EQUITABLE SHARING ACCOUNTS 1-X are the property of the U.S. government pursuant to 18 U.S.C. § 1963(c).

## COUNT 69

### (Reverse False Claim pursuant to 31 U.S.C. § 3729(a)(1)(G) against THOMAS DURKIN, BRIAN DURKIN, and THOMAS LAMPERT)

1640. THE RELATOR incorporates the foregoing paragraphs and allegations as if fully set forth herein.

1641. THOMAS DURKIN, BRIAN DURKIN, and THOMAS LAMPERT knowingly concealed or knowingly and improperly avoided an obligation to pay or transmit money

and/or property forfeited to the U.S. government pursuant to 18 U.S.C. § 1963(c), including the DURKIN CAR.

1642. The DURKIN CAR is the property of the U.S. government pursuant to 18 U.S.C. § 1963(c).

## COUNT 70

**(Claim for Declaratory Judgment and Related Injunctive Relief pursuant to 28 U.S.C. §§ 2201, 2202 against SUFFOLK SUPERIOR COURT, MASSACHUSETTS APPEALS COURT, U.S. DISTRICT COURT FOR THE DISTRICT OF MAINE, U.S. DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS, U.S. DISTRICT COURT FOR THE DISTRICT OF NEW HAMPSHIRE, and U.S. COURT OF APPEALS FOR THE FIRST CIRCUIT)**

1643. THE RELATOR incorporates the foregoing paragraphs and allegations as if fully set forth herein.

1644. A genuine controversy exists between THE RELATOR and each of the above-named courts for which THE RELATOR is entitled to declaratory relief pursuant to 28 U.S.C. §§ 2201, 2202, where there are ongoing violations of fundamental constitutional rights that should have ended a long time ago, but for the judicial and prosecutorial crime spree alleged herein.

1645. Each of the above-named courts, by their deliberate actions or inactions, have contributed to constitutional violations that are historic in their scope, severity, and synchronicity.

1646. The violations of the Constitution implicate the Fifth and Fourteenth Amendments, because the defendants sabotaged THE RELATOR's litigation and livelihood in order to save and advance themselves and their criminal enterprise.

1647. This Court should declare that the judge selection processes at SUFFOLK SUPERIOR COURT, MASSACHUSETTS APPEALS COURT, U.S. DISTRICT COURT FOR THE DISTRICT OF MAINE, U.S. DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS, U.S. DISTRICT COURT FOR THE DISTRICT OF NEW HAMPSHIRE, U.S. DISTRICT COURT FOR THE DISTRICT OF COLORADO, and/or U.S. COURT OF APPEALS FOR THE FIRST CIRCUIT are rigged.

1648. This Court should declare that such rigging of the judge selection process is violative of the Due Process and Equal Protection Clauses of the Fifth and Fourteenth Amendments.

1649. This Court should issue related injunctive relief mandating this Court's oversight of SUFFOLK SUPERIOR COURT, MASSACHUSETTS APPEALS COURT, U.S. DISTRICT COURT FOR THE DISTRICT OF MAINE, U.S. DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS, U.S. DISTRICT COURT FOR THE DISTRICT OF NEW HAMPSHIRE, U.S. DISTRICT COURT FOR THE DISTRICT OF COLORADO, and U.S. COURT OF APPEALS FOR THE FIRST CIRCUIT with respect to the judge selection process to ensure compliance with the requirements of the Fifth and Fourteenth Amendments.

## COUNT 71

**(Claim for Declaratory Judgment and Related Injunctive Relief pursuant to 28 U.S.C. §§ 2201, 2202 against each and every defendant that is a natural person, individually and in his or her respective official capacity)**

1650. THE RELATOR incorporates the foregoing paragraphs and allegations as if fully set forth herein.

1651. A genuine controversy exists between THE RELATOR and each of the defendants that is a natural person for which THE RELATOR is entitled to declaratory relief pursuant to 28 U.S.C. §§ 2201, 2202, where there are ongoing violations of fundamental constitutional rights that should have ended a long time ago, but for the judicial and prosecutorial crime spree alleged herein.

1652. Each of the defendants that is a natural person, by his or her deliberate actions or inactions, have contributed to constitutional violations that are historic in their scope, severity, and synchronicity.

1653. The violations of the Constitution implicate the Fifth and Fourteenth Amendments, because the each of the defendants that is a natural person sabotaged THE RELATOR's litigation and livelihood in order to save and advance themselves and their criminal enterprise.

1654. This Court should declare that each and every defendant that is a natural person is prohibited from participating in any manner in any litigation involving THE RELATOR except as a party in an individual capacity.

1655. This Court should issue related injunctive relief to preclude the direct and indirect participation of each of the defendants that is a natural person in any case involving THE RELATOR except as a party in an individual capacity to such case within the jurisdiction of the United States and any state or territory therein.

## COUNT 72

**(Claim for Amended Judgment pursuant to Mass. R. Civ. P. 59(e) and Leave to Amend Complaint pursuant to Mass. R. Civ. P. 15 against Suffolk Superior Court, Commonwealth of Massachusetts, and the Office of the Attorney General of the Commonwealth)**

1656. THE RELATOR incorporates the foregoing paragraphs and allegations as if fully set forth herein.

1657. This Court should vacate the judgment in the Parallel State Action pursuant to Mass. R. Civ. P. 59(e) based on this Complaint and newly discovered evidence and because GILES and GREEN are defendants in this action and both GILES and GREEN served as a judge in the Parallel State Action, which was prejudged and remains rigged.

1658. This claim is timely because it was first brought in the Rigged New Hampshire Action within 28 days after entry of judgment in the Parallel State Case.

1659. This Court should grant leave to amend the complaint in the Parallel State Action pursuant to Mass. R. Civ. P. 15.

## COUNT 73

**(Claim for Amended Judgment pursuant to Fed. R. Civ. P. 59(e) and Leave to Amend Complaint pursuant to Fed. R. Civ. P. 15 against the U.S. DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS, the COMMISSIONER, the U.S. Department of Justice, and the United States)**

1660. THE RELATOR incorporates the foregoing paragraphs and allegations as if fully set forth herein.

1661. Based on additional facts as alleged herein, this Court should vacate the judgment in the Rigged Sorokin Action pursuant to Fed. R. Civ. P. 59(e).

1662. This claim is timely because it was first brought in the Rigged New Hampshire Action within 28 days after entry of judgment in the Rigged Sorokin Action.

1663. This Court should grant leave to amend the complaint in the Rigged Sorokin Action pursuant to Fed. R. Civ. P. 15.

## COUNT 74

**(Claim for Relief from Judgment pursuant to Mass. R. Civ. P. 60(b)(4) against the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH, MASSACHUSETTS APPEALS COURT, and SUFFOLK SUPERIOR COURT)**

1664. THE RELATOR incorporates the foregoing paragraphs and allegations as if fully set forth herein.

1665. Rule 27 of the Massachusetts Rules of Appellate Procedure holds that "[a] petition for rehearing shall be decided by the quorum or panel which decided the appeal."

1666. No notice was provided to THE RELATOR that Rule 27 of the Massachusetts Rules of Appellate Procedure had been suspended before NEYMAN joined a new panel in ultimately disposing of the appeal of the dismissal of the *Qui Tam* Action.

1667. No notice was provided to THE RELATOR that NEYMAN had joined the panel disposing of the appeal of the dismissal of the *Qui Tam* Action before NEYMAN joined a new panel in ultimately disposing of the appeal of the dismissal of the *Qui Tam* Action.

1668. This claim was originally brought through the Rigged New Hampshire Action.

1669. The judgment of the Massachusetts Appeals Court affirming the dismissal of the *Qui Tam* Action is void for failure to conform to the requirements of the Due Process Clause.

1670. The judgment of the Massachusetts Appeals Court affirming the dismissal of the *Qui Tam* Action must be vacated in order to conform to the requirements of the Due Process Clause.

## COUNT 75

**(Claim for Relief from Judgment pursuant to Mass. R. Civ. P. 60(b)(5) against the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH, MASSACHUSETTS APPEALS COURT, and SUFFOLK SUPERIOR COURT)**

1671. THE RELATOR incorporates the foregoing paragraphs and allegations as if fully set forth herein.

1672. Applying the judgment in the *Qui Tam* Action prospectively would no longer be longer equitable.

1673. This claim was originally brought within one year of entry of judgment in the *Qui Tam* Action through the Rigged New Hampshire Action.

1674. The judgments in the *Qui Tam* Action should be vacated according to the principles of equity.

## COUNT 76

**(Claim for Relief from Judgment pursuant to Mass. R. Civ. P. 60(b)(6) against the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH, MASSACHUSETTS APPEALS COURT, and SUFFOLK SUPERIOR COURT)**

1675. THE RELATOR incorporates the foregoing paragraphs and allegations as if fully set forth herein.

1676. Allowing the judgment in the *Qui Tam* Action to stand would be a gross miscarriage of justice.

1677. This claim was originally brought within one year of entry of judgment in the *Qui Tam* Action through the Rigged New Hampshire Action.

1678. The judgment in the *Qui Tam* Action should be vacated to avoid a gross miscarriage of justice.

## COUNT 77

**(Claim for Relief from Judgment pursuant to Fed. R. Civ. P. 60(b)(2) against the COMMISSIONER, DOJ, and the United States)**

1679. THE RELATOR incorporates the foregoing paragraphs and allegations as if fully set forth herein.

1680. There is newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b) in the Rigged O'Toole Action.

1681. DOJ published statistics for Equitable Sharing Program payments from federal Fiscal Year 2015 on or about January 27, 2016, which is when the appeal of the dismissal of the Rigged O'Toole Action was pending in the U.S. COURT OF APPEALS FOR THE FIRST CIRCUIT.

1682. This claim was originally brought within one year of entry of judgment in the Rigged O'Toole Action through the Rigged Sorokin Action and the Rigged New Hampshire Action.

1683. The judgment in the Rigged O'Toole Action should be vacated based on the newly discovered evidence.

## COUNT 78

**(Claim for Relief from Judgment pursuant to Fed. R. Civ. P. 60(b)(3) against the COMMISSIONER, DOJ, and the United States)**

1684. THE RELATOR incorporates the foregoing paragraphs and allegations as if fully set forth herein.

1685. The judgment in the Rigged O'Toole Action involved fraud, misrepresentation, and/or misconduct by an opposing party.

1686. This claim was originally brought within one year of entry of judgment in the Rigged O'Toole Action through the Rigged Sorokin Action and the Rigged New Hampshire Action.

1687. The judgment in the Rigged O'Toole Action should be vacated based on fraud, misrepresentation, and/or misconduct by an opposing party.

## COUNT 79

**(Claim for Relief from Judgment pursuant to Fed. R. Civ. P. 60(b)(5) against the COMMISSIONER, DOJ, and the United States)**

1688. THE RELATOR incorporates the foregoing paragraphs and allegations as if fully set forth herein.

1689. Applying the judgment in the Rigged O'Toole Action prospectively would no longer be longer equitable.

1690. This claim was originally brought within one year of entry of judgment in the Rigged O'Toole Action through the Rigged Sorokin Action and the Rigged New Hampshire Action.

1691. The judgment of the Rigged O'Toole Action should be vacated according to the principles of equity.'

## COUNT 80

**(Claim for Relief from Judgment pursuant to Fed. R. Civ. P. 60(b)(6) against the COMMISSIONER, DOJ, and the United States)**

1692. THE RELATOR incorporates the foregoing paragraphs and allegations as if fully set forth herein.

1693. Allowing the judgment in the Rigged O'Toole Action to stand would be a gross miscarriage of justice.

1694. This claim was originally brought within one year of entry of judgment in the Rigged O'Toole Action through the Rigged Sorokin Action and the Rigged New Hampshire Action.

1695. The judgment in the Rigged O'Toole Action should be vacated to avoid a gross miscarriage of justice.

## COUNT 81

**(Claim for Relief from Judgment pursuant to Fed. R. Civ. P. 60(b)(4) and/or 60(b)(6) and Leave to Amend Complaint pursuant to Fed. R. Civ. P. 15 against All Defendants)**

1696. THE RELATOR incorporates the foregoing paragraphs and allegations as if fully set forth herein.

1697. TORRESEN was not validly appointed as a United States District Judge and therefore did not have jurisdiction to issue a judgment in the Rigged New Hampshire Action.

1698. The judgment in the Rigged New Hampshire Action is void for failure to conform to the requirements of the Due Process Clause.

1699. Alternatively, the judgment in the Rigged New Hampshire Action is void because TORRESEN and others obstructed justice in connection with concealing receipt of the TORRESEN Mailing.

1700. The judgment in the Rigged New Hampshire Action must be vacated in order to conform to the requirements of the Due Process Clause.

1701. This Court should grant leave to amend the complaint in the Rigged New Hampshire Action pursuant to Fed. R. Civ. P. 15.

## COUNT 82

**(Claim for Amended or Additional Findings pursuant to Fed. R. Civ. P. 52(b) and Leave to Amend Complaint pursuant to Fed. R. Civ. P. 15 against All Defendants)**

1702. THE RELATOR incorporates the foregoing paragraphs and allegations as if fully set forth herein.

1703. Pursuant to Fed. R. Civ. P. 52(b), this Court should amend the findings in the Rigged New Hampshire Action based on new allegations involving events occurring after entry of judgment in the Rigged New Hampshire Action.

1704. This Court should grant leave to amend the complaint in the Rigged New Hampshire Action pursuant to Fed. R. Civ. P. 15.

1705. This claim is timely because it is brought within 28 days after entry of judgment in the Rigged New Hampshire Action.

## COUNT 83

**(Claim for Relief from Judgment pursuant to Fed. R. Civ. P. 60(b)(4) and/or 60(b)(6) and Leave to Amend Complaint pursuant to Fed. R. Civ. P. 15 against All Defendants)**

1706.  THE RELATOR incorporates the foregoing paragraphs and allegations as if fully set forth herein.

1707.  BROOKE JACKSON was not validly appointed as a United States District Judge and therefore did not have jurisdiction to issue a judgment in the Rigged Colorado Action.

1708.  The judgment in the Rigged Colorado Action is void for failure to conform to the requirements of the Due Process Clause.

1709.  Alternatively, the judgment in the Rigged Colorado Action is void because JOHN DOE 1-X tampered and/or stole THE RELATOR's mail, including a copy of the judgment in the Rigged Colorado Action.

1710.  The judgment in the Rigged Colorado Action must be vacated in order to conform to the requirements of the Due Process Clause.

1711.  This Court should grant leave to amend the complaint in the Rigged New Hampshire Action pursuant to Fed. R. Civ. P. 15.

## COUNT 84

**(Claim for Relief from Judgment pursuant to Fed. R. Civ. P. 60(b)(2) and Leave to Amend Complaint pursuant to Fed. R. Civ. P. 15 against All Defendants)**

1712.  THE RELATOR incorporates the foregoing paragraphs and allegations as if fully set forth herein.

1713.  Pursuant to Fed. R. Civ. P. 60(b)(2), there is newly discovered evidence as to the Rigged Colorado Action that, with reasonable diligence, could not have been discovered in time

to move for a new trial, namely new allegations involving events occurring after entry of judgment in the Rigged Colorado Action.

1714. This Court should grant leave to amend the complaint in the Rigged Colorado Action pursuant to Fed. R. Civ. P. 15.

1715. This claim is timely because it is brought within one year days after entry of judgment in the Rigged Colorado Action.

## COUNT 85

### (Declaratory Judgment and Related Injunctive Relief pursuant to 28 U.S.C. §§ 2201, 2202 against U.S. TAX COURT, IRS, and DOR)

1716. THE RELATOR incorporates the foregoing paragraphs and allegations as if fully set forth herein.

1717. This Court ought to declare and issue a related injunction holding that any notice of deficiency sent by IRS or DOR to THE RELATOR is void.

1718. This Court ought to declare and issue a related injunction holding that THE RELATOR has timely filed a petition before the U.S. TAX COURT by virtue of the filing of this Complaint and the indefinite closure of the U.S. TAX COURT during and after the statutory time period to file a petition.

1719. This Court ought to declare and issue a related injunction holding that the U.S. TAX COURT violated the law by ordering THE RELATOR to provide the U.S. TAX COURT with a copy of the complaint in the Rigged New Hampshire Action.

1720. Absent declaratory and related injunctive relief, THE RELATOR will suffer irreparable harm as to accrual of interest and related costs associated with action by IRS and DOR against THE RELATOR.

1721. There is no other adequate remedy as to the dispute between THE RELATOR, IRS, and DOR regarding allegedly past due payments.

1722. An injunction is required in order to protect the due administration of justice and the rights of THE RELATOR, who does not owe money to but is owed money by IRS and DOR.

1723. Accordingly, this Court ought to enter a permanent injunction prohibiting IRS and DOR from pursuing payments from THE RELATOR based on any notice of deficiency sent by IRS or DOR.

## COUNTS 86-170

1724. ADAMS, individually and not as a state or federal relator, incorporates the foregoing counts 1-85 as if fully set forth herein and re-alleges each of the counts 1-85 in his own name as a separate count such that there are a total of 170 counts alleged in this Complaint, or such that this Court consider each count of this complaint as a state and/or federal relator and separately, as an individual.

## **RELIEF REQUESTED**

WHEREFORE, THE RELATOR and/or ADAMS respectfully request the following relief from this Court:

1. As to Count 1 and/or Count 86, enter a permanent injunction against the U.S. Department of Justice to compel the production of all records required to be produced pursuant to the Freedom of Information Act to THE RELATOR and/or ADAMS.

2. As to Count 2 and/or Count 87, enter a permanent injunction against the U.S. Department of Justice to compel the production of all records required to be produced pursuant to the Freedom of Information Act to THE RELATOR and/or ADAMS.

3. As to Counts 3 and 4 and/or Count 88 and 89, declare that the Massachusetts Department of Revenue violated the Massachusetts Public Records Law to THE RELATOR and/or ADAMS. In addition, provide THE RELATOR and/or ADAMS with costs as allowed by law and enter a permanent injunction against the Massachusetts Department of Revenue to compel the production of all records required to be produced pursuant to the Massachusetts Public Records Law.

4. As to Counts 5 and 6 and/or Counts 90 and 91 declare that the Office of the Attorney General of the Commonwealth of Massachusetts violated the Massachusetts Public Records Law. In addition, provide THE RELATOR and/or ADAMS with costs as allowed by law and enter a permanent injunction against the Office of the Attorney General of the Commonwealth of Massachusetts to compel the production of all records required to be produced pursuant to the Massachusetts Public Records Law.

5.  As to Count 7 and/or Count 92, declare that the Secret DOR Directive is unconstitutional under the Guarantee Clause and/or Article 20 of the Massachusetts Declaration of Rights and enter a permanent injunction against the COMMISSIONER precluding the executive suspension of the CST.

6.  As to Counts 8-43 and/or Counts 93-128, award THE RELATOR and/or ADAMS compensatory damages in an amount to be determined at trial and order injunctive relief as this Court may deem appropriate.

7.  As to Count 44, declare that OBAMA is not a natural born citizen of the United States and was therefore never eligible to be President of the United States, and accordingly, declare that each of the judicial commissions for the FAKE FEDERAL JUDGES was void *ab initio* and ordering injunctive relief for removal of each of the FAKE FEDERAL JUDGES.

8.  As to Counts 45-57 and/or Counts 130-142, award THE RELATOR and/or ADAMS treble damages and costs in an amount to be determined at trial and order injunctive relief as this Court may deem appropriate.

9.  As to Counts 58-63 and/or Count 143-148, award THE RELATOR and/or ADAMS compensatory damages in an amount to be determined at trial and order injunctive relief as this Court may deem appropriate.

10. As to Counts 64-69 and Counts 149-154, award THE RELATOR and/or ADAMS 30 percent of the proceeds of settlement of or recovery of property and/or funds from the enumerated violations of the False Claims Act, or such amounts as this Court deems just and proper, and award injunctive relief as this Court may deem appropriate.

11. As to Counts 70 and 71 and/or 155 and 156, grant the requested declaratory and related injunctive relief.

12. As to Count 72 and/or Count 157, vacate the judgment and/or order in the Parallel State Action (Suffolk Superior Court case number SUCV-2017-3165E), grant leave to amend the complaint in the Parallel State Action with this Complaint serving as the amended complaint, as well as order injunctive relief as this Court may deem appropriate.

13. As to Count 73 and/or Count 158, vacate the judgment and/or order in the Rigged Sorokin Action (U.S. DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS case number 18-11383-LTS), grant leave to amend the complaint in the Rigged Sorokin Action with this Complaint serving as the amended complaint, as well as order injunctive relief as this Court may deem appropriate.

14. As to Counts 74-76 and/or Counts 159-161, vacate the judgments and/or orders in the *Qui Tam* Action (Suffolk Superior Court case number SUCV-2014-2090D) as well as order injunctive relief as this Court may deem appropriate.

15. As to Counts 77-80 and/or Counts 162-165, vacate the judgments and/or orders in the Rigged O'Toole Action (U.S. DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS case number 14-14303-GAO) as well as order injunctive relief as this Court may deem appropriate.

16. As to Counts 81 and/or Count 166, vacate the judgment and/or orders in the Rigged New Hampshire Action (U.S. DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS case number 19-11283-NT (transferred from District of New Hampshire to Massachusetts)) and grant leave to amend the complaint in the Rigged New

Hampshire Action with this Complaint serving as the amended complaint, as well as order injunctive relief as this Court may deem appropriate.

17. As to Counts 82 and/or Count 167, amend the findings in the Rigged New Hampshire Action (U.S. DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS case number 19-11283-NT (transferred from District of New Hampshire to Massachusetts)) and grant leave to amend the complaint in the Rigged New Hampshire Action with this Complaint serving as the amended complaint, as well as order injunctive relief as this Court may deem appropriate.

18. As to Counts 83 and/or Count 168, vacate the judgment and/or orders in the Rigged Colorado Action (U.S. DISTRICT COURT FOR THE DISTRICT OF COLORADO case number 20-111-RBJ) and grant leave to amend the complaint in the Rigged Colorado Action with this Complaint serving as the amended complaint, as well as order injunctive relief as this Court may deem appropriate.

19. As to Count 84 and/or Count 169, vacate the judgment and/or order in the Rigged Colorado Action (U.S. DISTRICT COURT FOR THE DISTRICT OF COLORADO case number 20-111-RBJ) and grant leave to amend the complaint in the Rigged Colorado Action with this Complaint serving as the amended complaint, as well as order injunctive relief as this Court may deem appropriate.

20. As to Count 85 and/or 170, grant the requested declaratory and related injunctive relief.

21. In general, declare that each of the FAKE FEDERAL JUDGES are not federal judges, because their judicial commissions were signed by OBAMA, who was and is ineligible to hold the Office of President of the United States.

22. In general, declare that the RICO ASSOCIATES cannot, to the extent that each is and/or will be a government official, participate in any case or matter in which THE RELATOR and/or ADAMS is a party and/or has an interest in the outcome.

23. In general, declare that the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH has a disqualifying conflict of interest in any case involving THE RELATOR and/or ADAMS.

24. In general, declare that THE RELATOR and/or ADAMS is entitled to the maximum potential bounty in the *Qui Tam* Action, or such other amount as this Court deems just and proper.

25. In general, declare that THE RELATOR and/or ADAMS is entitled to the maximum potential bounty in the Second *Qui Tam* Action, or such other amount as this Court deems just and proper.

26. In general, declare that THE RELATOR and/or ADAMS is entitled to the maximum potential bounty in this action, or such other amount as this Court deems just and proper.

27. In general, declare that THE RELATOR and/or ADAMS is entitled to $360,000, or thirty percent of $1.2 million, as the relator in the *Qui Tam* Action, or such other amount as this Court deems just and proper.

28. In general, declare that THE RELATOR and/or ADAMS is entitled to $4,057,200, or thirty percent of $13,524,000, as the relator in the Second *Qui Tam* Action, or such other amount as this Court deems just and proper.

29. In general, declare that THE RELATOR and/or ADAMS is entitled to all expenses incurred in connection with proceeding *pro se* as the relator in the *Qui Tam* Action, the

Second *Qui Tam* Action, and all state and federal actions arising out of or related to the *Qui Tam* Action and the Second *Qui Tam* Action, including, but not limited to, this Complaint.

30. In general, order culpable defendants to make restitution to THE RELATOR and/or ADAMS for all expenses incurred by THE RELATOR and/or ADAMS in connection with proceeding *pro se* as the relator in the *Qui Tam* Action, the Second *Qui Tam* Action, as well as all state and federal actions arising out of or related to the *Qui Tam* Action and the Second *Qui Tam* Action, including this Complaint, in an amount to be determined at trial.

31. In general, award THE RELATOR and/or ADAMS his attorneys' fees as is just and proper.

32. In general, calculate any award to THE RELATOR and/or ADAMS with interest, costs, and fees in the *Qui Tam* Action, the Second *Qui Tam* Action, as well as all state and federal actions arising out of or related to the *Qui Tam* Action and the Second *Qui Tam* Action.

33. In general, where allowed by law, afford THE RELATOR and/or ADAMS punitive damages in an amount to be determined at trial.

34. In general, afford THE RELATOR and/or ADAMS such other relief as is just and proper.

*[SIGNATURE PAGE FOLLOWS]*

Respectfully Submitted,

JOHN ADAMS
(formerly Jaideep S. Chawla)
*PRO SE*
Mailing Address:
12 Lexington Avenue
Charlestown, MA 02129

Dated: April 28. 2020

**G ENVELOPE**

y specified for domestic use.

VG™ included to many major estinations.

tional insurance.

ile.

online.

rnationally, a customs y be required.

Label 228, July 2013

## PRIORITY ★ MAIL ★



**UNITED STATES POSTAL SERVICE** ®

VISIT US AT USPS.COM ®
ORDER FREE SUPPLIES ONLINE

**FROM:**
John Adams (formerly Judge S. Cheek)
12 Lexington Avenue
Charlestown, MA 02129

**TO:** Clerk's Office
U.S. District Court, Western District of Texas
800 Franklin Avenue, Room 380
Waco, TX 76701

FOR DOMESTIC AND INTERNATIONAL USE




To schedule free Package Pickup, scan the QR code.

---

**P**

## PRIORITY MAIL 3-DAY ®

EXPECTED DELIVERY DAY: 05/04/20

**U.S. POSTAGE**
**$23.85**
PM 3-DAY
03038 0004
Date of sale
04/28/20
06      2S
11486400   SSK

0004

4 lb 7.90 oz



883600428233911

**SHIP TO:**
Clerk's Office
U.S. District Court
800 FRANKLIN AVE
RM 380
WACO TX 76701-1934

C096

**USPS TRACKING ® NUMBER**



9505 5066 3216 0119 1253 84